**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**BEN FEIBLEMAN,**

                 **Plaintiff,**

     **v.**

**THE TRUSTEES OF COLUMBIA**
**UNIVERSITY IN THE CITY OF NEW**
**YORK,**

                 **Defendant.**

---

**Civil Action No.:**

**COMPLAINT**

**Jury Trial Demanded**

---

1.    PLAINTIFF BEN FEIBLEMAN, by his attorneys Warshaw Burstein LLP, as and

for his Complaint against Defendant The Trustees of Columbia University in the City of New

York, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

2.    This Title IX discrimination and related state law suit is brought on behalf of

Plaintiff Ben Feibleman ("Ben"), a permanently expelled former student at the Columbia

University Graduate School of Journalism ("CJS").

3.    Ben was expelled over allegations of sexual assault by a female student despite

Defendant The Trustees of Columbia University in the City of New York's ("Defendant" or

"Columbia") own admission that the alleged female victim repeatedly begged him to have sex

with her, that he refused to do so, and that no sex occurred.

4.    In the late evening and early morning hours of October 4-5, 2016, Ben and a

classmate, ▓▓▓▓▓▓▓ ("▓▓▓▓"), engaged in limited sexual contact including kissing,

fondling, and digital penetration.

5.    ▓▓▓▓ then asked Ben to have full-on sexual intercourse with her while in her

1

bedroom.

6.      When Ben declined, ███ would not let Ben leave her bedroom and demanded that he have sex with her.

7.      ███ pleaded with Ben to have sex with her for thirty (30) minutes, during which time she made twenty-nine (29) separate requests for sex (*e.g.*, "You don't want to f--k me?"; "Please have sex with me."; "Please because I can't let you go without it." and so forth).

8.      During the course of her badgering and coercive campaign, ███ physically and sexually assaulted Ben.

9.      After Ben was finally able to extract himself from ███'s bedroom, ███ immediately and falsely told her roommate, "Ben tried to have sex with [me]" and that she had been sexually assaulted.

10.     ███ then called her boyfriend at the time and repeated her lies.

11.     This is not a he-said/she-said matter – approximately 700 photos, 13 videos, and 30 minutes of audio establish the true facts surrounding the allegations.

12.     When interviewed by Columbia investigators, Ben provided an audio recording of his thirty-minute ordeal in ███'s bedroom, a transcript of the audio recording, multiple videos, and hundreds of photos from the night of the incident that showed that ███ was not incapacitated and was aggressively seeking sexual contact (including sexual intercourse) with him throughout the evening.

13.     Neither Columbia nor ███ deny the authenticity of the photographs, videos, audio recording, or audio recording transcript.

14.     In the course of her pursuit, ███ bit Ben three times without his consent, forcibly lowered his pants to expose his penis without his consent, and grabbed his buttocks in an effort to

force her mouth onto his penis without his consent.

15.     Despite clear and uncontroverted evidence to the contrary, Columbia determined that ▮▮▮ was incapacitated as a result of her alcohol consumption and found Ben "responsible" for sexual assault as a result of the consensual non-intercourse sexual contact he had with ▮▮▮ prior to her repeated demands for sex.

16.     This erroneous finding was the result of the anti-male, female protectionist gender-biases permeating Columbia's disciplinary process.

17.     Columbia found ▮▮▮ "not responsible" for her assaults on Ben, citing insufficient evidence and noting that even if the alleged conduct had occurred, Ben would have liked it despite clear evidence of and testimony that Ben repeatedly told ▮▮▮ "no."

18.     Columbia selectively enforced its sexual misconduct rules against Ben while declining to do so against ▮▮▮.

19.     Columbia selectively enforced its confidentiality requirement rules against Ben while declining to do so against ▮▮▮.

20.     Columbia withheld Ben's diploma because the investigation of ▮▮▮'s claims were ongoing but granted ▮▮▮ her diploma even though Ben's claims against her were unresolved at the time of graduation.

21.     Based on its determination of responsibility and motivated by gender bias, Columbia sanctioned Ben by expelling him permanently after he had already graduated and continues to withhold his degree.

22.     Columbia's actions, including the imposition of a wildly disproportionate sanction on Ben, were motivated by his male gender – if a male had prevented a woman from leaving his bedroom, demanded sex, disrobed her to expose her genitals, and attempted to force penetration

when she tried to leave, Columbia would not have expelled the female student, yet that is exactly what happened to Ben.

## THE PARTIES

23. Ben Feibleman is a natural person and a decorated United States Marine who was honorably discharged in 2006 with the rank of Sergeant residing in New York, New York.

24. Ben earned an undergraduate degree from Columbia is 2011, graduating *cum laude*.

25. Ben enrolled at CJS for the 2016-2017 school year, and, during the events described herein, he was a student at CJS.

26. Ben graduated CJS on May 17, 2017 with a master's degree.

27. On June 28, 2017, he was retroactively expelled, and his degree was revoked.

28. Defendant is a non-profit corporation duly organized and existing by virtue of the laws of the State of New York that conducts business in the State of New York.

## JURISDICTION AND VENUE

29. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

30. This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of New York and conducts business within the State of New York.

31. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    Columbia's Political Climate Prior to Ben's Enrollment

32.    Prior to the events in question, Columbia was highly sensitive to accusations that they did not take the complaints of female victims of sexual assault seriously.

33.    In April 2015, Steve Coll, Dean of CJS, co-authored a 12,595-word piece in the Columbia Journalism Review describing, in part, the political climate surrounding accusations of sexual assault at Columbia that read, in part:

> There were numerous reports of campus assault that had been mishandled by universities.  At Columbia, an aggrieved student dragged a mattress around campus to call attention to her account of assault and injustice.  The facts in these cases were sometimes disputed, but they had generated a wave of campus activism.

34.    The national criticism affected Columbia's relationship with alumni donors.

35.    The media criticism of Columbia's mishandling of sexual assault allegations (specifically allegations made by female students), stayed in the headlines of major news organizations throughout 2014 and 2015.

36.    The condemnation of Columbia's failures was exacerbated by the 2016 Presidential Campaign as the nomination of Donald Trump stoked activism on Columbia's campus and continued to lionize former Columbia student Emma Sulkowicz (often referred to in the press as "Mattress Girl").

37.    Columbia offered public affirmations of the victim-focused (read: female-focused) policies that were ultimately instituted in response to Ms. Sulkowicz's media campaign and other external and internal pressures.

### B.    CJS's Focus on Female Victims of Sexual Assault During Ben's Enrollment

38.    CJS's class of 2017 was approximately 75 percent female.

39.    Ben, upon his acceptance, received from Columbia copies of its school policies,

5

including the Gender-Based Misconduct Policy for Students (the "Gender-Based Misconduct Policy").

40.     Prior to orientation, students admitted to CJS were required to complete a mandatory online training course called the "Sexual Response Initiative."

41.     On August 4, 2016, the second day of orientation, all students were required to attend a "Sexual Violence Response" lecture where the Gender-Based Misconduct Policy was explained.

42.     Students were urged to report *any* behavior they think may have violated the Gender-Based Misconduct Policy.

43.     On September 13, 2016 all CJS students were required to attend a lecture about "An Unbelievable Story of Rape," a *Pro Publica* investigation which examined the consequences of not believing female victims of sexual assault.

44.     Prior to the lecture, CJS students were also implored to read an excerpt from Professor Helen Benedict's book "Virgin or Vamp," which advocated for changes in the way journalists report on victims in rape cases.

45.     No other school event, including graduation, received this much attention from CJS faculty during the entire school year.

46.     CJS student witnesses who initially supported ███████'s false allegations and counseled her to file a report (but who later realized their support and encouragement were provided in error) cited the school's environment surrounding allegations of sexual assault for their preliminary zeal, stating, "We just did what we were told to do."

C.     **The Evening of October 4, 2016 and Early Morning Hours of October 5, 2016**

47.     The series of events giving rise to this matter occurred on the evening of October

6

4, 2016 and the early morning hours of October 5, 2016 (the "Incident").

### i.    The Reception

48.    Ben went to CJS on the evening of October 4, 2016, hoping to run into some of his classmates to brainstorm story ideas for his Reporting class.

49.    When Ben arrived, ███, ████████ ("████"), ████████ ("████"), ████ ("████"), ████████ ("████████"), and ████████████ ("████████") were in Pulitzer Hall, attending the reception (the "Reception") that always followed the weekly Tuesday evening lecture series for CJS students.

50.    ████ was having problems in her long-distance relationship with ████████ ("████").

51.    Before Ben arrived, ████ informed her friends that she wanted to break up with ████ and that she had other options, specifically ████████ ("████████").

52.    Soon after making her Title IX complaint, ████ did in fact break up with ████ and begin dating ████.

53.    At approximately 7:30 p.m., Ben approached Pulitzer Hall and realized that he had missed the Tuesday lecture.  He decided to get a beer at the Reception and see if he could get some ideas from his classmates, many of whom would likely still be there.

54.    Inside Pulitzer Hall, Ben spent some time approaching seated groups of his classmates, eventually filling two full pages of his notebook with story ideas.

55.    Eventually, Ben approached ████ and her friends.

56.    Ben was able to spend a good amount of time discussing story ideas with ████'s friends, but after the conversation shifted from her relationship, witnesses noted that ████ grew quiet, and at some point, moved to sit next to Ben.

57.     Neither ■■■ nor her friends were drunk when Ben joined the group.

58.     Soon after ■■■ sat herself next to Ben on the floor, her friends observed the beginning of what would be an hours-long flirtation between them.

59.     As the Reception ended and the other CJS students began filtering out, ■■■ and ■■■ procured a leftover bottle of wine from the catering staff.

60.     ■■■ and ■■■ departed, leaving Ben and ■■■ with ■■■, ■■■ and ■■■.

61.     While ■■■ and Ben continued their side conversation, Ben took out his camera and began taking pictures.

62.     Ben was the *de facto* school photographer, documenting the social, academic, and professional life of the school, and he and his camera were a fixture both on and off campus.

63.     Ben took over 700 pictures that evening.

64.     Many pictures show an animated and dynamic ■■■ smiling and gazing directly at the camera showing no signs of incapacitation.

65.     ■■■ took the camera from Ben and snapped 47 photos between 8:47 to 8:52 p.m.

66.     Though ■■■ would later claim that she was very drunk at this point, the pictures that she took are steady and in focus, and some are even artistically composed.



*Photo #7943: Ben with his notebook and ■■■ (8:47 p.m.)*     *Photo #7948: Ben and (left to right) ■■■ ■■■ and ■■■ (8:48 p.m.)*

8



*Photo #7950: Ben using his phone (shot from over his right shoulder) (8:48 p.m.)*



*Photo #7978: Ben smiling at witnesses off-camera, with ▬'s shoulder and arm in frame (8:51 p.m.)*

67.     ▬ then presented the photographs to Ben for his approval and, sensing ▬'s obvious interest, he put his notebook away and focused the camera back on her and she began to model for him.

68.     Ben took hundreds of pictures over the next 12 minutes that show a playful and lively ▬ performing a series of flirtatious poses for the camera.



*Photo #8006: ▬ smiles at camera and raises cup, lying on back with her legs draped over the ottoman (8:56 p.m.)*



*Photo #8132: ▬ gazing meditatively into the distance (9:02 p.m.)*

69.     ▬'s friends noticed the playful energy between Ben and ▬.

70.     At around 9:15 p.m., after talking, flirting, and posing for about half an hour, ▬ invited him to rest his head on her stomach.

71.     Ben understood the invitation, and they had been getting on well, but he hesitated as he worried about gossip among his CJS classmates given ▬'s relationship and the presence of a diverse international group of her friends.

72.     The cultural climate at Columbia also caused Ben to hesitate.

9

73.     Every student knew that Columbia and its students were under a microscope when it came to consent as a result of the 2014 "Mattress Girl" case and Columbia's fear of another public relations disaster over its handling of sexual assault allegations and investigations.

74.     Ben, conscious of the climate surrounding consent, wanted to be completely sure of ███'s intentions.

75.     After Ben asked whether ███ wanted him to place his head on her stomach, ███ replied, "Yes."

76.     ███ observed Ben's hesitation and again invited him to rest his head on her stomach by tapping her stomach and saying, "Come on!  Sit!"

77.     This was the first of many commands ███ would give.

78.     ███ continued flirting with Ben as they lay together on the ground.

79.     During his time at the Reception, Ben observed ███ drink between only two to three glasses of wine.

**ii.     The Journey to ███'s Apartment**

80.     As the reception hall closed at approximately 9:30 p.m., ███ invited the group to her apartment.

81.     Ben declined because he needed to finish his assignment, but ███ insisted that Ben come with them so that she could show him the roof of ███'s building, including a water tower that they could climb.

82.     CCTV footage from the lobby of the Pulitzer Building recorded ███ waiting for Ben while he used the bathroom and taking his arm as she and the group stepped out towards ███'s apartment.

83.     As she and Ben walked notably faster than the remainder of the group, ███

10

wrapped her arms around Ben's waist and embraced him affectionately.

84.      ███ was also able to walk on her own.

85.      In fact, ███ was able to walk backwards while talking and gesticulating broadly to her friends.

86.      As she and Ben walked together down Broadway and got further away from her friends, ███ became much more affectionate and began sneaking kisses against Ben's neck and cheek.

87.      Video and photo evidence of ███ and Ben walking directly contradicts ███'s later claim that she was so drunk at the time that she could not stand or walk on her own.

88.      Though ███ later claimed to the Hearing Panel that, "On the way to the apartment I needed help to stand and walk, as verified by numerous witnesses and by security camera footage where you can see me leaning on [Ben]," in reality, selfies Ben and ███ took together at the time show ███ resting her hand on Ben's shoulder as she bounces beside him, aggressively flicking her tongue between the "V" of her splayed fingers to simulate oral sex.

89.      The group planned on buying food and drinks to take back to ███'s apartment.

90.      When the group stopped to do so, Ben attempted to leave the group so that he could finish his assignment.

91.      Just as before, ███ insisted that he remain with them, and said she would help him complete his homework so that he could stay.

92.      While waiting for pizza, ███ helped Ben interview and photograph one of the other customers.

93.      Ben offered to pay for the two boxes of pizza ███ ordered, but ███ insisted on paying for them herself.

94.    ███ went to an ATM, entered her pin number, withdrew cash, and paid for the pizza without incident.

95.    After getting the pizza, ███ facilitated another interview and photo session with some sanitation workers on the street in order to complete Ben's assignment.

96.    ███ then went with ███ into Westside Market to pick out beer for the group.

97.    ███ deferred to ███ because ███ used to be a bartender.

98.    During the 45 minutes that it took the group to obtain the pizza and beer, no one expressed any concern about ███'s ability or capacity.

99.    As they continued towards ███'s apartment, Ben and ███ once again walked apart from ███'s friends, and she leaned her head on his shoulder and stole kisses as they walked out of their view.

100.    ███ took his arm and again told Ben that when they got to the apartment, she wanted him to come to the roof with her, an implicit invitation to find themselves alone so they could make out.

101.    When the group entered ███'s apartment building, Ben and ███ lingered outside and let ███'s friends go up without them.

102.    As soon as her friends were out of view, ███ wrapped her arms around Ben and kissed him on the cheek, as documented in photographs provided to Columbia.

103.    Though the photographs are unmistakable in showing ███'s interest, ███ later claimed that "nothing was consensual" and that she had no interest in Ben.

104.    ███ and Ben then went inside, and in the elevator on the way to ███'s apartment she reminded him about the roof and the water tower.

