**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BEN FEIBLEMAN,

*Plaintiff*,

v.

THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK,

*Defendant*.

No. 1:19-cv-4327 (VEC) (KHP)

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK'S**
**PARTIAL MOTION TO DISMISS THE COMPLAINT**

Michele S. Hirshman
Darren W. Johnson
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
mhirshman@paulweiss.com
djohnson@paulweiss.com

Roberta A. Kaplan
Gabrielle E. Tenzer
Joshua Matz
Thomas A. Rawlinson
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
trawlinson@kaplanhecker.com

July 15, 2019

# **TABLE OF CONTENTS**

**PAGE(S)**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.    Events Before Plaintiff and Doe Arrived at Doe's Apartment ............................. 2

    B.    Events at Doe's Apartment ................................................................................... 3

    C.    The Complaint, Investigation, and Sanction........................................................ 7

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ....................................................................................................................... 8

I.      THE OUTCOME OF THE TITLE IX PROCESS WAS NOT ERRONEOUS ................. 9

    A.    Legal Standard ..................................................................................................... 9

    B.    Doe Lacked the Capacity to Consent to Plaintiff's Sexual Conduct ................... 10

II.    PLAINTIFF'S CONTRACT AND QUASI-CONTRACT CLAIMS LACK
     MERIT ....................................................................................................................... 15

    A.    Legal Standard ..................................................................................................... 15

    B.    Plaintiff Fails to State a Claim Based on Alleged Procedural Unfairness ........... 16

    C.    Plaintiff Fails to State a Claim Based on the Length of the Investigation ........... 18

    D.    Plaintiff Fails to State a Claim Based on Columbia's Withholding of His
        Degree .................................................................................................................. 19

CONCLUSION.................................................................................................................... 19

APPENDIX.......................................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**Cases**

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006)...................................................................... 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................ 8

*B.B. v. The New Sch.*,
No. 17-cv-8347, 2018 WL 2316342 (S.D.N.Y. Apr. 30, 2018) ..................... 9, 10, 14

*Bailey v. N.Y. Law Sch.*,
No. 16-cv-4283, 2017 WL 6611582 (S.D.N.Y. Dec. 27, 2017) ....................... 10, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................ 8

*Chamberlain v. City of White Plains*,
986 F. Supp. 2d 363 (S.D.N.Y. 2013)....................................................... 4

*Clarke v. Columbia Univ.*,
No. 95-cv-10627, 1996 WL 609271 (S.D.N.Y. Oct. 23, 1996)............................. 17

*Collins v. City of New York*,
156 F. Supp. 3d 448 (S.D.N.Y. 2016)......................................................... 4, 8

*Condit v. Dunne*,
317 F. Supp. 2d 344 (S.D.N.Y. 2004)......................................................... 4

*Dasrath v. Ross Sch. of Med.*,
494 F. App'x 177 (2d Cir. 2012) ............................................................... 15

*Davis v. Monroe Cty. Bd. of Educ.*,
526 U.S. 629 (1991)................................................................................ 9

*Doe v. Syracuse Univ.*,
341 F. Supp. 3d 125 (N.D.N.Y. 2018) ......................................................... 15, 17

*Gally v. Columbia Univ.*,
22 F. Supp. 2d 199 (S.D.N.Y. 1998)........................................................... 17

*Henneberry v. Sumitomo Corp. of Am.*,
No. 04-cv-2128, 2005 WL 991772 (S.D.N.Y. Apr. 27, 2005) ............................. 18

*Kilgore v. Ocwen Loan Servicing, LLC*,
   89 F. Supp. 3d 526 (E.D.N.Y. 2015) ................................................................ 18

*Noakes v. Syracuse Univ.*,
   369 F. Supp. 3d 397 (N.D.N.Y. 2019) ............................................................. 17

*Nungesser v. Columbia Univ.*,
   169 F. Supp. 3d 353 (S.D.N.Y. 2016)................................................. 16, 17, 18, 19

*Okoh v. Sullivan*,
   No. 10-cv-2547, 2011 WL 672420 (S.D.N.Y. Feb. 24, 2011) ............................. 16

*Papaspiridakos v. Educ. Affiliates, Inc.*,
   No. 10-cv-5628, 2013 WL 4899136 (S.D.N.Y. Sept. 11, 2013) ........................... 15

*Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*,
   No. 04-cv-704, 2005 WL 1214281 (S.D.N.Y. May 20, 2005) .............................. 16

*RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*,
   156 F. App'x 349 (2d Cir. 2005) ...................................................................... 15

*Rolph v. Hobart & William Smith Colls.*,
   271 F. Supp. 3d 386 (W.D.N.Y. 2017) .............................................................. 16

*Ward v. New York Univ.*,
   No. 99-cv-8733, 2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000) ........................... 16

*Yu v. Vassar Coll.*,
   97 F. Supp. 3d 448 (S.D.N.Y. 2015)....................................................... 15, 17, 19

*Yusuf v. Vassar Coll.*,
   35 F.3d 709 (2d Cir. 1994)................................................................................. 9

**Rules**

Federal Rule of Civil Procedure 12(a)(4) ...................................................................... 1

Federal Rule of Civil Procedure 12(b)(6) ................................................................... 1, 8

Defendant The Trustees of Columbia University in the City of New York ("Columbia" or the "University") respectfully submits this memorandum of law in support of its motion (the "Motion") to dismiss Counts I, III, IV, V, and VI of the Complaint.[1]

