UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

BEN FEIBLEMAN,

                           Plaintiff,

              -against-

THE TRUSTEES OF COLUMBIA UNIVERSITY
IN THE CITY OF NEW YORK,

                         Defendant.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_ 02/24/2020

19-CV-4327 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

      This case illustrates the complexities of policing sexual misconduct on college and university campuses. Plaintiff Ben Feibleman denies having sexually assaulted Jane Doe,[1] a classmate, and points to a contemporaneous audio recording, as well as witness statements and hundreds of photographs, that purportedly exculpate him. After reviewing the record of the night in question, Defendant Columbia University concluded that Jane Doe was too incapacitated to consent to sexual activity, and revoked Feibleman's degree from the Graduate School of Journalism. Feibleman now alleges that Columbia's decision was erroneous, that he was discriminated against on the basis of his gender, and that Columbia failed, as promised, to provide him with a fair process and a diploma for which he otherwise met the requirements. Columbia, relying in large part on the audio recording referenced in the Complaint, has moved to dismiss Feibleman's claim of an erroneous outcome, as well as his contract-based claims.

---

[1]     In order to protect the privacy of the woman, who is not a party to this action, the Court and the parties refer to the purported victim of Feibleman's assault as Jane Doe or Complainant in these proceedings. There is no discernible public interest in discovering Jane Doe's identity, which plays no role in the Court's decision. Moreover, the allegations in the Complaint are highly detailed and personal—and arguably calculated to be embarrassing to Doe. For those reasons, Doe's identity has been redacted from all public documents in this case to date.

Despite the incredible amount of detail as to what occurred on the night of October 4, 2016, based on the written record that is before the Court and without the benefit of live testimony, reasonable minds could differ on whether the preponderance of the evidence showed that Feibleman sexually assaulted Jane Doe.  While there is evidence in the record that supports an inference that Feibleman knew or should have known that Doe was incapacitated and nevertheless chose to engage in sexual activity with her, there is also sufficient evidence in the record to support the conclusion that Doe was not incapacitated and that Feibleman reasonably believed that she had consented to sexual activity.  Because the painfully detailed allegations currently before the Court could reasonably support diametrically opposite outcomes, Columbia's motion to dismiss Plaintiff's erroneous outcome claim must be denied at this early stage.  The motion is granted in part and denied in part as to Plaintiff's third cause of action for breach of contract; denied as to the fourth and sixth causes action for withholding Plaintiff's diploma; and granted as to the fifth cause of action for improper delay in conducting the investigation.

## I.      BACKGROUND

 In August 2016, Plaintiff Ben Feibleman began a one-year master's program at Columbia University's School of Journalism ("Columbia").  *See* Compl. (Dkt. 57) ¶¶ 25–26, 41. Barely two months into the semester, a fellow student accused Feibleman of sexually assaulting her on the night of October 4, 2016, and in the early morning hours of October 5.  *Id.* ¶¶ 47, 388. Feibleman, however, graduated from Columbia with a master's degree in May 2017, before the school resolved its investigation.  *Id.* ¶ 26.  A month after awarding the diploma, Columbia found Feibleman culpable and determined that the proper punishment was retroactive expulsion and degree revocation.  *Id.* ¶¶ 27, 698–99, 713–14.

Feibleman then commenced this action against Columbia, seeking damages and the restoration of his degree. *Id.* at 97–98. Columbia has filed a partial motion to dismiss. Dkt. 46. Of particular relevance at this juncture are Feibleman's claims that Columbia discriminated against him on the basis of gender during the administrative proceeding, in violation of Title IX of the Education Amendments of 1972 ("Title IX") (20 U.S.C. § 1681), and that Columbia breached its promises to him by denying him a fair and speedy disciplinary process and a degree for which he fulfilled his academic credits. Compl. (Dkt. 57) at 97–98. Plaintiff's Title IX claim, which the parties refer to as an "erroneous outcome" claim,[2] alleges that Columbia's bias against male students caused the school to conclude incorrectly that Jane Doe lacked capacity to consent to sexual activity during two encounters between approximately 10:50 P.M. on October 4 and 1:50 A.M. on October 5, 2016. *See id.* ¶¶ 889–91, 143, 654.

## A. The Reception[3]

According to Feibleman's version of events, the night began when he approached Doe and other classmates at a reception shortly after 7:30 P.M. *Id.* ¶¶ 53, 55. At that time, Doe was allegedly not visibly intoxicated, although there is no allegation as to how much alcohol Doe had

---

[2]     Feibleman also raises a Title IX "selective enforcement" claim, which is not part of Columbia's partial motion to dismiss. *See* Compl. (Dkt. 57) at 90; Dkt. 46.

[3]     The facts are taken from the Complaint and the well-pleaded allegations are assumed to be true—even though Plaintiff's purported eidetic recall of certain of the alleged facts strains credulity. *See, e.g.*, Compl. (Dkt. 57) ¶¶ 79 (alleging that Doe drank only two or three glasses of wine during two-hour long reception, with no explanation as to why or how Plaintiff was so closely tracking her alcohol consumption), 106 (alleging that Doe had only a "superficial sip" of beer for rest of night, which lasted nearly five more hours). The Court also notes that there are several allegations that are not well-pleaded because they could not possibly be based on Plaintiff's direct knowledge and the Complaint is silent as to the basis for any indirect knowledge. *See, e.g., id.* ¶¶ 117–18 (alleging that one classmate told another that Doe planned to breakup with her boyfriend and acknowledging that Plaintiff was not present for that conversation), 223 (alleging that a classmate privately informed Doe that her sweater was inside out), 347–51 (recounting exact quotes from conversation that allegedly occurred between Doe and her roommate after Plaintiff's departure).

consumed before Feibleman's arrival.[4]  *See id.* ¶ 57.  Photographs embedded in the Complaint show Doe raising half a glass of wine; a bottle of wine and at least one bottle of what appears to be a beer sat near Feibleman, Doe, and three other classmates.  *Id.* at 8–9.  Doe allegedly began flirting with Feibleman at the reception.  *Id.* ¶¶ 67–68, 70, 75–76.  Between Feibleman joining the group and the group leaving the venue at 9:30 P.M., Doe allegedly drank two or three glasses of wine.  *Id.* ¶ 79.

After leaving the reception, Feibleman and Doe, along with others, walked to a classmate's apartment.  *Id.* ¶¶ 80, 82–83.  According to Plaintiff, Doe had no difficulty walking on her own.  *Id.* ¶ 87.  Along the way, the group stopped to purchase beer and pizza.  *Id.* ¶¶ 93–94, 96.

## B.  The Rooftop

The group arrived at the classmate's apartment at approximately 10:30 P.M.  *Id.* ¶ 105.  There, Doe allegedly took charge of the party by serving drinks to the group.  *Id.* ¶ 106.  While she only took one sip of a beer, she insisted that others, including Feibleman, drink more.  *Id.* ¶¶ 106–08.  A video reportedly shows Doe playing a drinking game with Feibleman, pouring a glass of beer into his mouth faster than he could swallow.[5]  *Id.* ¶¶ 110–11.  Sometime thereafter, Doe and Feibleman followed the classmate's cat into a bedroom, where the two exchanged a kiss.  *Id.* ¶¶ 120–21.

Doe then asked Feibleman to follow her to the roof of the apartment building, on which perched a 30-foot high water tower.  *Id.* ¶¶ 122, 126–27.  Doe climbed a wrought-iron ladder

---

[4]      Feibleman implies that Doe had been drinking since approximately 6:00 P.M. that evening, well before his arrival, but it is unclear how he knows that fact.  *See* Compl. (Dkt. 57) ¶ 244 ("Ben took 23 photographs of [Doe] and her cat between 12:17 a.m. and 12:20 a.m., almost 6 hours since [Doe's] first drink, and 3 hours since her last full drink at the Reception.").

[5]      The video is described but not attached to the Complaint.

affixed to the side of the tower, and then summitted the cone-shaped dome on top of the water tank. *Id.* ¶¶ 127–28. According to timestamps on Feibleman's photographs, Doe needed only 17 seconds to climb approximately halfway up the ladder. *Id.* ¶ 129. The entire trip from the classmate's apartment to the water tank, which involved ascending two sets of stairs in addition to the 30-foot ladder, allegedly took a total of two minutes and six seconds. *Id.* ¶ 128. Photographs show Doe standing, crawling, and sitting on the inclined surface of the tank's dome. *Id.* at 17–18. Feibleman alleges that Doe was surefooted and moved confidently on the sloped surface, which had an angle of approximately 45 degrees, while he sat stationary due to his fear of heights. *Id.* ¶¶ 132–34.

While on the water tower, Doe and Feibleman kissed; she removed her sweater and he unhooked her bra. *Id.* ¶¶ 152–53. When Feibleman said he wanted to descend, Doe allegedly made fun of his fear, slapped him hard in the face, and bit him on the lip. *Id.* ¶¶ 157, 160–61.

Shortly thereafter, their friends joined them on the roof. *Id.* ¶¶ 163–65. Feibleman reached out to help Doe descend, but she slapped his hand away. *Id.* ¶ 171. According to the Complaint, she executed a backwards somersault towards the edge of the tank, before catching the ladder and descending.[6] *Id.* ¶¶ 171, 846. Doe would ascend and descend the tower once more, in an effort to encourage others to do so. *Id.* ¶¶ 174, 184, 186.

