**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **BEN FEIBLEMAN,** | Civil Action No.: 19-cv-04327-VEC |
| **Plaintiff,** | |
| **v.** | **AMENDED COMPLAINT** |
| **THE TRUSTEES OF COLUMBIA** | |
| **UNIVERSITY IN THE CITY OF NEW** | **Jury Trial Demanded** |
| **YORK,** | |
| **Defendant.** | |

1.  PLAINTIFF BEN FEIBLEMAN, by his attorneys Warshaw Burstein LLP, as and for his Amended Complaint against Defendant The Trustees of Columbia University in the City of New York, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

2.  This Title IX discrimination and related state law suit is brought on behalf of Plaintiff Ben Feibleman ("Mr. Feibleman"), a permanently expelled former student at the Columbia University Graduate School of Journalism ("CJS").

3.  Mr. Feibleman was expelled over allegations of sexual assault by a female student despite Defendant The Trustees of Columbia University in the City of New York's ("Defendant" or "Columbia") own admission that the alleged female victim repeatedly begged him to have sex with her, that he refused to do so, and that no sex occurred.

4.  In the late evening and early morning hours of October 4-5, 2016, Mr. Feibleman and a classmate (hereafter referred to as "Complainant"), engaged in limited sexual contact including kissing, fondling, and digital penetration.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

1

5.      Complainant then asked Mr. Feibleman to have full-on sexual intercourse with her while in her bedroom.

6.      When Mr. Feibleman declined, Complainant would not let Mr. Feibleman leave her bedroom and demanded that he have sex with her.

7.      Complainant pleaded with Mr. Feibleman to have sex with her for thirty (30) minutes, during which time she made twenty-nine (29) separate requests for sex (*e.g.*, "You don't want to f--k me?"; "Please have sex with me."; "Please because I can't let you go without it." and so forth).

8.      During the course of her badgering and coercive campaign, Complainant physically and sexually assaulted Mr. Feibleman.

9.      After Mr. Feibleman was finally able to extract himself from Complainant's bedroom, Complainant immediately and falsely told her roommate, "Ben tried to have sex with [me]" and that she had been sexually assaulted.

10.     Complainant then called her boyfriend at the time and repeated her lies.

11.     This is not a he-said/she-said matter – approximately 700 photos, 13 videos, and 30 minutes of audio establish the true facts surrounding the allegations.

12.     When interviewed by Columbia investigators, Mr. Feibleman provided an audio recording of his thirty-minute ordeal in Complainant's bedroom, a transcript of the audio recording, multiple videos, and hundreds of photos from the night of the incident that showed that Complainant was not incapacitated and was aggressively seeking sexual contact (including sexual intercourse) with him throughout the evening.

13.     Neither Columbia nor Complainant deny the authenticity of the photographs, videos, audio recording, or audio recording transcript.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

14.     In the course of her pursuit, Complainant bit Mr. Feibleman three times without his consent, forcibly lowered his pants to expose his penis without his consent, and grabbed his buttocks in an effort to force her mouth onto his penis without his consent.

15.     Despite clear and uncontroverted evidence to the contrary, Columbia determined that Complainant was incapacitated as a result of her alcohol consumption and found Mr. Feibleman "responsible" for sexual assault as a result of the consensual non-intercourse sexual contact he had with Complainant prior to her repeated demands for sex.

16.     This erroneous finding was the result of the anti-male, female protectionist gender-biases permeating Columbia's disciplinary process.

17.     Columbia found Complainant "not responsible" for her assaults on Mr. Feibleman, citing insufficient evidence and noting that even if the alleged conduct had occurred, Mr. Feibleman would have liked it despite clear evidence of and testimony that Mr. Feibleman repeatedly told Complainant "no."

18.     Columbia selectively enforced its sexual misconduct rules against Mr. Feibleman while declining to do so against Complainant.

19.     Columbia selectively enforced its confidentiality requirement and retaliation rules against Mr. Feibleman while declining to do so against Complainant.

20.     Columbia withheld Mr. Feibleman's diploma because the investigation of Complainant's claims were ongoing but granted Complainant her diploma even though Mr. Feibleman's claims against her were unresolved at the time of graduation.

21.     Based on its determination of responsibility and motivated by gender bias, Columbia sanctioned Mr. Feibleman by expelling him permanently after he had already graduated and continues to withhold his degree.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
  fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

3

22.     Columbia's actions, including the imposition of a wildly disproportionate sanction on Mr. Feibleman, were motivated by his male gender – if a male had prevented a woman from leaving his bedroom, demanded sex, disrobed her to expose her genitals, and attempted to force penetration when she tried to leave, Columbia would not have expelled the female student, yet that is exactly what happened to Mr. Feibleman.

## THE PARTIES

23.     Mr. Feibleman is a natural person and a decorated United States Marine who was honorably discharged in 2006 with the rank of Sergeant residing in New York, New York.

24.     Mr. Feibleman earned an undergraduate degree from Columbia is 2011, graduating *cum laude*.

25.     Mr. Feibleman enrolled at CJS for the 2016-2017 school year, and, during the events described herein, he was a student at CJS.

26.     Mr. Feibleman graduated CJS on May 17, 2017 with a master's degree.

27.     On June 28, 2017, he was retroactively expelled, and his degree was revoked.

28.     Defendant is a non-profit corporation duly organized and existing by virtue of the laws of the State of New York that conducts business in the State of New York.

## JURISDICTION AND VENUE

29.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

30.     This Court has personal jurisdiction over Defendant because Defendant is a resident of the State of New York and conducts business within the State of New York.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
  fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

31.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**A.      Columbia's Political Climate Prior to Mr. Feibleman's Enrollment**

32.     Prior to the events in question, Columbia was highly sensitive to accusations that they did not take the complaints of female victims of sexual assault seriously.

33.     In April 2015, Steve Coll, Dean of CJS, co-authored a 12,595-word piece in the Columbia Journalism Review describing, in part, the political climate surrounding accusations of sexual assault at Columbia that read, in part:

> There were numerous reports of campus assault that had been mishandled by universities.  At Columbia, an aggrieved student dragged a mattress around campus to call attention to her account of assault and injustice.  The facts in these cases were sometimes disputed, but they had generated a wave of campus activism.

34.     The national criticism affected Columbia's relationship with alumni donors.

35.     The media criticism of Columbia's mishandling of sexual assault allegations (specifically allegations made by female students), stayed in the headlines of major news organizations throughout 2014 and 2015.

36.     The condemnation of Columbia's failures was exacerbated by the 2016 Presidential Campaign as the nomination of Donald Trump stoked activism on Columbia's campus and continued to lionize former Columbia student Emma Sulkowicz (often referred to in the press as "Mattress Girl").

37.     Columbia offered public affirmations of the victim-focused (read: female-focused) policies that were ultimately instituted in response to Ms. Sulkowicz's media campaign and other

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

external and internal pressures.

**B.**   **CJS's Focus on Female Victims of Sexual Assault During Mr. Feibleman's Enrollment**

38.   CJS's class of 2017 was approximately 75 percent female.

39.   Mr. Feibleman, upon his acceptance, received from Columbia copies of its school policies, including the Gender-Based Misconduct Policy for Students (the "Gender-Based Misconduct Policy").

40.   Prior to orientation, students admitted to CJS were required to complete a mandatory online training course called the "Sexual Response Initiative."

41.   On August 4, 2016, the second day of orientation, all students were required to attend a "Sexual Violence Response" lecture where the Gender-Based Misconduct Policy was explained.

42.   Students were urged to report *any* behavior they think may have violated the Gender-Based Misconduct Policy.

43.   On September 13, 2016 all CJS students were required to attend a lecture about "An Unbelievable Story of Rape," a *Pro Publica* investigation which examined the consequences of not believing female victims of sexual assault.

44.   Prior to the lecture, CJS students were also implored to read an excerpt from Professor Helen Benedict's book "Virgin or Vamp," which advocated for changes in the way journalists report on victims in rape cases.

45.   No other school event, including graduation, received this much attention from CJS faculty during the entire school year.

46.   CJS student witnesses who initially supported Complainant's false allegations and

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

6

counseled her to file a report (but who later realized their support and encouragement were provided in error) cited the school's environment surrounding allegations of sexual assault for their preliminary zeal, stating, "We just did what we were told to do."

    **C.**    **The Evening of October 4, 2016 and Early Morning Hours of October 5, 2016**

47.    The series of events giving rise to this matter occurred on the evening of October 4, 2016 and the early morning hours of October 5, 2016 (the "Incident").

    **i.**    **The Reception**

48.    Mr. Feibleman went to CJS on the evening of October 4, 2016, hoping to run into some of his classmates to brainstorm story ideas for his Reporting class.

49.    When Mr. Feibleman arrived, Complainant, Mary Smith* (a pseudonym; "Ms. Smith*"), Lucy Johnson* (a pseudonym; "Ms. Johnson*"), Sarah Jones* (a pseudonym; "Ms. Jones*"), Nancy Brown* (a pseudonym; "Ms. Brown*"), and Rachel Williams* (a pseudonym; "Ms. Williams*") were in Pulitzer Hall, attending the reception (the "Reception") that always followed the weekly Tuesday evening lecture series for CJS students.

50.    Complainant was having problems in her long-distance relationship with Former Boyfriend #1 (a pseudonym).

51.    Before Mr. Feibleman arrived, Complainant informed her friends that she wanted to break up with Former Boyfriend #1 and that she had other options, specifically Former Boyfriend #2 (a pseudonym).

52.    Soon after making her Title IX complaint, Complainant did in fact break up with Former Boyfriend #1 and begin dating Former Boyfriend #2.

53.    At approximately 7:30 p m., Mr. Feibleman approached Pulitzer Hall and realized that he had missed the Tuesday lecture.  He decided to get a beer at the Reception and see if he

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

could get some ideas from his classmates, many of whom would likely still be there.

54.     Inside Pulitzer Hall, Mr. Feibleman spent some time approaching seated groups of his classmates, eventually filling two full pages of his notebook with story ideas.

55.     Eventually, Mr. Feibleman approached Complainant and her friends.

56.     Mr. Feibleman was able to spend a good amount of time discussing story ideas with Complainant's friends, but after the conversation shifted from her relationship, witnesses noted that Complainant grew quiet, and at some point, moved to sit next to Mr. Feibleman.

57.     Neither Complainant nor her friends were drunk when Mr. Feibleman joined the group.

58.     Soon after Complainant sat herself next to Mr. Feibleman on the floor, her friends observed the beginning of what would be an hours-long flirtation between them.

59.     As the Reception ended and the other CJS students began filtering out, Complainant and Ms. Smith* procured a leftover bottle of wine from the catering staff.

60.     Ms. Johnson* and Ms. Brown* departed, leaving Mr. Feibleman and Complainant with Ms. Smith*, Ms. Jones* and Ms. Williams*.

61.     While Complainant and Mr. Feibleman continued their side conversation, Mr. Feibleman took out his camera and began taking pictures.

62.     Mr. Feibleman was the *de facto* school photographer, documenting the social, academic, and professional life of the school, and he and his camera were a fixture both on and off campus.

63.     Mr. Feibleman took over 700 pictures that evening.

64.     Many pictures show an animated and dynamic Complainant smiling and gazing directly at the camera showing no signs of incapacitation.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

65.     Complainant took the camera from Mr. Feibleman and snapped 47 photos between 8:47 to 8:52 p.m.

66.     Though Complainant would later claim that she was very drunk at this point, the pictures that she took are steady and in focus, and some are even artistically composed.



*Photo #7943: Mr. Feibleman with his notebook and Ms. Jones\* (8:47 p.m.)*



*Photo #7948: Mr. Feibleman and (left to right) Ms. Jones\*, Ms. Williams\*, and Ms. Smith\* (8:48 p.m.)*



*Photo #7950: Mr. Feibleman using his phone (shot from over his right shoulder) (8:48 p.m.)*



*Photo #7978: Mr. Feibleman smiling at witnesses off-camera, with Ms. Jones's\* shoulder and arm in frame (8:51 p.m.)*

67.     Complainant then presented the photographs to Mr. Feibleman for his approval and, sensing Complainant's obvious interest, he put his notebook away and focused the camera back on her and she began to model for him.

68.     Mr. Feibleman took hundreds of pictures over the next 12 minutes that show a playful and lively Complainant performing a series of flirtatious poses for the camera.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person



*Photo #8006: Complainant smiles at camera and raises cup, lying on back with her legs draped over the ottoman (8:56 p.m.)*



*Photo #8132: Complainant gazing meditatively into the distance (9:02 p.m.)*

69.     Complainant's friends noticed the playful energy between Mr. Feibleman and Complainant.

70.     At around 9:15 p.m., after talking, flirting, and posing for about half an hour, Complainant invited him to rest his head on her stomach.

71.     Mr. Feibleman understood the invitation, and they had been getting on well, but he hesitated as he worried about gossip among his CJS classmates given Complainant's relationship and the presence of a diverse international group of her friends.

72.     The cultural climate at Columbia also caused Mr. Feibleman to hesitate.

73.     Every student knew that Columbia and its students were under a microscope when it came to consent as a result of the 2014 "Mattress Girl" case and Columbia's fear of another public relations disaster over its handling of sexual assault allegations and investigations.

74.     Mr. Feibleman, conscious of the climate surrounding consent, wanted to be completely sure of Complainant's intentions.

75.     After Mr. Feibleman asked whether Complainant wanted him to place his head on her stomach, Complainant replied, "Yes."

76.     Complainant observed Mr. Feibleman's hesitation and again invited him to rest his head on her stomach by tapping her stomach and saying, "Come on!  Sit!"

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

10

77.     This was the first of many commands Complainant would give.

78.     Complainant continued flirting with Mr. Feibleman as they lay together on the ground.

79.     During his time at the Reception, Mr. Feibleman observed Complainant drink between only two to three glasses of wine.

**ii.     The Journey to Ms. Smith's\* Apartment**

80.     As the reception hall closed at approximately 9:30 p m., Ms. Smith\* invited the group to her apartment.

81.     Mr. Feibleman declined because he needed to finish his assignment, but Complainant insisted that Mr. Feibleman come with them so that she could show him the roof of Ms. Smith's\* building, including a water tower that they could climb.

82.     CCTV footage from the lobby of the Pulitzer Building recorded Complainant waiting for Mr. Feibleman while he used the bathroom and taking his arm as she and the group stepped out towards Ms. Smith's\* apartment.

83.     As she and Mr. Feibleman walked notably faster than the remainder of the group, Complainant wrapped her arms around Mr. Feibleman's waist and embraced him affectionately.

84.     Complainant was also able to walk on her own.

85.     In fact, Complainant was able to walk backwards while talking and gesticulating broadly to her friends.

86.     As she and Mr. Feibleman walked together down Broadway and got further away from her friends, Complainant became much more affectionate and began sneaking kisses against Mr. Feibleman's neck and cheek.

87.     Video and photo evidence of Complainant and Mr. Feibleman walking directly

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are
fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

contradicts Complainant's later claim that she was so drunk at the time that she could not stand or walk on her own.

88.     Though Complainant later claimed to the Hearing Panel that, "On the way to the apartment I needed help to stand and walk, as verified by numerous witnesses and by security camera footage where you can see me leaning on [Mr. Feibleman]," in reality, selfies Mr. Feibleman and Complainant took together at the time show Complainant resting her hand on Mr. Feibleman's shoulder as she bounces beside him, aggressively flicking her tongue between the "V" of her splayed fingers to simulate oral sex.

89.     The group planned on buying food and drinks to take back to Ms. Smith's* apartment.

90.     When the group stopped to do so, Mr. Feibleman attempted to leave the group so that he could finish his assignment.

91.     Just as before, Complainant insisted that he remain with them, and said she would help him complete his homework so that he could stay.

92.     While waiting for pizza, Complainant helped Mr. Feibleman interview and photograph one of the other customers.

93.     Mr. Feibleman offered to pay for the two boxes of pizza Complainant ordered, but Complainant insisted on paying for them herself.

94.     Complainant went to an ATM, entered her pin number, withdrew cash, and paid for the pizza without incident.

95.     After getting the pizza, Complainant facilitated another interview and photo session with some sanitation workers on the street in order to complete Mr. Feibleman's assignment.

96.     Complainant then went with Ms. Smith* into Westside Market to pick out beer for

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

the group.

97.     Ms. Smith* deferred to Complainant because Complainant used to be a bartender.

98.     During the 45 minutes that it took the group to obtain the pizza and beer, no one expressed any concern about Complainant's ability or capacity.

99.     As they continued towards Ms. Smith's* apartment, Mr. Feibleman and Complainant once again walked apart from Complainant's friends, and she leaned her head on his shoulder and stole kisses as they walked out of their view.

100.    Complainant took his arm and again told Mr. Feibleman that when they got to the apartment, she wanted him to come to the roof with her, an implicit invitation to find themselves alone so they could make out.

101.    When the group entered Ms. Smith's* apartment building, Mr. Feibleman and Complainant lingered outside and let Complainant's friends go up without them.

102.    As soon as her friends were out of view, Complainant wrapped her arms around Mr. Feibleman and kissed him on the cheek, as documented in photographs provided to Columbia.

103.    Though the photographs are unmistakable in showing Complainant's interest, Complainant later claimed that "nothing was consensual" and that she had no interest in Mr. Feibleman.

104.    Complainant and Mr. Feibleman then went inside, and in the elevator on the way to Ms. Smith's* apartment she reminded him about the roof and the water tower.

105.    Almost an hour after Complainant's last drink of the evening, they entered Ms. Smith's* apartment.

**iii.    Ms. Smith's* Apartment**

106.    Once inside Ms. Smith's* apartment, Complainant was chatty, took charge, and

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

13

served drinks, though did not consume any herself, except for a superficial sip from the head of the beer she poured Mr. Feibleman.

107.   Ms. Johnson*, who had come straight home from the Reception, was annoyed by Complainant's insistence that everyone drink alcohol, including Ms. Johnson* who did not wish to partake.

108.   Despite her wishes, Ms. Johnson* drank some beer from a small glass "to appease" Complainant.

109.   Complainant approached Mr. Feibleman once again, and the two shared a seat with Complainant placing her arm around Mr. Feibleman, continuing the flirtation that had been taking place over the past two hours.

110.   Mr. Feibleman participated in an impromptu game that Complainant developed wherein she lifted a glass of beer to Mr. Feibleman's mouth, shouted "Beer!", and poured the contents of the glass into Mr. Feibleman's mouth faster than he could drink it.

111.   Mr. Feibleman and Complainant recorded a selfie video of the game that was submitted to Columbia's investigators.

112.   The video portrayed an exuberant Complainant entirely focused on Mr. Feibleman as she pours beer into his mouth and seeks his approval.

113.   After Mr. Feibleman gives Complainant approval, the video showed Complainant squeezing Mr. Feibleman affectionately.

114.   In the video, Complainant then says, "Okay, wait, let's go again this way," and covers Mr. Feibleman's eyes as she lifts the glass to his lips, making a mischievous face at the camera before tipping the glass faster than he can drink it.

115.   When Mr. Feibleman finishes the beer, Complainant celebrates by making a "V"

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

14

with her fingers and flicking her tongue between them in a sign for oral sex.

116. Mr. Feibleman joins her in fluttering his tongue at the camera before she clasps both her arms around him and pulls him close.

117. Ms. Johnson* was confused because she had not seen their earlier interactions, but Ms. Williams* informed her that Complainant was "having fun" because she was "breaking up with her boyfriend."

118. Mr. Feibleman was unaware of this conversation when it occurred and did not know that Complainant planned on breaking up with Former Boyfriend #1.

119. At one point, Ms. Johnson* brought her cat out so Mr. Feibleman could photograph it, after which the group took turns holding and petting the cat.

120. After the cat wriggled free from Complainant, it ran into Ms. Smith's* room, and Complainant and Mr. Feibleman went in after in it.

121. Once they were in Ms. Smith's* room and out of sight of the rest of the group, Complainant kissed Mr. Feibleman who, for the first time, kissed Complainant back to signal that he was interested.

122. When the kiss ended, Complainant told him to come with her to the roof.

123. Complainant and Mr. Feibleman left Ms. Smith's* room separately so as not to arouse suspicion.

124. Complainant then informed the group of her desire to go to the roof.

125. Mr. Feibleman agreed to go with her, but the rest of the group decided to stay in the apartment.

**iv.   The Roof/Water Tower**

126. Mr. Feibleman and Complainant went to the roof of the apartment building, which

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

15

contained a water tower.

127.    The water tower stands slightly over 30 feet tall.  The cone-shaped roof of the water tower is approximately 10 feet wide at its base, with a 45-degree incline all around and is covered with a sandpaper-like material.  The top of the water tower includes an ornamental wooden spire that is not load-bearing.  The north side of the water tower is flush against the edge of the roof of the building, such that any slip from that side of the tower would result in a 16-story drop.  The sloped roof is unlit and a black wrought-iron ladder rises approximately 30 feet to its edge.