105.    Almost an hour after ███'s last drink of the evening, they entered ███'s

apartment.

**iii.** ████'s Apartment

106.    Once inside ████'s apartment, ████ was chatty, took charge, and served drinks, though did not consume any herself, except for a superficial sip from the head of the beer she poured Ben.

107.    ████, who had come straight home from the Reception, was annoyed by ████'s insistence that everyone drink alcohol, including ████ who did not wish to partake.

108.    Despite her wishes, ████ drank some beer from a small glass "to appease" ████.

109.    ████ approached Ben once again, and the two shared a seat with ████ placing her arm around Ben, continuing the flirtation that had been taking place over the past two hours.

110.    Ben participated in an impromptu game that ████ developed wherein she lifted a glass of beer to Ben's mouth, shouted "Beer!", and poured the contents of the glass into Ben's mouth faster than he could drink it.

111.    Ben and ████ recorded a selfie video of the game that was submitted to Columbia's investigators.

112.    The video portrayed an exuberant ████ entirely focused on Ben as she pours beer into his mouth and seeks his approval.

113.    After Ben gives ████ approval, the video showed ████ squeezing Ben affectionately.

114.    In the video, ████ then says, "Okay, wait, let's go again this way," and covers Ben's eyes as she lifts the glass to his lips, making a mischievous face at the camera before tipping the glass faster than he can drink it.

115.    When Ben finishes the beer, ████ celebrates by making a "V" with her fingers and

flicking her tongue between them in a sign for oral sex.

116.    Ben joins her in fluttering his tongue at the camera before she clasps both her arms around him and pulls him close.

117.    ████ was confused because she had not seen their earlier interactions, but ████ informed her that ████ was "having fun" because she was "breaking up with her boyfriend."

118.    Ben was unaware of this conversation when it occurred and did not know that ████ planned on breaking up with ████.

119.    At one point, ████ brought her cat out so Ben could photograph it, after which the group took turns holding and petting the cat.

120.    After the cat wriggled free from ████, it ran into ████'s room, and ████ and Ben went after in it.

121.    Once they were in ████'s room and out of sight of the rest of the group, ████ kissed Ben who, for the first time, kissed ████ back to signal that he was interested.

122.    When the kiss ended, ████ told him to come with her to the roof.

123.    ████ and Ben left ████'s room separately so as not to arouse suspicion.

124.    ████ then informed the group of her desire to go to the roof.

125.    Ben agreed to go with her, but the rest of the group decided to stay in the apartment.

**iv.    The Roof/Water Tower**

126.    Ben and ████ went to the roof of the apartment building, which contained a water tower.

127.    The water tower stands slightly over 30 feet tall.  The cone-shaped roof of the water tower is approximately 10 feet wide at its base, with a 45-degree incline all around and is covered

with a sandpaper-like material.  The top of the water tower includes an ornamental wooden spire that is not load-bearing.  The north side of the water tower is flush against the edge of the roof of the building, such that any slip from that side of the tower would result in a 16-story drop.  The sloped roof is unlit and a black wrought-iron ladder rises approximately 30 feet to its edge.



*Photo #2141: The water tower in daylight, with the roof access visible in the background (2018)*

128.    It took ███ 110 seconds to exit ███'s apartment, ascend two flights of stairs, navigate across the unlit roof, and climb halfway up the 30-foot wrought-iron ladder on the side of the water tower.

129.    As shown by the timestamps of photos taken by Ben, it took ███ 17 seconds to climb the rest of the ladder.[1]

---

[1] The photos submitted to the Court show the true facts of events on the roof as they occurred but should not be misunderstood as representative of available light to the naked eye.  With the exception of #5160, all photos from the roof were taken with a professional Nikon D750 camera with "low light" settings that captured detail that was indistinguishable to ███ and Ben at the time and were further brightened to recover detail from the shadows.  For unadjusted eyes the roof was almost pitch black.



*Photos #8570 (10:49:52 p.m.) #8575 (10:49:55 p.m.) and #8578 (10:50:09 p.m.) show ▮▮▮'s speed and agility.*

130.    Once at the top, ▮▮▮ invited Ben to join her and "take pictures of the view."

131.    When Ben expressed apprehension, ▮▮▮ effectively cajoled Ben into climbing the 30-foot ladder to join her by calling him a "pussy."

132.    Once at the top, Ben scooted backward to sit with his feet against the top of the ladder and his back against the 45-degree roof.

133.    ▮▮▮, confident and sure-footed, was not worried about slipping and demonstrated how the sandpaper roof gripped her socks as she stood.

134.    Ben stood up briefly, to prove to her (and himself) that he could, but his fear of heights brought him back to a seated position, and he was not willing to move.

135.    ▮▮▮ then tried to lure him down to the edge so they could dangle their feet while sitting next to each other and presumably kiss while looking out at the skyline, but Ben refused.

136.    ▮▮▮ eventually sat on the south-facing edge of the water tower with her legs dangling below.

137.    Once again, she encouraged Ben to join her, this time reverting to her strategy from the reception by patting the open space on the ledge beside her and ordering Ben to "Come on! Sit!"





*Photos #5160: ▇ standing upright on the top of the water tower (10:51:25, taken with iPhone.)*   *Photo #8579: ▇ sitting and dangling her legs off the edge of the water tower (10:52 p.m.)*

138.   Throughout the evening, when Ben would refuse ▇'s invitations or advances, he would offer face-saving excuses or a compromise that would give ▇ some of what she wanted while staying within his own boundaries.

139.   However, there were several times during their encounter when ▇ took it too far and Ben was forced to give her a firm, unequivocal "No."

140.   The first time this occurred was while ▇ was sitting on the edge of the water tower when Ben plainly told her that he would not leave his current position and that she would have to come to him if she wanted to sit together.

141.   ▇ responded by crawling over from the far edge of the roof and straddling Ben.

142.   Timestamps from photos taken by Ben show that it took ▇ just over seven seconds to go from dangling her legs over the edge, traverse the 45-degree incline to where he was sitting, and straddle him.



*Photos #8579-8282: ▇ sits with her feet dangling over the edge and turns to Ben (left to right, 10:52:35-10:52:36 p.m.)*



*Photos #8583-8585 ▮▮▮▮ crawls towards Ben and straddles him (left to right, 10:52:39-10:52:41 p.m.)*

143.    Ben and ▮▮▮▮ engaged in non-intercourse consensual sexual contact atop the water tower between 10:52 p.m. and 10:57 p.m.

144.    ▮▮▮▮ sat in Ben's lap, straddled him, and kissed his lips with her arms wrapped around him.

145.    Ben and ▮▮▮▮ began to make out, and ▮▮▮▮ quickly began removing her top.

146.    As ▮▮▮▮ removed her top, Ben put his arms around her to keep her steady because of the dangerous height and location of the water tower, not because ▮▮▮▮ was incapacitated.

147.    As the camera dangled loose from the strap in his hand, the shutter was depressed for half a second capturing two photos showing ▮▮▮▮'s movements.

148.    The timestamps from these photos indicate that only 15 seconds had elapsed since ▮▮▮▮ climbed into Ben's lap.



*Photo #8586: ▮▮▮ and her sweater are partially visible atop the water tower in right edge of frame (10:52:58 p.m.)*



*Photo #8588: ▮▮▮ and her sweater are partially visible atop the water tower in right edge of frame (10:52:59 p.m.)*

149.    The next two minutes were full of intense, frenetic, and entirely consensual movement.

150.   ███ was in total control as she straddled Ben against the water tower while they made out.

151.   During the course of their consensual encounter, Ben unhooked ███'s bra and she leaned back and pulled Ben's face against her breasts.

152.   As ███ grinded against him, she reached down to rub his crotch while attempting to remove Ben's vest.

153.   Ben did not wish to go any further while perched on the water tower's roof and suggested that they descend.

154.   ███ began teasing Ben and eventually taunted him in a sing-song voice: *"I'm making-a-Mariiine scaaa-rrred; I'm making-a-Mariiine scaaa-rrred."*

155.   Ben admitted that he was scared, and because he could not climb down without ███ first getting up from his lap, his only recourse was to repeatedly ask to go down.

156.   ███ kept taunting him for being scared and being a weak Marine, noting, "Marines are supposed to be tough!"

157.   When Ben again told her he'd like to go down, she slapped him hard across the face and shouted, "Stop being a pussy!"

158.   The sting of her unwelcome slap so shocked Ben that he instinctively grabbed her by the shoulders to keep her from doing it again, and his aggressive response excited her and she resumed kissing him.

159.   Nevertheless, he persisted in his request to descend.

160.   As he pulled away, ███ responded by aggressively biting him on the lip, which was not desired.

161.   Ben freed himself from ███'s bite and stated clearly that he did not permit, enjoy,

19

nor consent to biting his lip.

162. ███ was excited by his aggressive reaction, but when she realized that he was serious in his refusal, she scoffed at him, "Booo."

163. At about 10:55 p.m. ███ and Ben heard the door to the roof open and the voices of her friends below.

164. In response, ███ pushed him flat against the roof and shushed him.

165. ███ wanted to stay hidden, but Ben shouted down to her friends.

166. After noticing Ben and ███ on the water tower, her friends looked away to give Ben and ███ time to get dressed.

167. None of ███'s friends suggested then that Ben was taking advantage of ███, nor did any of them express any concern that ███ didn't understand what she was doing.

168. According to ███, "[They] quickly dressed and pretend[ed] like nothing happen[ed]."

169. Photos taken by Ben after ███'s friends came up to the roof demonstrate ███'s state of mind on the water tower as she smiles into the camera while straddling him.

170. After ███ put her shirt back on, Ben gave her his hand and cautioned her to be careful while descending the water tower.

171. ███ slapped his hand away and stated to Ben, "Relax, b--ch, I'm a climber," before rolling backwards and performing a reverse tumble roll off the edge of the water tower, as seen in photos below.



*Photo #8597: ▇▇'s roll off the tower. (10:58:07 p.m.)*  *Photo #8600: ▇▇'s roll off the tower (10:58:09 p.m.)*

172.    Ben scrambled to the edge and found ▇▇ looking up at him, flicking her tongue between the "V" of her fingers and teasing him for not being brave enough to follow her.

173.    ▇▇ stated that ▇▇ and Ben "came down quickly and acted like nothing happened."

174.    After she put on her sweater in the dark, ▇▇ convinced ▇▇ and ▇▇ to go back up with her while Ben photographed them.

175.    ▇▇ again climbed the ladder, with ▇▇ and ▇▇ ascending behind her.

176.    ▇▇ and ▇▇ watched from the sidelines and debated if they should put a stop to it because they were afraid of someone getting hurt or of getting in trouble.



*Photo #8613 (cropped): ▇▇ climbing ladder followed by ▇▇ and ▇▇ ▇▇ chat in foreground (11:00:39 p.m.)*

177.    ████ and ████ finally intervened by asking ████ and ████ to come down when they were about halfway up the ladder.

178.    ████ urged ████ and ████ to continue their climb, but they relented to ████ authority as host.

179.    ████ refused to come down and appealed for ████ and ████ to change their mind.

180.    When they declined, ████ took a defiant step onto the top of the water tower and remarked about how it was their loss and that she would enjoy the view without them.



*Photos #8619, 8621, 8624, 8627: ████'s friends abandon her atop the water tower (taken over 10 seconds at 11:01 p.m.)*

181.    None of ████'s friends expressed any concern leaving ████ alone at the top of the water tower.

182.    After 30 seconds, ████ lost her patience and begged ████ to come down with her arms out wide in a gesture of exasperation which caused everyone to break out in laughter.

183.    ████ agreed to come down, but only after Ben agreed to take her picture on the top of the ladder.



*Photos #8639, 8640, 8644, 8647:* ▬ *begs* ▬ *to come down, drinks beer with* ▬ *(11:01:48 - 11:02:11p.m.)*

184.    ▬ descended the ladder, unaided, in the dark, only 3 minutes after climbing up the second time.

185.    A video recording of the incident shows that ▬ descended the ladder unaided.

186.    In the video, ▬ makes clear her disappointment in her friends when she scolds them in a clear voice, "I'm coming down, you dumb-dumbs!"

187.    At 11:04 p.m., the group returned to the apartment.

188.    Upon returning to the apartment, Ben realized that he did not see ▬, so he went back up to the roof with ▬ to find her.

189.    On the roof, they both called ▬'s name and received no response, so they began searching the roof while continuing to call ▬'s name.

190.    After a few minutes, Ben and ▬ abandoned their search and headed for the stairs.

191.    Just before Ben was about to enter the stairs, ▬ called to him in a low voice from the top of the water tower, which she had now climbed unassisted for a third time.

192.    Ben alerted ▬ that ▬ was back on the water tower, and ▬ insisted that ▬ come see the view.

193.    When ▬ worried that it wasn't safe, ▬ assured her that the water tower's

23

roof was sturdy and the view was worth it.

194. In order to assuage ███'s concerns, ███ demonstrated balance by standing upright on the water tower.

195. ███'s persistence paid off, and ███ climbed to the top, as depicted in photographs taken by Ben.



*Photo #8675: ███ dangles her feet off the edge of the water tower as ███ climbs the ladder (11:09:23 p.m.)*

*Photo #8682: ███ (right) shouts down to Ben from the top of the water tower, ███ sits next to her (11:09:54 p.m.)*

196. ███ was not satisfied until Ben agreed to join them, so he ascended the water tower as well.

197. ███ also suggested ███ would feel safer near the center if she held onto the spire, and took a knee to offer ███ her hand, which ███ soon accepted.



*Photo #8685: ███ stands upright without assistance on the 45-degree roof (11:11:07 p.m.)*

*Photo #8689: ███ extends a hand to ███ atop the water tower (11:11:17 p.m.)*

198. ███ demonstrated to ███ how to use the spire at the top as a hand-hold but cautioned her that it was superficial and not to overburden it.

199.   ■ also instructed ■ that she should widen her stance for stability and pulled the inside of ■'s leg to assist her.



*Photo #8694: ■ demonstrates to ■ how to safely use the spire as a hand hold (11:11:29)*    *Photo #8695: ■ instructs ■ on how to widen her stance for greater stability (11:11:32)*

200.   ■ was nervous, but ■ had now spent more than 20 minutes on the water tower without incident and was able to provide guidance to assist her in leaving her comfort zone.

201.   ■ presented the grand view of the city before she, ■, and Ben began shouting into the skyline.



*Photo #8711: ■ (right) smiles at ■ (left) and directs ■'s attention to the skyline (11:12:05 p.m.)*    *Photo #8733: ■ (left) and ■ (right) sit atop the water tower roof and shout into the sky (11:12:30 p.m.)*

202.   ■ and ■ posed for pictures taken by Ben.



*Photo #8752:* ▮ *looks at the camera as she and* ▮ *pose for pictures (11:13:24 p.m.)*   *Photo #8758:* ▮ *looks into the distance as she poses for pictures (11:13:31 p.m.)*

203.    They resumed shouting into the night, which soon turned to epithets at the university and the pressures of their degree program, before they all started laughing.



*Photo #8771:* ▮ *and* ▮ *laugh as they pose for pictures (11:14:10 p.m.)*

204.    ▮ asked ▮ to teach her how to curse in ▮, and Ben recorded a video showing ▮ adeptly learning a phrase in ▮ after minimal instruction by ▮, and checking her pronunciation with ▮, who approved.

205.    ▮ and ▮ then laughed and hugged before descending the water tower at 11:16 p.m.