## PRELIMINARY STATEMENT

As its name suggests, an "erroneous outcome" claim under Title IX can survive Rule 12(b)(6) only if a plaintiff plausibly alleges that a university *actually* reached the wrong result in adjudicating a Title IX complaint (and did so as a result of gender bias). Here, Plaintiff contends that the University erred in concluding that he sexually assaulted and harassed Jane Doe on October 4-5, 2016. Because he does not dispute that he digitally penetrated and choked Doe on the night in question, Plaintiff rests his case entirely on the premise that Doe was able to consent at the time. But that premise is squarely contradicted by a disturbing 30-minute audio recording that Plaintiff created just minutes after the acts in question. On that recording, there are prolonged periods in which Doe's speech is slurred and incomprehensible; Plaintiff and Doe both note that Doe has drifted in and out of consciousness; Doe repeatedly states that she does not understand where she is, how she got there, or how long she had been there; and Doe evinces clear memory impairment. Moreover, both Plaintiff and Doe remark many times that Doe is extremely drunk. In fact, Plaintiff states at several points that he would not be willing to have vaginal intercourse with Doe because of her severe inebriation. This recording, which is integral to the Complaint and submitted with this Motion as an exhibit, confirms beyond a shadow of a doubt that Doe was incapacitated when Plaintiff digitally penetrated and choked her minutes before. Plaintiff's

---

1  Because the University has filed this Motion, the deadline for filing an Answer is extended under Rule 12(a)(4) of the Federal Rules of Civil Procedure. Additionally, in light of the Court's grant of an extension of time for Plaintiff to file a pseudonymized Complaint (ECF 45), Columbia requests that this Motion be treated as applying to that pseudonymized Complaint.

erroneous outcome claim thus depends on an implausible allegation and must be dismissed—along with his common law claims, which rest on legal error.

## BACKGROUND[2]

### A.     Events Before Plaintiff and Doe Arrived at Doe's Apartment

Plaintiff and Doe were students in the 2016-2017 cohort of Columbia Journalism School ("CJS"). (*See* ¶¶ 4, 25.[3]) On October 4, 2016, following a regular Tuesday-evening lecture, they attended an on-campus reception. (¶¶ 48-49, 53.) Sometime after 7:30pm, while at the reception, Plaintiff approached a circle of students that included Doe. (¶¶ 55-56.) Plaintiff and Doe socialized at the reception, taking photographs of each other and flirting. (¶¶ 59-70.) Plaintiff was allegedly hesitant about flirting with Doe—and requested her consent to do so—because of the "cultural climate at Columbia" regarding sexual assault. (¶ 72.) At the reception, Plaintiff observed Doe drink several glasses of wine. (¶¶ 59, 79.) Photographs taken by Plaintiff (the self-appointed "*de facto* school photographer") show Doe drinking. (¶¶ 62-63, 66, 68.)

Around 9:30pm, the group ventured to an apartment. (¶¶ 80-82.) On the walk, Doe flirted with Plaintiff, withdrew cash from an ATM, and purchased more alcohol. (¶¶ 90-96.) Once they arrived at the apartment, Plaintiff saw Doe serve drinks, sip from his beer, and encourage the whole group to drink more. (¶¶ 106-07.) Plaintiff played along as Doe poured beer into his mouth faster than he could drink it. (¶ 110-11.) After that, they chased a cat into a bedroom and kissed. (¶¶ 120-21.)

Doe invited the group up to the roof's water tower, but Doe and Plaintiff went up alone. (¶¶ 124-26.) The unlit 30-foot water tower sat atop a 16-story building, a perch precarious enough

---

[2]     The factual allegations in the Complaint are accepted as true for purposes of this Motion only.

[3]     References to "¶ __" are to paragraphs of the Complaint.

to dissuade Plaintiff from moving past his anchoring on the ladder. (¶¶ 127, 131-32.) While straddling Plaintiff on the tower's lip, Doe removed her top while Plaintiff and Doe engaged in "intense" and "frenetic" sexualized contact before being interrupted by the rest of the group. (¶¶ 143-46, 149-52, 163.) After disengaging, Plaintiff offered Doe his hand "and cautioned her to be careful," but Doe rejected that warning and somersaulted backwards down to the roof. (¶¶ 163, 170-71.) Some friends climbed the tower; others "begged" them to come down. (¶¶ 175-79, 182.) Plaintiff and Doe returned to the apartment at 11:22pm. (¶ 221.) While others socialized, Doe fell asleep on the floor. (¶ 226.) When the party disbanded, Doe declined to stay over and Plaintiff escorted her home. (¶¶ 229-31.)

## B.    Events at Doe's Apartment

Shortly after midnight, Doe and Plaintiff arrived at Doe's apartment, where they spent 30 minutes talking to Doe's roommate ("Roommate"). (¶¶ 242-51.) Once again, Doe fell asleep on the floor. (¶ 250.) Plaintiff and Roommate carried Doe to bed, but Doe eventually returned to the living room, where she fell asleep on the floor for a third time. (¶¶ 252, 256, 263.) This time, Roommate was in the bathroom and Plaintiff carried the sleeping Doe into her bedroom alone. (¶¶ 263-64.)

Even though Doe had repeatedly passed out mid-conversation, and even though Plaintiff professes to have felt anxiety about campus sexual assault policies, he digitally penetrated Doe shortly after they entered her bedroom: "There was kissing, touching, fingering, and throat holding," which Plaintiff alleges "was consensual." (¶ 273.) "As things escalated," Doe told Plaintiff "she wanted him to [f--- her]," but at this point Plaintiff decided to "inform[] [Doe] that he was uncomfortable with how their physical encounter was progressing." (¶¶ 275-76.) The Complaint alleges that Plaintiff's discomfort about having vaginal intercourse with Doe was solely

about causing Roommate to spread "worthy gossip" about Doe and Plaintiff due to "paper thin walls" (¶¶ 279, 288), though the Complaint also alleges that Doe and Plaintiff had already engaged in loud sexual activity with Roommate awake and that Plaintiff then remained alone in Doe's room for over 30 minutes. (¶ 306.) As the audio recording from Plaintiff's phone makes clear, Plaintiff was not uncomfortable with the prospect of having sex with Doe.[4] (*See generally* Ex. B.[5])

Within seven minutes of digitally penetrating and choking Doe, Plaintiff surreptitiously began recording their encounter to create "a record." (¶¶ 305-06.) He did so because he "felt trapped" in Doe's room and was "well-aware of the political climate at Columbia and CJS." (¶ 305.)