According to the time stamps on pictures taken that night, at 11:04 P.M., the group returned to the apartment, at which point Feibleman noticed that Doe was missing. *Id.* ¶¶ 187–88. Feibleman and another classmate returned to the roof, discovering that Doe had climbed back onto the water tower. *Id.* ¶¶ 184, 186. Doe convinced the others to join her, and Feibleman took photos of Doe helping the other classmate find her balance on the tower. *Id.* at 24–25 & ¶¶

---

[6]     Photographs in the Complaint appear to confirm what would otherwise strain credulity: Doe is photographed mid-somersault, without her sweater, tumbling near the edge of the tower. Compl. (Dkt. 57) at 21.

194–95.  For the next ten minutes, Doe learned to how curse in a foreign language, as they shouted epithets from the tower.  *Id.* ¶¶ 203–04.

About 15 minutes later, the three began to descend from the tower.  *Id.* at 27.  On her way down, Doe paused and swung her left arm and leg off the ladder, holding onto the side of the ladder with her right arm, with her right foot resting on a rung.  *Id.*  The three eventually made their way down the stairs and back to the apartment.  *Id.* at 28 & ¶ 221.  Between 11:30 P.M. and midnight, at least some members of the group allegedly observed Doe falling asleep in the apartment.  *Id.* ¶ 226.  It is unclear from the Complaint whether Plaintiff noticed Doe nodding off.

At midnight, the group dispersed, and Feibleman offered to walk Doe home.  *Id.* ¶ 233.  Feibleman invited Doe to his apartment—but Doe reportedly insisted that they go to her apartment.  *Id.* ¶ 241.

### C.  Doe's Apartment

At Doe's apartment, she and Feibleman spent the next half hour talking to Doe's roommate and playing with Doe's cat.  *Id.* ¶ 245.  Photographs timestamped 12:18 and 12:19 A.M. show Doe standing and holding a cat for the camera.  *Id.* at 31.  Sometime thereafter, Doe appeared to fall asleep in the living room; Feibleman and Doe's roommate carried Doe to her bed.  *Id.* ¶¶ 251–52.  Feibleman alleges that Doe was merely pretending to be asleep in order to eavesdrop, because less than ten minutes later, Doe "burst out of her room" to contradict Feibleman's account of the evening to Doe's roommate.  *Id.* ¶¶ 254–56.  Doe again appeared to fall asleep in the living room, and this time, Feibleman carried her to the bedroom by himself.  *Id.* ¶¶ 263–64.

According to Feibleman, he did not intend to stay and had in fact left the bedroom door open. *Id.* ¶ 269.  But, when he leaned in for a good-night kiss on the forehead, Doe pulled him in for a kiss on the lips. *Id.* ¶ 269.  Although they did not engage in vaginal intercourse, Feibleman acknowledges that he removed Doe's pants and underwear, kissed her, held her throat, and penetrated her with his finger. *Id.* ¶¶ 273–74.  He alleges that at 1:30 A.M., Doe began asking to have vaginal intercourse; Feibleman refused because he was "uncomfortable with how their physical encounter was progressing." *Id.* ¶¶ 276–78.  Specifically, Feibleman claimed that he was afraid that if he stayed the night, there would be gossip. *Id.* ¶ 279.  He then reportedly manufactured a variety of excuses as to why they should not have sex, which Doe refused to accept. *Id.* ¶¶ 281–85.  Doe then allegedly became agitated, "burst into tears," and complained that Feibleman found her unattractive. *Id.* ¶ 289.

Feibleman further alleges that he "felt trapped" and was concerned about the "political climate" on campus surrounding sexual assault; for those alleged reasons, he began an audio recording of his interactions with Doe, starting at 1:37 A.M. *Id.* ¶ 305.  The audio recording, which lasts for approximately 30 minutes, begins with Doe speaking slowly and almost at a whisper, asking whether Feibleman wanted to engage in sexual intercourse. *See* Dkt. 48, Ex. B (audio filed under seal).  For the first 16 minutes of the recording, the two are engaged in conversation during which Doe repeatedly asks Feibleman to stay and have sex with her, while Feibleman insists that he will not do so because she is drunk; Feibleman also assures Doe that she is attractive, and expresses a desire to have sex with her when she is sober. *See generally* Audio Tr. (Dkt. 66-1) at 1–12.  As part of that exchange, Feibleman conjures a sexual fantasy involving the two of them. *See id.* at 5–6.  At around the 15:00 mark of the recording, there is audible clanking of what sounds like a belt buckle and the grating of a zipper as Feibleman states

his intention to go home.  *See id.* at 11–12 ("I have to go home . . . . This is what must be done."); Dkt. 48, Ex. B, 15:00–15:30.

Feibleman alleges that as he turned to leave, Doe lunged at him, pulled down his pants, exposed his penis, and attempted to engage in oral intercourse.  Compl. (Dkt. 57) ¶¶ 317–19. According to Feibleman, he struggled to push Doe away by the forehead as he tried to secure his pants.  *Id.* ¶¶ 319–20.

The audio recording, however, does not reveal evidence of a struggle.  There is no detectable expression of surprise, annoyance, physical exertion, or even a change in Feibleman's tone as he asks for a good-night kiss, almost immediately after the point that the struggle would have occurred.  *See* Audio Tr. (Dkt. 66-1) at 10–12; Dkt. 48, Ex. B, 14:50–15:30.  Nor did Feibleman protest in any way that Doe had pulled down his pants.  *See id.*

At the 16:10 mark of the recording, which would have been approximately 1:53 A.M., Doe's tone changes dramatically, and she appears to take on a different personality.  Audio Tr. (Dkt. 66-1) at 12; Dkt. 48, Ex. B, 16:10–17:00.  Her voice becomes louder and clearer, and she begins to curse repeatedly, before saying, "Wait.  No.  No.  No . . . . What's going on?"  Audio Tr. (Dkt. 66-1) at 12; Dkt. 48, Ex. B, 16:45–16:55.  She expresses surprise when Feibleman responds that she was attempting to have sex with him; she suddenly realizes that she is partially undressed.  Audio Tr. (Dkt. 66-1) at 13 ("Wait, I don't have pants on.").  Doe also expresses uncertainty as to her whereabouts.  *Id.* at 13 ("We're in my apartment, right?").  Doe then asks Feibleman to get back into bed with her to cuddle, and he agrees.  *Id.* at 13.

Feibleman tells Doe that he "like[s] this version of" Doe more.  *Id.* at 13.  And when Doe asked why, he responds, "It's like you kind of snapped out of it."  *Id.* at 13.  Doe says that she feels as if she has just awakened, and asks Feibleman how long he has been in her room.  *Id.* at

13.  Doe indicates that she has no recollection of most of the night, including their interactions on the water tower.  *Id.* at 16–18.

A few minutes later, the tape again reflects Doe asking to engage in sexual intercourse with Feibleman.  Audio Tr. (Dkt. 66-1) at 18–19.  Feibleman tells Doe that she has "kind of just woke up," and that they should avoid the possibility that she awakens in the middle of intercourse, unaware of her surroundings.  *Id.* at 18.  The conversation then becomes a replay of the initial phase of the recording, with Doe repeatedly asking Feibleman to have sex, and Feibleman repeatedly saying that she is drunk.  *Id.* at 19–22.

At around the 28:00 mark, Feibleman says good night and leaves Doe's room.  *Id.* at 22.  Two minutes later, Feibleman records himself, alone, saying:

> Ok, it's now 2:10 A.M.  F***!  I gotta get up early.  And I'm walking around the corner to my apartment, which is apparently two blocks away.  And, that was a really dangerous situation, and I'm going to message, uh, [Doe's roommate] now and let her know that, "Hey!  I just left, and nothing happened, we made out a bit and, uh, I left."  Alright.  So, that's it.

*Id.* at 22–23.

### D.  Columbia's Investigation

Later that day, on October 5, 2016, Doe filed a complaint with Columbia.  Compl. (Dkt. 57) ¶¶ 363–64.  Specifically, she reported that she fell asleep, woke up, and realized another student was trying to have sex with her.  *Id.* ¶¶ 365–66.  A week later, in a conversation with Title IX Investigator Serena Barnett, Doe identified Feibleman as the assailant.  *Id.* ¶ 388.  Between October and December 2016, Columbia interviewed twelve witnesses, including Doe and Feibleman, about the events of October 4 and 5.  *Id.* ¶¶ 397–402.

Feibleman claims that Columbia gave Doe various forms of preferential treatment throughout the course of the investigation.  First, although both were instructed not to "discuss the incident with those who may be connected to the investigation," Columbia's investigators

refused to enforce that direction against Doe, who allegedly spread her side of the story to the witnesses. *Id.* ¶¶ 406, 415–16. On the other hand, when Feibleman spoke about the case with a classmate, Barnett warned him that his discussion of the case could constitute retaliation. *Id.* ¶ 471. Second, Columbia reportedly discouraged Feibleman from involving an attorney, even though Doe had counsel. *Id.* ¶¶ 414, 500–501. Third, when Feibleman indicated that he wanted to file a complaint against Doe for unwanted sexual contact—specifically, Doe's slapping him when they were on the water tower, biting him, and grabbing Feibleman and undressing him while he was attempting to leave her bedroom—Barnett "downplayed" Doe's actions, characterizing them as "sexual harassment" or "attempted sexual assault." *Id.* ¶¶ 436–47. Fourth, Barnett delayed, for a month, the issuance of a no-contact instruction against Doe, whereas there was no delay in issuing one against Feibleman when Doe filed her complaint. *Id.* ¶¶ 462–63.