*Photo #2141: The water tower in daylight, with the roof access visible in the background (2018)*

128.    It took Complainant 110 seconds to exit Ms. Smith's* apartment, ascend two flights of stairs, navigate across the unlit roof, and climb halfway up the 30-foot wrought-iron ladder on the side of the water tower.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

16

129.   As shown by the timestamps of photos taken by Mr. Feibleman, it took Complainant 17 seconds to climb the rest of the ladder.[1]



*Photos #8570 (10:49:52 p.m.) #8575 (10:49:55 p.m.) and #8578 (10:50:09 p.m.) show Complainant's speed and agility.*

130.   Once at the top, Complainant invited Mr. Feibleman to join her and "take pictures of the view."

131.   When Mr. Feibleman expressed apprehension, Complainant effectively cajoled Mr. Feibleman into climbing the 30-foot ladder to join her by calling him a "pussy."

132.   Once at the top, Mr. Feibleman scooted backward to sit with his feet against the top of the ladder and his back against the 45-degree roof.

133.   Complainant, confident and sure-footed, was not worried about slipping and demonstrated how the sandpaper roof gripped her socks as she stood.

134.   Mr. Feibleman stood up briefly, to prove to her (and himself) that he could, but his fear of heights brought him back to a seated position, and he was not willing to move.

135.   Complainant then tried to lure him down to the edge so they could dangle their feet while sitting next to each other and presumably kiss while looking out at the skyline, but Mr. Feibleman refused.

---

[1] The photos submitted to the Court show the true facts of events on the roof as they occurred but should not be misunderstood as representative of available light to the naked eye   With the exception of #5160, all photos from the roof were taken with a professional Nikon D750 camera with "low light" settings that captured detail that was indistinguishable to Complainant and Mr Feibleman at the time and were further brightened to recover detail from the shadows   For unadjusted eyes the roof was almost pitch black

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

17

136.   Complainant eventually sat on the south-facing edge of the water tower with her legs dangling below.

137.   Once again, she encouraged Mr. Feibleman to join her, this time reverting to her strategy from the reception by patting the open space on the ledge beside her and ordering Mr. Feibleman to "Come on!  Sit!"





*Photos #5160: Complainant standing upright on the top of the water tower (10:51:25, taken with iPhone.)*

*Photo #8579: Complainant sitting and dangling her legs off the edge of the water tower (10:52 p.m.)*

138.   Throughout the evening, when Mr. Feibleman would refuse Complainant's invitations or advances, he would offer face-saving excuses or a compromise that would give Complainant some of what she wanted while staying within his own boundaries.

139.   However, there were several times during their encounter when Complainant took it too far and Mr. Feibleman was forced to give her a firm, unequivocal "No."

140.   The first time this occurred was while Complainant was sitting on the edge of the water tower when Mr. Feibleman plainly told her that he would not leave his current position and that she would have to come to him if she wanted to sit together.

141.   Complainant responded by crawling over from the far edge of the roof and straddling Mr. Feibleman.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

142.    Timestamps from photos taken by Mr. Feibleman show that it took Complainant just over seven seconds to go from dangling her legs over the edge, traverse the 45-degree incline to where he was sitting, and straddle him.



*Photos #8579-8282: Complainant sits with her feet dangling over the edge and turns to Mr. Feibleman (left to right, 10:52:35-10:52:36 p.m.)*



*Photos #8583-8585 Complainant crawls towards Mr. Feibleman and straddles him (left to right, 10:52:39-10:52:41 p.m.)*

143.    Mr. Feibleman and Complainant engaged in non-intercourse consensual sexual contact atop the water tower between 10:52 p m. and 10:57 p m.

144.    Complainant sat in Mr. Feibleman's lap, straddled him, and kissed his lips with her arms wrapped around him.

145.    Mr. Feibleman and Complainant began to make out, and Complainant quickly began removing her top.

146.    As Complainant removed her top, Mr. Feibleman put his arms around her to keep her steady because of the dangerous height and location of the water tower, not because Complainant was incapacitated.

147.    As the camera dangled loose from the strap in his hand, the shutter was depressed

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

19

for half a second capturing two photos showing Complainant's movements.

148.   The timestamps from these photos indicate that only 15 seconds had elapsed since Complainant climbed into Mr. Feibleman's lap.





*Photo #8586: Complainant and her sweater are partially visible atop the water tower in right edge of frame (10:52:58 p.m.)*

*Photo #8588: Complainant and her sweater are partially visible atop the water tower in right edge of frame (10:52:59 p.m.)*

149.   The next two minutes were full of intense, frenetic, and entirely consensual movement.

150.   Complainant was in total control as she straddled Mr. Feibleman against the water tower while they made out.

151.   During the course of their consensual encounter, Mr. Feibleman unhooked Complainant's bra and she leaned back and pulled Mr. Feibleman's face against her breasts.

152.   As Complainant grinded against him, she reached down to rub his crotch while attempting to remove Mr. Feibleman's vest.

153.   Mr. Feibleman did not wish to go any further while perched on the water tower's roof and suggested that they descend.

154.   Complainant began teasing Mr. Feibleman and eventually taunted him in a sing-song voice: *"I'm making-a-Mariiine scaaa-rrred; I'm making-a-Mariiine scaaa-rrred."*

155.   Mr. Feibleman admitted that he was scared, and because he could not climb down

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

20

without Complainant first getting up from his lap, his only recourse was to repeatedly ask to go down.

156.    Complainant kept taunting him for being scared and being a weak Marine, noting, "Marines are supposed to be tough!"

157.    When Mr. Feibleman again told her he'd like to go down, she slapped him hard across the face and shouted, "Stop being a pussy!"

158.    The sting of her unwelcome slap so shocked Mr. Feibleman that he instinctively grabbed her by the shoulders to keep her from doing it again, and his aggressive response excited her and she resumed kissing him.

159.    Nevertheless, he persisted in his request to descend.

160.    As he pulled away, Complainant responded by aggressively biting him on the lip, which was not desired.

161.    Mr. Feibleman freed himself from Complainant's bite and stated clearly that he did not permit, enjoy, nor consent to biting his lip.

162.    Complainant was excited by his aggressive reaction, but when she realized that he was serious in his refusal, she scoffed at him, "Booo."

163.    At about 10:55 p m. Complainant and Mr. Feibleman heard the door to the roof open and the voices of her friends below.

164.    In response, Complainant pushed him flat against the roof and shushed him.

165.    Complainant wanted to stay hidden, but Mr. Feibleman shouted down to her friends.

166.    After noticing Mr. Feibleman and Complainant on the water tower, her friends looked away to give Mr. Feibleman and Complainant time to get dressed.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

21

167.    None of Complainant's friends suggested then that Mr. Feibleman was taking advantage of Complainant, nor did any of them express any concern that Complainant didn't understand what she was doing.

168.    According to Ms. Johnson*, "[They] quickly dressed and pretend[ed] like nothing happen[ed]."

169.    Photos taken by Mr. Feibleman after Complainant's friends came up to the roof demonstrate Complainant's state of mind on the water tower as she smiles into the camera while straddling him.

170.    After Complainant put her shirt back on, Mr. Feibleman gave her his hand and cautioned her to be careful while descending the water tower.

171.    Complainant slapped his hand away and stated to Mr. Feibleman, "Relax, b--ch, I'm a climber," before rolling backwards and performing a reverse tumble roll off the edge of the water tower, as seen in photos below.



*Photo #8597: Complainant's roll off the tower. (10:58:07 p.m.)*          *Photo #8600: Complainant's roll off the tower (10:58:09 p.m.)*

172.    Mr. Feibleman scrambled to the edge and found Complainant looking up at him, flicking her tongue between the "V" of her fingers and teasing him for not being brave enough to follow her.

173.    Ms. Johnson* stated that Complainant and Mr. Feibleman "came down quickly and

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

22

acted like nothing happened."

174.    After she put on her sweater in the dark, Complainant convinced Ms. Williams*
and Ms. Jones* to go back up with her while Mr. Feibleman photographed them.

175.    Complainant again climbed the ladder, with Ms. Williams* and Ms. Jones*
ascending behind her.

176.    Ms. Johnson* and Ms. Smith* watched from the sidelines and debated if they
should put a stop to it because they were afraid of someone getting hurt or of getting in trouble.



*Photo #8613 (cropped): Complainant climbing ladder followed by Ms. Williams* and Ms. Jones*, Ms. Johnson* and Ms. Smith* chat in foreground (11:00:39 p.m.).*

177.    Ms. Johnson* and Ms. Smith* finally intervened by asking Ms. Williams* and Ms.
Jones* to come down when they were about halfway up the ladder.

178.    Complainant urged Ms. Williams* and Ms. Jones* to continue their climb, but they
relented to Ms. Johnson's* authority as host.

179.    Complainant refused to come down and appealed for Ms. Williams* and Ms.
Jones* to change their mind.

180.    When they declined, Complainant took a defiant step onto the top of the water tower

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

23

and remarked about how it was their loss and that she would enjoy the view without them.



*Photos #8619, 8621, 8624, 8627: Complainant's friends abandon her atop the water tower (taken over 10 seconds at 11:01 p.m.)*

181.    None of Complainant's friends expressed any concern leaving Complainant alone at the top of the water tower.

182.    After 30 seconds, Ms. Johnson* lost her patience and begged Complainant to come down with her arms out wide in a gesture of exasperation which caused everyone to break out in laughter.

183.    Complainant agreed to come down, but only after Mr. Feibleman agreed to take her picture on the top of the ladder.



*Photos #8639, 8640, 8644, 8647: Ms. Johnson* begs Complainant to come down, drinks beer with Ms. Jones* (11:01:48 -
11:02:11p.m.)*

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
  fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

24

184.    Complainant descended the ladder, unaided, in the dark, only 3 minutes after climbing up the second time.

185.    A video recording of the incident shows that Complainant descended the ladder unaided.

186.    In the video, Complainant makes clear her disappointment in her friends when she scolds them in a clear voice, "I'm coming down, you dumb-dumbs!"

187.    At 11:04 p.m., the group returned to the apartment.

188.    Upon returning to the apartment, Mr. Feibleman realized that he did not see Complainant, so he went back up to the roof with Ms. Williams* to find her.

189.    On the roof, they both called Complainant's name and received no response, so they began searching the roof while continuing to call Complainant's name.

190.    After a few minutes, Mr. Feibleman and Ms. Williams* abandoned their search and headed for the stairs.

191.    Just before Mr. Feibleman was about to enter the stairs, Complainant called to him in a low voice from the top of the water tower, which she had now climbed unassisted for a third time.

192.    Mr. Feibleman alerted Ms. Williams* that Complainant was back on the water tower, and Complainant insisted that Ms. Williams* come see the view.

193.    When Ms. Williams* worried that it wasn't safe, Complainant assured her that the water tower's roof was sturdy and the view was worth it.

194.    In order to assuage Ms. Williams's* concerns, Complainant demonstrated balance by standing upright on the water tower.

195.    Complainant's persistence paid off, and Ms. Williams* climbed to the top, as

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

25

depicted in photographs taken by Mr. Feibleman.



*Photo #8675:  Complainant dangles her feet off the edge of the water tower as Ms. Williams\* climbs the ladder (11:09:23 p.m.)*



*Photo #8682:  Complainant (right) shouts down to Mr. Feibleman from the top of the water tower, Ms. Williams\* sits next to her (11:09:54 p.m.)*

196.    Complainant was not satisfied until Mr. Feibleman agreed to join them, so he ascended the water tower as well.

197.    Complainant also suggested Ms. Williams\* would feel safer near the center if she held onto the spire, and took a knee to offer Ms. Williams\* her hand, which Ms. Williams\* soon accepted.



*Photo #8685: Complainant stands upright without assistance on the 45-degree roof (11:11:07 p.m.)*



*Photo #8689: Complainant extends a hand to Ms. Williams\* atop the water tower (11:11:17 p.m.)*

198.    Complainant demonstrated to Ms. Williams\* how to use the spire at the top as a hand-hold but cautioned her that it was superficial and not to overburden it.

199.    Complainant also instructed Ms. Williams\* that she should widen her stance for stability and pulled the inside of Ms. Williams's\* leg to assist her.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

26




*Photo #8694: Complainant demonstrates to Ms. Williams\* how to safely use the spire as a hand hold (11:11:29)*

*Photo #8695: Complainant instructs Ms. Williams\* on how to widen her stance for greater stability (11:11:32)*

200.    Ms. Williams\* was nervous, but Complainant had now spent more than 20 minutes on the water tower without incident and was able to provide guidance to assist her in leaving her comfort zone.

201.    Complainant presented the grand view of the city before she, Ms. Williams\*, and Mr. Feibleman began shouting into the skyline.




*Photo #8711:  Complainant (right) smiles at Ms. Williams\* (left) and directs Ms. Williams's\* attention to the skyline (11:12:05 p.m.)*

*Photo #8733:  Ms. Williams\* (left) and Complainant (right) sit atop the water tower roof and shout into the sky (11:12:30 p.m.)*

202.    Complainant and Ms. Williams\* posed for pictures taken by Mr. Feibleman.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

27



*Photo #8752: Complainant looks at the camera as she and Ms. Williams\* pose for pictures (11:13:24 p.m.)*



*Photo #8758:  Complainant looks into the distance as she poses for pictures (11:13:31 p.m.)*

203.  They resumed shouting into the night, which soon turned to epithets at the university and the pressures of their degree program, before they all started laughing.



*Photo #8771: Complainant and Ms. Williams\* laugh as they pose for pictures (11:14:10 p.m.)*

204.  Complainant asked Ms. Williams\* to teach her how to curse in ███, and Mr. Feibleman recorded a video showing Complainant adeptly learning a phrase in ███ after minimal instruction by Ms. Williams\*, and checking her pronunciation with Ms. Williams\*, who approved.

205.  Complainant and Ms. Williams\* then laughed and hugged before descending the water tower at 11:16 p.m.

206.  At this time, nearly two hours had elapsed from the time Complainant last consumed a full alcoholic beverage.

207.  Mr. Feibleman descended first, followed by Complainant, then Ms. Williams\*.

208.  As Complainant approached the bottom of the ladder, she splayed her legs and

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

28

wagged her tongue between the "V" of her fingers at Mr. Feibleman, signaling oral sex.

209.    After scaling the side of the ladder back up to the top to offer encouragement to Ms. Williams* for her fourth unassisted climb of the evening, Complainant guided Ms. Williams* down.

210.    Complainant then resumed her "Cirque Du Soleil"-style performance.

  

*Photo #8807 (cropped): Complainant looks up as Ms. Williams* climbs onto the ladder above (11:16:52 p.m.)*  *Photo #8809 (cropped): Complainant spreads her legs and makes oral sex gestures at Mr. Feibleman (11:16:55 p.m.)*  *Photo #8802:  Complainant hangs off the side of the ladder while smiling at Mr. Feibleman's camera (11:16:46 p.m.)*

211.    When Complainant finally descended the water tower for the last time, she led Ms. Williams* by the hand as they ran towards the stairs.



*Photo #8832 (cropped): Complainant leads Ms. Williams* in a dash back to the roof access (11:18:15 p.m.)*

212.    After descending from the water tower, Complainant, Ms. Williams*, and Mr. Feibleman noticed a small door hanging ajar next to the stairwell that Mr. Feibleman identified as an elevator maintenance room.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

213.    Complainant crawled inside to explore and encouraged Ms. Williams* and Mr. Feibleman to join her, but they refused.

214.    Complainant once again goaded and teased Mr. Feibleman about being too scared, this time about coming inside the elevator maintenance room.

215.    Mr. Feibleman knew Complainant just wanted to get a rise out of him so he pretended to be disinterested and shined a light inside the maintenance room and commented on how dirty it was.

216.    Complainant scoffed, came out, and walked down the stairs, followed by Ms. Williams* and then Mr. Feibleman.

217.    When he entered the stairwell, Mr. Feibleman found Complainant waiting, expertly posed against the wall, and looking up at him.

218.    He told her not to move as he adjusted the settings on his camera, but she again scoffed and looked away.

219.    Still, she held the pose until the first shutter click and let Ms. Williams* go past her.





*Photo #8833 (cropped): Complainant poses against the window as Ms. Williams* walks down the stairs (11:21:42 p.m.)*

*Photo #8834 (cropped): Complainant still leans against the window as Ms. Williams* continues (11:21:42 p.m.)*

*Photo #8835 (cropped): Ms. Williams* passes Complainant (11:21:42 p.m.)*

220.    After Ms. Williams* turned the second corner, Complainant and Mr. Feibleman

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

were left alone for the first time since they'd been interrupted by her friends and briefly made out against a wall before rushing to catch up before anyone noticed.

221.    Complainant and Mr. Feibleman re-entered Ms. Smith's* apartment at 11:22 p.m.

222.    They made a point to separate – Mr. Feibleman sat at the table to talk with others seated there and Complainant went and spoke to Ms. Johnson*.

223.    Ms. Johnson* pulled Complainant aside to inform her that she had inadvertently put her sweater on inside out after she and Mr. Feibleman were caught on the water tower.

224.    Complainant apologized to Ms. Johnson*, who was confused and stated that she told Complainant, "Whatever you did, it is your choice."

225.    Emerging from Ms. Johnson's* room, Complainant sat down on the floor, as there were not enough seats for everyone, and began to play with her phone.

226.    Over the course of the next half hour, Complainant appeared, to some members of the group, to fall asleep.

227.    By now, it was just before midnight, well over 2 hours since Complainant's last full drink.

**v.    The Walk to Complainant's Apartment**

228.    The party soon began to break up, and the group discussed how they would get home.

229.    Complainant declined Ms. Smith* and Ms. Johnson's* offer to stay at their apartment.

230.    Complainant's friends did not pressure her to accept this offer.

231.    After it was determined that Mr. Feibleman lived closest to Complainant, he offered to walk her home.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

232.    No one protested Complainant's acceptance of Mr. Feibleman's offer, nor did anyone offer to accompany Mr. Feibleman and Complainant.

233.    Around midnight, Complainant, Ms. Williams*, and Mr. Feibleman left Ms. Smith* and Ms. Johnson's* apartment together.

234.    As they walked past the public garden next to St. John the Divine, Complainant tried to convince Mr. Feibleman to sneak into the garden with her after dark.

235.    When Mr. Feibleman declined, she once again teased him for being unadventurous.

236.    Complainant, Mr. Feibleman, and Ms. Williams* were having fun and eventually began skipping and holding hands while singing "*We're Off to See the Wizard*" from *The Wizard of Oz*.

237.    Complainant helped Mr. Feibleman explain the cultural significance of the song to Ms. Williams*, as she had grown up in ███.

238.    After dropping off Ms. Williams* at her apartment, Complainant and Mr. Feibleman left hand-in-hand.

239.    Ms. Williams* observed them holding hands and singing together as they skipped towards ██████ Park.

240.    Once in the park, Mr. Feibleman photographed Complainant skipping and running unassisted.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

32



*Photos #8836, #8837, #8840 (all cropped): Complainant runs through the park. (12:10:24-28 a.m.)*

241.    Mr. Feibleman invited Complainant home with him, but Complainant insisted they go to her apartment because, she said, "I'm an independent lady."

**vi.    Complainant's Apartment**

242.    When Complainant brought Mr. Feibleman inside, her roommate was still up.

243.    The three classmates gathered in the living room, and Complainant went to retrieve her cat, ▉▉▉▉▉▉▉▉▉, and presented him for Mr. Feibleman to take pictures.

244.    Mr. Feibleman took 23 photographs of Complainant and her cat between 12:17 a.m. and 12:20 a m., almost 6 hours since Complainant's first drink, and 3 hours since her last full drink at the Reception.



*Photo #8854: Complainant smiles as she presents her cat ▉▉ ▉▉▉▉▉▉▉) to Mr. Feibleman's camera (12:18:37 a.m.)*

*Photo #8870: The final photo shows Complainant holding her cat, with her roommate partially in frame (12:19:39 a.m.)*

245.    For the next half hour, Complainant, Mr. Feibleman, and the roommate chatted and played with the cat in the living room.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

246.    Complainant and Mr. Feibleman recounted their evening to her roommate, including Complainant's performance on the water tower.

247.    As they talked, Complainant's roommate texted Ms. Johnson* to discuss the evening.

248.    At no time did the roommate or Ms. Johnson* discuss Complainant's level of intoxication.

249.    On the contrary, Complainant's roommate expressed concern for Mr. Feibleman's well-being as a result of Complainant's antics on the water tower and texted Ms. Johnson*, "I think Ben is traumatized."

250.    Because there were only two chairs, Complainant offered her seat to Mr. Feibleman, and Complainant sat on the floor.

251.    When the conversation lulled, Complainant curled up and appeared to fall asleep right in front of the door, blocking Mr. Feibleman's exit.

252.    With her roommate's assistance, Mr. Feibleman picked up Complainant and carried her to her room (adjacent to the living room) and laid her in her bed.

253.    Mr. Feibleman and the roommate then exited Complainant's room, closed the door behind them, and returned to their conversation in the living room.

254.    Complainant, however, was not actually asleep.

255.    Rather, she was eavesdropping on what Mr. Feibleman was telling her roommate about her.

256.    Five to ten minutes into Mr. Feibleman's recounting of Complainant's behavior on the roof, Complainant burst out of her room asserting, "That is *not* what happened!"

257.    The roommate was surprised by Complainant's supposed newfound energy and

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

alertness.

258.    Upon Complainant's return to the living room, her roommate found her speech to be intelligible and clear, describing her as "chipper and enthusiastic."