206.    At this time, nearly two hours had elapsed from the time ▮ last consumed a full alcoholic beverage.

207.    Ben descended first, followed by ▮, then ▮.

208.    As ▮ approached the bottom of the ladder, she splayed her legs and wagged

26

her tongue between the "V" of her fingers at Ben, signaling oral sex.

209. After scaling the side of the ladder back up to the top to offer encouragement to ██████ for her fourth unassisted climb of the evening, ██████ guided ██████ down.

210. ██████ then resumed her "Cirque Du Soleil"-style performance.



*Photo #8807 (cropped): ██ looks up as ██ climbs onto the ladder above (11:16:52 p.m.)*     *Photo #8809 (cropped): ██ spreads her legs and makes oral sex gestures at Ben (11:16:55 p.m.)*     *Photo #8802: ██ hangs off the side of the ladder while smiling at Ben's camera. (11:16:46 p.m.)*

211. When ██████ finally descended the water tower for the last time, she led ██████ by the hand as they ran towards the stairs.



*Photo #8832 (cropped): ██ leads ██ in a dash back to the roof access (11:18:15 p.m.)*

212. After descending from the water tower, ██████, ██████, and Ben noticed a small door hanging ajar next to the stairwell that Ben identified as an elevator maintenance room.

213. ██████ crawled inside to explore and encouraged ██████ and Ben to join her, but they refused.

214. ██████ once again goaded and teased Ben about being too scared, this time about

coming inside the elevator maintenance room.

215.    Ben knew ██ just wanted to get a rise out of him so he pretended to be disinterested and shined a light inside the maintenance room and commented on how dirty it was.

216.    ██ scoffed, came out, and walked down the stairs, followed by ██ and then Ben.

217.    When he entered the stairwell, Ben found ██ waiting, expertly posed against the wall, and looking up at him.

218.    He told her not to move as he adjusted the settings on his camera, but she again scoffed and looked away.

219.    Still, she held the pose until the first shutter click and let ██ go past her.



*Photo #8833 (cropped): ██ poses against the window as ██ walks down the stairs (11:21:42 p.m.)*

*Photo #8834 (cropped): ██ still leans against the window as ██ continues (11:21:42 p.m.)*

*Photo #8835 (cropped): ██ passes ██ (11:21:42 p.m.)*

220.    After ██ turned the second corner, ██ and Ben were left alone for the first time since they'd been interrupted by her friends and briefly made out against a wall before rushing to catch up before anyone noticed.

221.    ██ and Ben re-entered ██'s apartment at 11:22 p.m.

222.    They made a point to separate – Ben sat at the table to talk with others seated there and ██ went and spoke to ██.

223.    ██ pulled ██ aside to inform her that she had inadvertently put her sweater

on inside out after she and Ben were caught on the water tower.

224.    ███ apologized to ███, who was confused and stated that she told ███, "Whatever you did, it is your choice."

225.    Emerging from ███'s room, ███ sat down on the floor, as there were not enough seats for everyone, and began to play with her phone.

226.    Over the course of the next half hour, ███ appeared, to some members of the group, to fall asleep.

227.    By now, it was just before midnight, well over 2 hours since ███'s last full drink.

**v.    The Walk to ███'s Apartment**

228.    The party soon began to break up, and the group discussed how they would get home.

229.    ███ declined ███ and ███'s offer to stay at their apartment.

230.    ███'s friends did not pressure her to accept this offer.

231.    After it was determined that Ben lived closest to ███, he offered to walk her home.

232.    No one protested ███'s acceptance of Ben's offer, nor did anyone offer to accompany Ben and ███.

233.    Around midnight, ███, ███, and Ben left ███ and ███'s apartment together.

234.    As they walked past the public garden next to St. John the Divine, ███ tried to convince Ben to sneak into the garden with her after dark.

235.    When Ben declined, she once again teased him for being unadventurous.

236.    ███, Ben, and ███ were having fun and eventually began skipping and

holding hands while singing "*We're Off to See the Wizard*" from *The Wizard of Oz*.

237.   ██ helped Ben explain the cultural significance of the song to ████, as she had grown up in ████.

238.   After dropping off ████ at her apartment, ██ and Ben left hand-in-hand.

239.   ████ observed them holding hands and singing together as they skipped towards ██████.

240.   Once in the park, Ben photographed ██ skipping and running unassisted.



*Photos #8836, #8837, #8840 (all cropped):* ██ *runs through the park.* (12:10:24-28 a.m.)

241.   Ben invited ██ home with him, but ██ insisted they go to her apartment because, she said, "I'm an independent lady."

**vi.    ██'s Apartment**

242.   When ██ brought Ben inside, ██'s roommate, ██████ ("████"), was still up.

243.   The three classmates gathered in the living room, and ██ went to retrieve her cat, ████████, and presented him for Ben to take pictures.

244.   Ben took 23 photographs of ██ and her cat between 12:17 a.m. and 12:20 a.m., almost 6 hours since ██'s first drink, and 3 hours since her last full drink at the Reception.



Photo #8854: ⬛ smiles as she presents her cat (⬛) to Ben's camera (12:18:37 a.m.)

Photo #8870: The final photo shows ⬛ holding her cat, with ⬛ partially in frame (12:19:39 a.m.)

245.    For the next half hour, ⬛, Ben, and ⬛ chatted and played with the cat in the living room.

246.    ⬛ and Ben recounted their evening to ⬛, including ⬛'s performance on the water tower.

247.    As they talked, ⬛ texted ⬛ to discuss the evening.

248.    At no time did ⬛ or ⬛ discuss ⬛'s level of intoxication.

249.    On the contrary, ⬛ expressed concern for Ben's well-being as a result of ⬛'s antics on the water tower and texted ⬛, "I think Ben is traumatized."

250.    Because there were only two chairs, ⬛ offered her seat to Ben, and ⬛ sat on the floor.

251.    When the conversation lulled, ⬛ curled up and appeared to fall asleep right in front of the door, blocking Ben's exit.

252.    With ⬛'s assistance, Ben picked up ⬛ and carried her to her room (adjacent to the living room) and laid her in her bed.

253.    Ben and ⬛ then exited ⬛'s room, closed the door behind them, and returned to their conversation in the living room.

254.    ⬛, however, was not actually asleep.

255.    Rather, she was eavesdropping on what Ben was telling ⬛ about her.

31

256.     Five to ten minutes into Ben's recounting of ███'s behavior on the roof, ███ burst out of her room asserting, "That is *not* what happened!"

257.     ███ was surprised by ███'s supposed newfound energy and alertness.

258.     Upon ███'s return to the living room, ███ found her speech to be intelligible and clear, describing her as "chipper and enthusiastic."

259.     Ben and ███ then engaged in what ███ described as "mutual" cuddling and hand holding on the floor.

260.     At one point, ███ placed her head on Ben's chest.

261.     When ███ got up to retrieve a glass of water for Ben, she specifically noted to ███ that she was going to give him the "nice water" from ███'s Brita filter.

262.     ███ believed that Ben and ███ wanted some privacy.

263.     ███ once again curled up in front of the door and appeared to fall asleep, which once again blocked Ben's exit.

264.     Instead of helping Ben carry ███ to bed, ███ went to the bathroom, leaving Ben to carry ███ to bed alone.

265.     This time, when Ben picked ███ up, ███ wrapped her arms around his neck.

266.     Ben, mindful of the speed with which rumors spread through CJS, laid ███ in her bed and left the door open and the hallway light on, signaling to ███ (and ███) that he would not be staying long.

267.     ███ stayed in the bathroom for a minute or two.

268.     ███'s bedroom door was open when ███ emerged from the bathroom, and ███ felt awkward because she did not want to invade ███ and Ben's private moment.

269.     When Ben bent over to give her a goodnight kiss on the forehead, ███ put her

32

arms around him and pulled him in hard for a kiss on the lips, just as she had when she straddled him on the water tower, and they began to make out with her bedroom door still open.

270.    They made out aggressively, and as the intensity increased, ████ took Ben's hand and pushed it into her pants underneath her panties.

271.    ████ told Ben how much she liked rough sex and responded to his touch by grinding against him, pulling his head in to kiss her body, and vocalizing her pleasure.

272.    ████ and Ben engaged in excessive dirty talk but kept their voices low so as not to alert ████.

273.    Through their physicality and dirty talk, ████'s energy and enthusiasm was unmistakable.  There was kissing, touching, fingering, and throat holding, all of which was consensual.

274.    Together, they removed her pants and panties, with ████ lifting her lower back and buttocks into the air and pushing her pants and panties down and Ben pulling them off before they resumed.

275.    As things escalated, she soon told Ben she wanted him to "f--k [her]."

276.    Just as he had when things went beyond his comfort level on the water tower, Ben informed ████ that he was uncomfortable with how their physical encounter was progressing.

277.    ████ first asked Ben to have sex with her at approximately 1:30 a.m.

278.    Ben refused this initial entreaty.

279.    ████ and ████'s rooms faced each other down a hallway, both doors remained open, and the hallway light was on, and if Ben stayed, it would make for worthy gossip.

280.    When Ben refused to stay and have sex, ████ reacted just as she had earlier in the night, refusing to take "no" for an answer and teasing Ben for being a "pussy."

281.    Ben tried to placate her with excuses.

282.    He reminded ███ that her roommate was watching, but ███ said she didn't care.

283.    Ben said it was late and he had class in the morning, but ███ also claimed she had to get up early.

284.    When she asked him if he had a condom and Ben said he did not, ███ cast her eyes about the room indicating that they could find one to render Ben's excuse invalid.

285.    He then blamed his refusal on her having a boyfriend, but she told Ben not to worry about her boyfriend and he should just do it.

286.    ███ refused to accept any reason that Ben gave her for not wanting to have sex with her.

287.    She told him that she knew he "wanted it," and used words like "You know you want to," and "I know how bad you want to f--k me."

288.    Ben was not comfortable with what ███ was asking him to do, as he did not wish to have rough sex with her on a squeaky bed separated from her roommate (who was likely to spread rumors among the CJS class) by paper thin walls.

289.    ███ refused to accept the fact that Ben did not want to have sex with her, and when he stood up to leave, she burst into tears and begged him not to go and to tell her why he didn't find her attractive.

290.    ███'s behavior made Ben deeply uncomfortable.

291.    Ben tried to make her feel better, but ███ took every excuse that he gave as a personal judgment.

292.    Only after Ben had gone through every excuse he could think of, he falsely told

████ that she was drunk, which he believed would be a successful "nuclear option" that, given the climate at Columbia and in America more generally, would allow him to extricate himself from the deeply disturbing situation.

293. Ben knew that his claim regarding ████'s drunkenness was false.

294. It had been 4 hours since ████'s last full drink.

295. ████ demonstrated numerous feats of agility and balance during the time she spent with Ben.

296. ████ had not been slurring her speech and was able to learn and speak words in ████.

297. ████ was able to walk unassisted while travelling to ████'s apartment.

298. ████ was able to walk, run, and skip unassisted while travelling to her apartment.

299. ████'s words and actions showed that she was capable of consenting to sex.

300. ████'s words and actions indicated that she wanted to have sex.

301. Ben simply did not want to have sexual intercourse with ████.

302. ████'s hostile and self-indulgent reaction to Ben's refusal exacerbated his lack of desire and made him uncomfortable.

303. Moreover, the intensity of ████'s reaction made Ben anxious about how she might characterize their encounter if he left without calming her down.

304. ████ begged Ben not to go, and coerced by her tears, he reluctantly agreed to stay with the hope that he could buy time to raise her spirits and part on better terms.

305. Nevertheless, because Ben felt trapped, and being well-aware of the political climate at Columbia and CJS, he wanted a record of exactly what happened, so he began recording audio on his phone.

306.   The audio tape begins at 1:37 a.m. and contains numerous statements of consent and requests for sex made by ███ over the next 30 minutes as she prevents Ben from leaving her room.

307.   Despite her demands, Ben repeatedly refused to have sex with ███.

308.   ███ called him a "liar" and became sexually aggressive.

309.   Even though she knew that Ben had made it clear on the water tower that he absolutely did not consent to biting, ███ bit him once again.

310.   As ███ bit him, Ben voiced his clear disapproval.

311.   Ben said he was going to leave, but ███ repeatedly refused to let him go or otherwise accept his decision.

312.   ███ would not accept that Ben would not have sex with her and grew increasingly desperate the more it looked like Ben was actually going to leave.

313.   The first time Ben declined to have sex and tried to leave, ███ had grown hostile and started crying, which made him feel trapped.

314.   Ben agreed to stay a little longer to make her feel better.

315.   By 1:51 a.m., ███ had stopped crying, so Ben stood up to leave.

316.   Hoping that aggressive flattery would be enough to get him out the door, Ben kissed ███ goodnight, and said, "I have to go home and jerk off, thinking of you."

317.   As he turned to leave, ███ lunged forward, grabbed him by his waistband, and yanked down his pants and underwear, exposing his penis.

318.   ███ pulled on Ben's buttocks as she tried to pull Ben's penis towards her mouth.

319.   Ben reflexively attempted to twist away from her and push her away with his left hand against her forehead as he tried to pull his pants up, but ███ clung to him and pulled on his

buttocks to get her open mouth closer to his penis.

320. ███ kept trying to entice Ben as she pushed towards his penis while he attempted to wriggle free from her grasp.

321. Ben finally got enough leverage to push her back onto the bed.

322. He then pulled up his pants and explicitly told ███ that he did not want any further sexual contact.

323. Ben did not consent to ███ pulling down his pants to expose his penis.

324. Ben did not consent to ███ grabbing his buttocks as she tried to pull his penis towards her mouth.

325. To defuse the situation, Ben attempted to leave yet again and asked for a goodnight kiss.

326. ███ refused and made it clear that she was withholding a kiss as punishment for Ben not having sex with her, stating, "Here, Ben, you don't want to f--k me and that disappoints me."

327. Ben took the opportunity to leave, but as he did so, ███ began swearing.

328. ███'s sudden outburst made him scared to leave, so he asked if she was OK.

329. ███ pretended to not know what was happening and asked, "What's going on?".

330. However, before she asked, "What's going on?", ███ clearly stated that she knew where she was (in her room) and recalled that Ben needed to get up early the next morning.

331. Ben asked to leave, but ███ once again refused to let him go.

332. Instead, ███ asked Ben to snuggle with her.

333. Ben felt trapped and agreed to snuggle for a few minutes.

334. After some time, Ben said it was late and he had to get to class, but ███ demanded

that they keep snuggling, using the same language as before: "Come on!  Keep snuggling!"

335.   Ben continued snuggling with ███, who once again began to demand sex from him.

336.   Ben repeatedly declined, said he had to go, and once again he promised to have sex with her another time.

337.   ███ refused to take no for an answer, asked Ben to "f--k" her, and lamented that no one had ever "f--k[ed] [her] hard."

338.   Ben promised he would do so at a later date, but ███ begged him to do it there and then.

339.   Once again, ███ bit Ben hard while they were kissing.

340.   This action was met with an immediate protest from Ben, who clearly voiced his displeasure with ███'s unwelcome conduct, shouting, "No bite. No bite!" as he pulled away.

341.   This was now the third time ███ bit Ben's lip without his consent.

342.   When Ben once again attempted to leave, ███ begged for sex again.

343.   Ben refused once more, so ███ turned away from him and began to cry.

344.   Ben asked for a goodnight kiss, but ███, in an attempt to punish Ben for his rejection, said "no" and turned away with an audible, "harrumph."