The recording begins at 1:37am. (¶ 306.) Following audible shuffling and muffled heavy breathing, Plaintiff mollifies Doe, saying "it's all right." (0:20.[6]) Doe's first captured words, asking Plaintiff if he wants to sleep with her, are slurred, breathy, and run together. (0:27-0:28.) The

---

[4]    There are important elements of the audio recording that come through most clearly when the recording is listened to rather than read. Accordingly, the University has respectfully requested permission to file the recording under seal. (*See* Ex. B.) References to "Ex. _" are to the exhibits attached to the Declaration of Thomas A. Rawlinson in Support of Defendant The Trustees of Columbia University in the City of New York's Partial Motion to Dismiss the Complaint, dated July 15, 2019 ("Rawlinson Declaration"). If a transcript of the recording would aid the Court, the University is prepared to provide one upon request.

[5]    The Complaint relies heavily on Plaintiff's recording. (*See* ¶¶ 12-13 (asserting undisputed authenticity); 305 (asserting intended effect was to create "a record of exactly what happened"); 306-45 (describing recording's content in detail); 308, 316, 326, 329-30, 334, 337, 340, 344-45 (quoting recording verbatim); 11-13, 378, 411-12, 670, 672, 730, 863, 897 (asserting recording exculpates Plaintiff from sexual misconduct charges and evidences the merits of the instant claims).) The Court may therefore consider the recording at the pleading stage as integral to the Complaint. *See Collins v. City of New York*, 156 F. Supp. 3d 448, 455 n.4 (S.D.N.Y. 2016) ("[T]he court may . . . consider [a document] where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (citation omitted)); *see also, e.g.*, *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 380 (S.D.N.Y. 2013) ("It is clear that the recordings form a significant basis for much of the factual information contained in the Complaint, and I therefore find that the recordings are an integral component of the allegations as to how the hour-long incident unfolded. Accordingly, I will consider the Life Aid audio recordings and the Taser video recordings in resolving the instant Motions to Dismiss."); *Condit v. Dunne*, 317 F. Supp. 2d 344, 357 (S.D.N.Y. 2004) ("These recordings and transcripts are referenced and quoted at length in the complaint, but are submitted in their entirety by defendant in association with his motion to dismiss. The Court now takes into account these additional submissions because plaintiff relies on them and they are integral to plaintiff's action.").

[6]    Citations are to timestamps of the recording.

recording captures both Plaintiff's and Doe's speech at an audible volume, but many of Doe's responses are difficult to ascertain. She speaks slowly and her diction is indistinct. (*Id.*) Thirty seconds into the recording, Plaintiff tells Doe she is drunk. (0:29-0:32.) Indeed, over the course of the 30-minute tape, Plaintiff tells Doe she is drunk twelve times.[7]

For the first sixteen minutes of the recording, Doe expresses her desire for vaginal intercourse and Plaintiff insists on her obvious incapacity. In this period, Doe exhibits confusion. (*See* 0:32-0:35 (stating "I'm not drunk" and then asking "You're not drunk?").) Some of Doe's responses are unintelligible even to Plaintiff, who attempts to clarify. (0:39-0:41 ("Hmm?").) At other points, Doe is unable to converse coherently. (2:04-2:09 (DOE: "Do you trust half people?" PLAINTIFF: "Half people? Or, half of people?" DOE: "Yeah.").) When Plaintiff asks if Doe is okay—having digitally penetrated her just minutes earlier—Doe fails to answer with words. (2:31-2:34.) Indeed, of the four times Plaintiff asks if Doe is okay during the recording, Doe never says yes, answering twice with expletives that indicate she was not. (*See* 16:16-16:26; 17:05-17:09.)

In this half of the tape, Plaintiff expresses concern several times that Roommate knew how drunk Doe was and would object to him having vaginal intercourse with Doe. (2:42-2:50 ("I stopped because you're tired and you've been drinking and [your roommate] knows that, too."); 3:02-3:15 ("When our mutual friends ask if you got home safe and they ask [your roommate] – . . . Yeah, you're home safe, but that also kind of implies, 'Ben, don't f--- her, she's not sober.'"); *see also* 2:52-2:57.) Plaintiff himself also stated many times that Doe was drunk. (0:36-0:38 ("I'm not drunk enough to f--- you when you're drunk."); 8:52-8:58 ("when I finally f--- you, you won't be too tired, and you won't be drunk"); 12:02-12:17 ("I'll be able to f--- you harder if I know that

---

[7]     The Complaint alleges that at this point, it had been four hours since Doe's last full drink. (¶ 294.)

you want me sober, and I don't know."); *see also* 8:27-8:29.) Doe mostly speaks in short garbled sentences or single words. (*See generally* 3:16-16:05.)

Sixteen minutes and six seconds into the recording, the interaction changes dramatically. Doe begins cursing repeatedly and frenetic movement can be heard. (16:06-17:13.) Plaintiff is the first to articulate what Doe is experiencing: "I can't have these moments, if I'm in the middle of f---ing you, where you suddenly realize where you are," to which Doe responds, "What's going on?" (16:43-56.) Doe is unaware that she is in her own apartment (17:10); greets Plaintiff as if he had just entered the room (17:23); and asks "Wait, I don't have any pants on, is that weird?" (17:23-26; *see also* 18:10-15 (DOE: "Did I take [my pants] off?")). Her words become clear, the diction issues exhibited in the first half of the tape fade, and she speaks at a normal pace. Plaintiff acknowledges the shift. (17:39-17:41 ("It's like you kind of snapped out of it.").) Doe confirms this, saying "I think I just woke up," before asking what had happened and how long Plaintiff had been there. (17:40-17:46.) Plaintiff lies about his conduct minutes earlier when faced with this direct question. (*See* 18:28-18:30 ("We were making out for a while, nothing happened.").) Doe expresses incredulity upon being told that Plaintiff had been in her bed (17:47-17:56); that she had participated in removing her pants (18:10-18:25); and that she had been kissing Plaintiff (18:26-18:33).