Feibleman also accuses Columbia of failing to investigate Feibleman's defense adequately. After allegedly hearing from a classmate that Doe had offered someone an anti-anxiety medication known as Klonopin, he asked Columbia to investigate whether Doe had ingested Klonopin on the night of October 4; he asserted that the mixture of drugs and alcohol could have had an impact on her ability to recall the night's events. *Id.* ¶¶ 529–31. Columbia refused to investigate Doe's possible use of Klonopin after concluding that it was irrelevant to the pending claims. *Id.* ¶ 533.

On April 26, 2017,[7] Columbia completed a summary of its initial findings. *Id.* ¶¶ 546–47. According to Feibleman,[8] the summary omitted all "direct" references to Doe's sexual advances and Feibleman's rejection of those advances, as well as "substantive descriptions" of photos and videos that Feibleman contends corroborates his version of events. *Id.* ¶¶ 554–57. He also claims that the summary gave improper weight to witness statements that were contradicted by photographic and video evidence, although he does not allege any specific contradictions. *Id.* ¶ 558.

On May 15, 2017, Feibleman asked Columbia to conduct additional investigation into Doe's alleged retaliation against two of their classmates, who had spoken to Feibleman about Doe's behavior and credibility. *Id.* ¶¶ 579–81. He also asked Columbia to investigate the substance of those classmate's claims—that Doe had a pattern of treating other men the way she allegedly treated Feibleman on the night of October 4, 2016. *Id.* ¶¶ 579–81. The alleged retaliation took place at graduation party, at which Doe observed two classmates talking to Feibleman.[9] *Id.* ¶¶ 565, 574. Doe reportedly knocked a drink onto one of the classmates and yelled at Feibleman, violating the no-contact order. *Id.* ¶¶ 565–576. Columbia declined to reopen the investigation, concluding that those additional allegations were irrelevant. *Id.* ¶ 583.

Two weeks later, Feibleman submitted a purported expert report from Dr. David Greenblatt, reportedly a professor of medicine specializing in the physiological effects of alcohol. *Id.* ¶ 597. Based on a review of Columbia's investigative summary, a transcript of

---

[7]     The Complaint appears to contain a typographical error in paragraphs 546 and 552, which allege that the summary was completed and received in April 2016. Compl. (Dkt. 57) ¶¶ 546, 552.

[8]     Neither party provided either the summary or Columbia's investigative report to the Court. Accordingly, the Court is limited to Plaintiff's description of the content of those documents.

[9]     The Complaint at ¶ 574 alleges that Doe "observed" the classmates sharing specific negative information with Feibleman. The Complaint does not explain how Feibleman knows what Doe heard of his private conversation with their classmates.

Feibleman's audio recording from the night of October 4, 2016, photographs, and text messages, Dr. Greenblatt concluded that Doe did not lack capacity to consent to sexual activity. *Id.* ¶¶ 598–99. Columbia rejected the report as irrelevant, and Feibleman was not allowed to submit it to the disciplinary panel. *Id.* ¶¶ 601, 603.

At a pre-hearing conference, Barnett presented her conclusions and recommendations. Specifically, she found Doe to be more credible than Feibleman and found that Doe lacked capacity to consent to sexual activity at the relevant times on October 4 and 5. *Id.* ¶¶ 629–33, 646. In Barnett's view, Doe's dangerous exploits on the water tower indicated irrational risk-taking and corroborated the conclusion that Doe was incapacitated. *Id.* ¶¶ 647–48. Barnett discredited Feibleman and Doe's roommates' statements that Doe was only pretending to fall asleep in the living room, finding the fact that Doe fell asleep to be another sign of incapacity. *Id.* ¶¶ 652–53. Barnett allegedly concluded that Doe was at "peak incapacity" while she was atop the water tower, between 10:45 P.M. and 11:15 P.M., and that Doe remained incapacitated until she snapped out of her stupor at around 1:53 A.M., when Feibleman was attempting to leave Doe's bedroom. *See id.* ¶¶ 649, 654–55.

Based on Doe's incapacity, Barnett recommended finding Feibleman responsible for two instances of sexual harassment—for photographing Doe as they kissed on the water tower,[10] and for applying pressure to Doe's throat in her bedroom. *Id.* ¶ 640. Barnett also recommended finding Feibleman responsible for two instances of sexual assault in Doe's bedroom—for digital penetration and grinding. *Id.* Barnett found that there was insufficient evidence to conclude that Feibleman had sexually assaulted Doe on the water tower. *Id.* ¶¶ 641–42.

---

[10] Between the pre-hearing conference and the hearing, Barnett allegedly reversed her initial recommendation as to the photographing, from fault to no fault. Compl. (Dkt. 57) ¶ 642.

On June 15, 2017, Columbia allegedly issued an investigative report consistent with Barnett's recommendations.  *Id.* ¶¶ 666, 676.  The report accepted certain of Doe's statements as true, even though they were allegedly contradicted by video and photographic evidence.  *Id.* ¶ 670.  Although the Complaint does not specifically allege what those statements are, the Court infers that Feibleman is referring to Doe's statement that she needed help to walk to her classmate's apartment, which was allegedly contradicted by video and photographic evidence. *Id.* ¶¶ 87–88.

### E.  Hearing and Aftermath

On June 20, 2017, Columbia convened a three-member panel to hear Doe's claim against Feibleman and his counterclaim against Doe.  *Id.* ¶ 677.  Feibleman was not allowed to present documents and evidence that Columbia had previously determined to be irrelevant, including the Greenblatt report and allegations of retaliation by Doe.  *Id.* ¶¶ 681–83.  The panel received the investigation report and questioned Feibleman and Doe, but it did not take live statements from other witnesses; neither Barnett nor the other investigators were present.  *Id.* ¶¶ 688–90.

The panel reportedly found Feibleman responsible for three instances of sexual assault based on a preponderance of the evidence standard: (1) non-penetrative sexual contact atop the water tower, (2) digital penetration in Doe's bedroom, and (3) non-penetrative sexual contact in Doe's bedroom.  *See id.* ¶¶ 699, 760; Gender-Based Misconduct Policy ("GBMP") (Dkt. 48-1) at 4, 7, 24, 27.  Feibleman was found not responsible for sexual harassment on the tower, *i.e.*, photography.  Compl. (Dkt. 57) ¶ 700.  The panel concluded that Feibleman's actions on the night in question were not in dispute.  *Id.* ¶¶ 701–02.  As to consent and incapacity, the panel concluded that Doe was incapacitated based on the amount of alcohol she had consumed and the recklessness of her behavior.  *Id.* ¶¶ 705–06.

The panel determined that Doe was not responsible for sexual harassment because Feibleman was not credible, which meant that there was insufficient evidence to conclude that she committed unwanted sexual acts against Feibleman. *Id.* ¶¶ 709–10.

On June 28, 2017, Columbia issued a sanction letter, retroactively expelling Feibleman and rescinding his master's degree. *Id.* ¶¶ 712–14, 722. The letter informed Feibleman of his right to appeal based on procedural error, new information, or excessive sanction. *Id.* ¶ 723.

Feibleman appealed on all three bases—and lost on July 31, 2017. *See id.* ¶¶ 727–759. The three-member appellate panel found no error or excessive punishment and faulted Feibleman for recording the interaction rather than simply leaving Doe's apartment. *Id.* ¶¶ 761–62, 765.

### F.    Bias

Feibleman alleges that Columbia's adverse decision reflected gender bias stemming from a confluence of factors. First, within two weeks of Doe's complaint against Feibleman, on October 18, 2016, Columbia learned that it was being investigated by the Department of Education for failing to investigate the alleged rape of a female student—the team of investigators subjected to federal scrutiny was the very team investigating Feibleman. *Id.* ¶¶ 382–387. Second, Feibleman cites contemporaneous campus activism and an online petition endorsed by multiple student groups and professional organizations, which allegedly put additional pressure on that team of investigators. *Id.* ¶¶ 392–396. Third, he claims that one member of the appellate panel, Steve Coll, was biased in favor of Doe because he felt pressure to protect the school's reputation to maintain healthy donor relationships.[11] *Id.* ¶¶ 771–90. Finally, Feibleman claims that, around the time of his appeal, Columbia was experiencing negative press

---

[11]    Feibleman also alleges, in somewhat conclusory terms, that Coll and Doe had a close personal relationship. Even if well-pleaded and accepted as true, that fact does not give rise to an inference of *gender* bias. *See* Compl. (Dkt. 57) ¶¶ 771–86.

coverage surrounding its settlement of a lawsuit with a student accused of rape; the rape survivor

in that case had engaged in high-profile activism by carrying a mattress on campus allegedly to

raise awareness of sexual assault.  *Id.* ¶¶ 767–769.  All of those factors, according to Feibleman,

pushed Columbia to protect its public image and to favor Doe, a female accuser, at his expense.