259.    Mr. Feibleman and Complainant then engaged in what her roommate described as "mutual" cuddling and hand holding on the floor.

260.    At one point, Complainant placed her head on Mr. Feibleman's chest.

261.    When Complainant got up to retrieve a glass of water for Mr. Feibleman, she specifically noted to her roommate that she was going to give him the "nice water" from the roommate's Brita filter.

262.    Her roommate believed that Mr. Feibleman and Complainant wanted some privacy.

263.    Complainant once again curled up in front of the door and appeared to fall asleep, which once again blocked Mr. Feibleman's exit.

264.    Instead of helping Mr. Feibleman carry Complainant to bed, her roommate went to the bathroom, leaving Mr. Feibleman to carry Complainant to bed alone.

265.    This time, when Mr. Feibleman picked Complainant up, Complainant wrapped her arms around his neck.

266.    Mr. Feibleman, mindful of the speed with which rumors spread through CJS, laid Complainant in her bed and left the door open and the hallway light on, signaling to her roommate (and Complainant) that he would not be staying long.

267.    Complainant's roommate stayed in the bathroom for a minute or two.

268.    Complainant's bedroom door was open when her roommate emerged from the bathroom, and her roommate felt awkward because she did not want to invade Complainant and Mr. Feibleman's private moment.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

35

269.    When Mr. Feibleman bent over to give her a goodnight kiss on the forehead, Complainant put her arms around him and pulled him in hard for a kiss on the lips, just as she had when she straddled him on the water tower, and they began to make out with her bedroom door still open.

270.    They made out aggressively, and as the intensity increased, Complainant took Mr. Feibleman's hand and pushed it into her pants underneath her panties.

271.    Complainant told Mr. Feibleman how much she liked rough sex and responded to his touch by grinding against him, pulling his head in to kiss her body, and vocalizing her pleasure.

272.    Complainant and Mr. Feibleman engaged in excessive dirty talk but kept their voices low so as not to alert her roommate.

273.    Through their physicality and dirty talk, Complainant's energy and enthusiasm was unmistakable.   There was kissing, touching, fingering, and throat holding, all of which was consensual.

274.    Together, they removed her pants and panties, with Complainant lifting her lower back and buttocks into the air and pushing her pants and panties down and Mr. Feibleman pulling them off before they resumed.

275.    As things escalated, she soon told Mr. Feibleman she wanted him to "f--k [her]."

276.    Just as he had when things went beyond his comfort level on the water tower, Mr. Feibleman informed Complainant that he was uncomfortable with how their physical encounter was progressing.

277.    Complainant first asked Mr. Feibleman to have sex with her at approximately 1:30 a.m.

278.    Mr. Feibleman refused this initial entreaty.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

36

279.    Complainant and her roommate's rooms faced each other down a hallway, both doors remained open, and the hallway light was on, and if Mr. Feibleman stayed, it would make for worthy gossip.

280.    When Mr. Feibleman refused to stay and have sex, Complainant reacted just as she had earlier in the night, refusing to take "no" for an answer and teasing Mr. Feibleman for being a "pussy."

281.    Mr. Feibleman tried to placate her with excuses.

282.    He reminded Complainant that her roommate was watching, but Complainant said she didn't care.

283.    Mr. Feibleman said it was late and he had class in the morning, but Complainant also claimed she had to get up early.

284.    When she asked him if he had a condom and Mr. Feibleman said he did not, Complainant cast her eyes about the room indicating that they could find one to render Mr. Feibleman's excuse invalid.

285.    He then blamed his refusal on her having a boyfriend, but she told Mr. Feibleman not to worry about her boyfriend and he should just do it.

286.    Complainant refused to accept any reason that Mr. Feibleman gave her for not wanting to have sex with her.

287.    She told him that she knew he "wanted it," and used words like "You know you want to," and "I know how bad you want to f--k me."

288.    Mr. Feibleman was not comfortable with what Complainant was asking him to do, as he did not wish to have rough sex with her on a squeaky bed separated from her roommate (who was likely to spread rumors among the CJS class) by paper thin walls.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

289.    Complainant refused to accept the fact that Mr. Feibleman did not want to have sex with her, and when he stood up to leave, she burst into tears and begged him not to go and to tell her why he didn't find her attractive.

290.    Complainant's behavior made Mr. Feibleman deeply uncomfortable.

291.    Mr. Feibleman tried to make her feel better, but Complainant took every excuse that he gave as a personal judgment.

292.    Only after Mr. Feibleman had gone through every excuse he could think of, he falsely told Complainant that she was drunk, which he believed would be a successful "nuclear option" that, given the climate at Columbia and in America more generally, would allow him to extricate himself from the deeply disturbing situation.

293.    Mr. Feibleman knew that his claim regarding Complainant's drunkenness was false.

294.    It had been 4 hours since Complainant's last full drink.

295.    Complainant demonstrated numerous feats of agility and balance during the time she spent with Mr. Feibleman.

296.    Complainant had not been slurring her speech and was able to learn and speak words in ▇.

297.    Complainant was able to walk unassisted while travelling to Ms. Smith's* apartment.

298.    Complainant was able to walk, run, and skip unassisted while travelling to her apartment.

299.    Complainant's words and actions showed that she was capable of consenting to sex.

300.    Complainant's words and actions indicated that she wanted to have sex.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

38

301.    Mr. Feibleman simply did not want to have sexual intercourse with Complainant.

302.    Complainant's hostile and self-indulgent reaction to Mr. Feibleman's refusal exacerbated his lack of desire and made him uncomfortable.

303.    Moreover, the intensity of Complainant's reaction made Mr. Feibleman anxious about how she might characterize their encounter if he left without calming her down.

304.    Complainant begged Mr. Feibleman not to go, and coerced by her tears, he reluctantly agreed to stay with the hope that he could buy time to raise her spirits and part on better terms.

305.    Nevertheless, because Mr. Feibleman felt trapped, and being well-aware of the political climate at Columbia and CJS, he wanted a record of exactly what happened, so he began recording audio on his phone.

306.    The audio tape begins at 1:37 a.m. and contains numerous statements of consent and requests for sex made by Complainant over the next 30 minutes as she prevents Mr. Feibleman from leaving her room.

307.    Despite her demands, Mr. Feibleman repeatedly refused to have sex with Complainant.

308.    Complainant called him a "liar" and became sexually aggressive.

309.    Even though she knew that Mr. Feibleman had made it clear on the water tower that he absolutely did not consent to biting, Complainant bit him once again.

310.    As Complainant bit him, Mr. Feibleman voiced his clear disapproval.

311.    Mr. Feibleman said he was going to leave, but Complainant repeatedly refused to let him go or otherwise accept his decision.

312.    Complainant would not accept that Mr. Feibleman would not have sex with her and

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

grew increasingly desperate the more it looked like Mr. Feibleman was actually going to leave.

313.    The first time Mr. Feibleman declined to have sex and tried to leave, Complainant had grown hostile and started crying, which made him feel trapped.

314.    Mr. Feibleman agreed to stay a little longer to make her feel better.

315.    By 1:51 a m., Complainant had stopped crying, so Mr. Feibleman stood up to leave.

316.    Hoping that aggressive flattery would be enough to get him out the door, Mr. Feibleman kissed Complainant goodnight, and said, "I have to go home and jerk off, thinking of you."

317.    As he turned to leave, Complainant lunged forward, grabbed him by his waistband, and yanked down his pants and underwear, exposing his penis.

318.    Complainant pulled on Mr. Feibleman's buttocks as she tried to pull Mr. Feibleman's penis towards her mouth.

319.    Mr. Feibleman reflexively attempted to twist away from her and push her away with his left hand against her forehead as he tried to pull his pants up, but Complainant clung to him and pulled on his buttocks to get her open mouth closer to his penis.

320.    Complainant kept trying to entice Mr. Feibleman as she pushed towards his penis while he attempted to wriggle free from her grasp.

321.    Mr. Feibleman finally got enough leverage to push her back onto the bed.

322.    He then pulled up his pants and explicitly told Complainant that he did not want any further sexual contact.

323.    Mr. Feibleman did not consent to Complainant pulling down his pants to expose his penis.

324.    Mr. Feibleman did not consent to Complainant grabbing his buttocks as she tried

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

to pull his penis towards her mouth.

325.    To defuse the situation, Mr. Feibleman attempted to leave yet again and asked for a goodnight kiss.

326.    Complainant refused and made it clear that she was withholding a kiss as punishment for Mr. Feibleman not having sex with her, stating, "Here, Ben, you don't want to f--k me and that disappoints me."

327.    Mr. Feibleman took the opportunity to leave, but as he did so, Complainant began swearing.

328.    Complainant's sudden outburst made him scared to leave, so he asked if she was OK.

329.    Complainant pretended to not know what was happening and asked, "What's going on?".

330.    However, before she asked, "What's going on?", Complainant clearly stated that she knew where she was (in her room) and recalled that Mr. Feibleman needed to get up early the next morning.

331.    Mr. Feibleman asked to leave, but Complainant once again refused to let him go.

332.    Instead, Complainant asked Mr. Feibleman to snuggle with her.

333.    Mr. Feibleman felt trapped and agreed to snuggle for a few minutes.

334.    After some time, Mr. Feibleman said it was late and he had to get to class, but Complainant demanded that they keep snuggling, using the same language as before: "Come on! Keep snuggling!"

335.    Mr. Feibleman continued snuggling with Complainant, who once again began to demand sex from him.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

41

336.    Mr. Feibleman repeatedly declined, said he had to go, and once again he promised to have sex with her another time.

337.    Complainant refused to take no for an answer, asked Mr. Feibleman to "f--k" her, and lamented that no one had ever "f--k[ed] [her] hard."

338.    Mr. Feibleman promised he would do so at a later date, but Complainant begged him to do it there and then.

339.    Once again, Complainant bit Mr. Feibleman hard while they were kissing.

340.    This action was met with an immediate protest from Mr. Feibleman, who clearly voiced his displeasure with Complainant's unwelcome conduct, shouting, "No bite. No bite!" as he pulled away.

341.    This was now the third time Complainant bit Mr. Feibleman's lip without his consent.

342.    When Mr. Feibleman once again attempted to leave, Complainant begged for sex again.

343.    Mr. Feibleman refused once more, so Complainant turned away from him and began to cry.

344.    Mr. Feibleman asked for a goodnight kiss, but Complainant, in an attempt to punish Mr. Feibleman for his rejection, said "no" and turned away with an audible, "harrumph."

345.    At 2:07 a.m. Mr. Feibleman left Complainant's apartment and noted, "That was a really dangerous situation."

**D.     Complainant Starts a False Narrative**

346.    As soon as Mr. Feibleman left, Complainant went to her roommate's room and stated, "Ben tried to have sex with [me]," and told her that she had been "sexually assaulted."

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

347.    Complainant's roommate "thought it was a mutual hookup."

348.    Complainant did not tell her roommate anything about how she had repeatedly asked Mr. Feibleman to stay and have sex with her or how he refused to do so.

349.    Complainant did not tell her roommate that she forcibly took off Mr. Feibleman's pants, exposed his penis, grabbed his buttocks, and attempted to place her mouth on his penis without his consent.

350.    Complainant also conveniently left out her command for Mr. Feibleman to snuggle with her.

351.    Complainant asked to join her roommate in her roommate's bed so they could "cuddle," but her roommate refused.

352.    Mr. Feibleman sent Complainant's roommate a text message to let her know that he had left the apartment.

353.    In an attempt to preserve Complainant's dignity, Mr. Feibleman again falsely asserted that Complainant was drunk.

354.    Mr. Feibleman also noted that Complainant was "insecure," a revelation that prompted Complainant's roommate to call him.

355.    According to her roommate, "[Mr. Feibleman] made it sound like [Complainant] was desperate," during their phone call.

356.    Complainant knew her roommate was talking to Mr. Feibleman and was listening to the call.

357.    Complainant then called Former Boyfriend #1 and told him that she awoke with a classmate in her bed and the classmate was sexually assaulting her.

358.    Complainant falsely told Former Boyfriend #1 that she told Mr. Feibleman to leave.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

359.    During this call, Complainant was not slurring her words.

360.    When Former Boyfriend #1 questioned her supposed level of intoxication, Complainant called him an "asshole" and hung up on him.

**E.    October 5-12, 2016: Complainant's Complaint to Columbia**

361.    On the morning of October 5, 2016, Complainant repeated her lie to Ms. Smith*, claiming that Mr. Feibleman sexually assaulted her.

362.    Ms. Smith* and Ms. Johnson* had encouraged Complainant to go to the police to get a medical examination, but Complainant refused to report her encounter with Mr. Feibleman to the police or Columbia.

363.    Complainant only filed a complaint with Columbia because Ms. Smith* "made" her do so.

364.    On the morning of October 5, Complainant met with Melanie Huff, an Associate Dean at CJS.

365.    Complainant told Huff that the previous evening, "she fell asleep and when she woke up, [another student] was trying to have sex with her."

366.    Complainant declined to identify Mr. Feibleman to Huff.

367.    Later that same day, Complainant submitted an incident report online to Columbia's Gender-Based Misconduct Office ("GBMO").

368.    Complainant's written statement alleged that she had spent time at a classmate's apartment and "was extremely drunk," that her memory had already begun to fade around the time they left the Reception, and that while she was "either' blacking in' or waking up on [her] bed," the male student allegedly "fingered [her] and choked [her]" without her consent.

369.    Included with her allegations of non-consent were that "He mentioned taking me

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
    fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

44

back to his apartment and I said no."

370.    Complainant did not mention that this invitation to his apartment was for a later date after he refused to have sex then and there, nor that the invitation was preceded by her saying, "Please have sex with me.  Please.  I know you want to," and "Please because I can't let you go without it."

371.    On October 6, 2016, Columbia's GBMO contacted Complainant to discuss campus resources and Complainant's interest in identifying the accused student and/or participating in an investigation into Complainant's allegations by Columbia's GBMO.

372.    Complainant asked for more time to consider whether she wished to disclose the accused student.

### i.    Complainant Begins Spreading a False Version of Events to Witnesses and the School

373.    On the evening of October 6, 2016 at a "wine and cheese" party hosted by Ms. Brown*, Complainant began spreading false versions of the encounter to witnesses and gave them explicit permission to tell others, which they did, to great effect.

374.    Complainant suggested to Ms. Smith* that she tell Ms. Brown*, but Ms. Smith* declined, so Complainant told Ms. Brown* herself.

375.    Complainant described to Ms. Brown* that Mr. Feibleman had assaulted her "and the next morning was really awkward."

376.    Complainant also shared her salacious allegations with Kate Taylor* (a pseudonym; "Ms. Taylor*") at the "wine and cheese" party.

377.    Ms. Taylor* subsequently began warning other female students via WhatsApp that Mr. Feibleman had sexually assaulted Complainant.

378.    One of those students immediately contacted Mr. Feibleman, which was how he

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

first learned that Complainant was not only telling people that he had sexually assaulted her, but adding fabricated details, such as that she woke up as Mr. Feibleman was assaulting her but remained silent until he left (despite clear audio evidence to the contrary).

379.    Complainant was also inexplicably claiming that Mr. Feibleman left bruises on her.

380.    On October 11, 2016, Complainant met with Associate Professor Paula Span and informed her about the alleged assault.

381.    Span produced a mandatory report of the details of Complainant's claims, but the contents of the incident report were never made available.

**F.      Columbia's Mishandling of the Roskin-Frazee Case and Concurrent Title IX Investigation By OCR.**

382.    On October 18, 2016, the Department of Education's (the "DOE") Office of Civil Rights ("OCR") informed Columbia that it was opening an investigation into accusations of misconduct in the actions of Columbia GBMO employees Serena Barnett, Benjamin Marzolf, Adrienne Blount, and Jeri Henry, specifically for the alleged way that they mishandled the case of undergraduate student Amelia Roskin-Frazee ("Roskin-Frazee").

383.    This federal investigation into alleged misconduct by Columbia's GBMO was initiated mere days after Complainant reported her alleged assault to Columbia.

384.    In August of 2016, Columbia had initially refused to investigate two separate instances of extreme sexual violence against Roskin-Frazee, a Columbia undergraduate student.

385.    When pressed by Roskin-Frazee, Columbia had engaged in an "investigation" without conducting any witness interviews or reviewing the available digital evidence.

386.    During that investigation, Henry had questioned Roskin-Frazee's continued enrollment at Columbia in light of her criticisms of the school.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

387.    The Columbia officials that Roskin-Frazee accused of refusing to investigate her rapes because she was unable to provide the name of her alleged attacker (Barnett, Marzolf, Henry, and Blount)—and who were now targets of DOE scrutiny—were the *exact same team* ultimately assigned to investigate Complainant's allegations (with the addition of Tikola Russell).

**G.    October 12, 2016: Complainant Identifies Mr. Feibleman as Her Alleged Assailant**

388.    On October 12, 2016, Complainant met with Title IX Investigator Serena Barnett and identified Mr. Feibleman as her assailant.

389.    Barnett and Associate Director Tikola Russell initiated an investigation into Complainant's accusations.

390.    Complainant's case was the first Title IX case at Columbia since the conclusion of the botched Roskin-Frazee "investigation."

391.    The investigation opened by OCR on October 18, 2016, regarding Columbia's handling of Roskin-Frazee's allegations was its fourth concurrent investigation into alleged violations of Title IX in Columbia's conduct of investigating (or failing to investigate) sexual assault allegations.

**H.    Change.org Petition**

392.    On October 7, 2016, Columbia campus activist group, "No Red Tape Columbia" created a public petition on Change.org titled, "Let students record gender-based misconduct proceedings."

393.    The petition specifically targeted Barnett, Marzolf, Blount, Henry, Russell, Marjory Fisher, and Lee Bollinger, all of whom played a role in Complainant's case.

394.    The petition noted Columbia Title IX investigators' history of incomplete and

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

47

inaccurate note-taking as well as their repeated use of intimidating interrogation tactics.

395.    The petition asserted that as a result of Columbia's bar on recording any aspect of the gender-based misconduct process, the aforementioned abuse by Columbia's administrators goes unchecked and leaves students with no objective means of holding Columbia responsible for the improper practices and erroneous outcomes of the gender-based misconduct process.

396.    By the time Barnett interviewed Complainant, the Change.org petition questioning Barnett's competence and professionalism had 656 supporters and was endorsed by several student and professional organizations and guilds.

**I.    Delays, Bias, and Lack of Accuracy in Eyewitness Testimony Collected by Barnett**

397.    Barnett and Russell interviewed Complainant, Mr. Feibleman, and ten non-party witnesses about the evening of October 4-5, 2016.

398.    Complainant was not interviewed until October 27, 2016.

399.    Mr. Feibleman was not interviewed until November 22, 2016.

400.    Complainant's roommate and Ms. Smith* were not interviewed until November 10, 2016.

401.    Ms. Johnson* was not interviewed until November 14, 2016.

402.    Other non-party witnesses were not interviewed until November and December 2016.

403.    None of the witnesses were interviewed under oath.

404.    None of the interviews were recorded.

405.    The only record of testimony from eyewitnesses is what Barnett and Russell chose to write down.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

406.    Complainant and Mr. Feibleman were instructed to "not discuss the incident with those who may be connected to the investigation to protect the integrity of this investigation" (the "Confidentiality Policy").

407.    The Confidentiality Policy provided to Complainant and Mr. Feibleman requesting that they refrain from discussing the incident while the investigation was active was not enforced.

408.    Mr. Feibleman made direct appeals to Barnett, Russell, Huff, and Dean Ernest Sotomayor to enforce the Confidentiality Policy when he found out that Complainant was discussing the case with witnesses.

409.    Barnett, Russell, Huff, and Sotomayor refused to enforce the Confidentiality Policy.

410.    Barnett and Russell did not utilize the contemporaneous photo, video, and audio evidence showing Complainant's conduct on the night in question during her interviews with the non-party witnesses.

411.    Several witnesses provided statements that were inconsistent with the photo, video, and audio evidence of Complainant's conduct on the night in question.

412.    Barnett and Russell did not conduct follow-up interviews based on the questions that Mr. Feibleman submitted regarding the differences between the eyewitness statements and contemporaneous photo, video, and audio evidence that Mr. Feibleman provided.

**J.    Deans Huff and Sotomayor Refuse to Enforce Policy, Discourage Involving an Attorney, and Encourage Mr. Feibleman to Drop Out**

413.    On October 18, 2016, Mr. Feibleman had a meeting with Huff and Sotomayor in Huff's office.

414.    In an email prior to the meeting, Huff discouraged the involvement of Mr.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

Feibleman's attorney.

415.    During the meeting, Mr. Feibleman notified Huff and Sotomayor that Complainant was spreading provably false details among the student body and the non-party witnesses.

416.    Mr. Feibleman informed Huff and Sotomayor that he was honoring the Confidentiality Policy by not publicly defending himself and asked them to enforce the Confidentiality Policy.

417.    Huff and Sotomayor said they had no control over what people tell other people.

418.    When Mr. Feibleman asked for a very brief academic accommodation, Huff encouraged Mr. Feibleman to drop out of school and "apply" for the next year.

419.    If Mr. Feibleman accepted Huff's proposal, he would have lost all progress towards his degree.

420.    The solution presented by Huff to resolve a problem with slanderous sexual rumors at the Journalism School was to drop out.