345.   At 2:07 a.m. Ben left ███'s apartment and noted, "That was a really dangerous situation."

**D.**   ███ **Starts a False Narrative**

346.   As soon as Ben left, ███ went to her roommate ███'s room and stated, "Ben tried to have sex with [me]," and told ███ that she had been "sexually assaulted."

347.   ███ "thought it was a mutual hookup."

348.   ███ did not tell ███ anything about how she had repeatedly asked Ben to stay and have sex with her or how he refused to do so.

349.   ███ did not tell ███ that she forcibly took off Ben's pants, exposed his penis, grabbed his buttocks, and attempted to place her mouth on his penis without his consent.

350.   ███ also conveniently left out her command for Ben to snuggle with her.

351.   ███ asked to join ███ in her bed so they could "cuddle," but ███ refused.

352.   Ben sent ███ a text message to let her know that he had left the apartment.

353.   In an attempt to preserve ███'s dignity, Ben again falsely asserted that ███ was drunk.

354.   Ben also noted that ███ was "insecure," a revelation that prompted ███ to call him.

355.   According to ███, "[Ben] made it sound like [███] was desperate," during their phone call.

356.   ███ knew ███ was talking to Ben and was listening to the call.

357.   ███ then called her boyfriend and told him that she awoke with a classmate in her bed and the classmate was sexually assaulting her.

358.   ███ falsely told her boyfriend that she told Ben to leave.

359.   During this call, ███ was not slurring her words.

360.   When her boyfriend questioned her supposed level of intoxication, ███ called him an "asshole" and hung up on him.

### E.   **October 5-12, 2016: ███'s Complaint to Columbia**

361.   On the morning of October 5, 2016, ███ repeated her lie to ███, claiming that Ben sexually assaulted her.

362.    ███ and ███ had encouraged ███ to go to the police to get a medical examination, but ███ refused to report her encounter with Ben to the police or Columbia.

363.    ███ only filed a complaint with Columbia because ███ "made" her do so.

364.    On the morning of October 5, ███ met with Melanie Huff, an Associate Dean at CJS.

365.    ███ told Huff that the previous evening, "she fell asleep and when she woke up, [another student] was trying to have sex with her."

366.    ███ declined to identify Ben to Huff.

367.    Later that same day, ███ submitted an incident report online to Columbia's Gender-Based Misconduct Office ("GBMO").

368.    ███'s written statement alleged that she had spent time at a classmate's apartment and "was extremely drunk," that her memory had already begun to fade around the time they left the Reception, and that while she was "either' blacking in' or waking up on [her] bed," the male student allegedly "fingered [her] and choked [her]" without her consent.

369.    Included with her allegations of non-consent were that "He mentioned taking me back to his apartment and I said no."

370.    ███ did not mention that this invitation to his apartment was for a later date after he refused to have sex then and there, nor that the invitation was preceded by her saying, "Please have sex with me.  Please.  I know you want to," and "Please because I can't let you go without it."

371.    On October 6, 2016, Columbia's GBMO contacted ███ to discuss campus resources and ███'s interest in identifying the accused student and/or participating in an investigation into ███'s allegations by Columbia's GBMO.

372.     asked for more time to consider whether she wished to disclose the accused student.

**i.    ▮▮▮▮▮ Begins Spreading a False Version of Events to Witnesses and the School**

373.    On the evening of October 6, 2016 at a "wine and cheese" party hosted by ▮▮▮▮, ▮▮▮▮ began spreading false versions of the encounter to witnesses and gave them explicit permission to tell others, which they did, to great effect.

374.    ▮▮▮ suggested to ▮▮▮ that she tell ▮▮▮ but ▮▮▮ declined, so ▮▮▮ told ▮▮▮ herself.

375.    ▮▮▮ described to ▮▮▮ that Ben had assaulted her "and the next morning was really awkward."

376.    ▮▮▮ also shared her salacious allegations with ▮▮▮ ("▮▮") at the "wine and cheese" party.

377.    ▮▮ subsequently began warning other female students via WhatsApp that Ben had sexually assaulted ▮▮▮.

378.    One of those students immediately contacted Ben, which was how he first learned that ▮▮▮ was not only telling people that he had sexually assaulted her, but adding fabricated details, such as that she woke up as Ben was assaulting her but remained silent until he left (despite clear audio evidence to the contrary).

379.    ▮▮▮ was also inexplicably claiming that Ben left bruises on her.

380.    On October 11, 2016, ▮▮▮ met with Associate Professor Paula Span and informed her about the alleged assault.

381.    Span produced a mandatory report of the details of ▮▮▮'s claims, but the contents of the incident report were never made available.

41

**F.      Columbia's Mishandling of the Roskin-Frazee Case and Concurrent Title IX Investigation By OCR.**

382.    On October 18, 2016, the Department of Education's (the "DOE") Office of Civil Rights ("OCR") informed Columbia that it was opening an investigation into accusations of misconduct in the actions of Columbia GBMO employees Serena Barnett, Benjamin Marzolf, Adrienne Blount, and Jeri Henry, specifically for the alleged way that they mishandled the case of undergraduate student Amelia Roskin-Frazee ("Roskin-Frazee").

383.    This federal investigation into alleged misconduct by Columbia's GBMO was initiated mere days after ▮▮▮▮ reported her alleged assault to Columbia.

384.    In August of 2016, Columbia had initially refused to investigate two separate instances of extreme sexual violence against Roskin-Frazee, a Columbia undergraduate student.

385.    When pressured by Roskin-Frazee, Columbia had engaged in an "investigation" without conducting any witness interviews or reviewing the available digital evidence.

386.    During that investigation, Henry had questioned Roskin-Frazee's continued enrollment at Columbia in light of her criticisms of the school.

387.    The Columbia officials that Roskin-Frazee accused of refusing to investigate her rapes because she was unable to provide the name of her alleged attacker (Barnett, Marzolf, Henry, and Blount)—and who were now targets of DOE scrutiny—were the *exact same team* ultimately assigned to investigate ▮▮▮▮'s allegations (with the addition of Tikola Russell).

**G.      October 12, 2016: ▮▮▮▮  Identifies Ben as Her Alleged Assailant**

388.     On October 12, 2016, ▮▮▮▮ met with Title IX Investigator Serena Barnett and identified Ben as her assailant.

389.    Barnett and Associate Director Tikola Russell initiated an investigation into ▮▮▮▮'s accusations.

390.    █████'s case was the first Title IX case at Columbia since the conclusion of the botched Roskin-Frazee "investigation."

391.    The investigation opened by OCR on October 18, 2016, regarding Columbia's handling of Roskin-Frazee's allegations was its fourth concurrent investigation into alleged violations of Title IX in Columbia's conduct of investigating (or failing to investigate) sexual assault allegations.

### H.    Change.org Petition

392.    On October 7, 2016, Columbia campus activist group, "No Red Tape Columbia" created a public petition on Change.org titled, "Let students record gender-based misconduct proceedings."

393.    The petition specifically targeted Barnett, Marzolf, Blount, Henry, Russell, Marjory Fisher, and Lee Bollinger, all of whom played a role in █████'s case.

394.    The petition noted Columbia Title IX investigators' history of incomplete and inaccurate note-taking as well as their repeated use of intimidating interrogation tactics.

395.    The petition asserted that as a result of Columbia's bar on recording any aspect of the gender-based misconduct process, the aforementioned abuse by Columbia's administrators goes unchecked and leaves students with no objective means of holding Columbia responsible for the improper practices and erroneous outcomes of the gender-based misconduct process.

396.    By the time Barnett interviewed █████, the Change.org petition questioning Barnett's competence and professionalism had 656 supporters and was endorsed by several student and professional organizations and guilds.

### I.    Delays, Bias, and Lack of Accuracy in Eyewitness Testimony Collected by Barnett

397.    Barnett and Russell interviewed █████, Ben, and ten non-party witnesses about the

evening of October 4-5, 2016.

398.   ████ was not interviewed until October 27, 2016.

399.   Ben was not interviewed until November 22, 2016.

400.   ████ and ████ were not interviewed until November 10, 2016.

401.   ████ was not interviewed until November 14, 2016.

402.   Other non-party witnesses were not interviewed until November and December 2016.

403.   None of the witnesses were interviewed under oath.

404.   None of the interviews were recorded.

405.   The only record of testimony from eyewitnesses is what Barnett and Russell chose to write down.

406.   ████ and Ben were instructed to "not discuss the incident with those who may be connected to the investigation to protect the integrity of this investigation" (the "Confidentiality Policy").

407.   The Confidentiality Policy provided to ████ and Ben requesting that they refrain from discussing the incident while the investigation was active was not enforced.

408.   Ben made direct appeals to Barnett, Russell, Huff, and Dean Ernest Sotomayor to enforce the Confidentiality Policy when he found out that ████ was discussing the case with witnesses.

409.   Barnett, Russell, Huff, and Sotomayor refused to enforce the Confidentiality Policy.

410.   Barnett and Russell did not utilize the contemporaneous photo, video, and audio evidence showing ████'s conduct on the night in question during her interviews with the non-

44

party witnesses.

411.   Several witnesses provided statements that were inconsistent with the photo, video, and audio evidence of ████'s conduct on the night in question.

412.   Barnett and Russell did not conduct follow-up interviews based on the questions that Ben submitted regarding the differences between the eyewitness statements and contemporaneous photo, video, and audio evidence that Ben provided.

**J.**     **Deans Huff and Sotomayor Refuse to Enforce Policy, Discourage Involving an Attorney, and Encourage Ben to Drop Out**

413.   On October 18, 2016, Ben had a meeting with Huff and Sotomayor in Huff's office.

414.   In an email prior to the meeting, Huff discouraged the involvement of Ben's attorney.

415.   During the meeting, Ben notified Huff and Sotomayor that ████ was spreading provably false details among the student body and the non-party witnesses.

416.   Ben informed Huff and Sotomayor that he was honoring the Confidentiality Policy by not publicly defending himself and asked them to enforce the Confidentiality Policy.

417.   Huff and Sotomayor said they had no control over what people tell other people.

418.   When Ben asked for a very brief academic accommodation, Huff encouraged Ben to drop out of school and "apply" for the next year.

419.   If Ben accepted Huff's proposal, he would have lost all progress towards his degree.

420.   The solution presented by Huff to resolve a problem with slanderous sexual rumors at the Journalism School was to drop out.

**K.**     **Ben's Initial Interview With Barnett and Russell and Ben's Claim Against ████**

421.   On November 22, 2016, Ben was finally interviewed by Barnett.

422.     It had been 49 days since ▬▬ first made the false claim of sexual assault.

423.     Columbia's own policy, in accordance with the OCR Title IX regulations at the time, was that the entire process, from report to hearing results and disciplinary measures, is to be completed within 60 days, with few exceptions.[2]

424.     Ben asked to record the interview to ensure he was not misquoted or misrepresented, but Barnett refused.

425.     Ben and his attorney were also not allowed to take notes on what was discussed.

426.     Barnett stated that any attempt to circumvent this policy or create his own record of the interview would result in a Dean's Discipline proceeding.

427.     Barnett and Russell, however, took notes on a laptop.

428.     Barnett stated that once a report was produced, any questions of the accuracy of quotes and context of statements from Ben or any other witnesses would solely be judged against her and Russell's typed notes.

429.     During the interview, Barnett discouraged Ben from having his attorney participate.

430.     Barnett habitually objected when Ben's attorney asked procedural questions.

431.     Barnett said Ben's attorney was only allowed to be present in a capacity of "moral support."

432.     Barnett threatened to have Ben's attorney removed from the room and barred from being present at any future proceedings.

433.     During the interview, Ben provided a detailed account of what occurred on October

---

[2] On April 4, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The April 2011 Dear Colleague Letter, while now revoked, was in effect when Defendant Columbia's disciplinary procedures were put in place and when the alleged sexual misconduct occurred in this case. In discussing whether OCR will consider complaint resolutions to be timely, the April 2011 Dear Colleague Letter noted that a typical investigation takes approximately 60 calendar days.

4 and 5, 2016.

434.    Ben also provided a detailed written statement of the night in question.

435.    Ben described how ███ prevented him from descending the water tower despite numerous requests for them to stop and go down.

436.    Ben described how ███ slapped him across the face and called him a pussy.

437.    Ben noted that in response to his repeated requests to leave the water tower, ███ bit him hard without his consent.

438.    He also described the first time ███ bit his lip on the water tower, wherein he clearly said "No!" and ███ indicated she understood he did not consent to such behavior.

439.    Ben told Barnett about ███'s second hard, nonconsensual bite of his lip in her bedroom.

440.    Ben explained that when he tried to leave the bedroom, ███ grabbed him, forcibly exposed him, grabbed him by the buttocks, and attempted to force her mouth onto his penis while he verbally and physically resisted.

441.    Ben informed Barnett that ███ understood there was no consent and that when he resisted her attempt to force her mouth on to his penis, ███ responded, "Here, Ben, you don't want to f--k me and that disappoints me," and "F--k you."

442.    Ben stated that in response to his next attempt to leave, ███ again bit him hard on his lip without his consent for a third time.

443.    Barnett noted that ███'s behavior sounded like a violation of the Gender-Based Misconduct Policy.

444.    She asked Ben if he would like to make a claim against ███.

445.    Ben stated that he wished to file a claim against ███.

446.    Barnett then downplayed █████'s actions as nothing more than "Sexual Harassment" because she never actually touched Ben's penis despite forcibly attempting to do so.

447.    When Ben asked Barnett why she considered █████'s behavior sexual harassment rather than sexual assault, Barnett, stated, "We don't have a definition for *'Attempted'* Sexual Assault."

448.    In determining what charges to levy against █████, Barnett ignored Ben's allegation that █████ bit him three times without his consent.

449.    Non-consensual biting during sexual activity for the purpose of sexual gratification qualified as Sexual Assault: Contact under Columbia's Gender-Based Misconduct Policy.

450.    Non-consensual biting of an intimate partner constituted Domestic Violence under Columbia's Gender-Based Misconduct Policy.

451.    Non-consensual biting of an individual with whom one was in a social relationship of a sexually intimate nature constituted Dating Violence under Columbia's Gender-Based Misconduct Policy.

452.    In determining what charges to levy against █████, Barnett ignored Ben's allegation that █████ slapped him in the face without his consent.

453.    Non-consensual slapping of an intimate partner constituted Domestic Violence under Columbia's Gender-Based Misconduct Policy.

454.    Non-consensual slapping of an individual with whom one was in a social relationship of a sexually intimate nature constituted Dating Violence under Columbia's Gender-Based Misconduct Policy.

455.    In determining what charges to levy against █████, Barnett ignored Ben's allegation that █████ grabbed Ben's buttocks without his consent as she tried to pull his penis

towards her mouth.

456.     Non-consensual touching of an individual's buttocks for the purpose of sexual gratification constituted Sexual Assault: Contact under Columbia's Gender-Based Misconduct Policy.

457.     In determining what charges to levy against ████, Barnett ignored Ben's allegation that ████ forcibly exposed Ben's penis without his consent.

458.     Exposing an individual's genitals without their consent for the purpose of sexual gratification constituted Sexual Exploitation under Columbia's Gender-Based Misconduct Policy.

459.     Barnett then advised Ben that things would go poorly for him if and when his allegations were proven false.

460.     Barnett asked Ben to send her any photos or videos from the night in question only after he confirmed that, despite her warning, he wanted to pursue a claim against ████.

461.     Ben provided the photo, video, audio, and documentary evidence in his possession shortly thereafter.

462.     When ████ had made her claim against Ben, Barnett promptly issued a No-Contact Directive ordering Ben to immediately leave any classroom, campus area, or off-campus event if ████ was or became present.