In explaining the course of events, Plaintiff again tells Doe that she was too drunk for sex. (18:02-18:11 ("[Your roommate] went to bed, knowing that you were drunk, and I don't want her to think I f---ed you when you were drunk. I don't want to f--- you when you're drunk."); 18:50-18:59 ("I want us to be energized and sober . . . if something does happen.").) Plaintiff tells Doe that he would be "taking advantage of [her]" by engaging in sexual conduct in her state. (19:36-19:43.) Doe says "I've been drunk for so many hours," and Plaintiff responds, "Yeah." (20:50-56.)

Approximately twenty-two minutes into the recording, Doe slips back into the cadence of the first sixteen minutes. When Doe says "I'm here now," Plaintiff responds "but you weren't ten minutes ago, and if you were suddenly here now again in ten minutes . . . I want you to wait 24 hours." (23:47-23:59.) The interaction turns sexual and more contact can be heard. Finally, Plaintiff says "I'm going home to get sleep. And you're going to bed to get sober." (26:46-26:52.)

As he walked home ten minutes later, Plaintiff dictated a message in his phone: "That was a really dangerous situation, and I'm going to message, uh, [Roommate] now and let her know that, 'hey, I just left, nothing happened, we made out a bit and, uh, I left.'" (30:26-30:45.)

## C.     The Complaint, Investigation, and Sanction

Later that morning, Doe made an allegation of sexual misconduct to a CJS Associate Dean and filed an incident report with the University's Gender-Based Misconduct Office. (¶¶ 364-65, 367.) She alleged that her assailant digitally penetrated and choked her while she was "extremely drunk" and blacking in and out of consciousness (¶ 368), and identified Plaintiff as her assailant a week later (¶ 388). The University investigated from October 2016 through April 2017. (¶¶ 388-89, 397, 413, 421, 433-42, 464, 496, 552.) Plaintiff participated in the investigation. The Complaint sets forth his many objections to that process. (*See generally* ¶¶ 397-824.)

Given Plaintiff's concession that he committed the acts in question, on June 21, 2017, the University's Hearing Panel concluded that the key factual question was whether Doe had the capacity to give affirmative consent. (¶¶ 701-02.) The Panel concluded that Doe lacked such capacity. (¶ 703.) Accordingly, the Panel found Plaintiff responsible for four violations of Columbia's Gender-Based Misconduct Policy ("Policy"): Sexual Assault: Contact for sexually touching Doe atop the water tower; Sexual Assault: Intercourse for digitally penetrating Doe in her bedroom; Sexual Assault: Contact for "grinding against" Doe in her bedroom; and Sexual

Harassment for applying pressure to Doe's throat in her bedroom.[8] (¶¶ 640, 698-99, 705.) Plaintiff appealed the University's findings and sanction of expulsion, which were thoroughly reviewed and affirmed by a University appellate panel on July 31, 2017. (¶¶ 727, 759.) Plaintiff filed this lawsuit on May 13, 2019. (*See* Compl.)

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept as true all well-pleaded factual allegations in the complaint, and "draw[ ] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

Plaintiff's Title IX erroneous outcome claim (Count I) should be dismissed because he has failed to plausibly allege that the outcome of the University's Title IX process was erroneous.

---

[8]   The Policy is integral to the Complaint and therefore may be considered at the pleading stage. *See, e.g.*, *Collins*, 156 F. Supp. 3d at 456 n.4. (*See also* ¶¶ 39, 41-42, 443, 449-51, 453-54, 456, 458, 505, 752, 783, 853-54, 862, 924, 939-40.) A copy of the Policy applicable to the time of Doe's complaint is attached as Exhibit A to the Rawlinson Declaration. The Policy defines "Sexual Assault: Intercourse" as including "[a]ny form of vaginal . . . penetration . . . by a penis . . . or finger without a person's affirmative consent" (Policy at 4); Sexual Assault: Contact as "[a]ny sexual contact, including sexual touching for the purpose of sexual gratification of either party, without a person's affirmative consent" (*id.*); and Sexual Harassment as, *inter alia*, "[u]nwelcome . . . physical . . . conduct of a sexual nature" that "involves contact with parts of another individual's body that may cause that person to feel degraded or abused" (*id.* at 5).

Plaintiff's contract and quasi-contract claims (Counts III-VI) should be dismissed because he fails to identify any specific promises that the University breached in its Title IX or other procedures.

## I.   THE OUTCOME OF THE TITLE IX PROCESS WAS NOT ERRONEOUS

Plaintiff concedes that he engaged in sexual conduct with Doe, including choking and digital penetration. (¶¶ 143-51, 270-73.) Count I thus amounts to nothing more than a request that this Court sit as a super-appellate tribunal over Columbia's factual finding that Doe lacked the capacity to consent (a finding that caused the University to sanction Plaintiff). But even giving Plaintiff every reasonable inference, the audio recording that he made to "protect" himself confirms beyond cavil that Doe could not consent. This claim should therefore be dismissed.

### A.   Legal Standard

"Claims that challenge university disciplinary proceedings under Title IX generally fall within two categories: 'erroneous outcome' or 'selective enforcement' claims." *B.B. v. The New Sch.*, No. 17-cv-8347, 2018 WL 2316342, at *4 (S.D.N.Y. Apr. 30, 2018) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). The gravamen of an erroneous outcome claim "is that the plaintiff was innocent and wrongly found to have committed an offense." *Yusuf*, 35 F.3d at 715. To state an erroneous outcome claim, a plaintiff must plausibly allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) "a causal connection between the flawed outcome and gender bias." *Id.* The first element may be pleaded circumstantially, through allegations of procedural irregularities, but the ultimate question is whether the accuracy of the university's decision is in doubt. And in answering that question, courts afford substantial deference to university officials. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1991) ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

At the pleading stage, "[a]lthough the Court should draw reasonable inferences in favor of Plaintiff, it 'is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'" *B.B.*, 2018 WL 2316342, at *6 (citation omitted). Where a plaintiff does not "cast doubt on the authenticity or veracity" of such materials, and cannot explain a "conflict between his allegations and the exhibits," the "contradicted allegations are implausible" and "will not defeat a motion to dismiss." *Id.*; *see also Bailey v. N.Y. Law Sch.*, No. 16-cv-4283, 2017 WL 6611582, at *7 (S.D.N.Y. Dec. 27, 2017) ("If a plaintiff's own pleadings are contradicted by matters in [documents that may be considered at the pleading stage], the Court need not reconcile this difference or accept the plaintiff's pleadings as true." (collecting cases)).