*     *     *

On May 13, 2019, Plaintiff commenced this action against Columbia, alleging erroneous

outcome and selective enforcement, both under Title IX.  *Id.* at 83, 90.  He further claims that he

was treated less well due to his gender, in violation of New York City's Human Rights Law.  *Id.*

at 96.  Feibleman also alleges breach of contract, or in the alternative, promissory estoppel,

because Columbia failed to conduct a fair and impartial disciplinary process and withheld his

diploma.  *Id.* 92–95.  Columbia has moved to dismiss the erroneous outcome claim and the

contract and estoppel claims.

## II.     DISCUSSION

When adjudicating a Rule 12 motion to dismiss, the Court must accept as true all well-

pleaded allegations of fact in the Complaint, unless they are contradicted by other allegations,

attached exhibits, or documentary evidence incorporated by the Complaint.  *See L-7 Designs,*

*Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ("[W]e draw all facts—which we

assume to be true unless contradicted by more specific allegations or documentary evidence—

from the Complaint and from the exhibits attached thereto."); *Barberan v. Nationpoint*, 706 F.

Supp. 2d 408, 424 (S.D.N.Y. 2010) ("[T]he Court is not required to accept as true pleadings that

are directly contradicted by other factual statements in the [] Complaint."); *Hansen v. Wwebnet,*

*Inc.*, No. 14-CV-2263, 2015 WL 4605670, at *3 n.1 (S.D.N.Y. July 31, 2015) (holding that when

allegations are directly contradictory, courts need not accept either as true); *Gene Codes*

15

*Forensics, Inc. v. City of New York*, No. 10-CV-1641, 2012 WL 1506166, at *3 (S.D.N.Y. Apr. 26, 2012) ("[I]f the allegations 'are flatly contradicted by documentary evidence, they are not presumed to be true, or even accorded favorable inference.'" (citation omitted)).  Additionally, "unwarranted deductions of fact are not admitted." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (citation omitted).

A Rule 12(b)(6) motion to dismiss is granted if, accepting the well-pleaded facts as true and drawing all reasonable inferences in his favor, the plaintiff has failed to state a claim to relief that is plausible on its face.  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019). For the reasons discussed below, Columbia's motion to dismiss is denied as to Plaintiff's erroneous outcome claim; granted in part and denied in part as to the third cause of action for breach of contract for failure to provide a fair disciplinary process; denied as to the fourth and sixth causes of action for breach of contract and promissory estoppel for withholding of his diploma; and granted as to Plaintiff's fifth cause of action for promissory estoppel based on the length of Columbia's investigation.

## A.  Plaintiff's Erroneous Outcome Claim

Under Title IX, subject to limited exceptions inapplicable to this case, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  *See* 20 U.S.C. § 1681(a).  Plaintiff has adequately alleged that Columbia has received federal funding, including at the time of the events at issue.  *See* Compl. (Dkt. 57) ¶ 828.

The Second Circuit has recognized two general ways in which a plaintiff can "attack[] a university disciplinary proceeding on grounds of gender bias": an erroneous outcome claim and a

selective enforcement claim. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). An erroneous outcome claim rests on allegations that the "plaintiff was innocent and wrongly found to have committed an offense" as a result of gender discrimination. *Id.* Selective enforcement, in contrast, rests on allegations that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* Because Columbia did not move to dismiss Plaintiff's claim of selective enforcement, the only Title IX claim at issue on this motion is Plaintiff's erroneous outcome claim.

A plaintiff bringing an erroneous outcome claim must plead the existence of gender bias, an incorrect outcome, and a "causal connection" between the bias and the error. *Yusuf*, 35 F.3d at 715). Plaintiff purports to challenge two erroneous results—Columbia's conclusions that Doe was incapacitated and that Doe did not sexually assault Feibleman. *See* Pl. Opp. (Dkt. 65) at 1. As to each, Plaintiff must plausibly allege that Columbia's finding was incorrect and that the error was caused by gender-based bias.[12]

### 1.  Columbia's Gender Bias

The Second Circuit has established what it describes as a "low standard" for pleading the existence of gender bias in Title IX cases. *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) (citing *Littlejohn v. City of New York*, 795 F.3d 297 (2d Cir. 2015)). Adopting the pleading standard from Title VII discrimination cases, the Second Circuit has held that a plaintiff need only "alleg[e] facts giving rise to a plausible minimal inference of bias [] to survive a

---

[12]      As Plaintiff notes, Columbia's motion does not appear to dispute the issue of causation. *See* Pl. Opp. (Dkt. 65) at 18. In any event, the alleged bias in this case is attributed to Barnett, whose investigative decisions were allegedly affected by that bias, and to high-ranking university officers experiencing significant public pressure. Under those circumstances, a causal connection may be reasonably inferred. *See Prasad v. Cornell Univ.*, No. 15-CV-322, 2016 WL 3212079, at *17 (N.D.N.Y. Feb. 24, 2016) ("Given . . . that Jane Doe was treated more favorably than Plaintiff, that the investigators seemingly slanted the Investigative Report against Plaintiff, a drastic change in position of one investigator in the closing weeks of the investigation, and the possibility that male respondents in sexual assault cases are invariably found guilty at Cornell, Plaintiff plausibly establishes a causal connection between gender bias and the outcome of his disciplinary proceeding.").

motion to dismiss."  *Id.*  Specifically, procedural irregularities or preferential treatment during

the disciplinary proceeding, combined with a concrete motive to discriminate on the basis of

gender, is sufficient to create at least a "minimal inference" that a student was subjected to

gender bias.  *See id.* at 57 (explaining that allegations must support inference of bias and

inference that bias was on account of sex).  Because the allegations of bias in this case are

essentially identical to those found to be adequate in *Doe v. Columbia Univ.*, the Court must

conclude that Plaintiff has plausibly alleged at least a "minimal inference" that Columbia was

biased during the disciplinary proceeding and that the bias was because of his gender.  *See id.* at

57–58.

　　　　In terms of procedural irregularities, Feibleman claims that Columbia gave Jane Doe

preferential treatment by delaying the issuance of a no-contact order after he filed his complaint

against Doe, discouraging him from retaining an attorney (even though Doe was also represented

by counsel), refusing to investigate Doe's retaliatory behavior, declining to prevent Doe from

talking to witnesses about the incident, ignoring evidence contradicting Doe's version of events,

and finding him less credible than Doe, even though he had corroborating evidence while Doe

had limited recall.[13]  Those procedural deficiencies are similar in nature and magnitude to those

that the Second Circuit found indicative of a biased proceeding in *Doe v. Columbia Univ.*, which

included refusing to interview witnesses who could have corroborated the plaintiff's account,

ignoring the plaintiff's complaints of retaliatory behavior, failing to advise the plaintiff of his

option to seek advice from the dean of students, and reaching conclusions without reconciling

contradictory evidence.  *Id.* at 49–50, 56–57; *see also Doe v. Syracuse Univ.*, 341 F. Supp. 3d

---

[13]　　　Although Plaintiff also takes issue with Columbia's refusal to allow his expert report, that alone does not
support an inference of impropriety.  Feibleman has not cited any part of the GBMP that allows for outside experts, nor
is there any allegation that Doe was allowed to retain an expert.

125, 138 (N.D.N.Y. 2018) (applying *Doe v. Columbia Univ.* and finding plausible allegation of bias based on university's failure to investigate complainant's credibility, examine contradictions in her statements, and crediting respondent's testimony despite her having "very little memory of the [i]ncident"). Thus, the alleged irregularities in this case, when viewed in Plaintiff's favor as this Court must, plausibly suggest that Columbia may have been biased against Feibleman.

Feibleman must next allege facts supporting a plausible inference that the bias was based on gender. On that issue, his allegations, unsurprisingly, again bear a striking resemblance to those in *Doe v. Columbia Univ.* In both cases, the plaintiff is a male student, who was found responsible for sexual assault of a female student; both plaintiffs accused Columbia of adopting an anti-male bias due to "criticisms circulating in the student body and in the public press that Columbia was turning a blind eye to female students' charges of sexual assaults." *Id.* at 56. As did the plaintiff in *Doe v. Columbia Univ.*, Feibleman did more than simply allege in general conclusory terms that an anti-male, pro-female atmosphere or culture existed on campus. In *Doe v. Columbia Univ.*, the plaintiff cited specific complaints by student organizations, opinion articles and petitions by student leaders, negative coverage of Columbia's disregard of complaints against male athletes in local news, and public criticism expressly directed at the primary investigator of the claims against the plaintiff, all of which occurred during the three months preceding the plaintiff's disciplinary hearing. *Id.* at 50–52, 57. Here, Feibleman alleges that Columbia and its investigators were under similar pressure throughout his investigation, hearing, and appeal process. Two weeks after Doe complained of sexual assault, Barnett and other investigators assigned to the case became the subject of a Department of Education investigation into their alleged refusal to investigate a sexual assault case initiated by a female

student.[14]  Compl. (Dkt. 57) ¶¶ 382–87; *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp.