**K.    Mr. Feibleman's Initial Interview With Barnett and Russell and Mr. Feibleman's Claim Against Complainant**

421.    On November 22, 2016, Mr. Feibleman was finally interviewed by Barnett.

422.    It had been 49 days since Complainant first made the false claim of sexual assault.

423.    Columbia's own policy, in accordance with the OCR Title IX regulations at the time, was that the entire process, from report to hearing results and disciplinary measures, is to be completed within 60 days, with few exceptions.[2]

---

[2] On April 4, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter")  The April 2011 Dear Colleague Letter, while now revoked, was in effect when Defendant Columbia's disciplinary procedures were put in place and when the alleged sexual misconduct occurred in this case  In discussing whether OCR will consider complaint resolutions to be timely, the April 2011 Dear Colleague Letter noted that a typical investigation takes approximately 60 calendar days

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

50

424.    Mr. Feibleman asked to record the interview to ensure he was not misquoted or misrepresented, but Barnett refused.

425.    Mr. Feibleman and his attorney were also not allowed to take notes on what was discussed.

426.    Barnett stated that any attempt to circumvent this policy or create his own record of the interview would result in a Dean's Discipline proceeding.

427.    Barnett and Russell, however, took notes on a laptop.

428.    Barnett stated that once a report was produced, any questions of the accuracy of quotes and context of statements from Mr. Feibleman or any other witnesses would solely be judged against her and Russell's typed notes.

429.    During the interview, Barnett discouraged Mr. Feibleman from having his attorney participate.

430.    Barnett habitually objected when Mr. Feibleman's attorney asked procedural questions.

431.    Barnett said Mr. Feibleman's attorney was only allowed to be present in a capacity of "moral support."

432.    Barnett threatened to have Mr. Feibleman's attorney removed from the room and barred from being present at any future proceedings.

433.    During the interview, Mr. Feibleman provided a detailed account of what occurred on October 4 and 5, 2016.

434.    Mr. Feibleman also provided a detailed written statement of the night in question.

435.    Mr. Feibleman described how Complainant prevented him from descending the water tower despite numerous requests for them to stop and go down.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

436.  Mr. Feibleman described how Complainant slapped him across the face and called him a pussy.

437.  Mr. Feibleman noted that in response to his repeated requests to leave the water tower, Complainant bit him hard without his consent.

438.  He also described the first time Complainant bit his lip on the water tower, wherein he clearly said "No!" and Complainant indicated she understood he did not consent to such behavior.

439.  Mr. Feibleman told Barnett about Complainant's second hard, nonconsensual bite of his lip in her bedroom.

440.  Mr. Feibleman explained that when he tried to leave the bedroom, Complainant grabbed him, forcibly exposed him, grabbed him by the buttocks, and attempted to force her mouth onto his penis while he verbally and physically resisted.

441.  Mr. Feibleman informed Barnett that Complainant understood there was no consent and that when he resisted her attempt to force her mouth on to his penis, Complainant responded, "Here, Mr. Feibleman, you don't want to f--k me and that disappoints me," and "F--k you."

442.  Mr. Feibleman stated that in response to his next attempt to leave, Complainant again bit him hard on his lip without his consent for a third time.

443.  Barnett noted that Complainant's behavior sounded like a violation of the Gender-Based Misconduct Policy.

444.  She asked Mr. Feibleman if he would like to make a claim against Complainant.

445.  Mr. Feibleman stated that he wished to file a claim against Complainant.

446.  Barnett then downplayed Complainant's actions as nothing more than "Sexual Harassment" because she never actually touched Mr. Feibleman's penis despite forcibly

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

52

attempting to do so.

447.    When Mr. Feibleman asked Barnett why she considered Complainant's behavior sexual harassment rather than sexual assault, Barnett, stated, "We don't have a definition for *'Attempted'* Sexual Assault."

448.    In determining what charges to levy against Complainant, Barnett ignored Mr. Feibleman's allegation that Complainant bit him three times without his consent.

449.    Non-consensual biting during sexual activity for the purpose of sexual gratification qualified as Sexual Assault: Contact under Columbia's Gender-Based Misconduct Policy.

450.    Non-consensual biting of an intimate partner constituted Domestic Violence under Columbia's Gender-Based Misconduct Policy.

451.    Non-consensual biting of an individual with whom one was in a social relationship of a sexually intimate nature constituted Dating Violence under Columbia's Gender-Based Misconduct Policy.

452.    In determining what charges to levy against Complainant, Barnett ignored Mr. Feibleman's allegation that Complainant slapped him in the face without his consent.

453.    Non-consensual slapping of an intimate partner constituted Domestic Violence under Columbia's Gender-Based Misconduct Policy.

454.    Non-consensual slapping of an individual with whom one was in a social relationship of a sexually intimate nature constituted Dating Violence under Columbia's Gender-Based Misconduct Policy.

455.    In determining what charges to levy against Complainant, Barnett ignored Mr. Feibleman's allegation that Complainant grabbed Mr. Feibleman's buttocks without his consent as she tried to pull his penis towards her mouth.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

53

456.    Non-consensual touching of an individual's buttocks for the purpose of sexual gratification constituted Sexual Assault: Contact under Columbia's Gender-Based Misconduct Policy.

457.    In determining what charges to levy against Complainant, Barnett ignored Mr. Feibleman's allegation that Complainant forcibly exposed Mr. Feibleman's penis without his consent.

458.    Exposing an individual's genitals without their consent for the purpose of sexual gratification constituted Sexual Exploitation under Columbia's Gender-Based Misconduct Policy.

459.    Barnett then advised Mr. Feibleman that things would go poorly for him if and when his allegations were proven false.

460.    Barnett asked Mr. Feibleman to send her any photos or videos from the night in question only after he confirmed that, despite her warning, he wanted to pursue a claim against Complainant.

461.    Mr. Feibleman provided the photo, video, audio, and documentary evidence in his possession shortly thereafter.

462.    When Complainant had made her claim against Mr. Feibleman, Barnett promptly issued a No-Contact Directive ordering Mr. Feibleman to immediately leave any classroom, campus area, or off-campus event if Complainant was or became present.

463.    Barnett did not issue an updated No-Contact Directive to reflect Mr. Feibleman's claim against Complainant until December 21, 2016, a month after his interview and after the semester was over.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

**L.      Barnett Accuses Mr. Feibleman of "Retaliation"**

464.   On December 8, 20~~16~~67, Barnett conducted a second interview with Mr. Feibleman.

465.   During this interview Barnett accused Mr. Feibleman of retaliating against Complainant.

466.   Barnett had learned that CJS classmate Peter Moore* (a pseudonym; "Mr. Moore*") asked Mr. Feibleman about the case outside of a bar in December.

467.   In accordance with the Confidentiality Policy, Mr. Feibleman declined to give Mr. Moore* any details about the case and did not mention any evidence or his counter complaint.

468.   When Mr. Moore* pressed him for his thoughts on how it would turn out, Mr. Feibleman, believing that the case would be over soon because Barnett had hard evidence contradicting Complainant's version of events and supporting Mr. Feibleman's assertion that Complainant assaulted him, Mr. Feibleman stated that Complainant might not be a student next semester.

469.   Barnett characterized this remark as a threat.

470.   Barnett stated when Mr. Feibleman told this to Mr. Moore*, he should have known that Mr. Moore* would tell Complainant's roommate, and that he should have known that Complainant's roommate would tell Complainant, who would tell Barnett.

471.   Barnett indicated that Mr. Feibleman's vague, offhand comment to a friend that indirectly reached Complainant would be noted in his case and might qualify as "retaliation" and subject Mr. Feibleman to further "discipline."

472.   In response, Mr. Feibleman informed Barnett of Complainant's clear and unequivocal violation~~s~~ of the Gender-Based Misconduct Policy's retaliation provisions and the Confidentiality Policy with multiple CJS classmates.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

473.    According to classmate Vanessa Anderson* (a pseudonym, hereafter referred to as "Ms. Anderson*"), Complainant told her that Mr. Feibleman "raped" her with his penis and gave her an STD.

474.    Complainant also told Ms. Anderson* that she has proof that Mr. Feibleman gave her an STD.

475.    Mr. Feibleman asked Barnett to investigate these statements.

476.    Complainant's statements violated the Gender-Based Misconduct Policy's retaliation provision.

477.    Columbia's Gender-Based Misconduct Policy defines retaliation as follows:

> Any adverse action or threatened action, taken or made, personally or through a third- party, against someone who has filed a gender-based misconduct complaint (a Complainant) or has been the subject of a gender-based misconduct complaint (a Respondent) or any other individual (a Witness, Third-Party Reporter or Advisor) who engages with the Office and/or the process

478.    Complainant's false statements that Mr. Feibleman "raped" her with his penis and gave her an STD were an adverse action taken against Mr. Feibleman, who was both a Respondent and a Complainant in Columbia's Gender-Based Misconduct process.

476.479.    Barnett refused to investigate Complainant's statements.

477.480.    Barnett refused to enforce the Confidentiality Policy against Complainant.

481.    Barnett refused to investigate Mr. Feibleman's claim that Complainant retaliated against him as defined by the Gender-Based Misconduct Policy.

478.482.    Despite the clear directive of the Confidentiality Policy and a clear violation of the Gender-Based Misconduct Policy's retaliation provision, Barnett told Mr. Feibleman, "We can't stop people from sharing their experiences with others."

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

56

483.    Complainant was not sharing her "experience" with others.

484.    Complainant's statement that Mr. Feibleman "raped" her with his penis and gave her an STD contradicted the information from Complainant had provided to Columbia.

485.    Complainant never told Columbia that Mr. Feibleman "raped" her with his penis and gave her an STD.

479.486.    Mr. Feibleman's attorney informed Barnett (an experienced prosecutor) that Complainant's statements were undoubtedly influencing eyewitness testimony.

480.487.    In response, Barnett reiterated her refusal to enforce the Confidentiality Policy against Complainant or investigate Mr. Feibleman's retaliation claim.

481.488.    She also threatened to have Mr. Feibleman's attorney removed if he would not keep quiet.

482.489.    Barnett's statements indicated that Complainant was permitted to speak at length with all the witnesses in the case while Mr. Feibleman was forbidden from doing so.

**M.    December 9, 2016: Complainant Makes Another False Claim of Sexual Misconduct**

483.490.    On December 9, 2016, the Cavalier Daily Alumni Association ("CDAA") held its 2016 holiday party at the New York Times building for alumni of the Cavalier Daily, the student paper for the University of Virginia ("the "New York Times Reception").

484.491.    Complainant had written for the Cavalier Daily as an undergraduate.

485.492.    Complainant was the Communications Chair of the CDAA and served as an organizer for the New York Times Reception.

486.493.    She recruited Ms. Smith*, Ms. Jones*, and her roommate to help with the New York Times Reception, and all four of them were in attendance.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
  fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

487.494.        On the way to the New York Times Reception, Complainant told Ms. Smith* she had taken "some pills," and intended to drink, and Ms. Smith* advised Complainant against mixing such pills with alcohol.

488.495.        Complainant stated she was having problems with Former Boyfriend #2, her new boyfriend, specifically that she was mad at him and considering breaking up.

489.496.        Complainant said that she wanted to drink and not think about it.

490.497.        At the New York Times Reception, Complainant immediately began drinking and later flirting with a Cavalier Daily alumnus she met there.

491.498.        After the New York Times Reception ended, Complainant brought the alumnus with the group to a second location, a bar.

492.499.        At the bar, Complainant sat next to the man and engaged in what appeared to her friends to be consensual behavior that mirrored her behavior with Mr. Feibleman during the Incident.

493.500.        Complainant's friends became uncomfortable witnessing this behavior and intervened to let her know that it was inappropriate.

494.501.        Embarrassed, Complainant falsely accused her new male companion of sexual assault, telling Ms. Smith* that he "was a creep" who "touched her leg."

495.502.        Complainant's friends were shocked to the point of speechlessness by her unsubstantiated claim of victimhood in the face of social criticism.

**N.      January 17, 2017: The Final Investigative Meeting: Evidence Review**

496.503.        On January 17, 2017, Mr. Feibleman met with Barnett to review the submitted evidence.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

497.504.      Barnett made frequent comments and threats throughout the meeting.

498.505.      Barnett chided Mr. Feibleman over a previous letter he had sent, remarking "This looks like your attorney wrote this."

499.506.      When Mr. Feibleman's attorney spoke with Mr. Feibleman or asked questions, Barnett threatened to have Mr. Feibleman's lawyer barred from the disciplinary process.

500.507.      Barnett told Mr. Feibleman, "You know, not everyone can afford an expensive lawyer."

501.508.      When Mr. Feibleman's attorney asked who was representing Complainant, Barnett revealed that Complainant was being represented by Alexi Meyers, celebrity wife of talk show host Seth Meyers, on a pro bono basis.

502.509.      Complainant did not submit any evidence to support her claims against Mr. Feibleman.

503.510.      Barnett showed Mr. Feibleman CCTV surveillance footage from the night of October 4, 2016, which matched his account of events and the photographs he provided.

504.511.      As the meeting came to a close, Mr. Feibleman asked Barnett, who was more than 8 months pregnant at the time, what would happen when she went on maternity leave.

505.512.      Barnett stated that, in accordance with Gender-Based Misconduct Policy, a different Title IX investigator would finish the process.

506.513.      It had been 105 days since Complainant's initial allegations, but Columbia still had not provided any details regarding the allegations against him.

507.514.      At the end of the meeting, Barnett stated that the Factual Summary of all eyewitness testimony and evidence would be made available for review by January 31, 2016.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

**O.**      **January 23, 2017: Barnett's Confirmed Receipt of the Evidence**

~~508.~~515.      At the January 17 meeting, Barnett, who had been provided *all* of the photos in November, asked to be sent the "original" photo files.

~~509.~~516.      For the second time, Mr. Feibleman explained to Barnett that "raw" camera files were akin to undeveloped film, and that the software and computing power required to process the 23 gigabytes (23gb) of data would be difficult.

~~510.~~517.      In order to assist in Barnett's review of the photos, Mr. Feibleman had provided them in the common and easily consumable .jpeg format.

~~511.~~518.      Still, Barnett insisted on obtaining the "original" photo files.

~~512.~~519.      Two days later, Barnett was advised that special arrangements had been made for her to download the 23 gigabytes of photos in their original "raw" format as she requested.

~~513.~~520.      A download receipt with Barnett's email was generated.

~~514.~~521.      Fifteen minutes later, Barnett sent an email stating she was unfamiliar with the format and was having difficulty viewing the files.

~~515.~~522.      Special arrangements were once again made to process and upload the nearly 700 photos into a common .jpeg format.

~~516.~~523.      On January 23, 2017, two separate download receipts were generated with Barnett's email address.

~~517.~~524.      Barnett sent a separate email that stated: "We will review them and let you know if we have any questions."

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

**P.      January 25, 2016: Columbia Requires More Money From Mr. Feibleman**

~~518.~~525.      By January 25, 2016, Mr. Feibleman had exhausted his remaining G.I. Bill service-benefits to pay for graduate school and met with CJS's Director of Financial Aid, where he signed documents to take out an additional $20,000 in student loans to help cover the bills from Columbia.

~~519.~~526.      Columbia's investigation into Complainant's allegations had now been going on for 113 days across two semesters.

**Q.      January 31, 2017:  Benjamin Marzolf Replaces Serena Barnett**

~~520.~~527.       Columbia did not produce the Factual Summary on January 31, 2017.

~~521.~~528.      Mr. Feibleman was notified via email by Russell that Barnett was going on personal leave and Marzolf would be taking over as Title IX Investigator for the remainder of the process.

~~522.~~529.      Marzolf was only a titular replacement for Barnett.

~~523.~~530.      Barnett spent a significant portion of her maternity leave working on the case against Mr. Feibleman.

~~524.~~531.      Barnett did not permit the case against Mr. Feibleman to proceed until she returned.

~~525.~~532.      In at least one other case where the original Title IX investigator became unavailable during the investigative process, Marzolf promptly completed the process after he was assigned to the case.

**R.      March 6, 2017: Revelations from the Covering Religion Trip to India**

~~526.~~533.      The Covering Religion Class, including Complainant, Ms. Johnson*, and

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

other non-party witnesses traveled to India.

527.534.	One classmate called Mr. Feibleman directly from New Delhi and informed him of several disturbing disclosures Complainant made on the trip, such as Complainant repeatedly discussing how much she "loves drinking," to the point of making her classmates uncomfortable.

528.535.	On the flight to New Delhi, Complainant offered a classmate a Klonopin, a powerful benzodiazepine that serves as an anti-anxiety medication, in order to help the classmate sleep.

529.536.	Klonopin has strong, adverse reactions when mixed with alcohol, specifically related to memory.

530.537.	Mr. Feibleman had specifically asked Barnett to inquire about whether or not Complainant had taken benzodiazepines with alcohol on the night in question.

531.538.	The purpose of this question was to explore possible explanations for Complainant's alleged memory loss.

532.539.	Barnett refused to ask Complainant whether she had taken benzodiazepines with alcohol on the night in question.

533.540.	Barnett asserted that asking Complainant about her prescription drug use was not relevant to the investigation.

534.541.	By refusing to investigate Complainant's mixing of alcohol with prescription drugs, Barnett failed to consider all of the relevant evidence while authoring the Investigative Report and making her recommendations regarding responsibility.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

**S.**   **March 21, 2017:  Federal Lawsuit Alleges Barnett Refused to Investigate Sexual Assault Because No Male Assailant Was Named**

~~535.~~542.      On March 21, 2017, Roskin-Frazee filed a lawsuit in Federal Court, publicly alleging that after two violent sexual assaults in her dorm, Barnett and Henry refused to open an investigation or take action because Roskin-Frazee could not provide them the name of a male assailant.

~~536.~~543.      At that time, Columbia had the second highest number of active federal Title IX complaints, as there were four OCR investigations pending against it.

~~537.~~544.      This federal lawsuit and public criticism of Barnett came almost 6 months into Barnett's investigation of Complainant's allegations and at the midway point of her 90 days of maternity leave.

**T.**   **April 1, 2017: Benjamin Marzolf's 60th Day as Title IX Investigator**

~~538.~~545.      April 1, 2017 was Marzolf's 60th day as Title IX Investigator.

~~539.~~546.      Marzolf did not communicate in person, by telephone, by email, or by any other method with Mr. Feibleman from January 31, 2017 to April 1, 2017.

**U.**   **April 7, 2017: Complainant's Sexual Assault Awareness Event and Disclosure to Professor Helen Benedict**

~~540.~~547.      On April 7, 2017, Columbia hosted an event called Spotlight: Media and the Intersection of Sexual Violence and Justice.

~~541.~~548.      Professor Helen Benedict was a panelist at the April 7, 2017 event.

~~542.~~549.      Complainant was one of Benedict's students.

~~543.~~550.      Upon information and belief, Complainant received an extension on her work in Benedict's class due to stress from the alleged sexual assault perpetrated by Mr.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

63

Feibleman.

544.551.    Benedict shared Complainant's alleged victimhood and details surrounding

Complainant's claims of assault with at least one other student.

545.552.    Upon information and belief, Benedict also discussed Complainant's

alleged assault with other faculty members, including Sotomayor and Coll.

**V.    Barnett Returns from 90 Days of Leave and Immediately Resumes Her Role as Title IX Investigator**

546.553.    On April 26, 2016, Russell informed Mr. Feibleman via email that Barnett

would resume as the Title IX Investigator.

547.554.    Russell's email also informed Mr. Feibleman that the Factual Summary was

now available.

548.555.    Marzolf had been only nominally in command of the Title IX investigation

during Barnett's leave.

549.556.    Barnett never relinquished control of the investigation during her leave.

550.557.    Barnett spent approximately 45 hours of her maternity leave working on the

case against Mr. Feibleman.

551.558.    Barnett refused to allow the case to move forward out of a desire to ensure

a finding of responsibility against Mr. Feibleman, the male student at a time when she and her job

was being personally and publicly targeted in a federal lawsuit for failing to protect female student

Roskin-Frazee.

**W.    April 27, 2017: Columbia's Factual Summary**

552.559.    On April 27, 2016, Mr. Feibleman received the Factual Summary from

Barnett's investigation.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
  fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

553.560.      The Factual Summary quoted words and phrases selectively from the Investigative Team's interview notes and included numerous misquotations and mischaracterizations of Mr. Feibleman's statements.

554.561.      The Factual Summary did not include any direct references to the 29 times Complainant asked Mr. Feibleman to have sex with her,

555.562.      The Factual Summary did not include any direct references to Mr. Feibleman's repeated requests to leave Complainant's bedroom.

556.563.      The Factual Summary did not include any direct references to Mr. Feibleman's repeated refusals to have sex with Complainant.

557.564.      The Factual Summary did not contain any substantive descriptions of the photos and videos that corroborate the majority of Mr. Feibleman's description of their encounter.

558.565.      The Factual Summary presented witness statements that were directly contradicted by photo and video evidence as unchallenged and credible.

559.566.      Mr. Feibleman was afforded a "final opportunity" to address the Investigative Team's factfinding, including identifying any relevant information missing from the Factual Summary; sharing any new information not previously known; providing "clarification to details" in the Factual Summary (but only as to his own statements); requesting interviews of any additional witnesses; and submitting questions for Complainant and/or the witnesses.