463.     Barnett did not issue an updated No-Contact Directive to reflect Ben's claim against ████ until December 21, 2016, a month after his interview and after the semester was over.

## L.     Barnett Accuses Ben of "Retaliation"

464.     On December 8, 2017, Barnett conducted a second interview with Ben.

465.     During this interview Barnett accused Ben of retaliating against ████.

466.     Barnett had learned that CJS classmate ████████ ("████") asked Ben about

the case outside of a bar in December.

467.    In accordance with the Confidentiality Policy, Ben declined to give ████ any details about the case and did not mention any evidence or his counter complaint.

468.    When ████ pressed him for his thoughts on how it would turn out, Ben, believing that the case would be over soon because Barnett had hard evidence contradicting ████'s version of events and supporting Ben's assertion that ████ assaulted him, Ben stated that ████ might not be a student next semester.

469.    Barnett characterized this remark as a threat.

470.    Barnett stated when Ben told this to ████, he should have known that ████ would tell witness ████, and that he should have known that ████ would tell ████, who would tell Barnett.

471.    Barnett indicated that Ben's vague, offhand comment to a friend that indirectly reached ████ would be noted in his case and might qualify as "retaliation" and subject Ben to further "discipline."

472.    In response, Ben informed Barnett of ████'s clear and unequivocal violation of the Confidentiality Policy with multiple CJS classmates.

473.    According to classmate ████████ ("████"), ████ told her that Ben "raped" her with his penis and gave her an STD.

474.    ████ also told ████ that she has proof that Ben gave her an STD.

475.    Ben asked Barnett to investigate these statements.

476.    Barnett refused to investigate ████'s statements.

477.    Barnett refused to enforce the Confidentiality Policy against ████.

478.    Despite the clear directive of the Confidentiality Policy, Barnett told Ben, "We

can't stop people from sharing their experiences with others."

479. Ben's attorney informed Barnett (an experienced prosecutor) that ███████'s statements were undoubtedly influencing eyewitness testimony.

480. In response, Barnett reiterated her refusal to enforce the Confidentiality Policy against ██████.

481. She also threatened to have Ben's attorney removed if he would not keep quiet.

482. Barnett's statements indicated that ██████ was permitted to speak at length with all the witnesses in the case while Ben was forbidden from doing so.

**M.** **December 9, 2016:** ██████ **Makes Another False Claim of Sexual Misconduct**

483. On December 9, 2016, the Cavalier Daily Alumni Association ("CDAA") held its 2016 holiday party at the New York Times building for alumni of the Cavalier Daily, the student paper for the University of Virginia ("the "New York Times Reception").

484. ██████ had written for the Cavalier Daily as an undergraduate.

485. ██████ was the Communications Chair of the CDAA and served as an organizer for the New York Times Reception.

486. She recruited ██████, ██████, and ██████ to help with the New York Times Reception, and all four of them were in attendance.

487. On the way to the New York Times Reception, ██████ told ██████ she had taken "some pills," and intended to drink, and ██████ advised ██████ against mixing such pills with alcohol.

488. ██████ stated she was having problems with ██████, her new boyfriend, specifically that she was mad at him and considering breaking up.

489. ██████ said that she wanted to drink and not think about it.

490. At the New York Times Reception, ██████ immediately began drinking and later

Case 1:19-cv-00432-WEC   Document 13   Filed 05/23/19   Page 52 of 98

flirting with a Cavalier Daily alumnus she met there.

491.    After the New York Times Reception ended, ███ brought the alumnus with the group to a second location, a bar.

492.    At the bar, ███ sat next to the man and engaged in what appeared to her friends to be consensual behavior that mirrored her behavior with Ben during the Incident.

493.    ███'s friends became uncomfortable witnessing this behavior and intervened to let her know that it was inappropriate.

494.    Embarrassed, ███ falsely accused her new male companion of sexual assault, telling ███ that he "was a creep" who "touched her leg."

495.    ███'s friends were shocked to the point of speechlessness by her unsubstantiated claim of victimhood in the face of social criticism.

### N.    January 17, 2017: The Final Investigative Meeting: Evidence Review

496.    On January 17, 2017, Ben met with Barnett to review the submitted evidence.

497.    Barnett made frequent comments and threats throughout the meeting.

498.    Barnett chided Ben over a previous letter he had sent, remarking "This looks like your attorney wrote this."

499.    When Ben's attorney spoke with Ben or asked questions, Barnett threatened to have Ben's lawyer barred from the disciplinary process.

500.    Barnett told Ben, "You know, not everyone can afford an expensive lawyer."

501.    When Ben's attorney asked who was representing ███, Barnett revealed that ███ was being represented by ███, celebrity wife of talk show host ███, on a pro bono basis.

502.    ███ did not submit any evidence to support her claims against Ben.

52

503. Barnett showed Ben CCTV surveillance footage from the night of October 4, 2016, which matched his account of events and the photographs he provided.

504. As the meeting came to a close, Ben asked Barnett, who was more than 8 months pregnant at the time, what would happen when she went on maternity leave.

505. Barnett stated that, in accordance with Gender-Based Misconduct Policy, a different Title IX investigator would finish the process.

506. It had been 105 days since ████'s initial allegations, but Columbia still had not provided any details regarding the allegations against him.

507. At the end of the meeting, Barnett stated that the Factual Summary of all eyewitness testimony and evidence would be made available for review by January 31, 2016.

**O.      January 23, 2017: Barnett's Confirmed Receipt of the Evidence**

508. At the January 17 meeting, Barnett, who had been provided *all* of the photos in November, asked to be sent the "original" photo files.

509. For the second time, Ben explained to Barnett that "raw" camera files were akin to undeveloped film, and that the software and computing power required to process the 23 gigabytes (23gb) of data would be difficult.

510. In order to assist in Barnett's review of the photos, Ben had provided them in the common and easily consumable .jpeg format.

511. Still, Barnett insisted on obtaining the "original" photo files.

512. Two days later, Barnett was advised that special arrangements had been made for her to download the 23 gigabytes of photos in their original "raw" format as she requested.

513. A download receipt with Barnett's email was generated.

514. Fifteen minutes later, Barnett sent an email stating she was unfamiliar with the

format and was having difficulty viewing the files.

515.    Special arrangements were once again made to process and upload the nearly 700 photos into a common .jpeg format.

516.    On January 23, 2017, two separate download receipts were generated with Barnett's email address.

517.    Barnett sent a separate email that stated: "We will review them and let you know if we have any questions."

**P.      January 25, 2016: Columbia Requires More Money From Ben**

518.    By January 25, 2016, Ben had exhausted his remaining G.I. Bill service-benefits to pay for graduate school and met with CJS's Director of Financial Aid, where he signed documents to take out an additional $20,000 in student loans to help cover the bills from Columbia.

519.    Columbia's investigation into ████'s allegations had now been going on for 113 days across two semesters.

**Q.      January 31, 2017:  Benjamin Marzolf Replaces Serena Barnett**

520.     Columbia did not produce the Factual Summary on January 31, 2017.

521.    Ben was notified via email by Russell that Barnett was going on personal leave and Marzolf would be taking over as Title IX Investigator for the remainder of the process.

522.    Marzolf was only a titular replacement for Barnett.

523.    Barnett spent a significant portion of her maternity leave working on the case against Ben.

524.    Barnett did not permit the case against Ben to proceed until she returned.

525.    In at least one other case where the original Title IX investigator became unavailable during the investigative process, Marzolf promptly completed the process after he was

assigned to the case.

**R.**     **March 6, 2017: Revelations from the Covering Religion Trip to India**

526.     The Covering Religion Class, including ██████, ██████, and other non-party witnesses traveled to India.

527.     One classmate called Ben directly from New Delhi and informed him of several disturbing disclosures ██████ made on the trip, such as ██████ repeatedly discussing how much she "loves drinking," to the point of making her classmates uncomfortable.

528.     On the flight to New Delhi, ██████ offered a classmate a Klonopin, a powerful benzodiazepine that serves as an anti-anxiety medication, in order to help the classmate sleep.

529.     Klonopin has strong, adverse reactions when mixed with alcohol, specifically related to memory.

530.     Ben had specifically asked Barnett to inquire about whether or not ██████ had taken benzodiazepines with alcohol on the night in question.

531.     The purpose of this question was to explore possible explanations for ██████'s alleged memory loss.

532.     Barnett refused to ask ██████ whether she had taken benzodiazepines with alcohol on the night in question.

533.     Barnett asserted that asking ██████ about her prescription drug use was not relevant to the investigation.

534.     By refusing to investigate ██████'s mixing of alcohol with prescription drugs, Barnett failed to consider all of the relevant evidence while authoring the Investigative Report and making her recommendations regarding responsibility.

**S.** **March 21, 2017:  Federal Lawsuit Alleges Barnett Refused to Investigate Sexual Assault Because No Male Assailant Was Named**

535.    On March 21, 2017, Roskin-Frazee filed a lawsuit in Federal Court, publicly alleging that after two violent sexual assaults in her dorm, Barnett and Henry refused to open an investigation or take action because Roskin-Frazee could not provide them the name of a male assailant.

536.    At that time, Columbia had the second highest number of active federal Title IX complaints, as there were four OCR investigations pending against it.

537.    This federal lawsuit and public criticism of Barnett came almost 6 months into Barnett's investigation of ███████'s allegations and at the midway point of her 90 days of maternity leave.

**T.** **April 1, 2017: Benjamin Marzolf's 60th Day as Title IX Investigator**

538.    April 1, 2017 was Marzolf's 60th day as Title IX Investigator.

539.    Marzolf did not communicate in person, by telephone, by email, or by any other method with Ben from January 31, 2017 to April 1, 2017.

**U.** **April 7, 2017: ███████'s Sexual Assault Awareness Event and Disclosure to Professor Helen Benedict**

540.    On April 7, 2017, Columbia hosted an event called Spotlight: Media and the Intersection of Sexual Violence and Justice.

541.    Professor Helen Benedict was a panelist at the April 7, 2017 event.

542.    ███████ was one of Benedict's students.

543.    Upon information and belief, ███████ received an extension on her work in Benedict's class due to stress from the alleged sexual assault perpetrated by Ben.

544.    Benedict shared ███████'s alleged victimhood and details surrounding ███████'s

56

claims of assault with at least one other student.

545. Upon information and belief, Benedict also discussed ██████'s alleged assault with other faculty members, including Sotomayor and Coll.

## V.    <u>Barnett Returns from 90 Days of Leave and Immediately Resumes Her Role as Title IX Investigator</u>

546. On April 26, 2016, Russell informed Ben via email that Barnett would resume as the Title IX Investigator.

547. Russell's email also informed Ben that the Factual Summary was now available.

548. Marzolf had been only nominally in command of the Title IX investigation during Barnett's leave.

549. Barnett never relinquished control of the investigation during her leave.

550. Barnett spent approximately 45 hours of her maternity leave working on the case against Ben.

551. Barnett refused to allow the case to move forward out of a desire to ensure a finding of responsibility against Ben, the male student at a time when she and her job was being personally and publicly targeted in a federal lawsuit for failing to protect female student Roskin-Frazee.

## W.    <u>April 27, 2017: Columbia's Factual Summary</u>

552. On April 27, 2016, Ben received the Factual Summary from Barnett's investigation.

553. The Factual Summary quoted words and phrases selectively from the Investigative Team's interview notes and included numerous misquotations and mischaracterizations of Ben's statements.

554. The Factual Summary did not include any direct references to the 29 times ██████ asked Ben to have sex with her,

555.    The Factual Summary did not include any direct references to Ben's repeated requests to leave ███████'s bedroom.

556.    The Factual Summary did not include any direct references to Ben's repeated refusals to have sex with ███████.

557.    The Factual Summary did not contain any substantive descriptions of the photos and videos that corroborate the majority of Ben's description of their encounter.

558.    The Factual Summary presented witness statements that were directly contradicted by photo and video evidence as unchallenged and credible.

559.    Ben was afforded a "final opportunity" to address the Investigative Team's factfinding, including identifying any relevant information missing from the Factual Summary; sharing any new information not previously known; providing "clarification to details" in the Factual Summary (but only as to his own statements); requesting interviews of any additional witnesses; and submitting questions for ███████ and/or the witnesses.

560.    The "clarifications" that Columbia would permit were "generally typos, correction of names and/or dates, or other minor factual errors."

561.    For all intents and purposes, Columbia viewed the "initial" Factual Summary as final.

562.    All "requested changes, clarifications or questions" were to be submitted "at least one (1) business day" prior to the Pre-Determination Conference, or by 12:30 p.m. on Wednesday, May 3, 2017.

563.    Ben had less than 6 days to review the 78-page Factual Summary, including heretofore unseen statements from ███████ and all 10 witnesses (whose existence was only now made known to Ben and whose identities were withheld), and take advantage of this first and

"final" opportunity to contest the Investigative Team's factual determinations.

564.    The Pre-Determination Conference was postponed and ultimately held on May 10, 2017.

**X.    May 11, 2017: ███ Publicly Retaliates Against ███ and ███ When They Reveal Critical Evidence to Ben**

565.    On May 11, 2017, the student government hosted a graduation party at Bierstrasse Harlem Beer Garden.

566.    The majority of the CJS class of 2017 was in attendance, including Ben, ███, ███, and ███, as well as ███ and her new boyfriend, classmate ███

567.    The beer garden was crowded with CJS students, but the No-Contact Directive was still in effect.

568.    Ben and ███ were permitted to be in the same location as long as they did not approach or speak to each other.

569.    At the graduation party ███ and ███ invited Ben and a female classmate to sit at their table.

570.    ███ told Ben, "I've been wanting to talk to you for months."

571.    ███ and ███ then proceeded to tell Ben about ███'s behavior during and after the New York Times Reception.

572.    As ███ explained, "We didn't know [███] then, but we've gotten to know her since," and that the more time they spent with her, the more they realized that something was "not right" and "fishy" about ███'s allegations and cited incidents surrounding ███'s behavior.

573.    After recounting ███'s behavior during and after the New York Times Reception, ███ stated that ███ "was behaving with him the exact same way she was with you… The exact. Same. Way."

574.    ███ observed ███ and ███ sharing this information with Ben and the female classmate.

575.    In response, ███ rushed to the table, knocked a drink on ███, and began yelling at ███ for talking with Ben as he backed away with his hands up.

576.    As soon as Ben left the table, ███ started wagging her finger between ███ and Ben and admonished ███, stating, "Well that was a pleasure to see!" before storming off.

577.    On her way out of the bar, ███ crossed paths with ███, to whom she made it clear that she spilled her drink on ███ intentionally, clarifying to him that it was "on purpose."

578.    Later, ███ shared the following with Ben via Facebook Messenger regarding ███'s behavior during and after the New York Times Reception:

> ███: It was definitely the first time I thought it could be a pattern: [███] has boyfriend troubles and gets drunks[*sic*], [and] finds comfort with someone else[.]

### Y.    May 15, 2017: Barnett is Informed of New Information, Retaliation

579.    On May 15, 2017, Ben wrote to Barnett in accordance with Columbia Policy that allows the introduction of new evidence and follow-up questions for witnesses.

580.    Ben asked Barnett to ask ███, ███, and ███ four questions regarding ███'s behavior following the New York Times Reception.

581.    He also asked Barnett to question ███, ███, and ███ about ███'s retaliatory behavior at the May 11, 2017 graduation party.