### B.    Doe Lacked the Capacity to Consent to Plaintiff's Sexual Conduct

Plaintiff's erroneous outcome claim rests on a single premise: that Doe affirmatively consented to every sexual act. Plaintiff offers a grab-bag of circumstantial allegations to support this claim. For example, he alleges that Doe climbed a water tower and performed dangerous maneuvers on top of it. (¶¶ 295, 845.) He alleges that she was able to "walk[] unassisted . . . at times backwards." (¶¶ 297-98, 842.) And he alleges that he did not observe Doe drink alcohol after roughly 9:00pm (¶ 244), though he alleges that she encouraged others to do so (¶¶ 96, 110-11). But these allegations, which aim to show her capacity to consent, do not reasonably support that inference, which is implausible in light of the audio recording that begins just a few minutes after he penetrated and choked her.[9]

---

[9]  The University also found Plaintiff responsible for sexual misconduct atop the water tower, which occurred roughly 90 minutes before the audio recording. The only plausible inference from Doe's extremely reckless behavior at the time was that she was drunk. (*See* Policy at 7 ("Consent cannot be procured from a person who is incapacitated.").) Moreover, Plaintiff alleges that he did not observe Doe drink alcohol between the time she ascended the water tower and the time they entered her bedroom, which makes it implausible that she was less drunk (and more able to consent) earlier in the evening. (*See* ¶¶ 227, 244, 294.)

Because Plaintiff alleges that the University reached an erroneous outcome while applying its own policies, the relevant standard for assessing Doe's ability to consent is that set forth in the Policy. The Policy states that a "person cannot give consent if he or she lacks the ability to make or understand the decision" due to the "consumption of alcohol or drugs." (Policy at 4.) Among the evidentiary factors that Columbia considers when making this determination are whether the individual:

(1) Was "physically affected" by the alcohol, as evidenced by "slurred or incomprehensible speech," a "notable change in personality," "lacking consciousness," or "being asleep";

(2) "Understood the 'who, what, when, where, why or how' of the sexual activity"; or

(3) Was forgetting "entire or partial events."

(*Id.* at 8, 9.)

Here, listening to the audio recording while applying the Policy, it is implausible to conclude that the University erred in finding that Doe was incapacitated. (*See* ¶ 305 (Plaintiff's allegation that the audio recording offers "a record of exactly what happened").) This is confirmed not only by Doe's words and actions as recorded by Plaintiff, but also by Plaintiff's statements on the audio recording and his extraordinary decision to create that recording in the first place.

First, Doe was assuredly "physically affected" by her alcohol consumption that evening. Throughout the recording, there are prolonged periods in which her speech is "slurred" or entirely "incomprehensible," mixed with incoherent statements or confused single-word responses. (*E.g.*, 0:27-0:28; 0:32-0:35; 2:05-2:09; 2:28-2:33; 13:16-16:05.) Further, around the 16-minute mark, Doe undergoes a "notable change in personality" (Policy at 9; 16:06-17:12), which caused Plaintiff to remark, "I like this [Doe]. . . . 'Cause you were really tired. It's like you kind of snapped out of it" (17:37-17:39). Finally, both Plaintiff's allegations and the audio recording confirm that Doe

drifted in-and-out of consciousness across the evening—including during the time that Plaintiff and Doe were together in her bedroom. (*See* ¶¶ 226, 250, 252; 17:40-17:46; 23:46-23:51.) In fact, both Plaintiff and Doe say, separately, that she "just woke up" minutes after Plaintiff had digitally penetrated Doe. (17:40-17:46; 22:30-22:34.)

Second, the recording is replete with moments where Doe did not understand the "who, what, when, where, why or how" of the sexual activity. (Policy at 9.) This is especially clear from minutes 16 through 22: in a flash of clarity, Doe asks "what's going on?", and then expresses surprise and continuing confusion about where she is, who she is with, how long they have been there, when Plaintiff arrived, what they have done, and why she is not wearing pants. (*See* 16:43-21:53.) In response, Plaintiff falsely tells Doe that "nothing happened" (18:26-18:28), even though he had twice carried Doe to bed and had both choked and penetrated her (¶¶ 4, 252, 264, 273). While Plaintiff alleges that Doe exhibited bursts of "energy and enthusiasm" at points throughout the night (*see* ¶¶ 257, 273), this does not demonstrate ability to consent given Doe's other actions and statements.

Third, Doe indisputably experienced "memory impairment." (Policy at 9.) Again, this is the only reasonable inference from the four-minute exchange in which Doe expresses bewilderment and seeks "information" about events that had occurred only minutes earlier. (16:40-20:30.) Doe states, "I think I just woke up." (17:40-17:46.) In this exchange, Plaintiff does not suggest that Doe is lying about her impairment; instead, he gives her false information (18:26-18:28), which Doe does not correct because she does not remember what just happened. Then, six minutes later, when Doe insists that she is present, Plaintiff responds "but you weren't ten minutes ago." (23:46-23:51.)

Fourth, it takes no leap of logic to conclude that Doe's conduct reflected severe intoxication and inability to consent. Both Doe and Plaintiff say so on the recording. Doe remarks on how drunk she is (0:29-0:32; 20:50-41), and answers with profanity when asked if she is okay (16:16-16:25; 17:03-17:06). Plaintiff, in turn, repeatedly emphasizes that Doe is drunk and that he will not have vaginal intercourse with her until she is sober (though he *was* willing to digitally penetrate and choke her in this state). (*See* 0:36-0:38; 8:27-8:28; 8:53-8:58; 12:02-12:15; 13:24-13:34; 18:02-18:09; 18:50-18:57; 19:36-19:41; 20:51-53.) Given all these statements, Plaintiff's allegation that he was trying to salvage Doe's feelings when he called her drunk is implausible in the extreme.