3d 386, 402 (W.D.N.Y. 2017) (applying *Doe v. Columbia Univ.* and finding that

contemporaneous federal investigation for failing to prevent sexual harassment, among other

factors, supported minimal inference of gender bias against male students).  Furthermore, during

the pendency of Feibleman's appeal, Columbia allegedly received weeks of negative press

coverage for settling a court case with a male student who had been accused of rape in a high-

profile case.  Compl. (Dkt. 57) ¶¶ 767–70; *Rolph*, 271 F. Supp. 3d at 401 (finding that sustained

negative coverage during months preceding plaintiff's expulsion supported minimal inference of

bias).  Based on those allegations, consistent with the holding in *Doe*, Plaintiff has provided a

plausible motivation on the part of Columbia to discriminate against male students accused of

sexual assault.  *See Doe*, 831 F.3d at 58 ("There is nothing implausible or unreasonable about the

Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing

female and against the defending male varsity athlete in order to avoid further fanning the

criticisms that Columbia turned a blind eye to such assaults.").

---

[14]     The team of investigators was also targeted by a student activist group, which, within two days of Doe's complaint, commenced a petition calling for reform of the school's Title IX process; the petition allegedly gained significant traction and was endorsed by professional organizations as well as students.  Compl. (Dkt. 57) ¶¶ 392–96.  The Court notes, however, that the reforms called for by the student group bear no apparent relation to disparate treatment of the sexes.  Rather, the petitions called for procedural and transparency reforms, such as ending the use of alleged interrogation tactics and allowing for recordings of proceedings.  *Id.* ¶¶ 392, 394.  If anything, such a petition would have put pressure on Columbia to give Feibleman more process, not less.

         Similarly, Plaintiff's allegation that Coll, a member of the panel that considered Feibleman's appeal, discriminated against him in order to please Columbia's donors (in particular the Knight Foundation) does not support a plausible inference of gender bias.  *See id.* ¶¶ 787–90.  An allegation that university personnel is interested in protecting the institution's reputation could be plausibly alleged in every single Title IX case—that alone cannot give rise to an inference of gender bias, else the element is functionally eliminated from the pleading requirements.  Even assuming that Coll was motivated to preserve donor relations, there is no factual allegation as to the donor(s)' likely views of Title IX, if any, or Coll's knowledge of those views.

         Accordingly, those allegations do not support even a minimal inference of gender bias.

Because Feibleman has alleged facts showing that Columbia gave Doe preferential treatment during the process and that Columbia may have been motivated to do so in order to combat private and federal scrutiny of the school's purported historical leniency towards male students accused of sexual misconduct, he has plausibly pleaded a minimal inference of gender bias. As the Second Circuit has made clear, at the pleading stage a plaintiff need not show that gender bias is the "*most plausible*" interpretation of the events—a biased proceeding need only be within the range of reasonable inferences. *Id.* at 57 (emphasis original). In *Doe v. Columbia Univ.*, the Court of Appeals explained that Columbia may have treated the male student harshly because the school was motivated to take all sexual accusations seriously or to treat the original complainant (regardless of gender) with greater sensitivity. *Id.* at 57–58. Nevertheless, at this stage of the litigation, the Court must draw all reasonable inferences in the plaintiff's favor, and here, as in *Doe v. Columbia Univ.*, the existence of plausible, non-discriminatory explanations does not undermine the sufficiency of the complaint. *See id.* ("This reasoning [of alternative motivations] fails to recognize the court's obligation to draw reasonable inferences in favor of the sufficiency of the complaint.").

## 2.  Columbia's Conclusions

The existence of gender bias does not, by itself, support an erroneous outcome claim because Columbia could have reached the correct conclusion even if it was biased. Nevertheless, the plaintiff's burden to plead error is not onerous—he or she need only allege specific facts that "cast some articulable doubt on the accuracy of the outcome."[15]  *Yusuf*, 35 F.3d at 715. The

---

[15]     Columbia argues that, when assessing the accuracy of the outcome, courts should "afford substantial deference to university officials."  Defs. Br. (Dkt. 47) at 9.  It cites to the Supreme Court's observation in a Title IX deliberate indifference case that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," and its holding that liability should not attach unless the school's decision is "clearly unreasonable."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999).  There is, of course, significant daylight between "articulable doubt" and "clearly unreasonable."  Plaintiff contends that *Davis* is distinguishable because it was not an erroneous outcome case.  *See* Pl. Br. (Dkt. 65) at 11–12.  In reply,

Second Circuit has explained that articulable doubt can be created by "particular evidentiary weaknesses . . . such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge," such as "particular procedural flaws affecting the proof." *Id.* Here, Feibleman alleges that an abundance of photographic, video, and witness evidence contradicts Columbia's conclusion that the preponderance of the evidence showed that (a) Doe lacked capacity to consent to sexual activity, and (b) Doe did not commit sexual misconduct against Feibleman.

### a.  Doe's Incapacity

Because Feibleman does not dispute that he engaged in the sexual acts for which Columbia found him responsible, the only error he seeks to correct, as to Doe's complaint against him, is Columbia's conclusion that Doe was incapable of consenting to sexual activity. And, because he also does not contend that Columbia's Gender-Based Misconduct Policy ("GBMP"), which sets forth the standards that Columbia applies in disciplinary proceedings, is discriminatory, biased, or otherwise erroneous, the Court need only determine whether Plaintiff has adequately alleged that Columbia did not correctly apply its own policy, including the evidentiary burden of proof by a preponderance of the evidence.

The GBMP defines two types of sexual assault—intercourse and contact.[16]  GBMP (Dkt. 48-1) at 4.  Intercourse refers to "[a]ny form of vaginal, anal, or oral penetration, however slight,

---

Columbia seems to abandon any argument that *Davis* is controlling, and it fails to cite any instance of an erroneous outcome claim being dismissed under *Davis*'s "clearly unreasonable" standard. *See* Defs. Reply (Dkt. 74).  In any event, *Yusuf* directly controls the pleading standard for an erroneous outcome claim in this circuit, and the Court need not decide at this juncture whether a more demanding standard is appropriate at the summary judgment stage or beyond.

[16]      Although the Complaint does not include the GBMP as an attachment or expressly incorporate it by reference, the Court may nonetheless consider it because Plaintiff's reliance on the GBMP throughout the Complaint made it "integral" to the pleading. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

by a penis, object, tongue, or finger without a person's affirmative consent." *Id.* at 4.  Contact refers to "[a]ny . . . sexual touching for the purpose of sexual gratification of either party, without a person's affirmative consent." *Id.*  Affirmative consent is "a knowing, voluntary, and mutual decision among all participants to engage in sexual activity."[17] *Id.* at 7.  "Consent cannot be procured from a person who is incapacitated." *Id.* at 7.

According to the GBMP, "[i]ncapacitation occurs when an individual lacks the ability to knowingly choose to participate in sexual activity." *Id.* at 8 ("A person who is incapacitated cannot make a rational, reasonable decision because the person lacks the ability to understand his or her decision.").  "Whether sexual activity with an incapacitated person constitutes gender-based misconduct depends on whether the Respondent knew or should have known of the Complainant's incapacitation, based on objectively and reasonably apparent indications when viewed from the perspective of a sober, reasonable person in the Respondent's position." *Id.* at 9.  The GBMP sets forth specific factors to consider when determining whether a complainant's consumption of alcohol, drugs, or other intoxicants has rendered him or her incapacitated.  Those factors are:

- How the Complainant understood the "who, what, when, where, why or how" of the sexual activity; and

- How the Complainant was physically affected by the consumption of alcohol or drugs, which may include, but is not limited to, warning signs such as having slurred or incomprehensible speech, vomiting, unsteady gait, imbalance, bloodshot eyes, combativeness, emotional volatility, or notable change in personality.

---

[17]     The policy further clarifies that "[c]onsent can be given by words or actions, as long as those words or actions clearly communicate willingness to engage in the sexual contact or activity."  GBMP (Dkt. 48-1) at 7 ("If there is confusion or ambiguity, participants in sexual activity need to stop and talk about each person's willingness to continue.").

*Id.* But "[b]ecause the impact of alcohol and other drugs varies from person to person, the amount of alcohol and/or drugs a person consumes will not ordinarily" determine his or her capacity. *Id.* Intoxication, therefore, is not the same as incapacitation.

Applying those principles, the dispositive question is whether, accepting the factual allegations in the Complaint as true, there is an "articulable doubt" as to whether the preponderance of the evidence showed that Feibleman either knew, or should have reasonably known, based on Doe's observable characteristics, that she was incapacitated. In other words, it is not enough for Plaintiff to merely point to procedural missteps or weaknesses in the evidence—the identified defects must be material to the outcome in light of the applicable evidentiary standard. Because Columbia found Feibleman responsible for sexual assault at two different times—atop the water tower and in Doe's bedroom—the Court must answer that question for both incidents.

i.    *The Water Tower*

Accepting Plaintiff's allegations as true, there is reason to question whether he knew or should have known that Doe lacked capacity while they were on the water tower at approximately 11:00 P.M. on October 4, 2016.

As to the "who, what, when, where, why or how" of the sexual activity, there is reason to believe that Doe was aware of what she was doing and in command of her faculties. Doe appeared to know who Feibleman was, as she allegedly taunted him for being a former Marine who was afraid of heights. Compl. (Dkt. 57) ¶¶ 154, 156. Doe also appeared to know where she was, inasmuch it was her idea to climb the water tower of an apartment building in which she did not live. *Id.* ¶¶ 81, 104, 122. Doe was also the one who initiated the sexual contact by approaching Feibleman, kissing him, and taking off her sweater. *Id.* ¶¶ 141–46.