560.567.      The "clarifications" that Columbia would permit were "generally typos, correction of names and/or dates, or other minor factual errors."

561.568.      For all intents and purposes, Columbia viewed the "initial" Factual Summary as final.

562.569.      All "requested changes, clarifications or questions" were to be submitted

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

65

"at least one (1) business day" prior to the Pre-Determination Conference, or by 12:30 p.m. on Wednesday, May 3, 2017.

563.570.   Mr. Feibleman had less than 6 days to review the 78-page Factual Summary, including heretofore unseen statements from Complainant and all 10 witnesses (whose existence was only now made known to Mr. Feibleman and whose identities were withheld), and take advantage of this first and "final" opportunity to contest the Investigative Team's factual determinations.

564.571.   The Pre-Determination Conference was postponed and ultimately held on May 10, 2017.

**X.   May 11, 2017:  Complainant Publicly Retaliates Against Ms. Smith\* and Ms. Johnson\* When They Reveal Critical Evidence to Mr. Feibleman**

565.572.   On May 11, 2017, the student government hosted a graduation party at Bierstrasse Harlem Beer Garden.

566.573.   The majority of the CJS class of 2017 was in attendance, including Mr. Feibleman, Ms. Smith\*, Ms. Johnson\*, and Mr. Moore\*, as well as Complainant and her new boyfriend, classmate Boyfriend (a pseudonym).

567.574.   The beer garden was crowded with CJS students, but the No-Contact Directive was still in effect.

568.575.   Mr. Feibleman and Complainant were permitted to be in the same location as long as they did not approach or speak to each other.

569.576.   At the graduation party Ms. Smith\* and Ms. Johnson\* invited Mr. Feibleman and a female classmate to sit at their table.

570.577.   Ms. Smith\* told Mr. Feibleman, "I've been wanting to talk to you for

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

66

months."

571.578.    Ms. Smith* and Ms. Johnson* then proceeded to tell Mr. Feibleman about Complainant's behavior during and after the New York Times Reception.

572.579.    As Ms. Smith* explained, "We didn't know [Complainant] then, but we've gotten to know her since," and that the more time they spent with her, the more they realized that something was "not right" and "fishy" about Complainant's allegations and cited incidents surrounding Complainant's behavior.

573.580.    After recounting Complainant's behavior during and after the New York Times Reception, Ms. Smith* stated that Complainant "was behaving with him the exact same way she was with you… The exact.  Same.  Way."

574.581.    Complainant observed Ms. Smith* and Ms. Johnson* sharing this information with Mr. Feibleman and the female classmate.

575.582.    In response, Complainant rushed to the table, knocked a drink on Ms. Johnson*, and began yelling at Ms. Smith* for talking with Mr. Feibleman as he backed away with his hands up.

576.583.    As soon as Mr. Feibleman left the table, Complainant started wagging her finger between Ms. Smith* and Mr. Feibleman and admonished Ms. Smith*, stating, "Well that was a pleasure to see!" before storming off.

577.584.    On her way out of the bar, Complainant crossed paths with Mr. Moore*, to whom she made it clear that she spilled her drink on Ms. Johnson* intentionally, clarifying to him that it was "on purpose."

578.585.    Later, Ms. Smith* shared the following with Mr. Feibleman via Facebook Messenger regarding Complainant's behavior during and after the New York Times Reception:

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

67

MS. SMITH*: It was definitely the first time I thought it could be a pattern: [Complainant] has boyfriend troubles and gets drunks[*sic*], [and] finds comfort with someone else[.]

**Y.   May 15, 2017: Barnett is Informed of New Information, Retaliation**

~~579.~~586.       On May 15, 2017, Mr. Feibleman wrote to Barnett in accordance with Columbia Policy that allows the introduction of new evidence and follow-up questions for witnesses.

~~580.~~587.       Mr. Feibleman asked Barnett to ask Complainant's roommate, Ms. Smith*, and Ms. Jones* four questions regarding Complainant's behavior following the New York Times Reception.

~~581.~~588.       He also asked Barnett to question Ms. Smith*, Ms. Johnson*, and Mr. Moore* about Complainant's retaliatory behavior at the May 11, 2017 graduation party.

**Z.   May 16, 2017: Barnett Refuses to Investigate, Ignores Retaliation**

~~582.~~589.       Barnett refused to conduct the additional limited investigation that Mr. Feibleman requested.

~~583.~~590.       On May 16, 2017, she informed Mr. Feibleman that the questions posed were not relevant to the investigation.

~~584.~~591.       Barnett also asserted that the Pre-Determination Conference held on May 10, 2017 had been Mr. Feibleman's final chance to submit questions to be asked of Complainant or any witnesses.

~~585.~~592.       Mr. Feibleman only became aware of the need for additional questions on May 11, 2017.

~~586.~~593.       Mr. Feibleman explicitly told Barnett that the information upon which his

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

68

additional questions were based was obtained after the Pre-Determination Conference.

~~587.~~594.     Barnett's sudden concern for time as a reason to disregard new evidence stood in stark contrast to her 90 days of leave during the middle of the case.

~~588.~~595.     Despite this knowledge, Barnett refused to permit the questions Mr. Feibleman proposed.

**AA.     May 17, 2017:  Graduation**

~~589.~~596.     Mr. Feibleman graduated from CJS on May 17, 2017.

~~590.~~597.     Columbia placed a hold on the delivery of Mr. Feibleman's diploma because Complainant's sexual misconduct claim against him was pending.

~~591.~~598.     Columbia also blocked Mr. Feibleman's access to his transcripts and his undergraduate degree.

~~592.~~599.     Columbia granted Complainant her degree.

~~593.~~600.     Mr. Feibleman's sexual misconduct claim was pending against Complainant when Columbia granted her degree.

~~594.~~601.     At the graduation ceremony, Coll greeted the new graduates with a polite handshake or hug, depending on his relationship with the student.

~~595.~~602.     Complainant received a tight, two-arm hug from Coll.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person



*Photo #1309: Steve Coll and Complainant embrace each other at graduation (May 17, 2017)*

596.603._____ Mr. Feibleman received a handshake.

**BB.   Medical Report**

597.604._____ On May 30, 2017, Mr. Feibleman submitted an expert report from Dr. David Greenblatt, Editor-in-Chief of the Journal of Clinical Pharmacology in Drug Development and Co-Editor-in-Chief of the Journal of Clinical Psychopharmacology, a Professor of Medicine at Tufts University School of Medicine of 40 years whose specific expertise is how alcohol affects mental, motor, and memory functions.

598.605._____ Dr. Greenblatt reviewed Columbia's Factual Summary, the audio transcript, 29 photos summarizing the evening, and text message exchanges.

599.606._____ Dr. Greenblatt's Medical Report concluded that on the night in question Complainant was not suffering from any impairment that would have prevented her from consenting to sexual activity.

600.607._____ Dr. Greenblatt's Medical Report stated:

> [M]uch of what [Complainant] relates in her statement [to investigators] is qualified by loss of recall, incomplete or fragmented recollection, or recall that requires

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

photographic reminders or reminders from other sources. The apparent implication is that the lost or incomplete recall is at the same time automatically connected to an inability to make sound intellectual judgements or provide consent. The assumption of this connection is incorrect, and not supported by biomedical evidence. […]

The important point is that impaired or lost memory of events during these episodes does not imply that insight and judgment were impaired at the time. [citations omitted] Specifically, [Complainant]'s statements do not by any means indicate that her capacity for reasoning, insight, and judgment regarding the meaning of consent and its implications were in any way impaired. [Complainant]'s appearance and actions as documented in the Investigative Report, the photographic documents and accompanying narrative, the witness statements, and the audio transcript are consistent with her having intact reasoning, insight, and judgment, including the capacity to understand and give consent. […]

My overall conclusions are that [Complainant] had ingested alcohol during the evening/night of October 5, 2016. A consequence of this was alcohol-induced anterograde amnesia. This is a common and in fact an anticipated result of social alcohol use, with the density of the amnesic effect depending on the quantity and timing of alcohol consumption. The occurrence of anterograde amnesia associated with alcohol does not imply that reasoning, insight, and judgment become impaired. Based on the audio transcripts and witness statements, [Complainant]'s speech patterns were purposeful, directed, and unconfused, and there were no evident lapses of consciousness or wandering of focus. From those same sources and from the photographic record, [Complainant]'s motor function was evidently unimpaired - in fact, [Complainant] was able to walk, climb and descend stairs, and balance herself in a precarious position on the building rooftop. Putting together the available information, I see no evidence to indicate that [Complainant] had any impairment that would have modified or interfered with her capacity to give consent to sexual activity.

601.608.    On June 16, 2017, Barnett informed Mr. Feibleman that Dr. Greenblatt's opinion was "irrelevant" because Dr. Greenblatt had not met Complainant.

602.609.    Barnett also warned Mr. Feibleman that he may be subject to further discipline by consulting with a medical expert as part of his defense.

603.610.    Prior to the Disciplinary Hearing, Henry informed Mr. Feibleman that he was forbidden from telling the Hearing Panel of the Medical Report's existence.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

**CC.    June 1-8, 2018: The "Pre-Hearing Conference(s)"**

~~604.~~611.        On June 1, 2017, Mr. Feibleman attended a Pre-Hearing Conference with Barnett and Marzolf.

~~605.~~612.        This was the first and only time Marzolf and Mr. Feibleman met.

~~606.~~613.        During a procedural review at the start of the meeting, Barnett asked if Mr. Feibleman or his attorney had any questions about the latest changes to the report.

~~607.~~614.        Mr. Feibleman's attorney asked why Barnett did not include the full transcript of Complainant's repeated demands for sex in the "Undisputed Factual Summary" that she would present with her recommendations.

~~608.~~615.        Barnett argued that she had conceded *some* of Complainant's requests for sex and that the full transcript of Complainant's demands for sex would be available to the Hearing Panel in the appendix (a 113-page addendum to what would ultimately be a 120-page report).

~~609.~~616.        Barnett then shut down the conversation entirely and barred Mr. Feibleman's attorney from asking questions.

~~610.~~617.        Mr. Feibleman was ill and unable to speak due to laryngitis.

~~611.~~618.        Mr. Feibleman's attorney continued to asked questions.

~~612.~~619.        Barnett sat in silence, looking away and pretending not to hear the questions from Mr. Feibleman's attorney.

~~613.~~620.        Mr. Feibleman finally attempted to ask the same questions his attorney was asking despite his illness.

~~614.~~621.        Barnett grudgingly answered the questions when repeated by Mr. Feibleman.

~~615.~~622.        Barnett ultimately decided to postpone the Pre-Hearing Conference for

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

another week.

~~616.~~623.     As he was leaving, Mr. Feibleman asked if Complainant had already been told Barnett's theory of the case and recommendations to the Hearing Panel.

~~617.~~624.     Barnett stated that she informed Complainant of her theory of the case and recommendations.

~~618.~~625.     Mr. Feibleman asked if Barnett could tell him at the very least what her recommendations were for each of the alleged offenses by both Mr. Feibleman and Complainant.

~~619.~~626.     Barnett refused to provide this information.

**DD.    June 7, 2017: Letter to Barnett Detailing Bias in Factual Summary and Requesting Inclusion of the Medical Report**

~~620.~~627.     On June 7, 2017, Mr. Feibleman sent a letter to Barnett stating his belief that she was intentionally omitting critical uncontroverted factual evidence of Complainant's statements that "clearly communicat[e] her willingness to engage in sexual activity."

~~621.~~628.     The June 7, 2017 letter also noted Barnett's intentional "burying" of photo and video evidence that showed Complainant's "steady gait" and "balance."

**EE.    June 8, 2017: "Peaks and Valleys" - Barnett's Incredibly Perfect Theory of Incapacity**

~~622.~~629.     On June 8, 2017, Mr. Feibleman's Pre-Hearing Conference resumed.

~~623.~~630.     Barnett and Russell were present, while Marzolf was absent.

~~624.~~631.     For the first time, Barnett finally revealed her recommendations and her theory of the case to justify them to Mr. Feibleman.

~~625.~~632.     Barnett reiterated her refusal to consider the Medical Report.

~~626.~~633.     She also re-raised the issue of potential additional discipline because Mr.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

Feibleman shared the Factual Summary with an outside medical expert.

627.634.    During the ensuing conversation, Barnett threatened once more to bar Mr. Feibleman's attorney from future proceedings.

628.635.    Barnett then orally presented her recommendations.

629.636.    Barnett stated that Complainant was credible because she provided a consistent narrative of the allegedly little information she remembered.

630.637.    Barnett went on to note that Complainant's narrative was corroborated by evidence with few contradictions.

631.638.    She stated that Complainant's deteriorating relationship with her boyfriend was not a motivating factor to lie.

632.639.    Barnett noted that the witnesses in the case were overall credible with limited bias.

633.640.    Barnett stated that Mr. Feibleman was not credible despite providing a consistent narrative and "some" evidence.

634.641.    Barnett admitted that the evidence that Mr. Feibleman submitted corroborated his version of events.

635.642.    However, she asserted that Mr. Feibleman's evidence did not show that Complainant had the capacity to consent.

636.643.    Despite conceding that Mr. Feibleman had no motivation to lie, Barnett stated that he did not give a convincing explanation for why he recorded Complainant's repeated demands for sex.

637.644.    Barnett then explained the relevance of her credibility determination in light of the preponderance of the evidence standard.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

638.645.     According to Barnett, anything Complainant claimed to not remember (such as her assault and biting of Mr. Feibleman), did not happen unless witnesses or other evidence showed that it did.

639.646.     Additionally, Mr. Feibleman's account of what occurred in these moments appeared to serve no evidentiary value for Barnett.

640.647.     Barnett recommended finding Mr. Feibleman responsible for two instances of sexual assault (fingering Complainant in her bedroom and grinding against Complainant as they kissed in her bedroom) and two instances of sexual harassment (taking photographs of Complainant as she straddled him on the water tower and applying pressure to Complainant's throat in her bedroom).

641.648.     Barnett recommended finding Mr. Feibleman not responsible for one instance of sexual assault (kissing Complainant's lips and breasts on the water tower).

642.649.     Prior to the hearing, Barnett changed her recommendation regarding the alleged sexual harassment on the water tower to a finding of not responsible.

643.650.     Barnett recommended finding Complainant not responsible for sexual harassment for repeatedly biting Mr. Feibleman, exposing his penis, and attempting to force her mouth onto his penis.

644.651.     Barnett noted that even if Complainant did everything Mr. Feibleman claimed she did, her behavior would not have been unwelcome or made Mr. Feibleman feel degraded or abused, even though they acknowledged that he repeatedly told Complainant, "No."

645.652.     Mr. Feibleman asked Barnett why Complainant's repeated demands for sex were not considered.

646.653.     Barnett stated that Complainant's requests for sex were made when she was

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

incapacitated and were therefore irrelevant.

647.654.        Mr. Feibleman asked why the photo and video evidence of Complainant's ability to walk, climb, descend stairs, balance on the water tower, and perform acrobatic maneuvers were not considered indicative of capacity.

648.655.        Barnett stated that Complainant's decision to climb the water tower was a sign of her incapacitation because it showed she was not making rational decisions.

649.656.        Barnett stated that the time period that Complainant was on the water tower (approximately 10:45-11:15) constituted her peak incapacity for the evening.

650.657.        Despite this finding, Barnett recommended a finding that Mr. Feibleman was not responsible for the interaction that occurred on the water tower because of a lack of evidence.

651.658.        Mr. Feibleman asked why statements from Complainant's roommate regarding her behavior indicating that she had the capacity to consent and did in fact consent to physical contact with Mr. Feibleman were not considered.

652.659.        Barnett explained that Complainant allegedly "falling asleep" (around 1:00 a.m.) was a stronger indicator.

653.660.        Barnett did not discuss Complainant's roommate's testimony indicating that Complainant was not actually asleep.

654.661.        According to Barnett, Complainant resumed capacity immediately at 1:53 a.m.  between the time she said, "Here, Ben, you don't want to f--k me and that disappoints me" and when she began swearing repeatedly before asking Mr. Feibleman to snuggle.

655.662.        Barnett confirmed that Complainant still had capacity at 2:07 a.m. when she allegedly told her roommate that Mr. Feibleman tried to have sex with her.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

76

656.663.     Mr. Feibleman then asked Barnett to reconcile her finding that Complainant was incapacitated when she asked for sex with the fact that Complainant explicitly requested sex during the fourteen-minute period between 1:53 a.m. and 2:07 a.m. when Barnett indicated Complainant had capacity.

657.664.     Barnett responded, "Capacity can work in peaks and valleys."

658.665.     Barnett's theory of Complainant's incapacity was based not on medical science but rather perfectly tailored to fit Complainant's allegations.

659.666.     Barnett failed to account for the fact that Complainant requested sex at least seven (7) times between 1:53 a.m. and 2:07 a.m., a time period when Barnett admitted that Complainant had capacity.

660.667.     Mr. Feibleman repeated his understanding of Barnett's theory back to her to confirm that he had not misunderstood.

661.668.     Mr. Feibleman asked Barnett if she was stating that Complainant alternated between *incapacitated-drunk* and *sober* in turns of just a few seconds that perfectly and coincidentally aligned to disqualify every one of Complainant's 29 instances of enthusiastic affirmative consent.

662.669.     Mr. Feibleman also asked Barnett to confirm that Complainant was *incapacitated* when she said, "Look, Ben, you don't want to f--k me and that disappoints me…F--k you… You hate me," but *resumed capacity* only seconds later when she "woke up" and demanded that he snuggle with her rather than leave.

663.670.     Mr. Feibleman sought further confirmation that after he agreed to snuggle with Complainant and she quickly resumed begging him for sex, Complainant was once again incapacitated when she said, "I think you wanna f--k me," "muster the courage," "I don't get why

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

you won't do it now.  I know you want to.  Please.  Please, Ben, I want you," and only resumed

capacity *immediately after being rejected* by Mr. Feibleman.

664.671.      In response to these questions, Barnett looked down and muttered,

"Basically."

665.672.      Barnett did not attend the hearing.

**FF.**      **June 15, 2017: The Investigative Report.**

666.673.      The Investigative Report was issued on June 15, 2017.

667.674.      The Uncontested Factual Summary of the Investigative Report did not

mention Complainant's third and fourth climbs of the water tower despite the uncontroverted

photographic evidence that Mr. Feibleman provided.

668.675.      The Uncontested Factual Summary did not mention the fact that

Complainant took her shirt off on the water tower, nor did it state that Complainant initiated the

make out session with Mr. Feibleman by sitting on his lap and straddling him after her first climb

despite the uncontroverted photographic evidence provided by Mr. Feibleman.

669.676.      The Investigative Report found Complainant credible despite her limited

memory.

670.677.      The Investigative Report found Complainant credible despite photographic,

video, and audio recording evidence that contradicted her testimony.

671.678.      The Investigative Report noted that what Complainant did remember could

be relied upon.

672.679.      The Investigative Report acknowledged that Mr. Feibleman provided

detailed factual statements on the three occasions he was interviewed and provided photographs

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

and audio recordings to substantiate his account of what happened.

673.680.    The Investigative Report also noted that Mr. Feibleman's chronology of events was corroborated by Complainant, the non-party witnesses, and independent evidence.

674.681.    Still, the Investigative Report questioned Mr. Feibleman's credibility based on his explanations for certain actions that he took and his denial that Complainant showed any signs of intoxication.

675.682.    The Investigative Report did not meaningfully address the 29 times Complainant begged Mr. Feibleman for sex.

676.683.    The Investigative Report recommended findings related to the charges against Mr. Feibleman and Complainant consistent with Barnett's recommendations as described above.

**GG.**   **June 20-21, 2017: The Hearing Panel and Finding of Responsibility Against Mr. Feibleman**

   **i.**   **June 20, 2017: The Hearing Panel**

677.684.    On June 20, 2017, a Hearing Panel was convened to determine responsibility for the charges levied against Mr. Feibleman and Complainant.

678.685.    Prior to the Hearing, Mr. Feibleman submitted a written statement and documentary and photographic evidence (including the Medical Report) to the Hearing Panel.

679.686.    Henry heavily redacted material portions of Mr. Feibleman's statement.

680.687.    Henry also refused to submit the documentary and photographic evidence (including the Medical Report) that Mr. Feibleman included with his statement to the Hearing Panel.

681.688.    Henry prevented Mr. Feibleman from discussing the Medical Report.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

682.689.     Henry also barred any reference to Complainant's behavior following the New York Times Reception.

683.690.     Mr. Feibleman was also not allowed to describe Complainant's public retaliation against Ms. Smith* and Ms. Johnson* when they turned against her.

684.691.     Henry advised that if Mr. Feibleman raised any of the proscribed evidence, she would halt the Hearing immediately, Mr. Feibleman would be removed, and the Hearing would proceed without him.

685.692.     The Hearing Panel consisted of three Columbia employees: Spencer Bennett (Associate Director of the Student Conduct and Community Standards Office and a lawyer), Francisco Pardo (Associate Director of the Equal Opportunity and Affirmative Action Office and a lawyer), and Jazmin Taylor (Director of Investigations, Equal Opportunity and Affirmative Action Office).