### Z.    May 16, 2017: Barnett Refuses to Investigate, Ignores Retaliation

582.    Barnett refused to conduct the additional limited investigation that Ben requested.

583.    On May 16, 2017, she informed Ben that the questions posed were not relevant to the investigation.

584.     Barnett also asserted that the Pre-Determination Conference held on May 10, 2017 had been Ben's final chance to submit questions to be asked of ██████ or any witnesses.

585.     Ben only became aware of the need for additional questions on May 11, 2017.

586.     Ben explicitly told Barnett that the information upon which his additional questions were based was obtained after the Pre-Determination Conference.

587.     Barnett's sudden concern for time as a reason to disregard new evidence stood in stark contrast to her 90 days of leave during the middle of the case.

588.     Despite this knowledge, Barnett refused to permit the questions Ben proposed.

**AA.     May 17, 2017:  Graduation**

589.     Ben graduated from CJS on May 17, 2017.

590.     Columbia placed a hold on the delivery of Ben's diploma because ██████'s sexual misconduct claim against him was pending.

591.     Columbia also blocked Ben's access to his transcripts and his undergraduate degree.

592.     Columbia granted ██████ her degree.

593.     Ben's sexual misconduct claim was pending against ██████ when Columbia granted her degree.

594.     At the graduation ceremony, Coll greeted the new graduates with a polite handshake or hug, depending on his relationship with the student.

595.     ██████ received a tight, two-arm hug from Coll.



*Photo #1309: Steve Coll and ██████████ embrace each other at graduation (May 17, 2017)*

596.    Ben received a handshake.

## BB.    Medical Report

597.    On May 30, 2017, Ben submitted an expert report from Dr. David Greenblatt, Editor-in-Chief of the Journal of Clinical Pharmacology in Drug Development and Co-Editor-in-Chief of the Journal of Clinical Psychopharmacology, a Professor of Medicine at Tufts University School of Medicine of 40 years whose specific expertise is how alcohol affects mental, motor, and memory functions.

598.    Dr. Greenblatt reviewed Columbia's Factual Summary, the audio transcript, 29 photos summarizing the evening, and text message exchanges.

599.    Dr. Greenblatt's Medical Report concluded that on the night in question ██████ was not suffering from any impairment that would have prevented her from consenting to sexual activity.

600.    Dr. Greenblatt's Medical Report stated:

[M]uch of what [██████] relates in her statement [to investigators] is qualified by loss of recall, incomplete or fragmented recollection, or recall that requires photographic reminders or reminders from other sources.  The apparent implication is that the lost or incomplete recall is at the same time automatically connected to

an inability to make sound intellectual judgements or provide consent. The assumption of this connection is incorrect, and not supported by biomedical evidence. […]

The important point is that impaired or lost memory of events during these episodes does not imply that insight and judgment were impaired at the time. [citations omitted] Specifically, [████]'s statements do not by any means indicate that her capacity for reasoning, insight, and judgment regarding the meaning of consent and its implications were in any way impaired. [████]'s appearance and actions as documented in the Investigative Report, the photographic documents and accompanying narrative, the witness statements, and the audio transcript are consistent with her having intact reasoning, insight, and judgment, including the capacity to understand and give consent. […]

My overall conclusions are that [████] had ingested alcohol during the evening/night of October 5, 2016. A consequence of this was alcohol-induced anterograde amnesia. This is a common and in fact an anticipated result of social alcohol use, with the density of the amnestic effect depending on the quantity and timing of alcohol consumption. The occurrence of anterograde amnesia associated with alcohol does not imply that reasoning, insight, and judgment become impaired. Based on the audio transcripts and witness statements, [████]'s speech patterns were purposeful, directed, and unconfused, and there were no evident lapses of consciousness or wandering of focus. From those same sources and from the photographic record, [████]'s motor function was evidently unimpaired - in fact, [████] was able to walk, climb and descend stairs, and balance herself in a precarious position on the building rooftop. Putting together the available information, I see no evidence to indicate that [████] had any impairment that would have modified or interfered with her capacity to give consent to sexual activity.

601.   On June 16, 2017, Barnett informed Ben that Dr. Greenblatt's opinion was "irrelevant" because Dr. Greenblatt had not met [████].

602.   Barnett also warned Ben that he may be subject to further discipline by consulting with a medical expert as part of his defense.

603.   Prior to the Disciplinary Hearing, Henry informed Ben that he was forbidden from telling the Hearing Panel of the Medical Report's existence.

**CC.   June 1-8, 2018: The "Pre-Hearing Conference(s)"**

604.   On June 1, 2017, Ben attended a Pre-Hearing Conference with Barnett and Marzolf.

605.    This was the first and only time Marzolf and Ben met.

606.    During a procedural review at the start of the meeting, Barnett asked if Ben or his attorney had any questions about the latest changes to the report.

607.    Ben's attorney asked why Barnett did not include the full transcript of ███████'s repeated demands for sex in the "Undisputed Factual Summary" that she would present with her recommendations.

608.    Barnett argued that she had conceded *some* of ██████'s requests for sex and that the full transcript of ██████'s demands for sex would be available to the Hearing Panel in the appendix (a 113-page addendum to what would ultimately be a 120-page report).

609.    Barnett then shut down the conversation entirely and barred Ben's attorney from asking questions.

610.    Ben was ill and unable to speak due to laryngitis.

611.    Ben's attorney continued to asked questions.

612.    Barnett sat in silence, looking away and pretending not to hear the questions from Ben's attorney.

613.    Ben finally attempted to ask the same questions his attorney was asking despite his illness.

614.    Barnett grudgingly answered the questions when repeated by Ben.

615.    Barnett ultimately decided to postpone the Pre-Hearing Conference for another week.

616.    As he was leaving, Ben asked if █████ had already been told Barnett's theory of the case and recommendations to the Hearing Panel.

617.    Barnett stated that she informed ██████ of her theory of the case and

recommendations.

618. Ben asked if Barnett could tell him at the very least what her recommendations were for each of the alleged offenses by both Ben and █████.

619. Barnett refused to provide this information.

### DD. June 7, 2017: Letter to Barnett Detailing Bias in Factual Summary and Requesting Inclusion of the Medical Report

620. On June 7, 2017, Ben sent a letter to Barnett stating his belief that she was intentionally omitting critical uncontroverted factual evidence of █████'s statements that "clearly communicat[e] her willingness to engage in sexual activity."

621. The June 7, 2017 letter also noted Barnett's intentional "burying" of photo and video evidence that showed █████'s "steady gait" and "balance."

### EE. June 8, 2017: "Peaks and Valleys" - Barnett's Incredibly Perfect Theory of Incapacity

622. On June 8, 2017, Ben's Pre-Hearing Conference resumed.

623. Barnett and Russell were present, while Marzolf was absent.

624. For the first time, Barnett finally revealed her recommendations and her theory of the case to justify them to Ben.

625. Barnett reiterated her refusal to consider the Medical Report.

626. She also re-raised the issue of potential additional discipline because Ben shared the Factual Summary with an outside medical expert.

627. During the ensuing conversation, Barnett threatened once more to bar Ben's attorney from future proceedings.

628. Barnett then orally presented her recommendations.

629. Barnett stated that █████ was credible because she provided a consistent narrative

of the allegedly little information she remembered.

630.    Barnett went on to note that ████'s narrative was corroborated by evidence with few contradictions.

631.    She stated that ████'s deteriorating relationship with her boyfriend was not a motivating factor to lie.

632.    Barnett noted that the witnesses in the case were overall credible with limited bias.

633.    Barnett stated that Ben was not credible despite providing a consistent narrative and "some" evidence.

634.    Barnett admitted that the evidence that Ben submitted corroborated his version of events.

635.    However, she asserted that Ben's evidence did not show that ████ had the capacity to consent.

636.    Despite conceding that Ben had no motivation to lie, Barnett stated that he did not give a convincing explanation for why he recorded ████'s repeated demands for sex.

637.    Barnett then explained the relevance of her credibility determination in light of the preponderance of the evidence standard.

638.    According to Barnett, anything ████ claimed to not remember (such as her assault and biting of Ben), did not happen unless witnesses or other evidence showed that it did.

639.    Additionally, Ben's account of what occurred in these moments appeared to serve no evidentiary value for Barnett.

640.    Barnett recommended finding Ben responsible for two instances of sexual assault (fingering ████ in her bedroom and grinding against ████ as they kissed in her bedroom) and two instances of sexual harassment (taking photographs of ████ as she straddled him on the water

tower and applying pressure to ████'s throat in her bedroom).

641.     Barnett recommended finding Ben not responsible for one instance of sexual assault (kissing ████'s lips and breasts on the water tower).

642.     Prior to the hearing, Barnett changed her recommendation regarding the alleged sexual harassment on the water tower to a finding of not responsible.

643.     Barnett recommended finding ████ not responsible for sexual harassment for repeatedly biting Ben, exposing his penis, and attempting to force her mouth onto his penis.

644.     Barnett noted that even if ████ did everything Ben claimed she did, her behavior would not have been unwelcome or made Ben feel degraded or abused, even though they acknowledged that he repeatedly told ████, "No."

645.     Ben asked Barnett why ████'s repeated demands for sex were not considered.

646.     Barnett stated that ████'s requests for sex were made when she was incapacitated and were therefore irrelevant.

647.     Ben asked why the photo and video evidence of ████'s ability to walk, climb, descend stairs, balance on the water tower, and perform acrobatic maneuvers were not considered indicative of capacity.

648.     Barnett stated that ████'s decision to climb the water tower was a sign of her incapacitation because it showed she was not making rational decisions.

649.     Barnett stated that the time period that ████ was on the water tower (approximately 10:45-11:15) constituted her peak incapacity for the evening.

650.     Despite this finding, Barnett recommended a finding that Ben was not responsible for the interaction that occurred on the water tower because of a lack of evidence.

651.     Ben asked why statements from ████ regarding ████'s behavior indicating that

████ had the capacity to consent and did in fact consent to physical contact with Ben were not considered.

652.    Barnett explained that ████ allegedly "falling asleep" (around 1:00 a.m.) was a stronger indicator.

653.    Barnett did not discuss ████'s testimony indicating that ████ was not actually asleep.

654.    According to Barnett, ████ resumed capacity immediately at 1:53 a.m. between the time she said, "Here, Ben, you don't want to f--k me and that disappoints me" and when she began swearing repeatedly before asking Ben to snuggle.

655.    Barnett confirmed that ████ still had capacity at 2:07 a.m. when she allegedly told ████ that Ben tried to have sex with her.

656.    Ben then asked Barnett to reconcile her finding that ████ was incapacitated when she asked for sex with the fact that ████ explicitly requested sex during the fourteen-minute period between 1:53 a.m. and 2:07 a.m. when Barnett indicated ████ had capacity.

657.    Barnett responded, "Capacity can work in peaks and valleys."

658.    Barnett's theory of ████'s incapacity was based not on medical science but rather perfectly tailored to fit ████'s allegations.

659.    Barnett failed to account for the fact that ████ requested sex at least seven (7) times between 1:53 a.m. and 2:07 a.m., a time period when Barnett admitted that ████ had capacity.

660.    Ben repeated his understanding of Barnett's theory back to her to confirm that he had not misunderstood.

661.    Ben asked Barnett if she was stating that ████ alternated between *incapacitated-*

68

*drunk* and *sober* in turns of just a few seconds that perfectly and coincidentally aligned to disqualify every one of ███████'s 29 instances of enthusiastic affirmative consent.

662.    Ben also asked Barnett to confirm that ██████ was *incapacitated* when she said, "Look, Ben, you don't want to f--k me and that disappoints me…F--k you… You hate me," but *resumed capacity* only seconds later when she "woke up" and demanded that he snuggle with her rather than leave.

663.    Ben sought further confirmation that after he agreed to snuggle with ███████ and she quickly resumed begging him for sex, ██████ was once again incapacitated when she said, "I think you wanna f--k me," "muster the courage," "I don't get why you won't do it now.  I know you want to.  Please.  Please, Ben, I want you," and only resumed capacity *immediately after being rejected* by Ben.

664.    In response to these questions, Barnett looked down and muttered, "Basically."

665.    Barnett did not attend the hearing.

## FF.    June 15, 2017: The Investigative Report.

666.    The Investigative Report was issued on June 15, 2017.

667.    The Uncontested Factual Summary of the Investigative Report did not mention ██████'s third and fourth climbs of the water tower despite the uncontroverted photographic evidence that Ben provided.

668.    The Uncontested Factual Summary did not mention the fact that ██████ took her shirt off on the water tower, nor did it state that ██████ initiated the make out session with Ben by sitting on his lap and straddling him after her first climb despite the uncontroverted photographic evidence provided by Ben.

669.    The Investigative Report found ██████ credible despite her limited memory.

670.    The Investigative Report found ███ credible despite photographic, video, and audio recording evidence that contradicted her testimony.

671.    The Investigative Report noted that what ███ did remember could be relied upon.

672.    The Investigative Report acknowledged that Ben provided detailed factual statements on the three occasions he was interviewed and provided photographs and audio recordings to substantiate his account of what happened.

673.    The Investigative Report also noted that Ben's chronology of events was corroborated by ███, the non-party witnesses, and independent evidence.

674.    Still, the Investigative Report questioned Ben's credibility based on his explanations for certain actions that he took and his denial that ███ showed any signs of intoxication.

675.    The Investigative Report did not meaningfully address the 29 times ███ begged Ben for sex.

676.    The Investigative Report recommended findings related to the charges against Ben and ███ consistent with Barnett's recommendations as described above.

### GG.    June 20-21, 2017: The Hearing Panel and Finding of Responsibility Against Ben

#### i.    June 20, 2017: The Hearing Panel

677.    On June 20, 2017, a Hearing Panel was convened to determine responsibility for the charges levied against Ben and ███.

678.    Prior to the Hearing, Ben submitted a written statement and documentary and photographic evidence (including the Medical Report) to the Hearing Panel.

679.    Henry heavily redacted material portions of Ben's statement.

680.    Henry also refused to submit the documentary and photographic evidence

70

(including the Medical Report) that Ben included with his statement to the Hearing Panel.

681. Henry prevented Ben from discussing the Medical Report.

682. Henry also barred any reference to ███'s behavior following the New York Times Reception.

683. Ben was also not allowed to describe ███'s public retaliation against ███ and ███ when they turned against her.

684. Henry advised that if Ben raised any of the proscribed evidence, she would halt the Hearing immediately, Ben would be removed, and the Hearing would proceed without him.

685. The Hearing Panel consisted of three Columbia employees: Spencer Bennett (Associate Director of the Student Conduct and Community Standards Office and a lawyer), Francisco Pardo (Associate Director of the Equal Opportunity and Affirmative Action Office and a lawyer), and Jazmin Taylor (Director of Investigations, Equal Opportunity and Affirmative Action Office).

686. Ben and ███ appeared separately before the Hearing Panel.

687. No testimony was taken under oath or transcribed by the Hearing Panel.

688. None of the 10 non-party witnesses appeared before the Hearing Panel.

689. Barnett, Marzolf, and Russell did not attend because the Hearing Panel did not have any questions regarding the 8-month investigation.

690. The Hearing Panel did not ask ███ any questions regarding the 29 times she asked Ben for sex on tape.

691. Nor did they ask her about her repeated refusals to take "no" for an answer when Ben declined intercourse.

692. Pardo asked Ben what he thought ███ meant when she asked him to "f--k" her.

71

693.    Though ███ was available to explain her words on tape, neither Pardo nor the other panelists asked ███ what she meant when she asked Ben to "f--k" her.