Finally, Plaintiff's decision to record his interaction with Doe also supports the University's finding of incapacity. Plaintiff alleges that he did so because he "felt trapped" in Doe's room (¶ 305), though he does not explain why he could not get up and leave (which he did without any apparent difficulty after recording Doe for 30 minutes). Plaintiff also alleges that he created an audio recording because he was "well-aware of the political climate at Columbia and CJS" (¶ 305), though he does not explain why he decided to remain in Doe's bedroom alone—and to digitally penetrate her—under circumstances that contemporaneously struck him as "dangerous" in light of campus sexual assault policies (30:26-30:30). Finally, on the tape itself, Plaintiff returns time and again to his fear of having sex with Doe while Roommate knew that Doe was not sober. (*See* 2:42-2:48 ("I stopped because you're tired and you've been drinking and [Roommate] knows that, too."); 3:02-3:15 ("When our mutual friends ask if you got home safe and they ask [Roommate] – . . . Yeah, you're home safe, but that also kind of implies, 'Ben, don't f--- her, she's not sober.'"); 18:02-18:09 ("[Roommate] went to bed, knowing that you were drunk, and I don't want her to think I f---ed you when you were drunk. I don't want to f--- you when

you're drunk.").) While Plaintiff was more than willing to digitally penetrate and choke Doe, it appears that he drew the line at vaginal intercourse because he recognized that Doe was drunk and feared what Roommate and others would say. Plaintiff then created the audio *after* having digitally penetrated Doe to prove that he did not actually have vaginal intercourse with her—and as he left Doe's apartment, Plaintiff decided to create a self-serving paper trail by sending a message to Roommate with false information about what he did to Doe only forty minutes earlier: "I'm going to message, uh, [Roommate] now and let her know that, 'hey, I just left, and nothing happened, we made out a bit and, uh, I left.'" (30:26-30:45.)

Under the Policy, and taken together, these five considerations render implausible any allegation that the University reached an erroneous outcome regarding Doe's capacity to consent. Even if the Court determines that "Plaintiff does include some allegations that arguably cast doubt on the . . . accuracy of the disciplinary process," those allegations are "rebutted by the exhibits Plaintiff has . . . quoted in his complaint." *B.B.*, 2018 WL 2316342, at *5. For example, Plaintiff alleges that he "falsely told [Doe] that she was drunk" as a "nuclear option" (¶ 292), but his audio recording makes that allegation implausible. Doe did not know where she was, how she got there, or what had just happened. Plaintiff, in turn, refused to have vaginal intercourse because he worried that she would snap in and out of consciousness while he was inside her. Plaintiff also told Doe that she was drunk no fewer than twelve times in thirty minutes, each time in direct response to her own statements and actions. Plaintiff clearly knew what he was doing. For all his complaints about the University's investigatory process, the bottom line is that Doe plainly could not consent when he digitally penetrated and choked her a few minutes before hitting "record." Plaintiff's efforts to relitigate that conclusion—and to attempt to prove an erroneous outcome—must therefore be dismissed.

## II.    PLAINTIFF'S CONTRACT AND QUASI-CONTRACT CLAIMS LACK MERIT

Plaintiff alleges four causes of action sounding in contract and quasi-contract. Count III seeks damages based on allegations that Columbia violated a contract with Plaintiff by failing to "conduct a fair and impartial process." (¶ 925.) Counts IV and VI allege that Columbia violated a contract with Plaintiff, or is liable under a theory of promissory estoppel, for withholding Plaintiff's diploma, and seek damages and an injunction compelling Columbia to award the diploma. (¶¶ 932-37, 951-57.) Count V alleges that Columbia unduly delayed its investigation and seeks damages under a theory of promissory estoppel. (¶¶ 942-47.) All four claims fail as a matter of law.

### A.    Legal Standard

"The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC*, 156 F. App'x 349, 350-51 (2d Cir. 2005). The "relationship between a university and its students is contractual in nature." *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015). When a student is admitted to a school, "an implied contract forms, and the terms of the agreement are 'supplied by the bulletins, circulars and regulations made available to the student.'" *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-cv-5628, 2013 WL 4899136, at *3 (S.D.N.Y. Sept. 11, 2013) (quoting *Dasrath v. Ross Sch. of Med.*, 494 F. App'x 177, 178 (2d Cir. 2012)).

Although "[a] student may sue his college or university for breach of an implied contract in certain situations," the "application of contract principles to the student-university relationship does not provide judicial recourse for every disgruntled student." *Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 140 (N.D.N.Y. 2018) (citations omitted). To state a contract claim against a

university, "a plaintiff must state when and how the defendant breached" a "specific contractual promise." *Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04-cv-704, 2005 WL 1214281, at *10 (S.D.N.Y. May 20, 2005). "[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim." *Okoh v. Sullivan*, No. 10-cv-2547, 2011 WL 672420, at *4 (S.D.N.Y. Feb. 24, 2011), *aff'd*, 441 F. App'x 813 (2d Cir. 2011); *accord Bailey*, 2017 WL 6611582, at *8. "[G]eneral policy statements" and "broad and unspecified procedures and guidelines" will not suffice. *Ward v. New York Univ.*, No. 99-cv-8733, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000). That includes general statements of adherence to anti-discrimination law. *See Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016). Moreover, where a plaintiff alleges a breach of contract based on a disciplinary decision, the issue is "limited to whether the institution acted arbitrarily or whether it substantially complied with its own rules and regulations." *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 405 (W.D.N.Y. 2017) (citation omitted).