Other observable indicators alleged in the Complaint also suggest that she had capacity to consent to sexual activity. Fifteen to twenty minutes after the sexual interaction with Feibleman, Doe allegedly had the wherewithal to show another classmate how to maintain one's balance on the steep surface of the tower and to help that classmate descend the 30-foot ladder. *Id.* ¶¶ 197–99, 209. Doe did not appear to have slurred or incomprehensible speech, as she successfully learned to curse in a foreign language. *Id.* ¶ 204. There was no unsteady gait or imbalance, as she ascended and descended a 30-foot high water tower, multiple times, in addition to taking several flights of stairs, quickly and without issue, and somersaulting across the roof of the tank and onto a ladder. *See, e.g.*, *id.* ¶¶ 128, 184, 209. Notably, although Doe and Feibleman's classmates, who were not themselves intoxicated, allegedly noticed that Doe was in a state of undress atop the tower, they expressed no concern about her intoxication or mental state, even though they were concerned about her privacy and physical safety. *See id.* ¶¶ 166–67.

Balanced against that evidence is the unpredictable and reckless nature of Doe's behavior. According to Feibleman's allegations, Doe appeared to have been combative and emotionally volatile when she was on the water tower. She refused to descend the tower even at the urging of several of her friends; she insisted on others joining her; she took a dangerous roll off the roof of the water tank; and she behaved both aggressively and immaturely towards Feibleman.[18]

Rather than determining Doe's capacity by balancing all of the competing evidence, according to Plaintiff, Columbia began with a presumption that because Doe was incapacitated in her bedroom, she must have been even more incapacitated when she was on the tower, because

---

[18]     At this stage of the litigation, the probative value of this evidence is particularly difficult to evaluate. If Doe is normally cautious or risk-averse, her behavior would tend to indicate that she was significantly intoxicated. On the other hand, if she is a daredevil who likes to take risks even when entirely sober (*e.g.*, if she is someone who free climbs rocks), her behavior is less probative of intoxication, let alone incapacitation.

that was closer in time to her last consumption of alcohol.  *See id.* ¶¶ 648–49, 654–55.  While

Columbia's theory could be correct, it is not the only reasonable inference.  Looking through the

binoculars in the other direction, if one concluded that what happened on the roof was consistent

with a daredevil personality and that Doe was not incapacitated at that time, then it would be

highly unlikely that she would have been incapacitated almost three hours later in her room,

given no further alcohol consumption.  After balancing all of the competing factual allegations

and accepting Plaintiff's allegations as true, the Court finds there is at least some "articulable

doubt" that the conclusion Columbia reached—that a preponderance of the evidence showed that

Feibleman knew or should have known Doe was incapacitated on the water tower—was correct.

### *ii.*     *Doe's Bedroom*

Apart from evidence of Doe's capacity when she was on the roof, which was much closer

in time to her last drink, there are other reasons to question Columbia's determination that Doe

lacked capacity at approximately 1:30 A.M. in her bedroom.  Based on the audio recording, Doe

appeared to have been aware that she was in her room with Feibleman, and she repeatedly and

clearly stated her desire to have sex with him.[19]  Audio Tr. (Dkt. 66-1) at 4.  She also engaged in

an extended debate with Feibleman about whether she was drunk, Feibleman's real reason for

not having vaginal intercourse with her, and whether to have sex in her room versus at

Feibleman's apartment.  *See id.* at 1–12.  Although Doe was speaking slowly, she spoke

intelligibly and in complete, grammatical sentences,[20] with one exception during the half hour:

---

[19]     Columbia argues that Doe is slurring her words on the audio tape, implying that is incontrovertible proof of incapacity.  Columbia Br. (Dkt. 47) at 11.  While the tape shows that Doe is at times mumbling, it also shows that, overall, she is quite clear and coherent.  There are several inaudible words during the recording, but it is unclear whether those instances are a result of low-quality audio, Doe and Feibleman speaking softly, or the speaker's incapacity.  Because there are parts where Feibleman's speech is also inaudible, the Court draws an inference in his favor that the other inaudible parts of the conversation are not indicative of Doe's incapacity.  *See, e.g.*, Audio Tr. (Dkt. 66-1) at 21.

[20]     *See, e.g.*, Audio Tr. (Dkt. 66-1) at 3 ("I think that you're a nice person and that you're masquerading.").

when Feibleman stated that he does not trust everybody, Doe asked whether Feibleman trusted "half people," perhaps meaning to say, "half of the people" or "people half of the time." *See id.* at 4.

Feibleman also alleges circumstances suggesting that Doe may only have been pretending to fall asleep in the living room. After being carried to her bed the first time, Doe allegedly burst out of the room within minutes in response to something Feibleman said to her roommate; and after being carried to her bedroom a second time, she immediately "awoke" and pulled Feibleman to her as he was leaving. Compl. (Dkt. 57) ¶¶ 254–56, 269. Accepting those allegations as true, at least some aspects of Doe's behavior suggested that she was capable of consenting to sexual activity consistent with the GBMP and that some of the behavior tending to suggest incapacity may have been feigned.

Columbia has strong arguments to the contrary, although they ultimately do not prevail at this stage. Halfway through the audio recording, Doe appears to adopt a different personality and tone and professes to be completely unaware of the night's events, including how she ended up in her room in a state of undress.[21] Moreover, Feibleman's own contemporaneous statements, captured on the recording he made, are strong evidence that he knew she was incapable of consenting to sexual activity. He is repeatedly heard on the tape stating that he cannot and should not have sex with Doe because she is intoxicated; he also expressly acknowledges Doe's change in personality, noting that she had woken up, and stating that he preferred that version of Doe. *See, e.g.*, Audio Tr. (Dkt. 66-1) at 13.

---

[21]     Because the sexual activity for which Columbia found Feibleman responsible occurred prior to Doe's change in personality at 1:53 A.M., the fact that Doe later began to question her whereabouts and disclaim having any memory of the past several hours is not dispositive of Feibleman's guilt. Before Doe's observable change in personality, at least as captured on the audio tape, Doe did not appear to be unaware of her surroundings or suffer from memory loss. If the relevant sexual contact or intercourse had taken place after Doe displayed memory lapses and changes in personality, the case against Feibleman would be significantly stronger—but Columbia concluded that Doe regained capacity at 1:53 A.M.

Under those circumstances, one highly plausible—and perhaps the most plausible—inference is that Feibleman made a misguided decision that, despite Doe's incapacity, it was acceptable to remove her pants and penetrate her with his finger, even though he knew that it would be wrong to have vaginal sexual intercourse with Doe in her condition. Capacity to consent, of course, does not differ depending on the nature of the sex act for which consent would be given. Feibleman, realizing that he may have made a mistake, then created an audio recording that he thought would be exculpatory, knowing that it would capture Doe stating that she wanted to have sex and him saying no.

In contrast to that scenario, Feibleman points to an alternate, although less plausible, possibility. In particular, Feibleman argues that he did not in fact believe that Doe was intoxicated to the point of incapacity, in part because it had been four hours since her last drink. Compl. (Dkt. 57) ¶¶ 293–94 ("Mr. Feibleman knew that his claim regarding Complainant's drunkenness was false."). Rather, he did not want to stay the night due to potential gossip about their sexual relationship. *Id.* ¶¶ 279, 282, 288. And, because he did not want Doe to feel offended or rejected, he insisted that Doe was intoxicated so as to create a neutral excuse and to assure Doe that he found her attractive. *Id.* ¶¶ 289, 292–93.

Ordinarily, Feibleman's theory that he wanted to avoid gossip and let Doe down easy would not pass the straight-face test. If Feibleman truly wanted to avoid gossip, then one wonders why he stayed in Doe's room at all, let alone took off her pants while the door was allegedly still open and facing Doe's roommate's room. *See id.* ¶ 279. Additionally, the supposed intoxication charade, during which Doe allegedly pretended to be drunk and Feibleman pretended to agree, was maintained for approximately 20 minutes with not a hint that either was acting. And if Feibleman's insistence that Doe was intoxicated were merely an excuse to avoid

having sex, then he would not have acknowledged that Doe had come to her senses—doing so eviscerated his last chance, allegedly, to leave without causing offense.  *See id.* ¶ 292 ("Only after Mr. Feibleman had gone through every excuse he could think of, he falsely told Complainant that she was drunk, which he believed would be a successful 'nuclear option.'").

The only fact that makes Feibleman's leave-on-good-terms story remotely plausible is that Doe can be heard, on audio, repeatedly complaining that Feibleman found her unattractive. *See, e.g.*, Audio Tr. (Dkt. 66-1) at 3 ("You do not want me; you think that I'm gross.").  Doe's recorded statements provide some support for Feibleman's allegation that when he first attempted to leave, Doe "burst into tears" and asked why he was not attracted to her.  Compl. (Dkt. 57) ¶ 289.  In that context, there is at least some possibility that Feibleman was searching for a way to placate Doe before landing on intoxication as his way out.