686.693.     Mr. Feibleman and Complainant appeared separately before the Hearing Panel.

687.694.     No testimony was taken under oath or transcribed by the Hearing Panel.

688.695.     None of the 10 non-party witnesses appeared before the Hearing Panel.

689.696.     Barnett, Marzolf, and Russell did not attend because the Hearing Panel did not have any questions regarding the 8-month investigation.

690.697.     The Hearing Panel did not ask Complainant any questions regarding the 29 times she asked Mr. Feibleman for sex on tape.

691.698.     Nor did they ask her about her repeated refusals to take "no" for an answer when Mr. Feibleman declined intercourse.

692.699.     Pardo asked Mr. Feibleman what he thought Complainant meant when she

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

asked him to "f--k" her.

693.700.     Though Complainant was available to explain her words on tape, neither Pardo nor the other panelists asked Complainant what she meant when she asked Mr. Feibleman to "f--k" her.

694.701.     When Mr. Feibleman described in his opening statement how Complainant attempted to force oral sex on him, he begged the Panel, "Please, please, ask me about it."

695.702.     The Hearing Panel did not ask a single question about Mr. Feibleman's claims against Complainant despite Mr. Feibleman's impassioned request that they ask about Complainant's attempt to force oral sex upon him.

696.703.     When Mr. Feibleman tried to explain the lingering questions he felt the panel should ask Complainant, Bennett cut him off and told him to save it for his closing statement.

697.704.     In his closing statement, Mr. Feibleman implored the Hearing Panel to review the uncontroverted photographic and video evidence he provided.

**ii.     June 21, 2017: The Hearing Panel Findings**

698.705.     The Hearing Panel issued its findings on June 21, 2017.

699.706.     The Hearing Panel found Mr. Feibleman responsible for sexual assault for the sexual contact that occurred on top of the water tower (despite Barnett's recommendation to find him "not responsible") as well as the digital penetration and sexual contact at Complainant's apartment.

700.707.     Mr. Feibleman was found not responsible for sexual harassment that allegedly occurred on the water tower.

701.708.     The Hearing Panel stated that the facts of what happened on the night in

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

81

question were not in dispute.

702.709.      The issue was whether Complainant was incapacitated and thus unable to give affirmative consent.

703.710.      The Hearing Panel concurred with Barnett that Complainant was incapacitated.

704.711.      The Hearing Panel stated that their decision was due in part to the "significant issues with [Mr. Feibleman's] credibility," which allowed them to discredit all of his statements and testimony unless it was corroborated by Complainant, her friends, or other evidence.

705.712.      The Hearing Panel determined that Complainant was incapacitated on the water tower based on the amount of alcohol she allegedly consumed and her behavior.

706.713.      Regarding Complainant's ability to execute the reverse tumble roll off the water tower that was 30 feet above a 13-floor building, the Hearing Panel concluded that Complainant "lacked rational and reasonable decision-making abilities."

707.714.      The Hearing Panel noted that Mr. Feibleman had pointed out that the "reverse tumble roll" showed Complainant was in complete control of her body.

708.715.      The Hearing Panel ignored Mr. Feibleman's statements and the evidence he provided showing a fully capable Complainant who was not incapacitated.

709.716.      The Hearing Panel found Complainant not responsible for sexual harassment.

710.717.      The Hearing Panel stated that there was insufficient evidence to determine whether Complainant's alleged conduct occurred, citing Barnett's assessment of Mr. Feibleman's credibility.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

82

711.718.　　The Hearing Panel also noted the lack of witnesses and the lack of recollection on the part of Complainant.

**HH.　June 28, 2017: Mr. Feibleman Is Expelled**

712.719.　　On June 28, 2017, Columbia issued the Sanction Letter authored by Sotomayor.

713.720.　　Sotomayor stated that following his review of the entire file, he determined that the proper punishment was expulsion, which Sotomayor described as a complete separation from Columbia (the "Sanction").

714.721.　　As a result of his expulsion, Mr. Feibleman was prohibited from receiving the master's degree he earned from CJS.

715.722.　　When the Sanction was issued, Mr. Feibleman had completed all requirements necessary for the award of his master's degree.

716.723.　　The Sanction Letter did not make a single mention that Complainant doggedly begged Mr. Feibleman to have sex with her and that Mr. Feibleman refused.

717.724.　　The Sanction Letter did not mention Complainant's unaided ascents and descents of the water tower.

718.725.　　The Sanction letter did not mention Complainant's reverse tumble roll off of the water tower.

719.726.　　The Sanction letter did not mention the video and photographic evidence indicating that Complainant was not incapacitated on the night in question.

720.727.　　The Sanction letter did not mention Complainant's ability to balance herself on the water tower.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

83

721. 728.    The Sanction letter did not mention the video evidence showing Complainant walking with a steady gait.

722. 729.    The Sanction Letter gave no reasonable justification for why Columbia would apply the extreme sanction of clawing back a degree months after it had been earned and the student had been allowed to graduate.

723. 730.    The Sanction Letter advised Mr. Feibleman that he could appeal the decision but limited that appeal to a review of three grounds: (i) procedural error, (ii) new information and (iii) excessive sanction.

## II.    Complainant's "V for Victory" Celebrations

724. 731.    Within minutes of being notified of his expulsion, Mr. Feibleman received a phone call from Mr. Moore* offering his condolences.

725. 732.    Mr. Moore* informed Mr. Feibleman that Complainant was broadcasting Mr. Feibleman's expulsion to their classmates and inviting them to celebrate with her by "going drinking."

726. 733.    Complainant also posted a celebratory photo of ███████████ holding his hand up in the air with his fingers in the shape of a "V" on her Facebook page with the caption: "███████'s 'V' for Victory."

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person



*Celebratory Facebook Post by Complainant:* ▮ *'s "V" for Victory*

**JJ.**   **July 12-31, 2017: The Appeal**

727.734.     On July 12, 2017, Mr. Feibleman appealed the Hearing Panel findings and the Sanction (the "Appeal").

728.735.     Mr. Feibleman asserted that the Hearing Panel decision was contrary to the preponderance of the evidence.

729.736.     He further argued that the Sanction was excessive, unjustified, and unprecedented in light of significant mitigating factors.

730.737.     Mr. Feibleman pointed out that the undisputed facts, as verified by photographs, video and audio recordings, showed that Complainant was not incapacitated due to her alcohol consumption and at all times demonstrated affirmative consent through her words and

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

85

actions.

731.738.    Mr. Feibleman noted Complainant's consistent and clear willingness and desire to engage in sexual activity.

732.739.    He also reminded Columbia that Complainant's last significant consumption of alcohol  occurred hours before any alleged offending behavior occurred.

733.740.    The Appeal further noted that objective photographic and video evidence showed that Complainant had a steady gait and exhibited the ability to balance herself, even while climbing a ladder and standing on the summit of a water tower.

734.741.    The Appeal argued that the Sanction was excessive for numerous reasons.

735.742.    There was no force, coercion, or intentional incapacitation.

736.743.    There was no bias-motivated conduct.

737.744.    The Appeal noted that the evidence of Complainant's level of intoxication was, at best, inconclusive.

738.745.    Despite a lack of clear evidence regarding the extent of Complainant's intoxication, Columbia imposed the harshest possible penalty – expulsion, revocation of alumni privileges (including career services), and the clawing back of a degree rightfully earned.

739.746.    The Appeal noted that important mitigating factors were ignored.

740.747.    The Appeal noted that there are no aggravating factors.

741.748.    Mr. Feibleman did not provide Complainant with drugs or alcohol.

742.749.    Complainant had not consumed any significant amount of alcohol in Mr. Feibleman's presence during the last 4 hours they were together.

743.750.    Complainant never once said no or stop while engaging in sexual contact with Mr. Feibleman.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

86

744.751.    Complainant begged Mr. Feibleman to have sexual intercourse with her.

745.752.    Mr. Feibleman refused to have sexual intercourse with Complainant.

746.753.    The Appeal also stated that Mr. Feibleman was denied the ability to compare the Sanction with other students who have also been expelled.

747.754.    The Appeal further noted that the extreme sanction of expulsion was designated for an aggravated set of facts, of which there were none.

748.755.    The Appeal also raised several procedural errors.

749.756.    The disciplinary process took 257 days to complete.

750.757.    Columbia refused to ask follow-up questions regarding the New York Times Reception, an incident in which Complainant was the sexual aggressor in an interaction with another male and later mischaracterized the incident.

751.758.    Columbia refused to ask follow-up questions regarding Complainant's intimidation of witnesses when they attempted to share information regarding the aforementioned interaction with Mr. Feibleman.

752.759.    Columbia's Gender-Based Misconduct Policy states that new information can be submitted to the Hearing Panel.

753.760.    The Appeal noted that Barnett and Henry refused to provide the Medical Report to the Hearing Panel.

754.761.    The Appeal included several supporting exhibits, including the Medical Report.

755.762.    After Mr. Feibleman submitted the Appeal, Henry informed him that she had redacted any references to the Medical Report and his other supporting evidence.

756.763.    On July 14, 2017, Henry informed Mr. Feibleman and Complainant that the

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

87

Appellate Panel would consist of Deans Merit Janow (School of International and Public Affairs), Irwin Garfinkel (School of Social Work), and Steve Coll (CJS).

757.764.    Unbeknownst to Mr. Feibleman at that time, Coll had been Complainant's professor and had a close relationship with Complainant that began before he was named to the Appellate Panel.

758.765.    Coll was also aware of Complainant's allegations against Mr. Feibleman before he was named to the Appellate Panel.

**KK.    July 31, 2017: Appeal Decision**

759.766.    On July 31, 2017, 300 days after the Incident, the Appellate Panel denied Mr. Feibleman's Appeal.

760.767.    The Appellate Panel refused to consider Mr. Feibleman's argument that the Hearing Panel's findings were contrary to the preponderance of the evidence.

761.768.    The Appellate Panel stated that there were no procedural errors because there was no evidence that the delay affected the investigation and sanction in the case.

762.769.    The Appellate Panel stated that the Sanction was not excessive and upheld the Hearing Panel's decision that Complainant was incapacitated.

763.770.    The Appellate Panel noted that, "[Complainant] invited [Mr. Feibleman] to a tempting proposition[.]"

764.771.    The Appellate Panel stated that there are few cases where expulsion is the appropriate remedy.

765.772.    The Appellate Panel faulted Mr. Feibleman for recording the interaction in Complainant's bedroom instead of removing himself from the situation.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

88

766.773.    The Appellate Panel faulted Mr. Feibleman for trying to protect himself.

**LL.**   **Additional Factors Influencing Columbia's Sanction of Expulsion and Rejection of Mr. Feibleman's Appeal**

**a.**   **New Media Storm About "Mattress Girl" Case During the Appeal**

767.774.    On July 13, 2017, Columbia settled the lawsuit *Nungesser v. Columbia* (also known as the "Mattress Girl" case).

768.775.    Weeks of negative press for Columbia followed this settlement.

769.776.    None of this press would have gone unnoticed by the appellate panelists, and especially not by Coll, who was the dean of, as he wrote in the Appeal Decision, "possibly the finest journalism school in this country."

770.777.    In fact, The New Yorker, where Coll was employed as a staff writer, commented on the settlement in an article titled, "The Trump Administration's Fraught Attempt to Address Campus Sexual Assault" published on July 15, 2017.

**MM.**   **Complainant's Undisclosed Relationship with Steve Coll**

771.778.    Steve Coll was the most sought-after professor and advisor at CJS.

772.779.    Coll only accepted a handful of graduate students for his classes.

773.780.    Complainant was enrolled in at least one of Coll's classes.

774.781.    Coll was Complainant's favorite professor.

775.782.    Complainant was one of Coll's favorite students.

776.783.    Coll wrote professional reviews for Complainant.

777.784.    Coll ██████ Complainant ███████████ .

778.785.    ████████████████████████████████

████████████████████████████████████

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

███

779.786.     Steve Coll ███████████  Complainant ████████████

Complainant ██████████████████████████████.

780.787.     During the Title IX process, Complainant received at least one extension on her master's thesis due to the supposed stress she was enduring.

781.788.     Upon information and belief, Steve Coll also granted her an extension due to the stress she was enduring from the Title IX process.

782.789.     Throughout the Title IX process, Coll and Complainant knew that because of his role as Dean of CJS, Coll would be a member of the Appellate Panel unless he recused himself.

783.790.     Regarding conflicts of interest (potential or actual), the Gender-Based Misconduct Policy states:

> The University requires any individual participating in the investigation, adjudication process, sanctioning or appeal determinations to disclose to the Gender-Based Misconduct Office any potential or actual conflict of interest. […And that] the University will take steps to address the conflict in order to ensure an impartial process.

784.791.     Coll and Complainant kept their personal and professional relationship secret from the GBMO and the other members of the Appellate Panel.

785.792.     Coll did not disclose the conflict of interest when he was assigned to the Appellate Panel.

786.793.     In a social media post following the rejection of Mr. Feibleman's Appeal, Complainant ████████ Coll ███████████████████

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

90

**NN.** **The Knight Foundation**

787.794.     Between 2014 and 2016, the Knight Foundation increased its annual donations to CJS from $349,201 to $2,177,143.

788.795.     In 2015 the Knight Foundation committed $25,000,000 in future donations for the newly established Knight First Amendment Institute at Columbia University.

789.796.     Coll is a board member of the Knight First Amendment Institute.

790.797.     Coll had a vested interest in protecting Columbia Journalism School's reputation with donors and in the press.

**OO.** **Damages**

791.798.     As a direct and proximate result of the expulsion, Mr. Feibleman sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

792.799.     Columbia's decision villainized Mr. Feibleman.

793.800.     Due to Columbia's one-sided enforcement of the Confidentiality Policy and Anti-Retaliation Policy, Mr. Feibleman was unable to publicly defend himself.

794.801.     Mr. Feibleman's career as a journalist and photojournalist has been effectively killed by the Sanction.

795.802.     The most valuable aspect of CJS, as noted by Professor Bill Grueskin at the start of every school year, is the CJS professional alumni network.

796.803.     As a result of the Sanction, Mr. Feibleman does not have access to CJS alumni services.

797.804.     CJS makes sure that their graduates have access to job openings in an ever-

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

shrinking industry.

798.805.    Even during the school year, deans inform students about "magic" job openings from organizations like Slate or Bloomberg, that, by law, have to be open to the public, but which are only posted online in the middle of the night for a brief period of time.

799.806.    Only CJS students are told when and where the "magic" job openings will appear.

800.807.    As a result, CJS students, at the direction of CJS staff, queue up to take the jobs before competing journalists ever know they are available.

801.808.    The Sanction also prevents Mr. Feibleman from reaching out to CJS faculty for professional mentorship or advice.

802.809.    Columbia's choice to enable Complainant's slander has obscured the truth from Mr. Feibleman's former classmates, many of whom now operate in positions of influence.

803.810.    In 2017, when Mr. Feibleman first posted in support of the #MeToo movement, a CJS alumna (who was also Complainant's roommate during her India trip; "former roommate") posted on his Facebook page, "How ironic. Now imagine the pain of the women you have assaulted."

804.811.    Mr. Feibleman deleted the comment.

805.812.    Mr. Feibleman later contacted Complainant's former roommate to ask what Complainant had told her.

806.813.    Complainant's former roommate first apologized to Mr. Feibleman for misjudging him.

807.814.    She noted that "[Complainant] did a lot of horrible things and lied constantly."

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

92

~~808.~~815.    She described that "[Complainant] was dangerous.  I never want to be near her AGAIN!"

~~809.~~816.    The former roommate was concerned that Complainant would seek to ruin her life for reasons unrelated to the Incident, but she was thankful she had definitive proof that Complainant is a liar.

~~810.~~817.    The former roommate stated "It does not surprise me that you rejecting her made her play victim.  She's awful."

~~811.~~818.    When Mr. Feibleman asked her to explain this comment, she said that Complainant spent every night on their research trip lying to Former Boyfriend #2 about her behavior, describing, "I couldn't believe how innocent she played when really she is willing and ready to ruin people's lives." Adding, "She was willing to do it to me as well."

~~812.~~819.    The Sanction greatly limits Mr. Feibleman's career prospects because the #MeToo movement has directed its aim at men in the media.

~~813.~~820.    Mr. Feibleman will not be able to secure employment if potential employers find out that he was expelled from CJS for sexual misconduct.

~~814.~~821.    In the unlikely scenario that he is ever able to obtain a job in journalism, Mr. Feibleman will be terminated if Columbia's faulty determination becomes known.

~~815.~~822.    Complainant is keenly aware of the climate surrounding men in the media and the #MeToo movement.

~~816.~~823.    In January 2018, Complainant posted a story from the New York Times about the "Shitty Men in Media List" to a CJS alumni group.

~~817.~~824.    The story notes how the Shitty Men in Media List uses anonymous allegations to destroy male journalists' careers.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

818.825.    Complainant wrote that it was an "Interesting piece."

819.826.    She later deleted the post.

820.827.    Complainant has explicitly stated her desire to use Columbia's faulty decision to destroy Mr. Feibleman's career.

821.828.    In January 2019, Complainant stated that she "has eyes on [Mr. Feibleman]'s social media," and that, "as soon as she sees [Mr. Feibleman] working somewhere" she's going to "put all this out in front of people."

822.829.    One of Complainant's friends warned Mr. Feibleman, "Whatever you're doing, she plans on bringing this up in your life," adding that Complainant said that she is "waiting to pounce."

823.    Columbia's actions and the resultant death of his nascent career have caused Mr. Feibleman to suffer from depression and recurring nightmares about Complainant and Columbia officials.

824.    Columbia's actions have also exacerbated Mr. Feibleman's service-connected disabilities, requiring new treatment in therapy and incurring the economic costs of that therapy.

**FIRST CAUSE OF ACTION**
**(VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972 –**
**ERRONEOUS OUTCOME)**

825.830.    Mr. Feibleman repeats and re-alleges each and every allegation stated above as if fully set forth herein.

826.831.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

827.832.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

828.833.   In its fiscal year ending June 30, 2017, Columbia received hundreds of millions of dollars in federal funding for research and development.

829.834.   A school violates Title IX when it fails to prevent or remedy sexual harassment or sexual assault.

830.835.   A school violates Title IX when gender is a motivating factor in its decision to impose discipline.

831.836.   Title IX requires schools to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.

832.837.   Title IX requires that all educational institutions have policies and procedures that afford due process to both parties involved.

833.838.   The evidentiary and procedural errors rampant throughout the investigation, hearing, and appeal constituted a denial of due process in this case resulting in an erroneous outcome based on an erroneous and distorted conception of the facts.

834.839.   Under Title IX, an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature.

835.840.   Challenges to university disciplinary proceedings on the basis of "erroneous outcome" assert that the plaintiff was innocent and was wrongly found to have committed an offense and that gender bias was a motivating factor behind the erroneous findings.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

836.841.      An erroneous outcome occurred in this case because Mr. Feibleman was innocent and wrongly found responsible for sexual assault and sexual harassment charges, and gender bias was a motivating factor.

837.842.      Evidentiary weakness and procedural flaws support a case of an erroneous outcome.

838.843.      As fully described above with pertinent examples detailed below, Columbia committed numerous evidentiary and procedural missteps throughout the disciplinary process.

839.844.      Mr. Feibleman had explicit verbal and non-verbal consent for the non-intercourse sexual conduct that occurred.

840.845.      Columbia ignored the Medical Report, which indicated Complainant was not incapacitated at any point during the night in question.

841.846.      Mr. Feibleman provided relevant, objective, and uncontroverted evidence showing that Complainant was not incapacitated at any point during the night in question.

842.847.      Photographic and video evidence showed Complainant walking unassisted between the lecture hall and Ms. Smith's* apartment, at times backwards over brickwork.

843.848.      Mr. Feibleman provided relevant, objective, and uncontroverted evidence that directly contradicted the eyewitness testimony that Columbia improperly relied upon to find Mr. Feibleman responsible.

844.849.      Mr. Feibleman provided relevant, objective, and uncontroverted evidence that directly contradicted Columbia's factual findings.

845.850.      Mr. Feibleman provided relevant, objective, and uncontroverted photo and video evidence that firmly established that Complainant was not incapacitated on the roof/water tower at Ms. Smith's* apartment.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

846.851.      Incredibly, Columbia asserted that Complainant's ability to perform a backwards roll off of a water tower and catch the attached ladder was proof of her incapacity.

847.852.      The Hearing Panel chose to credit Complainant's implausible claim that she "was not in control of [her] faculties" on the water tower despite the clear photo and video evidence to the contrary.

848.853.      Columbia ignored evidence that established that Complainant was not incapacitated at her apartment when non-intercourse sexual contact occurred.

849.854.      Columbia stated that the peak of Complainant's supposed incapacity occurred at approximately 11:00 p m.

850.855.      Photo and video evidence that Mr. Feibleman provided to Columbia show that Complainant was not incapacitated around 11:00 p m., or at any time thereafter

851.856.      Mr. Feibleman and Complainant engaged in non-intercourse sexual contact approximately two and a half hours later.

852.857.      Unless Complainant is the only human being on Earth who metabolizes alcohol in reverse, there is no explanation for how Complainant could have been "incapacitated due to consumption of alcohol" at her apartment.