694.    When Ben described in his opening statement how ███ attempted to force oral sex on him, he begged the Panel, "Please, please, ask me about it."

695.    The Hearing Panel did not ask a single question about Ben's claims against ███ despite Ben's impassioned request that they ask about ███'s attempt to force oral sex upon him.

696.    When Ben tried to explain the lingering questions he felt the panel should ask ███, Bennett cut him off and told him to save it for his closing statement.

697.    In his closing statement, Ben implored the Hearing Panel to review the uncontroverted photographic and video evidence he provided.

### ii.    June 21, 2017: The Hearing Panel Findings

698.    The Hearing Panel issued its findings on June 21, 2017.

699.    The Hearing Panel found Ben responsible for sexual assault for the sexual contact that occurred on top of the water tower (despite Barnett's recommendation to find him "not responsible") as well as the digital penetration and sexual contact at ███'s apartment.

700.    Ben was found not responsible for sexual harassment that allegedly occurred on the water tower.

701.    The Hearing Panel stated that the facts of what happened on the night in question were not in dispute.

702.    The issue was whether ███ was incapacitated and thus unable to give affirmative consent.

703.    The Hearing Panel concurred with Barnett that ███ was incapacitated.

704.    The Hearing Panel stated that their decision was due in part to the "significant

issues with [Ben's] credibility," which allowed them to discredit all of his statements and testimony unless it was corroborated by ████, her friends, or other evidence.

705.    The Hearing Panel determined that ████ was incapacitated on the water tower based on the amount of alcohol she allegedly consumed and her behavior.

706.    Regarding ████'s ability to execute the reverse tumble roll off the water tower that was 30 feet above a 13-floor building, the Hearing Panel concluded that ████ "lacked rational and reasonable decision-making abilities."

707.    The Hearing Panel noted that Ben had pointed out that the "reverse tumble roll" showed ████ was in complete control of her body.

708.    The Hearing Panel ignored Ben's statements and the evidence he provided showing a fully capable ████ who was not incapacitated.

709.    The Hearing Panel found ████ not responsible for sexual harassment.

710.    The Hearing Panel stated that there was insufficient evidence to determine whether ████'s alleged conduct occurred, citing Barnett's assessment of Ben's credibility.

711.    The Hearing Panel also noted the lack of witnesses and the lack of recollection on the part of ████.

**HH.    June 28, 2017: Ben Is Expelled**

712.    On June 28, 2017, Columbia issued the Sanction Letter authored by Sotomayor.

713.    Sotomayor stated that following his review of the entire file, he determined that the proper punishment was expulsion, which Sotomayor described as a complete separation from Columbia (the "Sanction").

714.     As a result of his expulsion, Ben was prohibited from receiving the master's degree he earned from CJS.

715.    When the Sanction was issued, Ben had completed all requirements necessary for the award of his master's degree.

716.    The Sanction Letter did not make a single mention that ▐▐▐▐ doggedly begged Ben to have sex with her and that Ben refused.

717.    The Sanction Letter did not mention ▐▐▐▐'s unaided ascents and descents of the water tower.

718.    The Sanction letter did not mention ▐▐▐▐'s reverse tumble roll off of the water tower.

719.    The Sanction letter did not mention the video and photographic evidence indicating that ▐▐▐▐ was not incapacitated on the night in question.

720.    The Sanction letter did not mention ▐▐▐▐'s ability to balance herself on the water tower.

721.    The Sanction letter did not mention the video evidence showing ▐▐▐▐ walking with a steady gait.

722.    The Sanction Letter gave no reasonable justification for why Columbia would apply the extreme sanction of clawing back a degree months after it had been earned and the student had been allowed to graduate.

723.    The Sanction Letter advised Ben that he could appeal the decision but limited that appeal to a review of three grounds: (i) procedural error, (ii) new information and (iii) excessive sanction.

**II.    ▐▐▐▐'s ▐▐▐▐▐▐▐▐ Celebrations**

724.    Within minutes of being notified of his expulsion, Ben received a phone call from ▐▐▐▐ offering his condolences.

725.  ████ informed Ben that ████ was broadcasting Ben's expulsion to their classmates and inviting them to celebrate with her by "going drinking."

726.  ████ also posted a celebratory photo ███████████████████████ ███████████████████ on her Facebook page ████████████████ ████████████



*Celebratory Facebook Post by* ████████████████

## JJ.   July 12-31, 2017: The Appeal

727.  On July 12, 2017, Ben appealed the Hearing Panel findings and the Sanction (the "Appeal").

728.  Ben asserted that the Hearing Panel decision was contrary to the preponderance of the evidence.

729.  He further argued that the Sanction was excessive, unjustified, and unprecedented

in light of significant mitigating factors.

730. Ben pointed out that the undisputed facts, as verified by photographs, video and audio recordings, showed that ███ was not incapacitated due to her alcohol consumption and at all times demonstrated affirmative consent through her words and actions.

731. Ben noted ███'s consistent and clear willingness and desire to engage in sexual activity.

732. He also reminded Columbia that ███'s last significant consumption of alcohol occurred hours before any alleged offending behavior occurred.

733. The Appeal further noted that objective photographic and video evidence showed that ███ had a steady gait and exhibited the ability to balance herself, even while climbing a ladder and standing on the summit of a water tower.

734. The Appeal argued that the Sanction was excessive for numerous reasons.

735. There was no force, coercion, or intentional incapacitation.

736. There was no bias-motivated conduct.

737. The Appeal noted that the evidence of ███'s level of intoxication was, at best, inconclusive.

738. Despite a lack of clear evidence regarding the extent of ███'s intoxication, Columbia imposed the harshest possible penalty – expulsion, revocation of alumni privileges (including career services), and the clawing back of a degree rightfully earned.

739. The Appeal noted that important mitigating factors were ignored.

740. The Appeal noted that there are no aggravating factors.

741. Ben did not provide ███ with drugs or alcohol.

742. ███ had not consumed any significant amount of alcohol in Ben's presence

during the last 4 hours they were together.

743.     ███████ never once said no or stop while engaging in sexual contact with Ben.

744.     ███████ begged Ben to have sexual intercourse with her.

745.     Ben refused to have sexual intercourse with ██████.

746.     The Appeal also stated that Ben was denied the ability to compare the Sanction with other students who have also been expelled.

747.     The Appeal further noted that the extreme sanction of expulsion was designated for an aggravated set of facts, of which there were none.

748.     The Appeal also raised several procedural errors.

749.     The disciplinary process took 257 days to complete.

750.     Columbia refused to ask follow-up questions regarding the New York Times Reception, an incident in which ██████ was the sexual aggressor in an interaction with another male and later mischaracterized the incident.

751.     Columbia refused to ask follow-up questions regarding ██████'s intimidation of witnesses when they attempted to share information regarding the aforementioned interaction with Ben.

752.     Columbia's Gender-Based Misconduct Policy states that new information can be submitted to the Hearing Panel.

753.     The Appeal noted that Barnett and Henry refused to provide the Medical Report to the Hearing Panel.

754.     The Appeal included several supporting exhibits, including the Medical Report.

755.     After Ben submitted the Appeal, Henry informed him that she had redacted any references to the Medical Report and his other supporting evidence.

756.     On July 14, 2017, Henry informed Ben and ███ that the Appellate Panel would consist of Deans Merit Janow (School of International and Public Affairs), Irwin Garfinkel (School of Social Work), and Steve Coll (CJS).

757.     Unbeknownst to Ben at that time, Coll had been ███'s professor and had a close relationship with ███ that began before he was named to the Appellate Panel.

758.     Coll was also aware of ███'s allegations against Ben before he was named to the Appellate Panel.

**KK.     July 31, 2017: Appeal Decision**

759.     On July 31, 2017, 300 days after the Incident, the Appellate Panel denied Ben's Appeal.

760.     The Appellate Panel refused to consider Ben's argument that the Hearing Panel's findings were contrary to the preponderance of the evidence.

761.     The Appellate Panel stated that there were no procedural errors because there was no evidence that the delay affected the investigation and sanction in the case.

762.     The Appellate Panel stated that the Sanction was not excessive and upheld the Hearing Panel's decision that ███ was incapacitated.

763.     The Appellate Panel noted that, "[███] invited [Ben] to a tempting proposition[.]"

764.     The Appellate Panel stated that there are few cases where expulsion is the appropriate remedy.

765.     The Appellate Panel faulted Ben for recording the interaction in ███'s bedroom instead of removing himself from the situation.

766.     The Appellate Panel faulted Ben for trying to protect himself.

78

**LL.**    **Additional Factors Influencing Columbia's Sanction of Expulsion and Rejection of Ben's Appeal**

**a.**    **New Media Storm About "Mattress Girl" Case During the Appeal**

767.    On July 13, 2017, Columbia settled the lawsuit *Nungesser v. Columbia* (also known as the "Mattress Girl" case).

768.    Weeks of negative press for Columbia followed this settlement.

769.    None of this press would have gone unnoticed by the appellate panelists, and especially not by Coll, who was the dean of, as he wrote in the Appeal Decision, "possibly the finest journalism school in this country."

770.    In fact, The New Yorker, where Coll was employed as a staff writer, commented on the settlement in an article titled, "The Trump Administration's Fraught Attempt to Address Campus Sexual Assault" published on July 15, 2017.

**MM.**    **███████'s Undisclosed Relationship with Steve Coll**

771.    Steve Coll was the most sought-after professor and advisor at CJS.

772.    Coll only accepted a handful of graduate students for his classes.

773.    ███████ was enrolled in at least one of Coll's classes.

774.    Coll was ██████'s favorite professor.

775.    ███████ was one of Coll's favorite students.

776.    Coll wrote professional reviews for ██████.

777.    ████████████ ████ ███████████████

778.    █████████████████████████████████████████████

███████████████████████████████████████████

779.    ████████████ █████ ████████ ██████ ████████████

████████████████████████████████████.

780.    During the Title IX process, ██████ received at least one extension on her master's thesis due to the supposed stress she was enduring.

781.    Upon information and belief, Steve Coll also granted her an extension due to the stress she was enduring from the Title IX process.

782.    Throughout the Title IX process, Coll and ██████ knew that because of his role as Dean of CJS, Coll would be a member of the Appellate Panel unless he recused himself.

783.    Regarding conflicts of interest (potential or actual), the Gender-Based Misconduct Policy states:

> The University requires any individual participating in the investigation, adjudication process, sanctioning or appeal determinations to disclose to the Gender-Based Misconduct Office any potential or actual conflict of interest. [...And that] the University will take steps to address the conflict in order to ensure an impartial process.

784.    Coll and ██████ kept their personal and professional relationship secret from the GBMO and the other members of the Appellate Panel.

785.    Coll did not disclose the conflict of interest when he was assigned to the Appellate Panel.

786.    In a social media post following the rejection of Ben's Appeal, ██████ ████████ ████████████████████

## NN.    **The Knight Foundation**

787.    Between 2014 and 2016, the Knight Foundation increased its annual donations to CJS from $349,201 to $2,177,143.

788.    In 2015 the Knight Foundation committed $25,000,000 in future donations for the newly established Knight First Amendment Institute at Columbia University.

789.    Coll is a board member of the Knight First Amendment Institute.

790.     Coll had a vested interest in protecting Columbia Journalism School's reputation with donors and in the press.

**OO.    Damages**

791.     As a direct and proximate result of the expulsion, Ben sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

792.     Columbia's decision villainized Ben.

793.     Due to Columbia's one-sided enforcement of the Confidentiality Policy and Anti-Retaliation Policy, Ben was unable to publicly defend himself.

794.     Ben's career as a journalist and photojournalist has been effectively killed by the Sanction.

795.     The most valuable aspect of CJS, as noted by Professor Bill Grueskin at the start of every school year, is the CJS professional alumni network.

796.     As a result of the Sanction, Ben does not have access to CJS alumni services.

797.     CJS makes sure that their graduates have access to job openings in an ever-shrinking industry.

798.     Even during the school year, deans inform students about "magic" job openings from organizations like Slate or Bloomberg, that, by law, have to be open to the public, but which are only posted online in the middle of the night for a brief period of time.

799.     Only CJS students are told when and where the "magic" job openings will appear.

800.     As a result, CJS students, at the direction of CJS staff, queue up to take the jobs before competing journalists ever know they are available.

801.     The Sanction also prevents Ben from reaching out to CJS faculty for professional

mentorship or advice.

802.     Columbia's choice to enable ████'s slander has obscured the truth from Ben's former classmates, many of whom now operate in positions of influence.

803.     In 2017, when Ben first posted in support of the #MeToo movement, a CJS alumna (who was also ████'s roommate during her India trip) posted on his Facebook page, "How ironic. Now imagine the pain of the women you have assaulted."

804.     Ben deleted the comment.

805.     Ben later contacted ████'s former roommate to ask what ████ had told her.

806.     ████'s former roommate first apologized to Ben for misjudging him.

807.     She noted that "[████] did a lot of horrible things and lied constantly."

808.     She described that "[████] was dangerous.  I never want to be near her AGAIN!"

809.     The former roommate was concerned that ████ would seek to ruin her life for reasons unrelated to the Incident, but she was thankful she had definitive proof that ████ is a liar.

810.     The former roommate stated "It does not surprise me that you rejecting her made her play victim.  She's awful."

811.     When Ben asked her to explain this comment, she said that ████ spent every night on their research trip lying to her boyfriend about her behavior, describing, "I couldn't believe how innocent she played when really she is willing and ready to ruin people's lives." Adding, "She was willing to do it to me as well."

812.     The Sanction greatly limits Ben's career prospects because the #MeToo movement has directed its aim at men in the media.

813.     Ben will not be able to secure employment if potential employers find out that he was expelled from CJS for sexual misconduct.

814.     In the unlikely scenario that he is ever able to obtain a job in journalism, Ben will be terminated if Columbia's faulty determination becomes known.

815.     ███ is keenly aware of the climate surrounding men in the media and the #MeToo movement.

816.     In January 2018, ███ posted a story from the New York Times about the "Shitty Men in Media List" to a CJS alumni group.

817.     The story notes how the Shitty Men in Media List uses anonymous allegations to destroy male journalists' careers.

818.     ███ wrote that it was an "Interesting piece."

819.     She later deleted the post.

820.     ███ has explicitly stated her desire to use Columbia's faulty decision to destroy Ben's career.

821.     In January 2019, ███ stated that she "has eyes on [Ben]'s social media," and that, "as soon as she sees [Ben] working somewhere" she's going to "put all this out in front of people."

822.     One of ███'s friends warned Ben, "Whatever you're doing, she plans on bringing this up in your life," adding that ███ said that she is "waiting to pounce."

823.     Columbia's actions and the resultant death of his nascent career have caused Ben to suffer from depression and recurring nightmares about ███ and Columbia officials.

824.     Columbia's actions have also exacerbated Ben's service-connected disabilities, requiring new treatment in therapy and incurring the economic costs of that therapy.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 – ERRONEOUS OUTCOME)**

825.     Ben repeats and re-alleges each and every allegation stated above as if fully set

forth herein.

826.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

827.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

828.    In its fiscal year ending June 30, 2017, Columbia received hundreds of millions of dollars in federal funding for research and development.

829.    A school violates Title IX when it fails to prevent or remedy sexual harassment or sexual assault.

830.    A school violates Title IX when gender is a motivating factor in its decision to impose discipline.

831.    Title IX requires schools to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.

832.    Title IX requires that all educational institutions have policies and procedures that afford due process to both parties involved.