### B.   Plaintiff Fails to State a Claim Based on Alleged Procedural Unfairness

Columbia's Policy "promises that students will have a fair and impartial disciplinary process in which it is Columbia's responsibility to show that a violation has occurred." (¶ 924.) Count III of the Complaint alleges—without elaboration or specification—that "Columbia breached its contract with [Plaintiff] when it failed to conduct a fair and impartial process." (¶ 925.)  On this basis, the Complaint alleges that Plaintiff "is entitled to recover damages." (¶ 926.)

But under settled precedent, Columbia's promise of a "fair and impartial disciplinary process" is precisely the kind of broad, general, and unspecified procedure or guideline that cannot support contract liability as a matter of law. *See Nungesser*, 169 F. Supp. 3d at 370 (dismissing

16

contract claim based on the Columbia 2013 and 2014 Gender-Based Misconduct Policy, which stated that Columbia is "committed to providing an environment free from gender-based discrimination and harassment"); *see also Noakes v. Syracuse Univ.*, 369 F. Supp. 3d 397, 419-20 (N.D.N.Y. 2019) (dismissing contract claim based on university handbook stating that students have a right to "participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard"); *Doe*, 341 F. Supp. 3d at 140-41 (dismissing contract claim based on university policy of conducting a "full and fair investigation"); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998) (dismissing contract claim based on university promise to adhere to ethical conduct).

For this reason alone, dismissal of Count III is required and no further analysis is necessary. Plaintiff stands in the exact same position as many other plaintiffs whose contract claims have failed as a matter of law, and his claim is nothing like breach of contract claims that have survived. *See, e.g., Clarke v. Columbia Univ.*, No. 95-cv-10627, 1996 WL 609271, at *8 (S.D.N.Y. Oct. 23, 1996) (allowing claim to proceed where university promised that plaintiff could reapply to course upon fulfilling certain conditions, and plaintiff relied on promise in endeavoring to fulfill conditions).

That said, even if the Court were to scour the Complaint for signs that Columbia failed to provide Plaintiff "with the procedural safeguards that it has promised," the Complaint would come up short. *See Yu*, 97 F. Supp. 3d at 481. Although Plaintiff asserts a litany of supposed procedural irregularities, the Appendix attached to this Motion compares Plaintiff's allegations to Columbia's policies and confirms Plaintiff's failure to plausibly allege that Columbia breached a "specific" promise.[10] *Nungesser*, 169 F. Supp. 3d at 369.

---

[10]     In addition to the allegations listed in the Appendix to this Motion, Plaintiff alleges that a member of the Appellate Panel had an undisclosed conflict of interest, without stating that this amounts to a breach of [*footnote continues*]

### C.      Plaintiff Fails to State a Claim Based on the Length of the Investigation

Count V of the Complaint invokes the quasi-contract doctrine of promissory estoppel and alleges that Columbia broke a promise (on which Plaintiff supposedly relied in choosing universities) to "complete its investigation within 60 days." (¶¶ 939-45.) It is black letter law that the doctrine of promissory estoppel applies only to a promise that could be "reasonably expect[ed] to" and does in fact "induce action or forbearance" in circumstances where "injustice can be avoided only by enforcement of the promise." *Henneberry v. Sumitomo Corp. of Am.*, No. 04-cv-2128, 2005 WL 991772, at *5 (S.D.N.Y. Apr. 27, 2005) (citation omitted).

Count V fails at the very first step of this analysis. Columbia did not make any promises, to anyone, about the length of its gender-based misconduct investigations—let alone a "clear and unambiguous promise." *Nungesser*, 169 F. Supp. 3d at 374. The Policy states, in aspirational terms, that Columbia will "*seek* to resolve every report of gender-based misconduct within *approximately* sixty (60) days of an initial report, not including the time for any appeal." (Policy at 19 (emphasis added).) It expressly envisages that "[t]ime frames will vary depending on the complexity of the investigation," and that time frames will be extended to "account[] for complexities of a specific investigation, including the number of witnesses and volume of information provided by the parties." (*Id.*) These "vague" and "indefinite" statements are not "actionable under a theory of promissory estoppel." *Kilgore v. Ocwen Loan Servicing, LLC*, 89 F. Supp. 3d 526, 534 (E.D.N.Y. 2015) (citation omitted).

---

contract. (¶¶ 783-85.)   While Columbia considers this allegation to be baseless, as it does all of Plaintiff's claims, Columbia is not moving to dismiss Count III to the extent it is construed to include this allegation. Even if Count III were dismissed only to the extent it encompasses the allegations addressed in this Motion, doing so would substantially narrow the scope of this case.

### D. Plaintiff Fails to State a Claim Based on Columbia's Withholding of His Degree

Counts IV and VI of the Complaint allege Plaintiff's entitlement to damages on the basis that Columbia improperly withheld Plaintiff's degree. (¶¶ 932-37, 951-57.) But these allegations necessarily fall with Counts III and V: if Columbia did not breach any specific contract or promise in disciplining Plaintiff under the Policy, then it did not violate any contract or promise when it withheld his degree (and expelled him) for sexually assaulting a fellow student, as permitted by the Policy (*see* Policy at 30). *See Yu*, 97 F. Supp. 3d at 481 (granting college summary judgment on breach-of-contract claim where court had "already found that Vassar did not violate any of its own procedures", and plaintiff's "claims based on the same purported violations" therefore "fail[ed] for the same reasons").[11]

### CONCLUSION

For the foregoing reasons, Columbia respectfully requests that the Court dismiss Counts I, III, IV, V, and VI of the Complaint.

Dated: July 15, 2019

Respectfully submitted,

By:

Roberta A. Kaplan
Gabrielle E. Tenzer
Joshua Matz
Thomas A. Rawlinson
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, Suite 7110
New York, NY 10118
212.763.0883
rkaplan@kaplanhecker.com
gtenzer@kaplanhecker.com
jmatz@kaplanhecker.com
trawlinson@kaplanhecker.com

---

[11] Further, Count VI is improperly duplicative of Count IV. *See Nungesser*, 169 F. Supp. 3d at 374 (dismissing Plaintiff's promissory estoppel claim as "redundant" because the policies that he relied on to support his claim for promissory estoppel "are the exact same policies at issue in Nungesser's breach of contract claim").