The remaining issue that must be discussed is Feibleman's bizarre decision to make an audio recording of a highly intimate interaction.  In several respects, the recording is indicative of consciousness of guilt.  Even accepting his assertion that he made the recording to protect himself from an allegation of sexual misconduct, Feibleman must have recognized that the interaction in Doe's bedroom, at least arguably, put him in jeopardy.  That obvious conclusion is confirmed by his own words and actions at the end of the recording, when he verbalized (talking to himself on tape) that he was in "a really dangerous situation," and that he was "going to message [Doe's roommate] and let her know that" he had left and that "nothing happened." Audio Tr. (Dkt. 66-1) at 23.  At the same time, one could also infer that Feibleman genuinely did not believe that he had done anything wrong; otherwise, he would have been intentionally creating contemporaneous proof of his own guilt, at a moment when he was devising a strategy to avoid responsibility.  Drawing all reasonable inferences in Feibleman's favor, one could

plausibly conclude that Feibleman believed that he had not engaged in misconduct but was predisposed to create a record of potentially disputed events (perhaps as a result of his journalism training).  For those reasons, the fact that he made the recording does not compel a conclusion at this stage of the case that he was aware of Doe's incapacity while in her room.

Because Feibleman's theory as to why Doe was not incapacitated clears, albeit barely, the minimal plausibility threshold, dismissal of his erroneous outcome claim at this stage would amount to an improper credibility determination.  *See Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) ("[I]ssues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss[.]").  As the Second Circuit held in *Doe v. Columbia Univ.*, the Court's obligation at this stage is not to determine the "*most plausible*" inference.  831 F.3d at 57 (emphasis original).  Feibleman's allegations present a minimally plausible basis to question whether Doe's signs of incapacity were genuine, and the Court must accept those allegations as true for purposes of this motion.  That, combined with Doe's capacity when she was on the water tower, calls into question whether Columbia erred in finding by a preponderance of the evidence that Feibleman committed sexual assault in Doe's bedroom.[22]

---

[22]    The Court acknowledges that this holding, as well as Second Circuit precedent, places Columbia and other educational institutions in a challenging position.  That challenge, however, appears to be unavoidable under the current framework.  *See Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1226–27 (D. Or. 2016) ("[T]he Second Circuit's pleading standard [] put[s] universities in a double bind."), *aff'd*, 925 F.3d 1133 (9th Cir. 2019).  When a student initiates a Title IX complaint, he or she must be taken seriously, lest the college or university risk liability under Title IX for deliberate indifference (and possibly erroneous outcome) and loss of reputation for failure to investigate and protect its students.  But the tables turn when the respondent commences an action in federal court.  At that point, he or she dons the procedural mantle of a petitioner who must be afforded every reasonable inference at the early stages of the litigation; and the school gets no benefit of a deferential standard of review, such as "substantial evidence, or "abuse of discretion" or "clear error."  Rather, because of the low pleading standard for gender bias and articulable doubt, many students who lose a "he said-she said" case will likely be able to state a claim of erroneous outcome.  *See Yusuf*, 35 F.3d at 715 (explaining that university would not be liable for erroneous outcome if there is "overwhelming" evidence supporting disciplinary decision).

b.     **Doe's Responsibility for Sexual Assault Against Feibleman**

In his opposition to Columbia's motion to dismiss, Feibleman contends that Columbia failed to address a second allegedly erroneous outcome—the hearing panel's dismissal of Feibleman's counter-complaint against Doe for nonconsensual exposure of his genitals, slapping his face, and biting his lip.  *See* Pl. Opp. (Dkt. 65) at 13.  In reply, Columbia appears to argue that 20 U.S.C. § 1681(a) only provides a right of action to the target, not the complainant, of a disciplinary proceeding.  *See* Columbia Reply (Dkt. 74) at 2 n.2.

Regardless of whether Feibleman would have a cause of action on this theory, the Court does not read the Complaint to have raised such a claim.  Rather, the erroneous outcome count concludes with paragraph 891, which alleges that "[a]s a result of . . . increased litigation exposure and public scrutiny, Columbia ignored the relevant, objective, and uncontroverted evidence proving [Feibleman's] innocence in order to find him responsible for sexual misconduct," and paragraph 892, which alleges that "[a]s a result of the foregoing, [Feibleman] is entitled to damages."  Compl. (Dkt. 57) ¶¶ 891–90.  There is no parallel allegation that, as a result of discriminatory motives, Columbia ignored evidence that proved Doe engaged in sexual misconduct.  To be sure, there are allegations earlier in the Complaint that Doe slapped, bit, and exposed Feibleman without consent and that Columbia treated those claims less seriously than Doe's claims against Feibleman.  *See id.* ¶¶ 856–58, 864–67.  When read in context, however, those allegations appear to be in service of pleading an inference of gender-based bias rather than stating a separate claim about Columbia's erroneous determination of Doe's innocence.  *See id.* ¶ 868 ("According to Columbia, when a man says 'no,' he really means 'yes.'").

To the extent that Feibleman intends to plead a separate claim of erroneous outcome pertaining to Columbia's dismissal of Feibleman's complaint against Doe, Plaintiff may file a

letter motion requesting leave to amend the complaint.  The motion must address why such an amendment would not be futile, including whether a putative victim of sexual misconduct may raise an erroneous outcome claim pursuant to 20 U.S.C. § 1681, and whether such a claim should instead be pleaded as a deliberate indifference claim.  *See generally Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).  Consistent with the Court's Individual Practices, the letter motion must be accompanied by a proposed amended complaint with redlined changes.

*       *       *

Based on the foregoing, Feibleman has adequately pleaded a "minimal inference" of gender bias and an "articulable doubt" as to the accuracy of Columbia's determination that he committed sexual assault because Doe was incapable of consent.  Columbia's motion to dismiss Feibleman's erroneous outcome claim is, therefore, denied.

### B.   Plaintiff's Contract and Quasi-Contract Claims

Feibleman claims that Columbia is liable to him for failing to complete its investigation within 60 days, not providing a fair and impartial disciplinary process, and revoking or withholding his degree.  Compl. (Dkt. 57) ¶¶ 924, 933–35, 942–44 953–54.  Columbia contends that there is no liability under either a contract or quasi-contract theory because: the 60-day timeframe is merely aspirational; the assurance of a "fair and impartial" disciplinary process is merely a general policy statement, not an enforceable promise; and withholding his diploma did not breach any contract because Feibleman violated the GBMP.  Columbia Br. (Dkt. 47) at 16–19.

Under New York law, "[t]he elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance under the contract, the

defendant's breach, and resulting damages." *Detringo v. S. Island Family Med., LLC*, 158

A.D.3d 609, 609 (2d Dep't 2018). "[A]n implied contract is formed when a university accepts a

student for enrollment: if the student complies with the terms prescribed by the university and

completes the required courses, the university must award him a degree." *Papelino v. Albany

Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (collecting cases and applying

New York law). "The terms of the implied contract are 'contained in the university's bulletins,

circulars and regulations made available to the student.'" *Id.* (quoting *Vought v. Teachers Coll.,

Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987)).

The doctrine of promissory estoppel, which Feibleman has invoked as an alternative to

his contract theory, "allows for the enforcement of a promise in the absence of bargained-for

consideration." *See Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 824 (2d Cir. 1994)

(citing Restatement (Second) of Contracts § 90 (1981)). "In New York, promissory estoppel has

three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the

party to whom the promise is made, and an injury sustained by the party asserting the estoppel by

reason of the reliance.'" *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir.

1995) (collecting cases).

### 1. Columbia's Failure to Complete Investigation Within 60 Days

In his fifth cause of action, Feibleman asserts that Columbia should be held liable under a

promissory estoppel theory because it failed to complete its investigation within 60 days.

Compl. (Dkt. 57) at 94. Specifically, Feibleman argues that the U.S. Department of Education's

Office of Civil Rights "had dictated to universities that Title IX investigations should take no

more than 60 days, with small exceptions for holidays, complexity, and scheduling conflicts."

*Id.* ¶ 942.

Although the Court is not unsympathetic to Plaintiff's complaint about the length of Columbia's process,[23] his promissory estoppel theory based on the failure to complete the investigation within 60 days fails for several reasons.  First, the instruction from the Office of Civil Rights is not itself a promise and was not made by Columbia to Feibleman.  Second, to the extent that Columbia agreed to adhere to the Office of Civil Rights' policy and thereby converted the instruction into a promise, Feibleman has failed to allege that none of the specified exceptions to the 60-day rule applied in his case.  Next, Columbia's commitment to a 60-day timeline was made in general and less-than-definite terms; there is no evidence or allegation that it committed itself to complete *all* investigations within 60 days.  *See* GBMP at 19 ("The University will seek to resolve every report of gender-based misconduct within approximately sixty (60) days of an initial report, not including the time for any appeal.").  Indeed, the GBMP specifically cautions that "[t]ime frames will vary depending on the complexity of the investigation and the severity and extent of the alleged misconduct," and may be extended for a "[p]re-hearing conference" or for "good cause as necessary to ensure the integrity and completeness of this process."  *Id.*  Reasons for extension "include, but are not limited, to: compliance with a request by law enforcement; accommodation of the availability of parties and witnesses; students on leave; accounting for exam periods, school breaks or vacations; and/or accounting for complexities of a specific investigation, including the number of witnesses and volume of information provided by the parties."  *Id.*  Given the aspirational nature of the 60-day timeline, the array of possible exceptions in individual cases, and the absence of any allegations

---

[23]     It would appear that by dragging out the process for essentially an entire academic year, Columbia was able to collect tuition for Plaintiff's second semester.  The retroactive expulsion imposed almost nine months after the event also meant that, in addition to the wasted tuition and time, Plaintiff performed a second semester of graduate-level academic work for naught.  All of that could have been avoided had his punishment been more timely.

of specific assurances in this case, Feibleman has failed to plead a clear and unambiguous

promise and reasonable and foreseeable reliance.[24]

Columbia's motion to dismiss Feibleman's fifth cause of action is therefore be granted.