853.858.      In spite of the relevant, objective, and uncontroverted evidence that Mr. Feibleman provided, Columbia found him responsible for violating the Gender-Based Misconduct Policy.

854.859.      Columbia ignored evidence that Complainant violated the Gender-Based Misconduct Policy.

855.860.      Complainant repeatedly begged Mr. Feibleman to have sex with her and refused to take no for an answer.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

97

856.861.    Complainant bit Mr. Feibleman multiple times without his consent.

857.862.    Complainant slapped Mr. Feibleman without his consent.

858.863.    Complainant forcibly removed Mr. Feibleman's clothes, exposed his penis, grabbed his buttocks, and attempted to place her mouth on his penis without his consent.

859.864.    Complainant did not deny that she engaged in this behavior.

860.865.    She asserted that she cannot remember if she did or did not act this way because of how much she drank.

861.866.    That is not a defense against allegations of misconduct.

862.867.    The Gender-Based Misconduct Policy states, "The use of alcohol or other drugs is never an excuse for committing a policy violation and does not diminish anyone's responsibility to obtain informed and freely given consent."

863.868.    On the audio recording he provided to Columbia, Mr. Feibleman is heard repeatedly saying "no" and asking to leave.

864.869.    When Complainant bites him, he says, "Nope! Nope!"

865.870.    When Complainant assaults him he can be heard verbally and physically resisting.

866.871.    When Complainant bites him again, he shouts, "No bite! No bite!"

867.872.    Columbia claims that Mr. Feibleman's placating compliments and promises of future sex mean that, even though he can be heard repeatedly saying "no" and refusing consent at the time, Complainant's "conduct would not have been unwelcome."

868.873.    According to Columbia, when a man says "no," he really means "yes."

869.874.    Columbia impermissibly delayed completing the disciplinary process related to Mr. Feibleman and Complainant's allegations.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

870.875.    Barnett inexplicably delayed conducting witness interviews for multiple weeks.

871.876.    Barnett refused to conduct requested follow up interviews that would have impacted Complainant's credibility.

872.877.    Barnett and Henry denied Mr. Feibleman the opportunity to present relevant evidence related to the Medical Report, Complainant's false allegation of sexual misconduct following the New York Times Reception, and Complainant's retaliation against witnesses for sharing information regarding her false allegation.

873.878.    The Hearing Panel did not ask Mr. Feibleman any questions about his allegations against Complainant.

874.879.    The Hearing Panel did not question Barnett or Russell.

875.880.    The Hearing Panel's disinterest in the truth was predetermined.

876.881.    Barnett and Russell did not attend the Hearing.

877.882.    The Hearing Panel did not ask Complainant any questions regarding the 29 times she asked Mr. Feibleman to have sex with her.

878.883.    The Hearing Panel's finding that Complainant's reverse tumble roll off the water tower showed that she "lacked rational and reasonable decision-making abilities" runs counter to determinations made by Columbia regarding male students who claim to be incapacitated by alcohol.

879.884.    In at least one recent case, Columbia determined that a male student's ability to carry a female stranger he had met only hours before showed that he was not incapacitated.

880.885.    Several Columbia administrators directly involved in the disciplinary process are attorneys.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
   fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

881.886.    Despite their professional training, these administrators allowed the disciplinary process to proceed unchecked against the evidentiary and procedural errors.

882.887.    The evidentiary and procedural errors occurred because of Mr. Feibleman's male gender.

883.888.    In response to a spate of recent bad press, Columbia sought to appear responsive to allegations by female students.

884.889.    Specifically, Barnett made it her mission to use Mr. Feibleman's case as vindication for various attacks against her by survivor advocates.

885.890.    Columbia could not afford to have another female "victim" pillory them in a public forum.

886.891.    Columbia also feared a Title IX lawsuit from Complainant.

887.892.    Henry's LinkedIn profile notes that when she served as the Interim Director of the GBMO from 2014 to 2015 she "[d]rafted policies and procedures for compliance and risk mitigation with thoughtful acknowledgement of reducing litigation exposure."

888.893.    After she was promoted to Assistant Vice President of Student Conduct and Community Standards at Columbia in 2015, Henry, according to her LinkedIn profile, "led the strategic plan to change the [Columbia's] response to gender-based misconduct in the midst of significant public scrutiny with special consideration to drastic legislative changes."

889.894.    Thus, Columbia adopted a policy of bias favoring female students over male students in order to avoid liability and bad publicity.

890.895.    Such behavior constitutes illegal sex discrimination.

891.896.    As a result of its stated efforts to change its response to alleged gender-based misconduct in the face of increased litigation exposure and public scrutiny, Columbia

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

ignored the relevant, objective, and uncontroverted evidence proving Mr. Feibleman's innocence in order to find him responsible for sexual misconduct.

892.897.    As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**SECOND CAUSE OF ACTION**
**(SELECTIVE ENFORCEMENT VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972)**

893.898.    Mr. Feibleman repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

894.899.    Mr. Feibleman and Complainant were similarly situated male and female students in the circumstances of this case.

895.900.    Both were graduate students at the same school, under the same student policies.

896.901.    Both were reported to have committed sexual misconduct violations against each other.

897.902.    Nearly the entirety of their 6-hour encounter was documented in 744 photos, 13 videos, and 30 minutes of audio, the material content of which is not in dispute.

898.903.    This removed from Columbia the heavy burden of weighing allegations of he-said/she-said and freed them to weigh objective evidence.

899.904.    However, the evidence did not favor Columbia's intended outcome, so they treated the same set of facts very differently for the male and female student.

900.905.    Complainant repeatedly begged Mr. Feibleman to have sex with her.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

901.906.    Mr. Feibleman repeatedly refused to have sex with Complainant.

902.907.    Mr. Feibleman repeatedly asked to leave Complainant's bedroom.

903.908.    Complainant repeatedly denied Mr. Feibleman's requests to leave.

904.909.    Columbia determined that when Complainant said "yes," she really meant "no."

905.910.    Columbia determined that when Mr. Feibleman said "no," he really meant "yes."

906.911.    When Complainant straddled Mr. Feibleman, removed her shirt, and pulled his mouth to her breasts, Columbia called it "Sexual Assault."

907.912.    When Complainant forcibly exposed Mr. Feibleman's penis and attempted to place her mouth on his penis despite physical and verbal indications that Mr. Feibleman did not consent, Columbia downgraded the charge against Complainant to "Sexual Harassment."

908.913.    Columbia withheld Mr. Feibleman's diploma at graduation because Complainant's allegations were pending against him.

909.914.    Columbia granted Complainant her diploma despite Mr. Feibleman's pending allegations against her.

910.915.    Columbia enforced the Confidentiality Policy against Mr. Feibleman, barred him from discussing the disciplinary process with other students, and threatened repercussions if Mr. Feibleman violated the Confidentiality Policy.

911.916.    Columbia did not enforce the Confidentiality Policy against Complainant and permitted Complainant to discuss the disciplinary process freely with other students without fear of reprisal.

912.917.    When Complainant gave vague descriptions of alleged misconduct, it was

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

102

broken into 5 separate charges against Mr. Feibleman.

913.918.     When Mr. Feibleman gave detailed descriptions and actual evidence of multiple instances of misconduct by Complainant, they were bundled into one single charge against Complainant.

914.919.     Columbia threatened to charge Mr. Feibleman with retaliation for making a vague statement to a fellow student.

915.920.     Columbia did not investigate Complainant for retaliation despite her making false and incendiary statements to CJS students about Mr. Feibleman.

916.921.     Columbia did not investigate Complainant for retaliation despite being informed of evidence that she verbally and physically attacked other students who shared favorable information with Mr. Feibleman.

917.922.     Complainant's testimony was deemed credible despite being contradicted by physical evidence.

918.923.     Mr. Feibleman's testimony was found not credible despite being supported by physical evidence.

919.924.     Columbia's actions were motivated by its desire to avoid liability and bad publicity.

920.925.     As a direct and proximate result of the above conduct, Mr. Feibleman sustained tremendous damages, including, without limitation, ~~emotional distress,~~ loss of educational and career opportunities, economic injuries and other direct and consequential damages.

921.926.     As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

disbursements.

## THIRD CAUSE OF ACTION
### (STATE LAW BREACH OF CONTRACT)

922.927.      Mr. Feibleman repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

923.928.      A contractual relationship existed between Mr. Feibleman and Columbia at all relevant times hereto.

924.929.      The Gender-Based Misconduct Policy promises that students will have a fair and impartial disciplinary process in which it is Columbia's responsibility to show that a violation has occurred before any sanctions are imposed.

930.    Columbia breached its contract with Mr. Feibleman when it failed to disclose conflicts of interest that were present conduct a fair and impartial during the disciplinary process, notably Steve Coll's appointment to the Appellate Panel.

931.    Columbia's Gender-Based Misconduct Policy promises to protect participants in the Gender-Based Misconduct process from retaliation.

932.    Columbia's Gender-Based Misconduct Policy defines retaliation as follows:

925.    Any adverse action or threatened action, taken or made, personally or through a third- party, against someone who has filed a gender-based misconduct complaint (a Complainant) or has been the subject of a gender-based misconduct complaint (a Respondent) or any other individual (a Witness, Third-Party Reporter or Advisor) who engages with the Office and/or the process

933.    According to Columbia's Gender-Based Misconduct Policy:

Retaliation includes threatening, intimidating, harassing, or any other conduct that would discourage a reasonable person from engaging in activity protected under this Policy, such as seeking services; receiving protective measures and accommodations; reporting gender-based

**Formatted:** Indent: Left: 1", Right: 0.5", Space After: 12 pt, Line spacing: single, No bullets or numbering

**Formatted:** Font: 12 pt

**Formatted:** Font: 12 pt

**Formatted:** Indent: Left: 1", Right: 0.5", Space After: 12 pt, Line spacing: single, No bullets or numbering

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

misconduct; or participating in an investigation or adjudication as a Complainant, Respondent, Witness, Third-Party Reporter or Advisor.

934. Columbia's Gender-Based Misconduct Policy notes, "Retaliation includes maliciously and purposefully interfering with, threatening, or damaging the academic or professional career of another individual, before, during or after the investigation and resolution of a report of gender-based misconduct under this Policy."

935. Columbia's Gender-Based Misconduct Policy further notes, "Retaliation may also include violations of a no contact directive and/or other interim measures put in place during the course of an investigation."

936. The Gender Based-Misconduct Policy notes, "All individuals and groups of individuals, not just a Respondent or Complainant, are prohibited from engaging in retaliation."

937. The Gender-Based Misconduct Policy states, "If the alleged retaliation occurs during the course of an investigation and occurs between the Complainant and the Respondent, these allegations may be investigated separately through the Dean's Discipline process or folded into the pending investigation, based on the circumstances of the allegation."

938. The Gender-Based Misconduct Policy further notes, "Allegations of retaliation by other parties, i.e., not between the Complainant and the Respondent, will be investigated separately by the Office when the allegations involve gender-based misconduct. Any other allegations of retaliation will be investigated and adjudicated through the Dean's Discipline process."

939. During the course of Columbia's investigation, Complainant spread false rumors about Mr. Feibleman to fellow CJS classmates.

940. Complainant falsely told fellow CJS students that Mr. Feibleman "raped" her with his penis and gave her a sexually transmitted disease.

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

105

941.    Complainant's statements were an adverse action that she made personally against Mr. Feibleman.

942.    Complainant's statements were malicious and purposeful and made with the intent to interfere with, threaten, and damage Mr. Feibleman's academic and professional career.

943.    Many students within the CJS community were aware of Complainant's statements.

944.    Mr. Feibleman's reputation with his CJS classmates was damaged as a result of Complainant's false and inflammatory statements.

945.    The damage to Mr. Feibleman's reputation interfered with, threatened, and damaged Mr. Feibleman's academic career, as Complainant was providing inflammatory and false information to potential witnesses to the Gender-Based Misconduct.

946.    Being forced to confront a false rape accusation and a false claim that the rape led to the transmission of a sexually transmitted disease is conduct that would discourage a reasonable person from engaging in activity protected by the Gender-Based Misconduct Policy, such as participating in an investigation or reporting gender-based misconduct.

947.    Complainant's false statements constituted Retaliation under the terms of the Gender-Based Misconduct Policy.

948.    Mr. Feibleman informed Columbia that Complainant was spreading false statements regarding their sexual interaction within the CJS community.

949.    Despite knowledge that Complainant was spreading false statements that Mr. Feibleman had "raped" her with his penis and gave her a sexually transmitted disease, Columbia failed to investigate Mr. Feibleman's claims of retaliation against Complainant.

950.    Columbia knew that Complainant's statements were false because they contradicted the information that Complainant provided to Columbia.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

106

951.   Despite knowing that Complainant's statements were false, Columbia failed to protect Mr. Feibleman from retaliation.

952.   Despite knowing that Complainant's statements were false, Columbia failed to enforce the Gender-Based Misconduct Policy's Retaliation provision against Complainant.

953.   Complainant also threatened, intimidated, and harassed third-party witnesses in Mr. Feibleman's presence.

954.   On May 11, 2017, Complainant spilled a drink on Ms. Johnson* and yelled at Ms. Smith* as they were talking with Mr. Feibleman and sharing helpful information with Mr. Feibleman related to Columbia's investigation of Complainant's allegations against Mr. Feibleman.

955.   After spilling her drink on Ms. Johnson* and yelling at Ms. Smith*, Complainant wagged her finger between Ms. Smith* and Mr. Feibleman and admonished Ms. Smith* further, stating, "Well that was a pleasure to see!"

956.   Complainant informed Mr. Moore* that she purposefully spilled her drink on Ms. Johnson*.

957.   Mr. Feibleman informed Columbia that Complainant threatened, intimidated, and harassed third-party witnesses in his presence.

958.   Complainant's actions on May 11, 2017 constituted conduct that would discourage a reasonable person from engaging in activity protected under Columbia's Gender-Based Misconduct Policy, such as participating in an investigation or adjudication as a Complainant, Respondent, or witness.

959.   Despite knowledge that Complainant threatened, intimidated, and harassed third-party witnesses in Mr. Feibleman's presence, Columbia did not investigate Complainant's May

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

11, 2017 behavior.

960.   Despite knowledge that Complainant threatened, intimidated, and harassed third-party witnesses in Mr. Feibleman's presence, Columbia failed to protect Mr. Feibleman from retaliation.

961.   Despite knowledge that Complainant threatened, intimidated, and harassed third-party witnesses in Mr. Feibleman's presence, Columbia failed enforce the Gender-Based Misconduct Policy's Retaliation provision.

962.   Columbia's decision not to investigate Mr. Feibleman's claims of retaliation enabled Complainant's slanderous comments among his CJS classmates.

963.   Columbia's decision not the investigate Mr. Feibleman's claims of retaliation obscured the truth from Mr. Feibleman's CJS classmates.

964.   Columbia's decision not to investigate Mr. Feibleman's claims of retaliation caused him to suffer occupational damages.

965.   Many of Mr. Feibleman's CJS classmates operate in positions of influence in the journalism profession.

966.   Mr. Feibleman, despite attending one of the nation's premier journalism schools, has yet to obtain employment in the journalism field.

967.   Columbia's decision not to protect Mr. Feibleman from retaliation enabled Complainant's slanderous comments among his CJS classmates.

968.   Columbia's decision not to protect Mr. Feibleman from retaliation obscured the truth from Mr. Feibleman's CJS classmates.

969.   Columbia's decision not to protect Mr. Feibleman from retaliation has caused him to suffer occupational damages.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

970.   Many of Mr. Feibleman's CJS classmates operate in positions of influence in the journalism profession.

971.   Mr. Feibleman, despite attending one of the nation's premier journalism schools, has yet to obtain employment in the journalism field.

972.   Columbia's decision not to investigate Mr. Feibleman's claims of retaliation damaged Mr. Feibleman's reputation among his CJS classmates.

973.   Columbia's decision not to investigate Mr. Feibleman's claims of retaliation has caused Mr. Feibleman reputational damages.

974.   Columbia's decision not to protect Mr. Feibleman from retaliation damaged Mr. Feibleman's reputation among his CJS classmates.

975.   Columbia's decision not to protect Mr. Feibleman from retaliation has caused Mr. Feibleman reputational damages.

976.   Columbia's decision not to enforce the Gender-Based Misconduct Policy's Retaliation provision enabled Complainant's slanderous comments among his CJS classmates.

977.   Columbia's decision not to enforce the Gender-Based Misconduct Policy's Retaliation provision obscured the truth from Mr. Feibleman's CJS classmates.

978.   Columbia's decision not to enforce the Gender-Based Misconduct Policy's Retaliation provision has caused Mr. Feibleman to suffer occupational damages.

979.   Many of Mr. Feibleman's CJS classmates operate in positions of influence in the journalism profession.

980.   Mr. Feibleman, despite attending one of the nation's premier journalism schools, has yet to obtain employment in the journalism field.

981.   Columbia's decision not to enforce the Gender-Based Misconduct Policy's

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

Retaliation provision damaged Mr. Feibleman's reputation among his CJS classmates.

982.   Columbia's decision not to enforce the Gender-Based Misconduct Policy's Retaliation provision has caused Mr. Feibleman reputational damages.

926.983.   Mr. Feibleman is entitled to recover damages for Columbia's breach of the contractual obligations described above.

927.984.   As a direct and proximate result of the above conduct, Mr. Feibleman sustained tremendous damages, including, without limitation, emotional distress, reputational damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

928.985.   As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### FOURTH CAUSE OF ACTION
### (STATE LAW BREACH OF CONTRACT)

929.986.   Mr. Feibleman repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

930.987.   A contractual relationship existed between Mr. Feibleman and Columbia at all relevant times hereto.

931.988.   Columbia created express and/or implied contracts when Mr. Feibleman accepted an offer of admission.

932.989.   Mr. Feibleman completed all of the academic requirements necessary to obtain his master's degree.

933.990.   Mr. Feibleman paid all of the required tuition during his enrollment at

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

Columbia.

934.991.    In exchange, Columbia was required to grant his master's degree.

935.992.    Columbia continues to withhold Mr. Feibleman's diploma.

936.993.    As a direct and proximate result of the above conduct, Mr. Feibleman sustained tremendous damages, including, without limitation, ~~emotional distress,~~ loss of educational and career opportunities, economic injuries and other direct and consequential damages.

937.994.    As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Mr. Feibleman from the Columbia School of Journalism.

## FIFTH CAUSE OF ACTION
### (STATE LAW PROMISSORY ESTOPPEL)

938.995.    Mr. Feibleman repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

939.996.    Columbia's Gender-Based Misconduct Policy constitutes unambiguous representations and promises that Columbia should have reasonably expected to induce action or forbearance on the part of Mr. Feibleman.

940.997.    Columbia expected or should have expected Mr. Feibleman to accept its offer of admission and choose not to attend other universities based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Gender-Based Misconduct Policy be heard by an impartial and objective panel, to be

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

free from discrimination, and to have complaints resolved impartially and promptly.

941.998.      Mr. Feibleman reasonably and foreseeably relied on these express and implied promises and representations made by Columbia, to his detriment.

999.    Columbia's Gender-Based Misconduct Policy states, "The University will seek to resolve every report of gender-based misconduct within approximately sixty (60) days of an initial report, not including the time for any appeal. Time frames will vary depending on the complexity of the investigation and the severity and extent of the alleged misconduct."

1000.  On November 22, 2016, Columbia provided Mr. Feibleman with a document setting forth the guidelines and requirements for the investigation, hearing, and appeals process under the Gender-Based Misconduct Policy.

1001.  One of the guidelines/requirements provided to Mr. Feibleman on November 22, 2016 noted that the Gender-Based Misconduct Policy includes a 60-day framework for conducting investigations based on guidance from the Department of Education's Office of Civil Rights.

942.1002.      The Office of Civil Rights had dictated to universities that Title IX Investigations should take no more than 60 days, with small exceptions for holidays, complexity, and scheduling conflicts.

943.1003.      Columbia did not interview Mr. Feibleman and collect his evidence until Day 49.

1004.  Columbia did not complete its investigationresolve Complainant's report against Mr. Feibleman within 60 days.

1005.  On January 17, 2017, Barnett informed Mr. Feibleman that she was going on maternity leave and that the Investigative Report would be completed "by the end of the month," i.e., January 31, 2017.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

1006.   The fact-finding portion of the disciplinary process was completed on January 18, 2017.

1007.   The Investigative Report was not completed by January 31, 2017.

1008.   On January 31, 2017, Russell informed Mr. Feibleman that Marzolf would be taking over as Title IX Investigator through the resolution of Complainant's report against Mr. Feibleman.

1009.   Marzolf took over as Title IX Investigator after the fact-finding portion of the disciplinary process was complete.

1010.   Marzolf did not resolve Complainant's report against Mr. Feibleman.

1011.   The Investigative Report was not completed until April 27, 2017, which was 86 days after the date Columbia promised that the Investigative Report would be completed and 86 days after Columbia informed Mr. Feibleman that Marzolf would be taking over as Title IX Investigator through the resolution of Complainant's report against Mr. Feibleman.