833.    The evidentiary and procedural errors rampant throughout the investigation, hearing, and appeal constituted a denial of due process in this case resulting in an erroneous outcome based on an erroneous and distorted conception of the facts.

834.    Under Title IX, an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature.

835.    Challenges to university disciplinary proceedings on the basis of "erroneous outcome" assert that the plaintiff was innocent and was wrongly found to have committed an

offense and that gender bias was a motivating factor behind the erroneous findings.

836.    An erroneous outcome occurred in this case because Ben was innocent and wrongly found responsible for sexual assault and sexual harassment charges, and gender bias was a motivating factor.

837.    Evidentiary weakness and procedural flaws support a case of an erroneous outcome.

838.    As fully described above with pertinent examples detailed below, Columbia committed numerous evidentiary and procedural missteps throughout the disciplinary process.

839.    Ben had explicit verbal and non-verbal consent for the non-intercourse sexual conduct that occurred.

840.    Columbia ignored the Medical Report, which indicated ███ was not incapacitated at any point during the night in question.

841.    Ben provided relevant, objective, and uncontroverted evidence showing that ███ was not incapacitated at any point during the night in question.

842.    Photographic and video evidence showed ███ walking unassisted between the lecture hall and ██'s apartment, at times backwards over brickwork.

843.    Ben provided relevant, objective, and uncontroverted evidence that directly contradicted the eyewitness testimony that Columbia improperly relied upon to find Ben responsible.

844.    Ben provided relevant, objective, and uncontroverted evidence that directly contradicted Columbia's factual findings.

845.    Ben provided relevant, objective, and uncontroverted photo and video evidence that firmly established that ███ was not incapacitated on the roof/water tower at ██'s apartment.

846. Incredibly, Columbia asserted that ███████'s ability to perform a backwards roll off of a water tower and catch the attached ladder was proof of her incapacity.

847. The Hearing Panel chose to credit ███████'s implausible claim that she "was not in control of [her] faculties" on the water tower despite the clear photo and video evidence to the contrary.

848. Columbia ignored evidence that established that ███████ was not incapacitated at her apartment when non-intercourse sexual contact occurred.

849. Columbia stated that the peak of ███████'s supposed incapacity occurred at approximately 11:00 p.m.

850. Photo and video evidence that Ben provided to Columbia show that ███████ was not incapacitated around 11:00 p.m., or at any time thereafter

851. Ben and ███████ engaged in non-intercourse sexual contact approximately two and a half hours later.

852. Unless ███████ is the only human being on Earth who metabolizes alcohol in reverse, there is no explanation for how ███████ could have been "incapacitated due to consumption of alcohol" at her apartment.

853. In spite of the relevant, objective, and uncontroverted evidence that Ben provided, Columbia found him responsible for violating the Gender-Based Misconduct Policy.

854. Columbia ignored evidence that ███████ violated the Gender-Based Misconduct Policy.

855. ███████ repeatedly begged Ben to have sex with her and refused to take no for an answer.

856. ███████ bit Ben multiple times without his consent.

857.    ███ slapped Ben without his consent.

858.    ███ forcibly removed Ben's clothes, exposed his penis, grabbed his buttocks, and attempted to place her mouth on his penis without his consent.

859.    ███ did not deny that she engaged in this behavior.

860.    She asserted that she cannot remember if she did or did not act this way because of how much she drank.

861.    That is not a defense against allegations of misconduct.

862.    The Gender-Based Misconduct Policy states, "The use of alcohol or other drugs is never an excuse for committing a policy violation and does not diminish anyone's responsibility to obtain informed and freely given consent."

863.    On the audio recording he provided to Columbia, Ben is heard repeatedly saying "no" and asking to leave.

864.    When ███ bites him, he says, "Nope! Nope!"

865.    When ███ assaults him he can be heard verbally and physically resisting.

866.    When ███ bites him again, he shouts, "No bite! No bite!"

867.    Columbia claims that Ben's placating compliments and promises of future sex mean that, even though he can be heard repeatedly saying "no" and refusing consent at the time, ███'s "conduct would not have been unwelcome."

868.    According to Columbia, when a man says "no," he really means "yes."

869.    Columbia impermissibly delayed completing the disciplinary process related to Ben and ███'s allegations.

870.    Barnett inexplicably delayed conducting witness interviews for multiple weeks.

871.    Barnett refused to conduct requested follow up interviews that would have

87

impacted ███'s credibility.

872. Barnett and Henry denied Ben the opportunity to present relevant evidence related to the Medical Report, ███'s false allegation of sexual misconduct following the New York Times Reception, and ███'s retaliation against witnesses for sharing information regarding her false allegation.

873. The Hearing Panel did not ask Ben any questions about his allegations against ███.

874. The Hearing Panel did not question Barnett or Russell.

875. The Hearing Panel's disinterest in the truth was predetermined.

876. Barnett and Russell did not attend the Hearing.

877. The Hearing Panel did not ask ███ any questions regarding the 29 times she asked Ben to have sex with her.

878. The Hearing Panel's finding that ███'s reverse tumble roll off the water tower showed that she "lacked rational and reasonable decision-making abilities" runs counter to determinations made by Columbia regarding male students who claim to be incapacitated by alcohol.

879. In at least one recent case, Columbia determined that a male student's ability to carry a female stranger he had met only hours before showed that he was not incapacitated.

880. Several Columbia administrators directly involved in the disciplinary process are attorneys.

881. Despite their professional training, these administrators allowed the disciplinary process to proceed unchecked against the evidentiary and procedural errors.

882. The evidentiary and procedural errors occurred because of Ben's male gender.

883. In response to a spate of recent bad press, Columbia sought to appear responsive to allegations by female students.

884. Specifically, Barnett made it her mission to use Ben's case as vindication for various attacks against her by survivor advocates.

885. Columbia could not afford to have another female "victim" pillory them in a public forum.

886. Columbia also feared a Title IX lawsuit from ████.

887. Henry's LinkedIn profile notes that when she served as the Interim Director of the GBMO from 2014 to 2015 she "[d]rafted policies and procedures for compliance and risk mitigation with thoughtful acknowledgement of reducing litigation exposure."

888. After she was promoted to Assistant Vice President of Student Conduct and Community Standards at Columbia in 2015, Henry, according to her LinkedIn profile, "led the strategic plan to change the [Columbia's] response to gender-based misconduct in the midst of significant public scrutiny with special consideration to drastic legislative changes."

889. Thus, Columbia adopted a policy of bias favoring female students over male students in order to avoid liability and bad publicity.

890. Such behavior constitutes illegal sex discrimination.

891. As a result of its stated efforts to change its response to alleged gender-based misconduct in the face of increased litigation exposure and public scrutiny, Columbia ignored the relevant, objective, and uncontroverted evidence proving Ben's innocence in order to find him responsible for sexual misconduct.

892. As a result of the foregoing, Ben is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION
### (SELECTIVE ENFORCEMENT VIOLATION OF TITLE IX
### OF THE EDUCATION AMENDMENTS OF 1972)

893.    Ben repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

894.    Ben and ▮▮▮▮ were similarly situated male and female students in the circumstances of this case.

895.    Both were graduate students at the same school, under the same student policies.

896.    Both were reported to have committed sexual misconduct violations against each other.

897.    Nearly the entirety of their 6-hour encounter was documented in 744 photos, 13 videos, and 30 minutes of audio, the material content of which is not in dispute.

898.    This removed from Columbia the heavy burden of weighing allegations of he-said/she-said and freed them to weigh objective evidence.

899.    However, the evidence did not favor Columbia's intended outcome, so they treated the same set of facts very differently for the male and female student.

900.    ▮▮▮▮ repeatedly begged Ben to have sex with her.

901.    Ben repeatedly refused to have sex with ▮▮▮▮.

902.    Ben repeatedly asked to leave ▮▮▮▮'s bedroom.

903.    ▮▮▮▮ repeatedly denied Ben's requests to leave.

904.    Columbia determined that when ▮▮▮▮ said "yes," she really meant "no."

905.    Columbia determined that when Ben said "no," he really meant "yes."

906.    When ▮▮▮▮ straddled Ben, removed her shirt, and pulled his mouth to her breasts, Columbia called it "Sexual Assault."

907. When █████ forcibly exposed Ben's penis and attempted to place her mouth on his penis despite physical and verbal indications that Ben did not consent, Columbia downgraded the charge against █████ to "Sexual Harassment."

908. Columbia withheld Ben's diploma at graduation because █████'s allegations were pending against him.

909. Columbia granted █████ her diploma despite Ben's pending allegations against her.

910. Columbia enforced the Confidentiality Policy against Ben, barred him from discussing the disciplinary process with other students, and threatened repercussions if Ben violated the Confidentiality Policy.

911. Columbia did not enforce the Confidentiality Policy against █████ and permitted █████ to discuss the disciplinary process freely with other students without fear of reprisal.

912. When █████ gave vague descriptions of alleged misconduct, it was broken into 5 separate charges against Ben.

913. When Ben gave detailed descriptions and actual evidence of multiple instances of misconduct by █████, they were bundled into one single charge against █████.

914. Columbia threatened to charge Ben with retaliation for making a vague statement to a fellow student.

915. Columbia did not investigate █████ for retaliation despite her making false and incendiary statements to CJS students about Ben.

916. Columbia did not investigate █████ for retaliation despite being informed of evidence that she verbally and physically attacked other students who shared favorable information with Ben.

917. █████'s testimony was deemed credible despite being contradicted by physical

evidence.

918.    Ben's testimony was found not credible despite being supported by physical evidence.

919.    Columbia's actions were motivated by its desire to avoid liability and bad publicity.

920.    As a direct and proximate result of the above conduct, Ben sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

921.    As a result of the foregoing, Ben is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION
### (STATE LAW BREACH OF CONTRACT)

922.    Ben repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

923.    A contractual relationship existed between Ben and Columbia at all relevant times hereto.

924.    The Gender-Based Misconduct Policy promises that students will have a fair and impartial disciplinary process in which it is Columbia's responsibility to show that a violation has occurred before any sanctions are imposed.

925.    Columbia breached its contract with Ben when it failed to conduct a fair and impartial process.

926.    Ben is entitled to recover damages for Columbia's breach of the contractual obligations described above.

927.    As a direct and proximate result of the above conduct, Ben sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career

opportunities, economic injuries and other direct and consequential damages.

928.    As a result of the foregoing, Ben is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FOURTH CAUSE OF ACTION
### (STATE LAW BREACH OF CONTRACT)

929.    Ben repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

930.    A contractual relationship existed between Ben and Columbia at all relevant times hereto.

931.    Columbia created express and/or implied contracts when Ben accepted an offer of admission.

932.    Ben completed all of the academic requirements necessary to obtain his master's degree.

933.    Ben paid all of the required tuition during his enrollment at Columbia.

934.    In exchange, Columbia was required to grant his master's degree.

935.    Columbia continues to withhold Ben's diploma.

936.    As a direct and proximate result of the above conduct, Ben sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

937.    As a result of the foregoing, Ben is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Ben from the Columbia School of Journalism.

## FIFTH CAUSE OF ACTION
### (STATE LAW PROMISSORY ESTOPPEL)

938.    Ben repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

939.    Columbia's Gender-Based Misconduct Policy constitutes unambiguous representations and promises that Columbia should have reasonably expected to induce action or forbearance on the part of Ben.

940.    Columbia expected or should have expected Ben to accept its offer of admission and choose not to attend other universities based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Gender-Based Misconduct Policy be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

941.    Ben reasonably and foreseeably relied on these express and implied promises and representations made by Columbia, to his detriment.

942.    The Office of Civil Rights had dictated to universities that Title IX Investigations should take no more than 60 days, with small exceptions for holidays, complexity, and scheduling conflicts.

943.    Columbia did not interview Ben and collect his evidence until Day 49.

944.    Columbia did not complete its investigation within 60 days.

945.    If the investigation had been concluded, even erroneously, within the 90 days between initial allegations and the start of the second semester, Ben would have likely moved on with his life.

946.    Instead, the disciplinary process continued through the entire second semester,

during which he exhausted his G.I. Bill benefits, and took out an additional $20,000 in federally-backed student loans.

947.     As a result of the foregoing, Ben is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SIXTH CAUSE OF ACTION
## (STATE LAW PROMISSORY ESTOPPEL)

948.     Ben repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

949.     Columbia expected or should have expected Ben to accept its offer of admission and choose not to attend other universities based on its express and implied promises that if he completed all of the academic coursework required and paid the required tuition that he would be granted his master's degree.

950.     Ben reasonably and foreseeably relied on these express and implied promises and representations made by Columbia, to his detriment.

951.     Ben completed all of the academic coursework required to obtain his master's degree.

952.     Ben paid all of the required tuition during his enrollment at Columbia.

953.     Despite completing all of the necessary academic requirements for his master's degree and paying full tuition, Columbia continues to withhold Ben's diploma.

954.     Expressed and implied promises and representations made by Columbia, including but not limited to credit for work done and tuition paid, must be enforced to prevent substantial injustice to Ben.

955.     Based on the foregoing, Columbia is liable to Ben based on promissory estoppel.

956.     As a direct and proximate result of the above conduct, Ben sustained tremendous

damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

957.    As a result of the foregoing, Ben is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Ben from the Columbia School of Journalism.

**SEVENTH CAUSE OF ACTION**
**(VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW)**

958.    Ben repeats and realleges each and every allegation hereinabove as if fully set forth herein.

959.    Columbia's actions were based upon impermissible discrimination based on Ben's gender and therefore violated the New York City Human Rights Law (N.Y. City Administrative Code §§ 8-101, et seq.).

960.    Columbia's actions have impacted Ben's major life activities, such as his ability to attend school.

961.    Based upon the foregoing, Columbia discriminated against Ben in the terms, conditions, and privileges of his school attendance, and the rights and privileges contained therein, in violation of New York City Human Rights Law by discriminating against Ben because of his gender.

962.    As a direct and proximate result of this conduct, Ben has suffered, and continues to suffer, physical and psychological harm, emotional distress, embarrassment, humiliation, damage to his reputation, and other damages in an amount to be proven at trial.

963.    Ben failed to receive his master's degree despite meeting all academic

96

requirements, and has been deprived of invaluable networking, alumni connections, and job placement opportunities concurrent with being an alumnus of CJS.

964.    Columbia's behavior constitutes willful and wanton negligence, recklessness, and a conscious disregard of Ben's rights in furtherance of protecting their reputation with donors and the press, for which Ben is entitled to an award of punitive damages in an amount of $25,000,000.

965.    Ben is also entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Ben demands judgment against Columbia as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action for state law breach of contract, a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for state law breach of contract a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of

97

educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Ben from the Columbia School of Journalism;

(v)     on the fifth cause of action for state law promissory estoppel, a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for state law promissory estoppel, a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Ben from the Columbia School of Journalism

(vii)   on the seventh cause of action for violation of the New York City Human Rights Law, a judgment against Defendant awarding Ben damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and punitive damages in the amount of $25,000,000, plus post-judgment interest, attorneys' fees, expenses, costs and disbursements; and

(viii)  awarding Ben such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
       May 13, 2019

                        **WARSHAW BURSTEIN, LLP**
                        *Attorneys for Plaintiff*

                        By: _____
                              Kimberly C. Lau
                              James E. Figliozzi
                        555 Fifth Avenue
                        New York, New York 10017
                        (212) 984-7700
                        klau@wbny.com
                        jfigliozzi@wbny.com