Michele S. Hirshman
Darren W. Johnson
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Main: 212.373.3000
Fax: 212.757.3990
mhirshman@paulweiss.com
djohnson@paulweiss.com

*Attorneys for Defendant The Trustees of
Columbia University in the City of New York*

## APPENDIX

### A Comparison of Procedural Objections Alleged in the Complaint to Applicable University Policies

| Compl. ¶ | Summary of Allegation | Nature of Applicable Policy |
|---|---|---|
| 381 | Columbia failed to make an incident report available to Plaintiff. | The Policy does not require incident reports to be disclosed to respondents when notice is given. (*See* Policy at 20.) |
| 403, 687 | The Investigative Team's witness interviews were not under oath, and no testimony was taken under oath by the Hearing Panel. | Nothing in the Policy requires that testimony be taken under oath at any stage. (*See* Policy at 23 (setting forth witness protocol); *id.* at 26-27 (setting forth Hearing Panel protocol).) The Policy specifically provides that no witness testimony is taken by the Hearing Panel. (*Id.* at 28.) |
| 404-05, 424-28 | The Investigative Team's witness interviews were not recorded, and Plaintiff was not permitted to take notes. | The Policy prohibits recording interviews, and in fact requires parties and participants to agree in writing not to record interviews. No specific provision allows note-taking. (Policy at 22.) |
| 414, 429-35, 481, 498-500, 609-12, 627 | The Investigative Team improperly restricted the involvement of Plaintiff's attorney. | Under the Policy, attorneys are permitted to act only as advisors. Advisors are prohibited from intervening in investigative meetings, addressing the Investigative Team in a more than "limited" fashion, participating (beyond silent presence) in the hearing, or authoring student submissions. (Policy at 18.) |
| 412, 750-51, 871 | The Investigative Team failed to ask witnesses about any differences between their statements and documentary evidence submitted by Plaintiff. | The Investigative Team's obligation is to determine the credibility of each witness, and Plaintiff does not allege that the Investigative Team failed to do so. (Policy at 24.) |
| 530-34 | The Investigative Team failed to ask Doe about her use of benzodiazepines. | The Investigative Team has discretion to ask follow-up questions of the parties "as appropriate," and is not required to ask |

| Compl. ¶ | Summary of Allegation | Nature of Applicable Policy |
|---|---|---|
| | | any specific question requested by a party. (Policy at 24.) |
| 579-83, 750-52 | The Investigative Team failed to ask follow-up questions of certain witnesses as requested by Plaintiff. | The Investigative Team has discretion to ask follow-up questions of witnesses "as appropriate," and so is not required to ask any specific question requested by a party. (Policy at 24.)  Additionally, the Investigative Team has discretion to "determine the relevance of any proffered witness and/or evidence" and determine that certain evidence "should be . . . excluded." (Policy at 23.) Plaintiff fails to allege that the Investigative Team abused its discretion in determining that Plaintiff's proposed questions were irrelevant. (¶ 583.) |
| 601-03, 625-26, 679-81, 753-55, 840 | The Investigative Team refused to consider Plaintiff's expert medical report, and references to the expert medical report submitted by Plaintiff were redacted in his submissions to the Hearing Panel. | Under the Policy, respondents do not have any entitlement to submit expert evidence. Additionally, the Investigative Team has discretion to exclude evidence (Policy at 23), and may redact information "outside the scope of review by the hearing panel" in documents submitted to the Hearing Panel (*id.* at 27). Plaintiff fails to allege that the Investigative Team abused its discretion in excluding the medical report on the basis that the expert had not examined Doe. (¶ 601.) |
| 522-25, 539, 548-51, 604-05 | An investigator retained control of the investigation while on maternity leave. | The Policy is silent on the participation of investigators who are on leave. |
| 590-93 | Plaintiff's diploma was withheld while the investigation was pending. | A hold "may" be placed on a respondent's diploma pending resolution of an investigation, determination or appeal. (Policy at 30.) |

| Compl. ¶ | Summary of Allegation | Nature of Applicable Policy |
|---|---|---|
| 616-19 | An investigator failed to inform Plaintiff of the case against him at the first Pre-Hearing Conference. | Plaintiff fails to allege any prejudice arising from this allegation. The Pre-Hearing Conference was adjourned due to Plaintiff's illness. (¶ 610.) When the conference resumed on June 8, the investigator explained her recommendations and the theory of the case to Plaintiff. (¶ 622.) |
| 690-96, 873, 877 | The Hearing Panel failed to ask certain questions of Plaintiff and Doe and failed to permit Plaintiff to explain the questions he wanted the Panel to ask Doe. | The Hearing Panel alone has discretion to ask questions, and will question a party at the request of another only "if the Panel deems necessary." (Policy at 28.)  Plaintiff fails to allege that the Hearing Panel abused this discretion. |
| 716-22 | The Sanction Letter failed to include certain asserted facts. | The Sanction Letter need only include "[n]otice of the sanctions imposed and the reasons for the sanctions and the University's appeals process." (Policy at 20; *see also id.* at 29 ("The sanctioning decision will be communicated in writing . . . with a rationale for the sanction.").) |
| 755 | References to the expert medical report submitted by Plaintiff were redacted in his submissions to the Appellate Panel. | The Policy provides three grounds for appeal: procedural error, new information, or excessiveness of the sanctions. (Policy at 31.) "[T]he purpose of an appeal is not to initiate a review of substantive issues of fact." (*Id.*) Plaintiff fails to allege how the expert medical report could have been relevant to the Appellate Panel's determination in light of these limited grounds of appeal. |
| 760 | The Appellate Panel did not consider whether the Hearing Panel's findings were contrary to a preponderance of the evidence. | This is consistent with the Policy, which provides only three grounds for appeal: procedural error, new information, or excessiveness of the sanctions. (Policy at 31.) "[T]he purpose of an appeal is not to initiate a review of substantive issues of fact." (*Id.*) |