## 2.   Columbia's Failure to Provide a Fair or Impartial Process

Feibleman's third cause of action alleges a breach of contract based on Columbia's

failure to provide a fair and impartial disciplinary process.  This count is dismissed except to the

extent that Columbia allegedly failed to disclose all actual and potential conflicts of interest

during the selection of the appellate panel.[25]  A commitment to provide a "fair and impartial"

process is too generic to be an enforceable promise—a proposition that Feibleman does not

appear to dispute.  *See* Pl. Opp. (Dkt. 65) at 22; *see Noakes v. Syracuse Univ.*, 369 F. Supp. 3d

397, 405, 419–20 (N.D.N.Y. 2019) (holding that university's policy of providing a

"fundamentally fair" and "impartial" process is a "non-actionable statement[] of general policy

that . . . cannot support a breach of contract claim"); *Gally v. Columbia Univ.*, 22 F. Supp. 2d

199, 207 (S.D.N.Y. 1998) ("Plaintiff does not point to a specific promise to, say, provide certain

hours of instruction, state-of-the art facilities, one-on-one mentors, or particular courses.  Unlike

these obligations, [Defendant's] alleged promises about ethical conduct are subject to neither

quantification nor objective evaluation.").  Instead, Feibleman attempts to clarify the precise

promises that Columbia allegedly breached, Pl. Opp. (Dkt. 65) at 22–23, but that effort is not

successful.

---

[24]   To the extent that Feibleman can plead specific assurances and the inapplicability of exceptions in his case, he may request leave to amend in the manner set forth in the Court's discussion of his alternative erroneous outcome claim.

[25]   Columbia opted not to challenge any alleged breach of contract based on a failure to disclose a conflict of interest.  Columbia Br. (Dkt. 47) at 17 n.10.

First, Feibleman cites to pages 4, 5, and 7 of the GBMP as support for his claim that Columbia promised to investigate and adjudicate his assault claim against Doe fairly.  *Id.* at 22.  But pages 4, 5, and 7 of the GBMP do not promise anything and instead simply define sexual assault, harassment, and consent.  *See* GBMP (Dkt. 48-1) at 4–5, 7.  To the extent that there is an implied promise to make a good-faith effort to investigate Feibleman's claim of harassment or assault, Feibleman does not allege breach of that implied promise in his third cause of action; the third cause of action is entirely about Columbia's alleged failure to impartially adjudicate *Doe's* claims.  *See* Compl. (Dkt. 57) ¶¶ 924–28 ("The Gender-Based Misconduct Policy promises that students will have a fair and impartial disciplinary process in which it is Columbia's responsibility to show that a violation has occurred before any sanctions are imposed.").  Even assuming that his third cause of action could be construed to allege a failure to investigate his claims against Doe, Feibleman has not alleged damages, one of the required elements of a breach of contract claim.  *See Detringo*, 158 A.D.3d at 609.  All of Feibleman's pleaded damages and injury flow from Columbia's handling of Doe's complaint against him and his resulting expulsion; a finding of fault against Doe for slapping or biting him, for instance, in no way exonerates him from engaging in non-consensual contact of his own.  *See* Compl. (Dkt. 57) at 97 (citing damages as loss of reputation, educational opportunities, career prospects); *see also* Damages Stipulation (Dkt. 76).

Feibleman also asserts in his opposition brief that Columbia committed breach of contract because it failed to enforce its anti-tampering and anti-retaliation policy against Doe.  Pl. Opp. (Dkt. 65) at 22.  Although Feibleman claims that Columbia failed to enforce its "confidentiality policy," the GBMP expressly disclaims "prevent[ing] either party from discussing the incident itself," which is consistent with Columbia's alleged response when Plaintiff complained about

Doe's breach of confidentiality.  *See* GBMP (Dkt. 48-1) at 18; Compl. (Dkt. 57) ¶ 478 ("Barnett told Mr. Feibleman, 'We can't stop people from sharing their experiences with others.'").  The alleged promise at issue is not fairly characterized as a confidentiality policy but is instead an instruction to the students involved not to speak with witnesses about the case. *See id.* ¶ 406 ("Complainant and Mr. Feibleman were instructed to 'not discuss the incident with those who may be connected to the investigation to protect the integrity of this investigation.'").  As currently drafted, the Complaint does not allege a breach of contract based on Columbia's failure to investigate Plaintiff's claim of retaliation. *See id.* at 92–93.  It is also questionable whether, even assuming that Plaintiff can allege an enforceable promise, he will be able to allege damages from its breach.  Nevertheless, as with his second erroneous outcome claim and his claim of breach of contract based on the length of the investigation, he may request leave to amend to add a breach of contract claim for failure to investigate Feibleman's claims of retaliation and tampering against Doe.

Next, Feibleman argues that Columbia breached its promise to provide him with updates "throughout the investigative process, including with timely notice of meetings in which either or both the Complainant and the Respondent may participate, and/or if there are updates to the alleged violations that will be investigated and/or adjudicated based on information learned during the investigation."  Pl. Opp. (Dkt. 65) at 22 (citing GBMP (Dkt. 48-1) at 20).  The language of the GBMP is general and undefined; there is no specific schedule of updates that is contemplated.  Rather, the timeliness of an update is tied to the occurrence of specific events, and there is no dispute that Feibleman received updates at various stages of the investigation.  Nor has Feibleman identified any specific update that he alleges he should have received but did not, or any other form of injury or damages. *See Detringo*, 158 A.D.3d at 609.  Thus, Feibleman

has failed to plead a breach of any promise related to the timeliness or frequency of investigative updates.

Finally, Feibleman claims that Columbia breached its promise to apply a preponderance of the evidence standard. Pl. Opp. (Dkt. 65) at 23. That allegation is nowhere in the Complaint. Indeed, the Complaint alleged that Columbia's investigator explained her conclusions using a preponderance standard. *See* Compl. (Dkt. 57) ¶ 637 ("Barnett then explained the relevance of her credibility determination in light of the preponderance of the evidence standard."). The mere fact that Feibleman disagrees with the outcome does not support a plausible inference that Columbia surreptitiously chose to apply a lesser evidentiary standard. *See id.* ¶ 728 ("Mr. Feibleman asserted that the Hearing Panel decision was contrary to the preponderance of the evidence.").

In sum, Defendant's motion to dismiss the third cause of action for failure to provide a fair and impartial process is granted except as to Columbia's alleged failure to disclose conflicts of interest.

### 3.   Columbia's Withholding of Plaintiff's Diploma

Because Columbia is contractually bound to confer Feibleman's diploma once he has "satisf[ied] the university's academic requirements and compl[ied] with its procedures," Columbia's liability under the common law for withholding his diploma rises and falls with Feibleman's Title IX erroneous outcome claim. *See Papelino*, 633 F.3d at 93. If Feibleman violated the GBMP, then he did not perform his end of the bargain, a critical element of a breach of contact claim. *Detringo*, 158 A.D.3d at 609. Nor would Feibleman have had a reasonable expectation, for promissory estoppel purposes, of receiving his degree if he had committed sexual assault against a fellow student in violation of school policy. *See New York Military*

*Acad. v. NewOpen Grp.*, 142 A.D.3d 489, 490 (2d Dep't 2016).  Because the Court has concluded that Feibleman has plausibly alleged an erroneous outcome claim, the motion to dismiss the fourth and sixth causes of action for wrongful withholding of Plaintiff's diploma is denied.

## III.    CONCLUSION

For the foregoing reasons, Columbia's motion to dismiss is DENIED as to the first cause of action for erroneous outcome under Title IX; GRANTED in part and DENIED in part as to the third cause of action for breach of contract relative to the disciplinary process; DENIED as to the fourth cause of action for breach of contract and the sixth cause of action for promissory estoppel for withholding of Plaintiff's diploma; and GRANTED as to the fifth cause of action for breach of contract for failure to complete the disciplinary investigation within 60 days.

To the extent that Plaintiff wishes to seek leave to amend the Complaint to add an erroneous outcome claim aimed at Columbia's dismissal of Plaintiff's claims against Doe, or to allege any specific promise as to the length of Plaintiff's investigation or Columbia's obligation to investigate retaliation claims against Doe, Plaintiff must file a letter motion (no longer than seven pages) for leave to amend in accordance with the Court's Individual Practices and in a manner consistent with this opinion, no later than **March 13, 2020**; Columbia may file an opposition (no longer than seven pages) on or before **March 20, 2020**; Plaintiff may file a reply (no longer than three pages) on or before **March 25, 2020**.

The Clerk of Court is respectfully requested to terminate docket entry 46.

**SO ORDERED.**

Date:  **February 24, 2020**
      **New York, New York**

                                      **VALERIE CAPRONI**
                                **United States District Judge**