944.1012.   Complainant's report against Mr. Feibleman, not including appeals, was not "resolved" as defined in the Gender-Based Misconduct Policy until June 28, 2017, well beyond the 60-day timeline contemplated by Columbia's Gender-Based Misconduct Policy and Columbia's November 22, 2016 representation to Mr. Feibleman.

1013.   Columbia's Gender-Based Misconduct Policy notes, "Time frames may be extended for Resolution, Mediation, Restorative Justice, Pre-hearing Conference, and/or good cause as necessary to ensure the integrity and completeness of this process."

1014.   Columbia's Gender-Based Misconduct Policy lists the following reasons for extending the time frame of an investigation: "compliance with a request by law enforcement; accommodation of the availability of parties and witnesses; students on leave; accounting for exam

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

periods, school breaks or vacations; and/or accounting for complexities of a specific investigation, including the number of witnesses and volume of information provided by the parties."

**Formatted:** Eng ish (United States)

1015.  Complainant's report against Mr. Feibleman did not involve "Resolution, Mediation, or Restorative Justice."

1016.  The need to conduct a resolution, mediation, or restorative justice process does not account for Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1017.  Columbia was not required to comply with any requests from law enforcement during the resolution of Complainant's report against Mr. Feibleman.

1018.  Compliance with a request by law enforcement does not account for Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1019.  All witness interviews were completed by January 18, 2017.

1020.  The accommodation of the availability of witnesses does not explain Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1021.  The accommodation of the availability of parties does not explain Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1022.  Columbia interviewed 10 non-party witnesses and 2 party witnesses prior to January 18, 2017.

1023.  The number of witnesses interviewed does not explain Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1024.  There were no substantial exam periods, school breaks, or vacations following the completion of the fact-finding portion of the disciplinary process that would have prevented Columbia from timely resolving Complainant's report against Mr. Feibleman.

1025.  Accounting for exam periods, school breaks, or vacations does not explain

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1026.   The fact-finding portion of the disciplinary process was completed on January 18, 2017.

1027.   Plaintiff provided multimedia evidence to assist in Columbia's understanding of the events in questions.

1028.   Plaintiff provided his evidence in easily reviewable formats for Columbia's benefit.

1029.   The complexities of the investigation, including the number of witnesses and volume of information provided by the parties does not account for the substantial delay in resolving Complainant's report against Mr. Feibleman following the completion of the fact-finding portion of the disciplinary process on January 18, 2017.

1030.   Pre-Hearing Conferences related to Complainant's report against Mr. Feibleman were held on May 25, 2017 and June 1, 2017.

1031.   The fact-finding portion of the disciplinary process was complete on January 18, 2017.

1032.   The Investigative Report was not completed until April 27, 2017.

1033.   The Pre-Hearing Conferences related to Complainant's report against Mr. Feibleman were presumably delayed as a result of the unexplained 99-day gap between the completion of the fact-finding portion of the disciplinary process and the completion of the Investigative Report.

1034.   The Pre-Hearing Conferences do not account for Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1035.   The fact-finding portion of the disciplinary process was completed on January 18, 2017.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

1036.   Marzolf was capable of resolving Complainant's report against Mr. Feibleman.

1037.   Marzolf was capable of resolving Complainant's report against Mr. Feibleman without Barnett's assistance.

1038.   In other matters where Title IX Investigators have gone on maternity leave, reports have been resolved by the substitute Title IX Investigator in a timely fashion.

1039.   The re-assignment of Complainant's report against Mr. Feibleman to Marzolf does not explain the delay in resolving Complainant's report against Mr. Feibleman.

1040.   Despite being informed that Complainant engaged in retaliation and witness tampering, Columbia did not investigate these claims.

1041.   The need to investigate Complainant's additional violations of Columbia's Gender-Based Misconduct Policy does not explain the delay in resolving Complainant's report against Mr. Feibleman.

1042.   Good cause as necessary to ensure the integrity and completeness of this process does not account for Columbia's delay in resolving Complainant's report against Mr. Feibleman.

1043.   None of the exceptions to the 60-day rule noted Columbia's Gender-Based Misconduct Policy and Columbia's November 22, 2016 representation to Plaintiff applied to the resolution of Complainant's report against Mr. Feibleman.

945.1044.   If the investigation had been concludedColumbia had resolved Complainant's report against Mr. Feibleman, even erroneously, within the 90 days between initial allegations and the start of the second semesterthe timeframe promised by Columbia, Mr. Feibleman would have likely moved on with his life.

1045.   Instead, the disciplinary process continued through the entire second semester, during which he exhausted his G.I. Bill benefits, and took out an additional $20,000 in federally-

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

116

backed student loans.

1046.   Columbia's failure to resolve Complainant's report against Mr. Feibleman within the promised timeframe caused him to exhaust his G.I. Bill benefits and spend $20,000 in tuition.

1047.   If Columbia had resolved Complainant's report against Mr. Feibleman within the promised timeframe, he would not have exhausted his G.I. Bill benefits or spent $20,000 in additional tuition.

1048.   During the relevant time period, Columbia provided pro-rata refunds for students who withdrew within the first 8 weeks of the Fall or Spring Semester.

946. 1049.   If Columbia had resolved Complainant's report against Mr. Feibleman in a timely fashion after the Spring 2017 Semester began, Mr. Feibleman would have been able to recoup some of the tuition fees that he paid to Columbia for the Spring 2017 Semester.

947. 1050.   As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SIXTH CAUSE OF ACTION
### (STATE LAW PROMISSORY ESTOPPEL)

948. 1051.   Mr. Feibleman repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

949. 1052.   Columbia expected or should have expected Mr. Feibleman to accept its offer of admission and choose not to attend other universities based on its express and implied promises that if he completed all of the academic coursework required and paid the required tuition that he would be granted his master's degree.

950. 1053.   Mr. Feibleman reasonably and foreseeably relied on these express and

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

117

implied promises and representations made by Columbia, to his detriment.

951. 1054.    Mr. Feibleman completed all of the academic coursework required to obtain his master's degree.

952. 1055.    Mr. Feibleman paid all of the required tuition during his enrollment at Columbia.

953. 1056.    Despite completing all of the necessary academic requirements for his master's degree and paying full tuition, Columbia continues to withhold Mr. Feibleman's diploma.

954. 1057.    Expressed and implied promises and representations made by Columbia, including but not limited to credit for work done and tuition paid, must be enforced to prevent substantial injustice to Mr. Feibleman.

955. 1058.    Based on the foregoing, Columbia is liable to Mr. Feibleman based on promissory estoppel.

956. 1059.    As a direct and proximate result of the above conduct, Mr. Feibleman sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

957. 1060.    As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Mr. Feibleman from the Columbia School of Journalism.

**SEVENTH CAUSE OF ACTION**
**(VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW)**

958. 1061.    Mr. Feibleman repeats and realleges each and every allegation hereinabove

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

118

as if fully set forth herein.

959.1062.   Columbia's actions were based upon impermissible discrimination based on Mr. Feibleman's gender and therefore violated the New York City Human Rights Law (N.Y. City Administrative Code §§ 8-101, et seq.).

960.1063.   Columbia's actions have impacted Mr. Feibleman's major life activities, such as his ability to attend school.

961.1064.   Based upon the foregoing, Columbia discriminated against Mr. Feibleman in the terms, conditions, and privileges of his school attendance, and the rights and privileges contained therein, in violation of New York City Human Rights Law by discriminating against Mr. Feibleman because of his gender.

962.1065.   As a direct and proximate result of this conduct, Mr. Feibleman has suffered, and continues to suffer, physical and psychological harm, emotional distress, embarrassment, humiliation, damage to his reputation, and other damages in an amount to be proven at trial.

963.1066.   Mr. Feibleman failed to receive his master's degree despite meeting all academic requirements, and has been deprived of invaluable networking, alumni connections, and job placement opportunities concurrent with being an alumnus of CJS.

964.1067.   Columbia's behavior constitutes willful and wanton negligence, recklessness, and a conscious disregard of Mr. Feibleman's rights in furtherance of protecting their reputation with donors and the press, for which Mr. Feibleman is entitled to an award of punitive damages in an amount of $25,000,000.

1068.   Mr. Feibleman is also entitled to recover the costs of this lawsuit, including his reasonable attorneys' fees.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

### EIGHTH CAUSE OF ACTION
### (DELIBERATE INDIFFERENCE VIOLATION OF TITLE IX
### OF THE EDUCATION AMENDMENTS OF 1972)

1069.   Mr. Feibleman repeats and realleges each and every allegation hereinabove as if fully set forth herein.

1070.   Columbia ignored evidence that Complainant violated the Gender-Based Misconduct Policy.

1071.   Complainant repeatedly begged Mr. Feibleman to have sex with her and refused to take no for an answer.

1072.   Complainant bit Mr. Feibleman multiple times without his consent.

1073.   Complainant slapped Mr. Feibleman without his consent.

1074.   Complainant forcibly removed Mr. Feibleman's clothes, exposed his penis, grabbed his buttocks, and attempted to place her mouth on his penis without his consent.

1075.   Complainant did not deny that she engaged in the above-referenced behavior.

1076.   Complainant asserted that she could not remember if she engaged in the above-referenced behavior because of her alcohol consumption.

1077.   Under Columbia's policies, Complainant's assertion is not an adequate defense to allegations of sexual misconduct.

1078.   The Gender-Based Misconduct Policy states, "The use of alcohol or other drugs is never an excuse for committing a policy violation and does not diminish anyone's responsibility to obtain informed and freely given consent."

1079.   On the audio recording he provided to Columbia, Mr. Feibleman is heard repeatedly saying "no" and asking to leave.

1080.   When Complainant bites him, Mr. Feibleman exclaims, "Nope! Nope!"

---

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

1081.   When Complainant sexually assaults him by removing his clothes and attempting to fellate him, Mr. Feibleman can be heard verbally and physically resisting.

1082.   When Complainant bites Mr. Feibleman again, he shouts, "No bite! No Bite!"

1083.   Columbia's Gender-Based Misconduct Policy defines Sexual Assault: Contact as follows:

> Any sexual contact, including sexual touching for the purpose of sexual gratification of either party, without a person's affirmative consent. Sexual touching includes contact under or over clothing with the breasts, buttocks, genitals, groin or inner thigh, or touching another with any of these body parts; making another person touch any of these body parts under or over clothing; or the emission of ejaculate on the clothing or body of another person without that person's consent.

1084.   Columbia's Gender-Based Misconduct Policy defines Domestic Violence as follows:

> The use or threat of physical or sexual violence that is directed toward (1) a current or former spouse or intimate partner[.] . . . This violation includes behavior that seeks to establish power and control over another person by causing fear of physical or sexual violence. Domestic violence can be a single act or a pattern of behavior, based on the frequency, nature, and severity of the conduct.

1085.   Columbia's Gender-Based Misconduct Policy defines Dating Violence as follows:

> The use or threat of physical or sexual violence that is directed toward a person who is or has been in a social relationship of a romantic or sexually intimate nature with the Respondent. This violation includes behavior that seeks to establish power and control over another person by causing fear of physical or sexual violence. Dating violence can be a single act or a pattern of behavior, based on the frequency, nature, and severity of the conduct.

1086.   Columbia's Gender-Based Misconduct Policy defines Sexual Exploitation as, "Non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, financial gain, personal benefit or advantage, or any other illicit purpose."

1087.   Complainant's non-consensual biting of Mr. Feibleman during sexual activity for

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

121

the purpose of sexual gratification constituted Sexual Assault: Contact under Columbia's Gender-Based Misconduct Policy.

1088.   Complainant's non-consensual biting of Mr. Feibleman, an intimate partner, constituted Domestic Violence under Columbia's Gender-Based Misconduct Policy.

1089.   Complainant's non-consensual biting of Mr. Feibleman, an individual with whom she was in a social relationship of a sexually intimate nature, constituted Dating Violence under Columbia's Gender-Based Misconduct Policy.

1090.   Complainant's non-consensual slapping of Mr. Feibleman, an intimate partner, constituted Domestic Violence under Columbia's Gender-Based Misconduct Policy.

1091.   Complainant's non-consensual touching of Mr. Feibleman's buttocks for the purpose of sexual gratification constituted Sexual Assault: Contact under Columbia's Gender-Based Misconduct Policy.

1092.   Complainant's exposure of Mr. Feibleman's penis without his consent for the purpose of sexual gratification constituted Sexual Exploitation under Columbia's Gender-Based Misconduct Policy.

1093.   Columbia knew about Plaintiff's allegations against Complainant on November 22, 2016.

1094.   Columbia did not issue an updated No-Contact Directive to Complainant after learning about Mr. Feibleman's allegations until December 21, 2016.

1095.   The December 21, 2016 No-Contact Directive did not state that Complainant was being investigated for Sexual Assault: Contact.

1096.   The December 21, 2016 No-Contact Directive did not state that Complainant was being investigated for Domestic Violence.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

122

1097. The December 21, 2016 No-Contact Directive did not state that Complainant was being investigated for Dating Violence.

1098. The December 21, 2016 No-Contact Directive did not state that Complainant was being investigated for Sexual Exploitation.

1099. The December 21, 2016 No-Contact Directive only stated that Complainant was being investigated for Sexual Harassment.

1100. In issuing the December 21, 2016 No-Contact Directive, Columbia ignored Mr. Feibleman's allegation that Complainant committed Sexual Assault: Contact as defined by Columbia's Gender-Based Misconduct Policy when she bit him for sexual gratification multiple times without his consent during sexual activity.

1101. In issuing the December 21, 2016 No-Contact Directive, Columbia ignored Mr. Feibleman's allegation that Complainant committed Domestic Violence as defined by Columbia's Gender-Based Misconduct Policy when she bit Mr. Feibleman, an intimate partner, multiple times without his consent.

1102. In issuing the December 21, 2016 No-Contact Directive, Columbia ignored Mr. Feibleman's allegation that Complainant committed Dating Violence as defined by Columbia's Gender-Based Misconduct Policy when she bit Mr. Feibleman, an individual with whom she was in a social relationship of a sexually intimate nature, multiple times without his consent.

1103. In issuing the December 21, 2016 No-Contact Directive, Columbia ignored Mr. Feibleman's allegation that Complainant committed Domestic Violence as defined by Columbia's Gender-Based Misconduct Policy when she slapped of Mr. Feibleman, an intimate partner, without his consent.

1104. In issuing the December 21, 2016 No-Contact Directive, Columbia ignored Mr.

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

123

Feibleman's allegation that Complainant committed Sexual Assault: Contact when she touched his buttocks for the purpose of sexual gratification without his consent.

1105.  In issuing the December 21, 2016 No-Contact Directive, Columbia ignored Mr. Feibleman's allegation that Complainant committed Sexual Exploitation as defined by Columbia's Gender-Based Misconduct Policy when she exposed his penis without his consent for the purpose of sexual gratification.

1106.  Despite being provided information indicating that Complainant had committed multiple instances of Sexual Assault: Contact, Domestic Violence, and Dating Violence, as well as one instance of Sexual Exploitation, as defined by the Gender-Based Misconduct Policy, Columbia immediately informed Mr. Feibleman that Complainant's conduct constituted mere Sexual Harassment.

1107.  Columbia did not thoroughly investigate Mr. Feibleman's claims of Gender-Based Misconduct against Complainant before it informed him that Complainant's conduct constituted mere Sexual Harassment.

1108.  Columbia did not impartially investigate Mr. Feibleman's claims of Gender-Based Misconduct against Complainant before it informed him that Complainant's conduct constituted mere Sexual Harassment.

1109.  Columbia did not thoroughly investigate Mr. Feibleman's claims of Gender-Based Misconduct against Complainant at any time.

1110.  Columbia did not impartially investigate Mr. Feibleman's claims of Gender-Based Misconduct against Complainant at any time.

1111.  Columbia was motivated by gender bias when it failed to perform a thorough and impartial investigation of Mr. Feibleman's claims of Gender-Based Misconduct against

* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person

124

Complainant.

1112.  Columbia stated that Complainant's conduct "would not have been unwelcome" to Mr. Feibleman despite audio evidence and Mr. Feibleman's own statements indicating that Complainant's conduct was unwelcome.

1113.  According to Columbia, when a man says "no," he really means "yes."

1114.  Complainant's sexual assaults of Mr. Feibleman were severe, pervasive, and objectively offensive.

1115.  The violent acts Complainant took against Mr. Feibleman in the course of their intimate relationship were severe, pervasive, and objectively offensive.

1116.  Complainant's sexual exploitation and attempt to force oral sex on Mr. Feibleman were severe, pervasive, and objectively offensive.

1117.  Columbia failed to thoroughly and impartially investigate the facts related to Mr. Feibleman's reports of Complainant's behavior.

1118.  Columbia knew that Complainant was retaliating against Mr. Feibleman and third-party witnesses helpful to Mr. Feibleman as a result of their participation in the Gender-Based Misconduct process.

1119.  Complainant was spreading false rumors that Mr. Feibleman had "raped" her with his penis and that he gave her a sexually transmitted disease.

1120.  Complainant threatened, intimidated, and harassed third-party witnesses who were sharing helpful information with Mr. Feibleman related to Columbia's investigation of Complainant's allegations against Mr. Feibleman.

1121.  Columbia ignored Mr. Feibleman's allegations that Complainant was retaliating against him and third-party witnesses helpful to him.

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person.

1122. Columbia failed to thoroughly or impartially investigate relevant facts related to Complainant's retaliation against Mr. Feibleman and third-party witnesses favorable to Mr. Feibleman.

1123. Columbia failed to interview witnesses related to Mr. Feibleman's reports of retaliation.

1124. Complainant's retaliation against Mr. against Mr. Feibleman and third-party witnesses favorable to Mr. Feibleman was severe, pervasive, and objectively offensive.

1125. Columbia was motivated by gender bias when it failed to perform a thorough and impartial investigation of the evidence and witnesses provided by Mr. Feibleman related to Complainant's retaliation.

1126. Mr. Feibleman was effectively denied equal access to Columbia's resources and opportunities.

1127. As a result of Columbia's actions, Mr. Feibleman was denied equal access to Columbia's disciplinary process.

1128. As a result of Columbia's actions, Mr. Feibleman was denied equal access to the protection and use of Columbia's disciplinary process.

1129. Columbia allowed Complainant to propagate false rumors that created a hostile environment and alienated Mr. Feibleman from his classmates.

1130. As a result of the hostile and alienating environment created by Columbia's actions, Mr. Feibleman was denied equal access to Columbia's educational opportunities.

1131. As a result of the hostile and alienating environment created by Columbia's actions, Mr. Feibleman was denied the ability to fully participate in his educational program.

1132. As a result of Columbia's actions, Mr. Feibleman was prevented from attending

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person.

educational, professional, and networking events sponsored by CJS.

1133.   As a result of Columbia's actions, Mr. Feibleman was deprived of his diploma.

1134.   As a result of Columbia's actions, Mr. Feibleman was deprived of invaluable networking, alumni connections, and job placement opportunities concurrent with being an alumnus of CJS.

1135.   Columbia exercised "substantial control" over Complainant and the context in which Complainant's offending behavior occurred.

1136.   Under the circumstances, Columbia's actions were clearly unreasonable.

1137.   Columbia was therefore deliberately indifferent to Mr. Feibleman's allegations of sexual misconduct, violence, and retaliation against Complaint.

1138.   As a direct and proximate result of the above conduct, Mr. Feibleman sustained tremendous damages, including, without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

965.1139.   As a result of the foregoing, Mr. Feibleman is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Mr. Feibleman demands judgment against Columbia as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("*") are
  fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person.

(ii)   on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, ~~damages to physical well-being, emotional and psychological damages,~~ damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)   on the third cause of action for state law breach of contract, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, ~~damages to physical well-being, emotional and psychological damages,~~ damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)   on the fourth cause of action for state law breach of contract a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, ~~damages to physical well-being, emotional and psychological damages,~~ damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Mr. Feibleman from the Columbia School of Journalism;

(v)   on the fifth cause of action for state law promissory estoppel, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, ~~damages to physical well-being, emotional and psychological damages,~~ damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)   on the sixth cause of action for state law promissory estoppel, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, ~~damages to physical well-being, emotional and psychological damages,~~ damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction ordering the award of the diploma earned by Mr. Feibleman from the Columbia School of Journalism

(vii)   on the seventh cause of action for violation of the New York City Human Rights Law, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, ~~damages to physical well-being, emotional and psychological damages,~~ damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person.

prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and punitive damages in the amount of $25,000,000, plus post-judgment interest, attorneys' fees, expenses, costs and disbursements; ~~and~~

(vii)(viii)      on the eighth cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant awarding Mr. Feibleman damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(viii)(ix)      awarding Mr. Feibleman such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
        ~~July 24, 2019~~March 13, 2020

                                        **WARSHAW BURSTEIN, LLP**
                                        *Attorneys for Plaintiff*

                                        By: _____
                                              Kimberly C. Lau
                                              James E. Figliozzi
                                              ~~555 Fifth Avenue~~575 Lexington Avenue
                                              New York, New York 100~~17~~22
                                              (212) 984-7700
                                              klau@wbny.com
                                              jfigliozzi@wbny.com

---

\* To protect the identities of certain non-parties to this case, names in this document marked with an asterisk ("\*") are fictitious, bear no relation to the person's real name, and are not intended as a reference to any other person.

> **Formatted:** Indent: Left: 1", No bullets or numbering